Case No. 22-10326

# United States Court of Appeals
## for the Ninth Circuit

United States of America,

      Plaintiff/Appellee,

v.

Stephon James Whitney,

      Defendant/Appellant.

D.C. No. 2:21-cr-00002-JAD-NJK

Appeal from the United States District Court
for the District of Nevada

## Appellant Stephon Whitney's
## Opening Brief

Rene L. Valladares
Federal Public Defender
*Jeremy C. Baron
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577
jeremy_baron@fd.org

*Counsel for Appellant Stephon Whitney

# Table of Contents

Jurisdictional Statement ............................................................. 1

Detention Status ........................................................................ 1

Issues Presented ........................................................................ 1

Introduction and Summary of the Argument ......................... 2

Statement of the Case ................................................................ 5

I.      Mr. Whitney experiences a difficult childhood. .............. 5

II.     The local police find a gun and cannabis in Mr. Whitney and Ms. Rodosh's shared apartment ........................................ 7

III.    The government charges Mr. Whitney. ........................... 10

Argument .................................................................................. 13

I.      The district court incorrectly applied an offense level enhancement under Section 2K2.1(b)(6)(B). ................. 13

        A.      Standard of review. ............................................. 13

        B.      The enhancement was inapplicable here. ........... 13

                1.      Mr. Whitney's fiancé owned the gun, not Mr. Whitney. ............................................ 15

                2.      Mr. Whitney's fiancé possessed the cannabis. ........... 21

                3.      The gun possession wasn't in connection with drug distribution. ....................................... 30

II.     The district court incorrectly determined Mr. Whitney's criminal history category. ............................................. 35

        A.      Standard of review. ............................................. 35

        B.      The court improperly counted a non-qualifying amended conviction. .............................................................. 36

i

C.    The court improperly counted a non-qualifying minor conviction..................................................................... 46

III.   The Court failed to consider a variance based on ineligibility for credit for time served. .......................................... 51

     A.    Standard of review. ............................................................. 51

     B.    The court didn't explain why it was rejecting a variance for uncredited time spent in custody.......................................... 51

IV.   The district court imposed two improper special conditions of supervision. ..................................................................... 57

     A.    Standard of review. ............................................................. 57

     B.    The mental health treatment condition fails to specify outpatient treatment................................................................ 56

     C.    The gang affiliation prohibition is vague. ............................ 59

V.    18 U.S.C. § 922(g)(1) is unconstitutional. ..................................... 61

     A.    Standard of review. ............................................................. 61

     B.    The statute violates the Second Amendment....................... 61

Conclusion ............................................................................................. 65

# Table of Authorities

## Cases

*Class v. United States*, 138 S. Ct. 798 (2018) ...................................... 64

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ........................................... 31, 32

*Lewis v. State*, 90 Nev. 436, 529 P.2d 796 (1974) ................................ 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................................... 61, 62

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) ........................... *passim*

*Rosales-Mireles v United States*, 138 S. Ct. 1897 (2018) ............... 48, 56

*Smith v. United States*, 508 U.S. 223 (1993) ....................................... 14

*Stinson v. United States*, 508 U.S. 36 (1993) ...................................... 31

*Teter v. Lopez*, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) .............. 63, 64

*United States v. Alba-Flores*, 577 F.3d 1104 (9th Cir. 2009) .... 41, 42, 44

*United States v. Bullock*, 2023 WL 4232309
    (S.D. Miss. June 28, 2023) .................................................. 62, 63, 64

*United States v. Bunner*, 134 F.3d 1000 (10th Cir. 1998) ................... 29

*United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023) ...... 31, 32, 48, 64

*United States v. Chadwell*, 798 F.3d 910 (9th Cir. 2015) ......... 13, 14, 29

*United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012) ................... 61

*United States v. Choulat*,
    2023 WL 4781488 (5th Cir. July 27, 2023) ......................... 30, 33, 34

*United States v. Cole*, 416 F.3d 894 (8th Cir. 2005) ............................ 53

*United States v. Ellis*, 241 F.3d 1096 (9th Cir. 2001) .................... 14, 20

*United States v. Evans*, 883 F.3d 1154 (9th Cir. 2018) ....................... 60

*United States v. Gambino-Zavala*, 539 F.3d 1221 (10th Cir. 2008) ..... 29

*United States v. Gomez-Arrellano*, 5 F.3d 464 (10th Cir. 1993) .......... 29

*United States v. Gonzalez*, 506 F.3d 940 (9th Cir. 2007) ............... 24, 25

*United States v. Grob*, 625 F.3d 1209 (9th Cir. 2010) ......................... 47

*United States v. Guagliardo*, 278 F.3d 868 (9th Cir. 2002) ................. 59

*United States v. Halamek*, 5 F.4th 1081 (9th Cir. 2021) ............... 35, 48

*United States v. Heyward*, 3 F.4th 75 (2d Cir. 2021) ........................... 64

*United States v. Johnson*, 979 F.3d 632 (9th Cir. 2020) ........... 36, 48, 56

*United States v. Kitchell*, 653 F.3d 1206 (10th Cir. 2011) .............. 15, 16

*United States v. Lindsey*, 634 F.3d 541 (9th Cir. 2011) ........................ 63

*United States v. Lockhart*, 947 F.3d 187 (4th Cir. 2020) ...................... 50

*United States v. Madrid-Becerra*, 14 F.4th 1096 (9th Cir. 2021) ........ 35

*United States v. Mejia*, 559 F.3d 1113 (9th Cir. 2009) ............. 43, 48, 50

*United States v. Morris*, 349 F.3d 1009 (7th Cir. 2003) ...................... 29

*United States v. Nishida*, 53 F.4th 1144 (9th Cir. 2022) ............... 57, 58

*United States v. Oliveira*, 907 F.3d 88 (1st Cir. 2018) ........................ 26

*United States v. Pantelakis*, 58 F.3d 567 (10th Cir. 1995) ................... 20

*United States v. Parlor*, 2 F.4th 807 (9th Cir. 2021) ................... *passim*

*United States v. Perez*, 5 F.4th 390 (3d Cir. 2021) ............................... 33

*United States v. Polanco*, 93 F.3d 555 (9th Cir. 1996) ............. 14, 29, 34

*United States v. Rangel*, 697 F.3d 795 (9th Cir. 2012) ................... 51, 56

*United States v. Riley*, 335 F.3d 919 (9th Cir. 2003) ........................... 15

*United States v. Ruiz-Apolonio*, 657 F.3d 907 (9th Cir. 2011) ............. 51

*United States v. Sales*, 476 F.3d 732 (9th Cir. 2007) ........................... 59

*United States v. Seymour*, 739 F.3d 923 (6th Cir. 2014) ............... 20, 21

*United States v. Simon*, 858 F.3d 1289 (9th Cir. 2017) ........................ 13

*United States v. Soltero*, 510 F.3d 858 (9th Cir. 2007) ........................ 60

*United States v. Terry*, 911 F.2d 272 (9th Cir. 1990) ........................... 15

*United States v. Thompson*, 32 F.3d 1 (1st Cir. 1994) ......................... 29

*United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013) ..................... 51

*United States v. Vasquez*, 654 F.3d 880 (9th Cir. 2011) ...................... 15

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) .................... 63

*United States v. Waknine*, 543 F.3d 546 (9th Cir. 2008) ..................... 50

*United States v. Waltower*, 643 F.3d 572 (7th Cir. 2011) .................... 28

*United States v. West*, 643 F.3d 102 (3d Cir. 2011) ........................ 25, 26

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012) ................ 59

*United States v. Yepez*, 704 F.3d 1087 (9th Cir. 2012) ............. 38, 39, 40

**Statutes**

18 U.S.C. § 922 ............................................................... *passim*

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3585 ................................................................ 52, 53

18 U.S.C. § 3742 ..................................................................... 1

28 U.S.C. § 1291 ..................................................................... 1

NRS 179C.110 ....................................................................... 47

**Guidelines Provisions**

U.S.S.G. § 2K2.1 ........................................................... *passim*

U.S.S.G. § 4A1.1 ........................................................... *passim*

U.S.S.G. § 4A1.2 ........................................................... *passim*

U.S.S.G., Amendments to the Sentencing Guidelines

(Apr. 27, 2023) ........................................................... 49

U.S.S.G., "Public Meeting – August 24, 2023." ..................................... 49

**Other**

Fed. R. App. P. 4 ............................................................. 1

"Secondary transfer," Jones on Evidence § 60:10

(7th ed. updated 2023) ...................................................... 19

## Jurisdictional Statement

This is a criminal direct appeal following a guilty plea. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered its judgment on December 13, 2022. Excerpts of Record (ER) 1-ER-2-8. Mr. Whitney filed a timely notice of appeal the same day. 3-ER-590-91; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## Detention Status

Mr. Whitney is federally incarcerated with a projected release date of July 8, 2026.

## Issues Presented

I. Whether the district court erroneously imposed an offense level enhancement under U.S.S.G. § 2K2.1(b)(6)(B).

II. Whether the district court erroneously calculated Mr. Whitney's criminal history.

III. Whether the district court erroneously failed to address Mr. Whitney's argument for a variance based on uncredited time spent in custody.

IV.    Whether the district court erroneously imposed two vague and/or

overbroad special conditions of supervision.

V.    Whether 18 U.S.C. § 922(g)(1) is unconstitutional.

## Introduction and Summary of the Argument

The police searched the apartment Mr. Whitney shared with his

fiancé Jessica Rodosh and her son.  They found a firearm, ammunition,

and about eight ounces of cannabis.  The federal government indicted

Mr. Whitney for felon in possession of a firearm, and Mr. Whitney pled

guilty.  The district court imposed a sentence of 54 months'

imprisonment.  Mr. Whitney now appeals.  Five issues require remand.

First, the district court incorrectly applied a four-level

enhancement under U.S.S.G. § 2K2.1(b)(6)(B).  That provision applies

when a defendant possesses a gun in connection with another felony

offense.  The district court concluded Mr. Whitney possessed the

firearm at issue in this case in connection with the felony offense of

possession of cannabis with intent to distribute.  But the evidence

overwhelmingly demonstrated Ms. Rodosh owned the gun for self-

protection purposes and owned the cannabis for self-medication

purposes. The district court erred when it applied this enhancement, and this Court should reverse and remand for resentencing.

Second, the district court incorrectly calculated Mr. Whitney's criminal history score. Mr. Whitney was convicted in 2017 for a misdemeanor state drug possession offense. That offense would normally add two points to Mr. Whitney's criminal history score. But by the time of sentencing, the state court had amended the 2017 judgment and changed the offense of conviction to a loitering offense, as opposed to a drug possession offense. Loitering convictions don't add points to a defendant's criminal history score. But the district court added the two points anyway, increasing Mr. Whitney's criminal history category from IV to V. The district court erred when it added these two points. In addition, the district court erred when it added a third point from a separate non-qualifying conviction. This Court should reverse and remand for resentencing.

Third, the district court failed to address a substantial argument for a variance. The state authorities arrested Mr. Whitney for the conduct underlying this case in September 2020. At the time, Mr. Whitney was on probation for a state offense; the state court revoked

his probation and imposed a prison term. Mr. Whitney was in primary state custody from September 2020 to August or September 2022 serving that prison term. He would've received parole for that state offense in mid-2021—at which point he would've begun accruing credit for time served against the federal sentence in this case—but the state department of corrections was unable to process his parole grant because the federal magistrate judge ordered him returned to physical federal custody immediately after the parole hearing. Mr. Whitney sought a variance to capture the time spent in primary state custody from September 2020 forward, or in the alternative from mid-2021 forward. But while the district court granted a variance based on other reasons, it failed to address these analytically distinct arguments. The district court erred when it failed to consider this ground for a variance, and this Court should reverse and remand for resentencing.

Fourth, the district court imposed two vague and/or overbroad special conditions of supervised release, and the Court should reverse and remand for clarification.

Fifth, the statute of conviction—18 U.S.C. § 922(g)(1)—is unconstitutional. *See Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en

4

banc). The Court should reverse Mr. Whitney's conviction and remand with instructions to dismiss the indictment.

## Statement of the Case

### I. Mr. Whitney experiences a difficult childhood.

Mr. Whitney was born in 1990. Pre-Sentence Report (PSR) ¶ 44. When he was nine months old, his father Keith Whitney caused Mr. Whitney's brother DeAngelo to be scarred in a bathing accident. *Id.* ¶ 46. Keith was convicted of child abuse and sentenced to 15 years in prison. *Id.* DeAngelo was removed from the home and adopted by another family. *Id.* Mr. Whitney would visit the adoptive family growing up and experienced inappropriate touching. *Id.* ¶ 49. Mr. Whitney was also sexually abused by older cousins. *Id.*

Mr. Whitney was raised by his mother Janice Crawford. PSR ¶¶ 44, 46. Ms. Crawford worked overnight shifts and suffered from a serious gambling addiction, so Mr. Whitney's older sister had to step in as a parental figure. *Id.* ¶ 46. The family had difficulty finding enough money for food. *Id.* At some point, the family was victimized in a home invasion, and Mr. Whitney was cut on the back of his head. *Id.* ¶ 50.

5

When Mr. Whitney was in high school, his father Keith was released from prison. PSR ¶ 47. Keith and Ms. Crawford remarried, but they fought frequently, and they quickly divorced. *Id.* Around that time, Mr. Whitney moved out of his mother's home and began living with his older sister. *Id.* ¶ 48. Soon after, in 2007—just after he turned 17 years old—Mr. Whitney participated as a lookout in a robbery. *Id.* ¶ 31. One of his friends died in the incident. *Id.* ¶¶ 31, 50. Mr. Whitney pled guilty to charges in state court and was sentenced to 52 to 240 months in prison. *Id* ¶ 31. He received parole in 2015, after serving roughly seven-and-a-half years' incarceration. *Id.*

In 2017, Mr. Whitney attempted to start a homeless outreach non-profit organization. PSR ¶ 51. He abandoned the project after his brother Teddy was killed in a domestic violence incident. *Id.* ¶¶ 50, 51.

Around 2017 or 2018, Mr. Whitney met Ms. Rodosh. PSR ¶ 52. Mr. Whitney stepped in as a father figure for Ms. Rodosh's son. *Id.* Mr. Whitney and Ms. Rodosh became engaged. *Id.* Ms. Rodosh became pregnant but suffered a miscarriage in her fifth month of pregnancy. *Id.* She and Mr. Whitney experienced substantial grief from the miscarriage. *Id.*

Mr. Whitney was convicted in 2018 for a drug offense. PSR ¶ 34. He pled guilty and received a suspended sentence of 18 to 48 months with up to three years' probation. *Id.*

## II. The local police find a gun and cannabis in Mr. Whitney and Ms. Rodosh's shared apartment.

This case began on August 28, 2020. The police heard about a gang-related party in North Las Vegas. PSR ¶ 36. They saw a van driving near the location of the party and suspected partygoers were inside. *Id.* They pulled over the van and instructed the occupants to leave. *Id.* They asked the occupants for their names. *Id.* Mr. Whitney was one of the occupants; he provided his brother's name "DeAngelo Whitney" and his true address. *Id.* The police let the occupants go, searched the van, and found three guns. *Id.* The police never linked those guns to Mr. Whitney. 1-ER-98.

The police ran a records check on the address Mr. Whitney provided. PSR ¶ 36. The police learned his true name was Stephon Whitney and determined Mr. Whitney was on state probation. *Id.* They contacted his probation officer, who set up a home visit at the two-

7

bedroom apartment Mr. Whitney shared with Ms. Rodosh and her son. *Id.*; 1-ER-46-52, 74-76; 2-ER-301.

The probation officer arrived for the home visit. He came with the detective who was investigating the van stop; the detective waited outside. 1-ER-75; 2-ER-288-89. The probation officer found two ammunition magazines in the top shelf of a closet in the master bedroom. 1-ER-75-76, 80; 2-ER-289. Mr. Whitney told the officer the magazines weren't his. 2-ER-297.

The probation officer called the detective, who applied for and received a search warrant. 1-ER-76-77. The police executed the warrant. They searched inside the headboard of the bed in the master bedroom and found a gun, a third magazine, and an envelope with $4,450 in cash. 1-ER-78-80; 3-ER-509. The magazines in the closet didn't fit the gun. 1-ER-123. The police found a laundry basket in the master bedroom next to the television; inside the basket were two jars and a plastic bag containing cannabis. 1-ER-81-84. The total amount of cannabis in the apartment was about eight ounces. 3-ER-509. They found two boxes of ammunition in a bag in a shoebox on a shelf above a laundry area in the hallway; the bag also contained a receipt with

Ms. Rodosh's name.  1-ER-82-85.  On the same shelf, they found a digital scale with green leafy residue and sandwich bags.  *Id.*

The police arrested Mr. Whitney and interrogated him. Mr. Whitney explained the gun and cannabis belonged to Ms. Rodosh. 2-ER-315, 318.  The detective suggested Ms. Rodosh might face charges if Mr. Whitney didn't take responsibility for the contraband.  2-ER-314, 355-58.  After extending questioning, Mr. Whitney made ambiguous statements the government interprets as incriminating.  For example, the detective asked Mr. Whitney if he was selling cannabis.  2-ER-378-79.  He answered, "I ain't know what to do with it last minute like that. I just went back to the first thing that I was ever taught by somebody bro."  2-ER-379.

The crime lab conducted a DNA analysis on the gun and two of the magazines.  It found DNA mixtures consistent with three contributors and concluded Mr. Whitney's DNA was included.  3-ER-520.  The lab apparently didn't have a reference sample from Ms. Rodosh and didn't analyze whether Ms. Rodosh's DNA was also included.

The state court instituted probation revocation proceedings.  At a contested revocation hearing on September 22, 2020, the defense called

Ms. Rodosh to testify.  She explained the gun, ammunition, money, and cannabis were hers.  2-ER-302-05.  The state court revoked Mr. Whitney's probation and imposed the previously suspended sentence of 18 to 48 months' imprisonment.  2-ER-308-09.

### III.  The government charges Mr. Whitney.

A federal grand jury indicted Mr. Whitney on January 5, 2021, charging him with felon in possession of a firearm under 18 U.S.C. § 922(g)(1).  3-ER-587-89.  At the time, Mr. Whitney was still in primary state custody serving his state revocation sentence; he was brought into physical federal custody for his initial appearance.  3-ER-585-86.

At a detention hearing, Mr. Whitney's attorney asked the magistrate judge to allow Mr. Whitney to return to physical state custody for an upcoming parole hearing.  3-ER-565-69, 577-78.  That way, if Mr. Whitney received parole, he would enter primary federal custody and would begin accruing credit for time served against any federal sentence in this case.  The magistrate judge allowed Mr. Whitney to return to physical state custody for the parole hearing but ordered him returned to physical federal custody immediately following the parole hearing.  3-ER-558-59.

Mr. Whitney pled guilty without a plea agreement. 2-ER-399-18; 3-ER-533-38. The government filed pleadings arguing for a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) because, in its view, Mr. Whitney possessed the gun in connection with drug distribution. 2-ER-212-17; 3-ER-423.

The defense filed a sentencing memorandum disputing the enhancement. 2-ER-258-73. It then filed a supplemental memorandum making multiple additional arguments. 2-ER-224-40. First, the memorandum argued probation miscalculated Mr. Whitney's criminal history score because it added points for a prior drug-related conviction that had been amended to a non-qualifying conviction. Second, the memorandum sought a variance for time spent in state custody. Mr. Whitney had remained in primary state custody since September 2020 without accruing credit for time served against his anticipated federal sentence. While the magistrate judge allowed Mr. Whitney to return to physical state custody for a parole hearing, the magistrate judge ordered him immediately returned to physical federal custody after the hearing. As a result, although the state parole board voted to grant Mr. Whitney parole shortly after the hearing, the state

11

department of corrections couldn't process the parole grant because Mr. Whitney was already back in physical federal custody. The defense requested a 26-month variance to account for Mr. Whitney's entire time in primary state custody, or alternatively a 19-month variance to account for credit for time served he would've accrued had the state department of corrections been able to process his parole grant. Third, the memorandum presented additional unrelated arguments for a variance.

The district court held an initial sentencing hearing. 1-ER-64-134. The government called a detective to testify regarding the four-level enhancement under Section 2K2.1(b)(6)(B). At a continued sentencing hearing, the court concluded the enhancement applied. 1-ER-21-22. It also rejected the defense's argument that Mr. Whitney's criminal history score improperly included a non-qualifying amended conviction. 1-ER-19-21. It calculated a total offense level of 25 and a criminal history category V, producing a guidelines imprisonment range of 100 to 125 months (120 months after accounting for the statutory maximum sentence). 1-ER-23-24.

The government and probation requested a prison term of 100 months.  1-ER-24-25.  The defense requested a prison term of 28 months.  1-ER-25.  The court varied downward and imposed a prison term of 54 months with a three-year supervised release term.  1-ER-3-4, 56-59.  Mr. Whitney filed a timely notice of appeal.  3-ER-590-91.

## Argument

## I. The district court incorrectly applied an offense level enhancement under Section 2K2.1(b)(6)(B).

### A. Standard of review.

This Court "review[s] a district court's construction and interpretation of the Guidelines de novo and its application of the Guidelines to the facts for abuse of discretion."  *United States v. Simon*, 858 F.3d 1289, 1293 (9th Cir. 2017) (en banc) (cleaned up).  This Court reviews "the district court's factual findings for clear error."  *United States v. Chadwell*, 798 F.3d 910, 914 (9th Cir. 2015) (cleaned up).

### B. The enhancement was inapplicable here.

Under the guidelines, a four-level enhancement applies if a defendant "used or possessed any firearm or ammunition in connection

with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B).[1] Here, the

government alleged Mr. Whitney possessed the charged firearm in

connection with the felony offense of cannabis possession with intent to

distribute. 2-ER-212.

"The government bears the burden of producing sufficient

evidence that the defendant intended to use or possessed the firearm in

connection with a specifically contemplated felony." *Chadwell*, 798 F.3d

at 916 (cleaned up). The "mere possession of a firearm" isn't enough;

the government must demonstrate the firearm "facilitated or potentially

facilitated—i.e., had some potential emboldening role—in a defendant's

felonious conduct." *United States v. Polanco*, 93 F.3d 555, 566-67 (9th

Cir. 1996) (cleaned up). The "presence or involvement" of the gun

"cannot be the result of accident or coincidence." *Smith v. United

States*, 508 U.S. 223, 238 (1993) (interpreting 18 U.S.C. § 924(c)(1)); *see

also United States v. Ellis*, 241 F.3d 1096, 1100 (9th Cir. 2001)

(applying *Smith* to the predecessor to Section 2K2.1(b)(6)(B)). The

government must prove the underlying facts at least by a

---

[1] Previous versions of the guidelines placed this provision in
Section 2K2.1(b)(5).

preponderance of the evidence.  *See United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003).[2]

There are three reasons why the district court erroneously applied the enhancement here.

### 1.    Mr. Whitney's fiancé owned the gun, not Mr. Whitney.

The evidence overwhelmingly demonstrated the gun belonged to Mr. Whitney's fiancé (Ms. Rodosh), not Mr. Whitney.  Although Mr. Whitney pled guilty to the underlying firearm possession charge, he did so under a theory of "constructive possession."  2-ER-237; *see, e.g.*, *United States v. Vasquez*, 654 F.3d 880, 885-86 (9th Cir. 2011) (discussing constructive possession); *United States v. Terry*, 911 F.2d 272, 278 (9th Cir. 1990) (finding sufficient evidence of constructive possession in an analogous case); *see also United States v. Kitchell*, 653 F.3d 1206, 1228 (10th Cir. 2011) ("[T]he government must show that

_____

[2] Mr. Whitney argued below that the heightened clear and convincing evidence standard was appropriate.  *See, e.g.*, *United States v. Parlor*, 2 F.4th 807, 816-17 (9th Cir. 2021).  The district court rejected the argument but stated it would've reached the same result either way.  1-ER-22.  Regardless of which standard applies, the government failed to meet its burden even under the relaxed preponderance of the evidence standard.

the defendant had knowledge of and access to the firearm.").  Because Ms. Rodosh obtained the gun solely for her own self-protection, there was no plausible argument Mr. Whitney possessed the gun in connection with drug trafficking.

Ms. Rodosh testified at Mr. Whitney's state probation revocation hearing.  She explained the gun and ammunition were hers.  2-ER-302. The master bedroom had two closets; one was Mr. Whitney's, and the other was Ms. Rodosh's; the authorities found the initial two magazines in her closet, not Mr. Whitney's.  2-ER-302-03.

The state court revoked Mr. Whitney's probation.  2-ER-308-09. While it concluded Mr. Whitney "knew [about] or had access to" the gun, it didn't contradict Ms. Rodosh's testimony that the gun was hers, and it didn't make any adverse credibility findings regarding Ms. Rodosh.  *Id.*  Meanwhile, the burden of proof in a state revocation hearing is lower than the preponderance of the evidence standard that applies at a federal sentencing.  *See Lewis v. State*, 90 Nev. 436, 438, 529 P.2d 796, 797 (1974); 2-ER-215-16 (discussing *Lewis* and conceding this point).  Notably, the district court expressly declined to consider the state revocation decision as part of its analysis.  1-ER-22.

Ms. Rodosh wrote a letter to the district court in advance of sentencing. She again explained the gun was hers. She experienced a traumatic miscarriage when she was over five months' pregnant with her second child (who would've been Mr. Whitney and Ms. Rodosh's first child together). 2-ER-242; *see also* 2-ER-304. She had a mental breakdown after the miscarriage. 2-ER-242-43. Then the COVID-19 pandemic hit. 2-ER-243. She was "scared," so she "went and got a gun to protect my family"—"I felt like I had to." *Id.* Mr. Whitney "had nothing to do with it. He didn't want it in the house but I wanted it." *Id.* Her thought process didn't "make sense and it wasn't rational but my depression was so bad. I was so scared and my anxiety was out of control." *Id.* "I know now I shouldn't have gotten the gun but I wasn't in my right mind." *Id.*

Ms. Rodosh spoke at sentencing. She stood by her letter. 1-ER-46. She yet again explained the gun was hers. "[I]n the middle of COVID I did buy a gun. I was scared." 1-ER-49. Someone "tried to break in my house" while she present with her young son. *Id.* "And being a woman and . . . already losing so many people, I had a momentary lapse of []sanity." *Id.* Before the police conducted the

search, they asked her whether there were any guns or drugs in the apartment, and she said no. 1-ER-91-92. At the time, she was concerned she "could have my son taken away." 1-ER-46. So "when I was told that they were going to take my son if there's anything in the house, I said that there was nothing." *Id.* She was "scared." *Id.* She did "what any other . . . mother who's already lost a baby would do." *Id.*

The police interrogated Mr. Whitney at length. His statements are consistent with Ms. Rodosh's.

During the interrogation, Mr. Whitney denied the gun was his. 2-ER-315. The police said Ms. Rodosh might face charges if Mr. Whitney didn't take responsibility for the contraband. 2-ER-314, 355-58. The police asked why the gun was in the apartment; Mr. Whitney answered, "she's always been use[d] to firearms and things like that." 2-ER-367-68. The police asked, "What did I find in the headboard of the bed?" 2-ER-375. Mr. Whitney said, "her money . . . and . . . the firearm." *Id.* He explained the gun was a "[n]ine-millimeter" but couldn't say what "brand" it was; "it was a brand that I've never seen before." *Id.* The police asked him to describe the gun; he said, "*I think* it was all black." 2-ER-376 (emphasis added). He noted it wasn't a revolver. *Id.* And he

18

reiterated it was a nine-millimeter. *Id.* The police asked if he ever loaded the gun in front of Ms. Rodosh's child; Mr. Whitney answered no. 2-ER-385. He agreed his DNA would be on the gun. 2-ER-386.

Mr. Whitney's answers tend to show the gun was Ms. Rodosh's, not his. He denied the gun was his. He said Ms. Rodosh was used to having guns. After the police threatened to charge Ms. Rodosh with a crime, Mr. Whitney made statements the government interprets as incriminating, such as admitting the gun was in the headboard. But he demonstrated a lack of knowledge about the gun. While he knew it was a nine-millimeter and wasn't a revolver, he was unsure of other details: he said he *thought* it was black, and he couldn't say what brand it was. Those comments suggest Ms. Rodosh owned the gun, and while Mr. Whitney might've been generally aware of it, it wasn't really his.

The crime lab found Mr. Whitney's DNA on the gun. 3-ER-520. That isn't probative. Mr. Whitney and Ms. Rodosh lived together, so it would be unsurprising if Mr. Whitney's DNA had been innocuously transferred to the gun. *See, e.g.*, "Secondary transfer," Jones on Evidence § 60:10 (7th ed. updated 2023). Alternatively, Mr. Whitney's interrogation may demonstrate he was generally aware of the gun; if so,

19

he may have touched it on occasion; but that sheds little light on whether the gun was truly his as opposed to Ms. Rodosh's.

The district court applied the enhancement. 1-ER-21-22. But its reasoning focused on the supposed evidence of drug distribution, as opposed to evidence regarding ownership of the gun. The district court failed to explain why it was concluding Mr. Whitney possessed the gun for his own purposes, as opposed to Ms. Rodosh possessing the gun solely for her own purposes.

In sum, Ms. Rodosh provided multiple "uncontradicted" accounts that she "purchased the weapon solely for self-protection purposes." *United States v. Pantelakis*, 58 F.3d 567, 568 (10th Cir. 1995); *see also Ellis*, 241 F.3d at 1100 (referencing "[u]ncontradicted evidence in the district court"). The record therefore refutes the conclusion the gun was present in the apartment at Mr. Whitney's initiative. While the circumstances may have nonetheless supported a conviction based on constructive possession, there was minimal (if any) evidence Mr. Whitney owned or used the gun for his own purposes. The district court therefore clearly erred in concluding Mr. Whitney possessed the gun specifically for drug trafficking purposes. *Cf. United States v.*

*Seymour*, 739 F.3d 923, 931 (6th Cir. 2014) (explaining the enhancement didn't apply because the defendant possessed but was trying to sell the gun).

### 2. Mr. Whitney's fiancé possessed the cannabis.

Even assuming the district court permissibly concluded Mr. Whitney possessed the gun for his own purposes, the evidence overwhelmingly demonstrated Ms. Rodosh possessed the cannabis for personal use, as opposed to Mr. Whitney possessing the cannabis with intent to distribute. The district court clearly erred when it determined Mr. Whitney planned to distribute drugs.

Ms. Rodosh testified at Mr. Whitney's state probation revocation hearing. She explained the cannabis was hers. 2-ER-302-03. She used it to "help[] with the loss and the anxiety" after her miscarriage. 2-ER-304. Mr. Whitney didn't use her cannabis. *Id.* She kept it in the laundry basket because she was responsible for doing laundry and he wouldn't find it there. 2-ER-304-05. She would leave the apartment to smoke so he wouldn't know what she was doing. 2-ER-305.

The state court revoked Mr. Whitney's probation. 2-ER-308-09. It said "[t]here was a substantial amount of marijuana" and "[t]he

21

circumstances here suggest that it was being sold." 3-ER-309.  But the court ultimately found "him in violation" due to "sufficient evidence of his possession and access both to the magazines . . . and to the firearm," not the cannabis.  *Id.*  Once again, it didn't explicitly contradict Ms. Rodosh's testimony that the cannabis was hers, and it didn't make any adverse credibility findings regarding Ms. Rodosh.  *Id.*  And once again, the district court expressly declined to consider the state court's revocation decision as part of its analysis.  1-ER-22.

Ms. Rodosh wrote a letter to the district court in advance of sentencing.  She again explained the cannabis was hers; she used it to self-medicate after her miscarriage.  2-ER-243.  She tried to "hide" her cannabis use from Mr. Whitney, so she "hid it in the laundry hamper." *Id.*  She "would smoke when they would go to sleep and before they would wake up, I would go outside so nobody would smell it or know." *Id.*

Ms. Rodosh spoke at sentencing.  She stood by her letter.  1-ER-46.  She yet again explained the cannabis was hers and she used it to self-medicate.  1-ER-47, 50.  Mr. Whitney "didn't know I smoked"—she "never did it in the house."  1-ER-47.  She bought the cannabis from "a

legal, operating dispensary." 1-ER-50. She "was able to purchase a large amount" from the dispensary. *Id.* The dispensary was perhaps selling more than the authorized limit under state law, and the dispensary "ended up getting shut down I think two months later." *Id.* She bought a large quantity because she "didn't want to have to keep going back." *Id.*

The police interrogated Mr. Whitney, and his statements are again consistent with Ms. Rodosh's. The police said they found cash and suggested the cash was from drug sales; Mr. Whitney explained the money was from Ms. Rodosh's unemployment. 2-ER-316. He said the cannabis belonged to Ms. Rodosh. 2-ER-318. At one point, the police asked "is this a result of shit go sideways so you go back to what you know?" 2-ER-341. Mr. Whitney answered, "Man, this is a result of I have people depending on me and . . . I'm nowhere familiar with that type of pressure." *Id.* Mr. Whitney said the cannabis was "[i]n the bathroom" and "by the TV" in their room. 2-ER-376-77. It was separated into two jars based on potency; Ms. Rodosh would regularly smoke the less potent cannabis and would occasionally smoke the more potent cannabis. 2-ER-377-78.

The police asked him where the baggie and scales were; he said he didn't "really know," although they must've been "together." 2-ER-378. He then said, "All that belong to me. Everything." *Id.* The police followed up by asking if he was "actively" selling cannabis. *Id.* He responded, "I ain't know what to do with it last minute like that. I just went back to the first thing that I was ever taught by somebody bro." 2-ER-379. The police then asked whether he'd sold drugs in the past, and the conversation shifted to that topic. *Id.*

This interrogation is inconsistent with the conclusion Mr. Whitney was selling cannabis. Mr. Whitney repeatedly explained the cannabis belonged to Ms. Rodosh. After the police threatened that Ms. Rodosh could face charges, and after the police questioned Mr. Whitney at length regarding the cannabis, he said, "All that belong to me. Everything." 2-ER-378. The officers asked if he was selling cannabis, and he made the ambiguous comment, "I ain't know what to do with it last minute like that. I just went back to the first thing that I was ever taught by somebody bro." 2-ER-379. These statements are a slender reed for finding evidence of drug distribution. *Compare id.*; *with United States v. Gonzalez*, 506 F.3d 940, 947 (9th Cir. 2007) (en banc)

(explaining the defendant "admitted that both the drugs and the guns in the car were his" and "admitted to selling drugs"). Notably, although the district court applied the enhancement, it didn't reference Mr. Whitney's interrogation as evidence supporting drug distribution. 1-ER-21-22.

In applying the enhancement, the district court referenced "the cash stashed with the handgun." 1-ER-22. The police found an envelope with $4,450 in cash in the headboard near the gun. 1-ER-79; 2-ER-275. But as Mr. Whitney explained during his interrogation, this money wasn't from drug sales—it was from Ms. Rodosh's unemployment payments. 2-ER-316. Indeed, after Mr. Whitney's arrest, Ms. Rodosh contacted the police and successfully convinced them to release the funds back to her. 2-ER-277-84; *see United States v. Parlor*, 2 F.4th 807, 821 (9th Cir. 2021) (Berzon, J., dissenting) (explaining "the cash found in the house was returned to [the defendant's] girlfriend"); *United States v. West*, 643 F.3d 102, 114 (3d Cir. 2011) ("The District Court heard testimony from [the defendant's] mother that $5,000 of the $9,000 was her gift to [the defendant] for the

purchase of a new car, and she produced a check stub for $5,000 to support that claim.").

The district court also noted the "quantities" of cannabis and how it "was stored." 1-ER-22. But as Ms. Rodosh explained, she purchased a bulk quantity from a dispensary (which was perhaps selling amounts over the legal state limit) because she "didn't want to have to keep going back." 1-ER-50. It's reasonable that if someone uses cannabis to self-medicate for anxiety, that person would feel anxiety about running out of cannabis and would want to keep a reliable supply on hand. Although the total amount of cannabis—about eight ounces—is perhaps larger than an average consumer's personal use stock, the amount isn't significant enough to be reasonably deemed evidence of intent to distribute, especially in a state with a legal cannabis market. *Cf. United States v. Oliveira*, 907 F.3d 88, 95 (1st Cir. 2018) (Thompson, J., concurring) ("[P]erhaps someday we as a court will have to reconsider whether a factfinder can reasonably infer felonious intent to distribute in part from a defendant's lawful possession—under state law, anyway—of both personal-use marijuana and marijuana-related paraphernalia).

26

The district court suggested Ms. Rodosh "stored" the cannabis in an incriminating fashion. 1-ER-22. As Mr. Whitney explained, Ms. Rodosh split the cannabis into separate jars based on potency levels. 2-ER-377-78. It's unclear why the district court thought the method of storage was incriminating.

According to the district court, "[t]he manner and places in which [the cannabis] was hidden are inconsistent with the way in which a mother who was purportedly concerned with her children's safety would store such a substance for personal use." 1-ER-22. But Ms. Rodosh explained she kept her cannabis in a laundry basket because she was solely responsible for doing laundry. 2-ER-243. The district court didn't explain where else Ms. Rodosh should've hidden the cannabis. At the same time, the district court recognized they lived in a "small apartment," suggesting a lack of reliable hiding spots. 1-ER-22.

The district court referenced the police finding "baggies" and a "scale" in the apartment. 1-ER-22. But baggies and scales are common household items and aren't necessarily incriminating. *See Parlor*, 2 F.4th at 822 (Berzon, J., dissenting). Mr. Whitney couldn't say where the baggies and scale were, which again indicates Ms. Rodosh was using

27

those items for her own purposes, as opposed to Mr. Whitney using them for drug sales.  2-ER-378.  Indeed, the police found these items in a shelf above the laundry area.   1-ER-82-85.  Ms. Rodosh explained she kept the cannabis in a laundry basket because she was solely responsible for doing laundry.  2-ER-243.  Because the baggies and the scale were in the laundry area, and because Ms. Rodosh was responsible for laundry, the location of these items suggests Ms. Rodosh was using them, not Mr. Whitney.

The district court indicated the cannabis, the baggies, the scale, and the money were in close "proximity . . . to one another."  1-ER-22.  That characterization is inapt.  The cash was in a headboard in the master bedroom; the cannabis was in a laundry basket in the master bedroom; and the baggies and scale were in a shelf above the laundry area.  These items weren't found particularly close together, especially considering the "small apartment" they were living in.  *Id.*

Perhaps most notable is the lack of direct evidence of actual drug sales.  The police didn't find a "drug ledger" recording profits, losses, debts owed, or customer information.  *United States v. Waltower*, 643 F.3d 572, 578 (7th Cir. 2011).  Almost all the cannabis was contained in

three large packages as opposed to "multiple small containers amenable for customer sales." *United States v. Gambino-Zavala*, 539 F.3d 1221, 1230 (10th Cir. 2008). There were no controlled purchases by undercover informants or other observed purchases. *See United States v. Bunner*, 134 F.3d 1000, 1006 (10th Cir. 1998) (explaining "the police made a controlled purchase of methamphetamine from a white male in defendant's residence").[3] Without any such evidence, there was little reason to conclude Mr. Whitney was selling or intended to sell drugs.

In sum, the district court seized on innocuous details to find evidence of drug distribution. Indeed, the court recognized Mr. Whitney had "an exculpatory explanation for virtually every fact here." 1-ER-21. The evidence overwhelmingly demonstrated Ms. Rodosh possessed the cannabis for self-medication purposes, as opposed to Mr. Whitney

---

[3] *See also, e.g.*, *Chadwell*, 798 F.3d at 917 (describing a previous controlled purchase of drugs); *United States v. Morris*, 349 F.3d 1009, 1015 (7th Cir. 2003) ("[I]t gives us pause that there is no direct evidence showing that Morris personally was engaged in drug sales."); *Polanco*, 93 F.3d at 567 (noting that "on two separate occasions [the defendant] was observed selling marijuana"); *United States v. Thompson*, 32 F.3d 1, 7 (1st Cir. 1994) (explaining there was evidence of controlled buys); *United States v. Gomez-Arrellano*, 5 F.3d 464 (10th Cir. 1993) (noting the lack of "any indication that drug transactions occurred inside the house").

possessing the cannabis with intent to sell.  The district court clearly erred when it concluded otherwise.

### 3. The gun possession wasn't in connection with drug distribution.

Assuming the district court permissibly concluded the gun was Mr. Whitney's, and Mr. Whitney intended to sell cannabis, Mr. Whitney nevertheless didn't possess the gun "in connection with" the alleged drug offense.  U.S.S.G. § 2K2.1(b)(6)(B).

According to the commentary to the guidelines provision (application notes 14(A) & (B)), the enhancement applies when the firearm "facilitated, or had the potential of facilitating, another felony offense"; for example, "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs."  The "enhancement necessarily applies" in the circumstances described by application note 14(B), i.e., when a gun is found near drugs.  *Parlor*, 2 F.4th at 815; *see also United States v. Choulat*, __ F.4th __, 2023 WL 4781488, at *4 (5th Cir. July 27, 2023) (stating that under the commentary, "a gun is *automatically* connected to a drug trafficking offense if it is found in close proximity to drugs or drug paraphernalia") (cleaned up).  A

firearm is "in 'close proximity' to" drugs where, as here, the firearm and drugs were "near the same bed" or "in the same house." *Parlor*, 2 F.4th at 815.

The Court should reconsider its prior precedent applying this application note following the U.S. Supreme Court's intervening decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *See United States v. Castillo*, 69 F.4th 648, 656-62 (9th Cir. 2023) (overruling a prior guidelines-related precedent based on *Kisor*).

Prior to *Kisor*, federal courts gave authoritative deference to guidelines commentary. *See Stinson v. United States*, 508 U.S. 36, 38-41 (1993). "[U]nder *Stinson*, commentary must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Castillo*, 69 F.4th at 655 (cleaned up). *Stinson* deference applied even when the guideline provision was "unambiguous," and even when "commentary . . . expand[ed] the meaning of the" guideline provision. *Id.*

The deference owed to these types of agency interpretations "has narrowed over time." *Castillo*, 69 F.4th at 655. "[I]n *Kisor*, the Supreme Court cabined the scope of this deference, clarifying that the

31

possibility of deference to an agency's interpretation of its own rules can arise *only* if a regulation is genuinely ambiguous." *Id.* (cleaned up). "The more demanding deference standard articulated in *Kisor* applies to the Guidelines' commentary." *Id.*

Because *Kisor* reduced the level of deference owed to guidelines commentary, courts need to reconsider prior precedents deferring to and applying guidelines commentary. *See, e.g.*, *Castillo*, 69 F.4th at 656-62.

Under *Kisor*, a court must begin by determining whether the relevant guideline provision is "genuinely ambiguous" after "exhaust[ing] all the traditional tools of construction." 139 S. Ct. at 2415 (cleaned up). If the provision is unambiguous, the analysis stops there, and the court owes no deference to the commentary. *Id.* If the provision is ambiguous, the court must ask whether the commentary's interpretation is "reasonable." *Id.* (cleaned up). If the interpretation is unreasonable, the analysis again stops there, and the court again owes no deference to the commentary. *Id.* at 2416. If the interpretation is reasonable, the court must determine "whether the character and context of the agency interpretation entitle[] it to controlling weight." *Id.*

Here, application note 14(B) should receive no deference under *Kisor* either because the guideline provision is unambiguous, or because the commentary is an unreasonable interpretation of the ambiguous provision. Under the plain text of the guideline, the enhancement applies only when the defendant "used or possessed any firearm or ammunition *in connection with* another felony offense." U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). This provision unambiguously requires the government to prove an actual *connection* between the firearm possession and the other felony offense. "[T]he text has a single core meaning: a causal or logical relationship, not a spatial one." *United States v. Perez*, 5 F.4th 390, 404 (3d Cir. 2021) (Bibas, J., concurring). "Under the plain text, the defendant's gun possession must be involved with and related to the other felony." *Id.* But the commentary "authorizes the enhancement whenever the gun is found near drugs," even though "under the Guideline's text, just being nearby is not enough." *Id.* "This *spatial* relationship falls outside any textual ambiguity" and thus "deserves no deference." *Id.*; *see also Choulat*, 2023 WL 4781488, at *4 (agreeing this "reading of *Kisor* is not

unreasonable" but concluding existing precedent "foreclosed" the argument).

For substantially the same reasons, even if the guideline is ambiguous, the commentary expands the guideline in an unreasonable manner and thus doesn't satisfy *Kisor*.

Assuming the Court agrees, the government failed to prove a bona fide connection (as opposed to a mere spatial connection) between the gun and the cannabis at issue in this case. The government presented no evidence (aside from mere proximity) suggesting Mr. Whitney possessed or used the firearm in connection with any actual or intended cannabis sales. There was no evidence (aside from mere proximity) suggesting the gun played "some potential emboldening role in" Mr. Whitney's alleged drug distribution. *Polanco*, 93 F.3d at 567 (cleaned up). Absent such evidence, the district court expressly relied on "the proximity" of the gun to the cannabis when applying the enhancement. 1-ER-22. The district court failed to explain any other connection between the two, and none appears in the record. The enhancement is therefore inapplicable under a correct reading of this unambiguous guideline provision.

In sum, courts should refrain from deferring to application note 14(B) following *Kisor*. Rather, courts should demand the government prove an actual connection, not just a spatial connection, between the firearm and the alleged drug trafficking offense. Because the evidence fails to establish any such connection in this case, the Court should reverse.

## II. The district court incorrectly determined Mr. Whitney's criminal history category.

### A. Standard of review.

This Court "review[s] de novo the district court's interpretation of the Sentencing Guidelines, including the calculation of the criminal history score." *United States v. Madrid-Becerra*, 14 F.4th 1096, 1099 (9th Cir. 2021) (cleaned up). If a defendant fails to object to a guidelines calculation, "imposition of an erroneous sentence may be reviewed for plain error." *United States v. Halamek*, 5 F.4th 1081, 1087 (9th Cir. 2021) (cleaned up). "To establish plain error, [a defendant] must show that (1) there was an error, (2) the error is clear or obvious, (3) the error affected his substantial rights, and (4) the error seriously affected the

fairness, integrity, or public reputation of judicial proceedings." *United States v. Johnson*, 979 F.3d 632, 636 (9th Cir. 2020).

**B.      The court improperly counted a non-qualifying amended conviction.**

Mr. Whitney had a prior state misdemeanor drug possession conviction from April 2017. 2-ER-199. In September 2022, Mr. Whitney filed an unopposed motion in state court seeking to amend the April 2017 judgment to reflect a conviction for a loitering offense as opposed to a drug possession offense. 2-ER-202-03. The state court granted the motion on September 21, 2022, and issued an amended judgment listing the loitering offense. 2-ER-188-90, 205, 207.

Prior to September 2022, the drug possession conviction would've added two criminal history points to Mr. Whitney's criminal history score because he was sentenced to 60 days in jail. *See* U.S.S.G. § 4A1.1(b). In September 2022, however, the state court reclassified the offense as a loitering offense. Loitering offenses never add criminal history points to a defendant's criminal history score. *See* U.S.S.G. § 4A1.2(c)(2). Thus, by the time of sentencing in this case in December

2022, the offense no longer contributed to Mr. Whitney's criminal history score.

Nevertheless, over defense objection, the district court added two points to Mr. Whitney's criminal history score based on the conviction's original classification as a drug possession offense. 1-ER-19-21. The district court therefore increased Mr. Whitney's criminal history score from 9 points to 11 points and changed his criminal history category from IV to V. This calculation was erroneous.

A defendant's criminal history score is generally calculated as of the date of sentencing. *See, e.g.*, U.S.S.G. § 4A1.2 app. n. 1 (explaining a court should count "[a] sentence imposed after the defendant's commencement of the instant offense, but prior to sentencing on the instant offense," unless the prior sentence is for relevant conduct). Thus, if a defendant has a prior state conviction and the state court amends the judgment before sentencing, then the amended judgment in effect at the time of sentencing should generally control the defendant's criminal history score. Here, by the time of sentencing, Mr. Whitney's prior 2017 conviction was amended to a loitering conviction. Because

the amended conviction was for loitering, it should've had no effect on Mr. Whitney's criminal history score.

In concluding otherwise, the district court relied on exceptions to this general rule that aren't applicable here.

The district court referenced *United States v. Yepez*, 704 F.3d 1087 (9th Cir. 2012) (en banc) (per curiam). 1-ER-20. That case interpreted Section 4A1.1(d), which instructs courts to add two points to the defendant's criminal history score "if the defendant committed the instant offense while under any criminal justice sentence, including probation." The defendants in *Yepez* committed drug trafficking offenses while on state probation. After being charged in federal court but before federal sentencing, the defendants successfully had the state courts terminate their probation *nunc pro tunc* to the day before they committed the federal offenses. The defendants then argued Section 4A1.1(d) didn't apply to them because the state courts terminated their probation *nunc pro tunc* to the day before their federal offenses, meaning they were no longer serving a criminal justice sentence when they committed the federal offenses.

The Court rejected this argument. As it explained, Section 4A1.1(d)'s "plain language" instructs courts to consider the "defendant's status at the time he commits the federal crime"—i.e., whether the defendant was serving a criminal justice sentence on the date the defendant committed the federal offense. *Yepez*, 704 F.3d at 1090. "That a state court later deemed the probation terminated before the federal crime was committed can have no effect on a defendant's status at the moment he committed the federal crime." *Id.* A state "court cannot alter the historical fact that the defendant had the status of probationer when he committed his federal crime." *Id.*

*Yepez* doesn't control this case. *Yepez* involves a guideline provision that specifically instructs courts to consider the defendant's status as of the date of the federal offense. According to *Yepez*, whether a defendant was serving a criminal justice sentence on the date of the federal offense is a historical fact that a state court cannot retroactively alter. Here, however, the district court had an obligation to accurately calculate Mr. Whitney's criminal history score as of the date of sentencing, based on the status of Mr. Whitney's state court convictions in December 2022. By that time, Mr. Whitney's 2017 conviction was for

an offense that didn't trigger additional criminal history points. The
district court should've calculated Mr. Whitney's criminal history score
accordingly.

Were there any doubt, principles of comity and federalism require
the federal courts to defer to the state courts in this distinguishable
situation. Five out of eleven judges dissented in *Yepez*. The dissent
invoked principles of "[c]omity between state and federal courts," which
are "a bulwark of the federal system." 704 F.3d at 1092 (Wardlaw, J.,
dissenting) (cleaned up); *see also id.* at 1103. "[T]he entire concept of
calculating criminal history points is predicated on respect for and
deference to state court criminal proceedings." *Id.* at 1098. The
guidelines "instruct that judges look to state laws and state court
rulings to determine whether a defendant is serving a sentence under
state law." *Id.* at 1099. Thus, while the guideline provision at issue in
*Yepez* uniquely instructs courts to consider the defendant's status at the
time of the federal offense, that unusual requirement doesn't govern all
aspects of a criminal history score calculation. Outside of the specific
scenario in *Yepez*, principles of comity and federalism require federal

40

courts to defer to state courts when a state court amends a defendant's conviction.

The district court also referenced *United States v. Alba-Flores*, 577 F.3d 1104 (9th Cir. 2009). There, the defendant was serving a three-year term of probation for a state misdemeanor driving offense at the time he committed the federal offense. Before sentencing, he had the state court reduce the driving conviction to an infraction and terminate his probation before he'd served a full year. In doing so, the state court relied on a state law provision that falls short of expungement and still allows courts to use "the convictions in question . . . in a variety of circumstances, both criminal and civil." *Id.* at 1108. At the federal sentencing, the defendant argued he had no criminal history points because (1) the prior conviction was no longer a countable offense since it was now an infraction; (2) the prior conviction was no longer a countable offense since he served less than a year's probation for the offense; and (3) he could no longer be deemed to have been on probation for that infraction at the time he committed the federal offense. The district court rejected those arguments; it added one point for the prior

conviction and two points for the defendant having committed the federal offense while serving another criminal justice sentence.

This Court affirmed. The defendant insisted his state conviction had "been expunged," so the district court erred by adding the first point. *Alba-Flores*, 557 F.3d at 1108. But the state court didn't expunge the conviction; instead, it relied on a "more limited" state law provision that "does not result in an expungement." *Id.* The defendant therefore couldn't "rely on an expungement theory." *Id.* at 1109. The defendant alternatively argued that because he served less than a year's probation for that offense, the offense wasn't countable, so the district court again erred by adding the first point. The Court indicated this argument was likely correct, although it declined to "decide that precise issue." *Id.* at 1110. It ultimately concluded—as in *Yepez*—that as a historical matter the defendant was serving a criminal justice sentence when he committed the federal offense, and "[t]he later state court order could not change that concrete fact." *Id.* at 1111. The defendant therefore had at least two criminal history points, which was sufficient to resolve the appeal in the government's favor. *Id.*

*Alba-Flores* doesn't apply here.  In *Alba-Flores*, the defendant relied on an expungement theory that was legally erroneous under state law.  Here, by contrast, Mr. Whitney isn't presenting an expungement theory—he admits he still has a conviction stemming from the 2017 incident.  Instead, Mr. Whitney is arguing the *offense* underlying the conviction has changed.  *Alba-Flores* suggests these types of changes matter for federal sentencing.  Indeed, the decision indicates the state court's early termination of probation likely resolved in the defendant's favor the question whether the defendant had served over a year on probation.  If so, a state court's amendment to the offense of conviction should be controlling, just like a state court's amendment to the length of probation should be controlling.  *See United States v. Mejia*, 559 F.3d 1113, 1116 (9th Cir. 2009) (explaining that if the court sentences a defendant to a lengthy term of probation but terminates probation early, application of Section 4A1.2(c)(1)(A) depends on the actual term of probation served, not the original sentence).

In any event, these portions of *Alba-Flores* are ultimately dicta. The Court based its holding in *Alba-Flores* on the same theory underlying *Yepez*:  as a historical matter, the defendant was on

probation at the time the defendant committed the federal offense. 577 F.3d at 1111 (stating in conclusion that the defendant "was properly assigned two criminal history points pursuant to USSG § 4A1.1(d)," which was enough to resolve the appeal in the government's favor). As explained above, that holding has no bearing here.

The district court also referenced the commentary to Section 4A1.2. 1-ER-20. Under Section 4A1.2(j), expunged convictions aren't counted. Application note 6 explains that if a conviction is "reversed or vacated because of errors of law or because of subsequently discovered evidence exonerating the defendant" or because the conviction was "ruled constitutionally invalid," the conviction doesn't count. By contrast, application note 10 explains that if a conviction is "set aside" or the defendant is "pardoned" merely "for reasons unrelated to innocence or errors of law," those convictions count. In other words, if a defendant has a conviction reversed, vacated, set aside, or pardoned, then a court should consider the reason why. But these provisions don't cover the situation at issue here, where a conviction remains on the books, but the court *amends* the judgment and *changes* the offense of conviction. That type of change is analogous to a change in the

44

sentence, which is controlling.  Because the application notes don't cover this distinct scenario—*changes* to a conviction, as opposed to actions rendering a conviction null—the district court erred when it applied the commentary.

In the alternative, if the application notes apply here, they're unworthy of deference under *Kisor*.  As explained above, *Kisor* forbids courts from deferring to guidelines commentary unless the actual guideline provision is ambiguous, and unless the commentary reasonably interprets the ambiguous guideline provision.  Here, Section 4A1.2(j) simply says expunged convictions aren't counted.  The commentary unreasonably expands on this straightforward and unambiguous provision, so courts shouldn't apply these two application notes, at least not in the situation at issue here.

In sum, Mr. Whitney has a prior 2017 conviction.  By the time of sentencing, the state court had amended the conviction to a loitering offense.  Under the guidelines, loitering offenses don't contribute points to a defendant's criminal history score.  The 2017 conviction therefore shouldn't have contributed to Mr. Whitney's criminal history score.  The district court erred when it nonetheless added two points for this

conviction, raising Mr. Whitney from criminal history category IV to V. This Court should reverse and remand for resentencing.

### C. The court improperly counted a non-qualifying minor conviction.

The district court assessed Mr. Whitney one criminal history point for a minor offense from 2018. This was plain error.

Mr. Whitney has a conviction from July 2018; he was sentenced to four days in jail. PSR ¶ 32. The charged counts include "convicted person fail to change address," "no driver's license in possession," and "no proof of insurance." *Id.* (cleaned up).

The district court shouldn't have added a point for this conviction. Under U.S.S.G. § 4A1.2(c)(1), convictions for certain enumerated offenses aren't counted unless the defendant received a sentence of more than a year's probation or 30 days' imprisonment. The listed offenses include "driving without a license or with a revoked or suspended license" and "false information to a police officer." *Id.* (cleaned up). The provision applies to the listed offenses, as well as other unenumerated offenses that are "similar to" a listed offense. *Id.* When deciding whether an unenumerated offense is similar to a listed

offense, "the court should use a common sense approach" that considers, among other things, "the perceived seriousness of the offense," "the level of culpability involved," and "the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct." *Id.* app. n. 12(A); *see also United States v. Grob*, 625 F.3d 1209, 1213-15 (9th Cir. 2010).

The 2018 conviction involves three counts that are excluded under Section 4A1.2(c)(1). Driving without a license is specifically excluded. Driving without proof of insurance is analogous to driving without a license and is therefore also excluded. A convicted person failing to provide an updated address to the authorities, *see* NRS 179C.110, is a minor administrative offense analogous to providing false information to a police officer. Mr. Whitney served less than 30 days in jail for these offenses. All three charges are thus excluded, so this conviction shouldn't have contributed to Mr. Whitney's criminal history score.

Mr. Whitney didn't object to this one-point increase below. But because this challenge raises a pure question of law—whether the July 2018 conviction falls within Section 4A1.2(c)(1)—the Court may address

the issue de novo, not under plain error review. *See Castillo*, 69 F.4th at 653 (stating this principle but questioning its continued validity).

In the alternative, this mistake satisfies the plain error standard. The error is clear or obvious. *Johnson*, 979 F.3d at 636. When combined with the effect of other errors, this error is prejudicial within the meaning of the plain error standard. *See Rosales-Mireles v United States*, 138 S. Ct. 1897, 1907 (2018) (discussing the plain error prejudice standard's application to guidelines errors); *Mejia*, 559 F.3d at 1116.

Mr. Whitney recognizes the single point attributed to the July 2018 conviction isn't outcome-determinative on its own: the court calculated a criminal history score of 11; reducing that score to 10 wouldn't drop Mr. Whitney's criminal history category. *See Halamek*, 5 F.4th at 1092 (explaining a defendant cannot demonstrate plain error if the "Guidelines range would have been the same had the district court applied the correct criminal history score"). Normally, that would prevent a showing of plain error.

Mr. Whitney can nonetheless demonstrate prejudice under the plain error standard because he will likely soon be eligible for a separate one-point reduction. Mr. Whitney received a two-point

48

increase in his criminal history score under U.S.S.G. § 4A1.1(d) because he committed the federal offense while serving another criminal justice sentence. PSR ¶ 38. The U.S. Sentencing Commission has approved an amendment to this provision effective November 1, 2023. Under the amendment, a defendant who commits a federal offense while under a criminal justice sentence will no longer automatically receive a two-point increase; rather, a defendant will receive only a one-point increase, and only if the defendant otherwise has seven criminal history points. *See* U.S.S.G., Amendments to the Sentencing Guidelines at 82 (Apr. 27, 2023).[4] The Commission will hold a meeting on August 24, 2023, and will potentially vote on whether to make this change retroactive. *See* U.S.S.G., "Public Meeting – August 24, 2023."[5]

Because Mr. Whitney will potentially be eligible for a new one-point reduction under amended Section 4A1.1, the district court's one-

_____

[4] Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf

[5] Available at https://www.ussc.gov/policymaking/meetings-hearings/public-meeting-august-24-2023

49

point error under Section 4A1.2(c)(1) meets the plain error prejudice standard: a combined two-point reduction would drop Mr. Whitney from criminal history category V to IV. *Cf. United States v. Lockhart*, 947 F.3d 187, 196 (4th Cir. 2020) (en banc) (finding prejudicial plain error based on the combined prejudicial effect of two errors); *United States v. Waknine*, 543 F.3d 546, 554-55 (9th Cir. 2008) (similar).[6] Were Mr. Whitney in category IV, his guidelines range would be reduced, and there's a reasonable probability the district court would've reduced his sentence accordingly. *See Mejia*, 559 F.3d at 1116 (explaining a defendant can show prejudicial plain error based on a reduced guidelines range). This Court and should reverse and remand for resentencing.

---

[6] Assuming the Court credits both arguments in this section, and assuming Mr. Whitney benefits from the new guidelines amendments, Mr. Whitney would ultimately be in criminal history category III. Had the district court properly excluded both the April 2017 and July 2018 convictions, Mr. Whitney's criminal history score would've initially been six. In that event, under the proposed amended Section 4A1.1, he wouldn't have received a further increase for serving a criminal justice sentence during the federal offense because his criminal history score would've been less than seven.

## III. The Court failed to consider a variance based on ineligibility for credit for time served.

### A. Standard of review.

The Court "review[s] the sentence imposed by the district court for abuse of discretion." *United States v. Ruiz-Apolonio*, 657 F.3d 907, 910 (9th Cir. 2011). When a district court fails to adequately explain a sentence, but the defendant fails to contemporaneously object on that ground, the Court reviews for plain error. *See United States v. Rangel*, 697 F.3d 795, 805 (9th Cir. 2012).

### B. The court didn't explain why it was rejecting a variance for uncredited time spent in custody.

When selecting a sentence, "the district court must explain it sufficiently to permit meaningful appellate review." *Rangel*, 697 F.3d at 805. "[W]hen a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Id.* (cleaned up); *see also, e.g.*, *United States v. Trujillo*, 713 F.3d 1003, 1011 (9th Cir. 2013) (reversing based on a lack of explanation).

Here, Mr. Whitney presented a substantial argument for a variance based on time he spent in custody that isn't being credited against his federal sentence. 1-ER-25-31; 2-ER-226-29.

The local police arrested Mr. Whitney for the conduct underlying this case on September 2, 2020. PSR ¶ 43. The state court revoked Mr. Whitney's probation on September 22, 2020, and imposed the previously suspended sentence of 18 to 48 months' imprisonment. 2-ER-309. Mr. Whitney remained in primary state custody from September 2020 until roughly August or September 2022. 1-ER-131.

A federal grand jury indicted Mr. Whitney on January 5, 2021. 3-ER-587. At the time, Mr. Whitney was still in primary state custody, and he was brought into physical federal custody through a writ of habeas corpus ad prosequendum. 3-ER-585-86.

Mr. Whitney's attorney asked the magistrate judge to allow Mr. Whitney to return to physical state custody so he could proceed to a parole hearing, receive parole from his state sentence, enter primary federal custody, and begin earning credit for time served against the anticipated federal sentence. 3-ER-565-69; *see* 18 U.S.C. § 3585(b) (explaining the Bureau of Prisons must award a defendant credit for

time served in official detention leading up to sentencing, but only if that time "has not been credited against another sentence"); *United States v. Cole*, 416 F.3d 894, 897 (8th Cir. 2005) (explaining a state sovereign relinquishes primary custody of a defendant if the state sovereign grants parole). The magistrate judge allowed Mr. Whitney to return to physical state custody for his parole hearing but ordered Mr. Whitney transported back to physical federal custody immediately after the hearing. 3-ER-558-59.

Mr. Whitney went to physical state custody and had his parole hearing. After the hearing, he returned to physical federal custody, as the magistrate judge ordered. The state parole board then voted to grant parole. But because Mr. Whitney was in physical federal custody at the time of the vote, the state department of corrections was unable to process the parole grant, and Mr. Whitney remained in primary state custody. 2-ER-228. Had Mr. Whitney remained in physical state custody at the time of the parole grant, the state department of corrections would've processed his parole in mid-2021, and Mr. Whitney would've entered primary federal custody and begun receiving credit for time served at that point. *Id.*

53

As a result, Mr. Whitney presented two alternative variance requests to the district court.  First, he requested a variance of 26 months to account for the entire time spent in primary state custody from September 2020 forward.  While he was technically ineligible for credit for time served for that period (since the time was credited to his state sentence), Mr. Whitney argued it would be appropriate to grant a variance to achieve the same result as credit for time served.  Second, in the alternative, Mr. Whitney requested a variance of 19 months to account for the time he spent in primary state custody after he should've received parole on or about mid-2021.[7]

In addition to these variance requests, Mr. Whitney presented other arguments for a variance based on multiple mitigating factors.  2-ER-229-38.

---

[7] On information and belief, the calculations presented below may be slightly erroneous.  It appears Mr. Whitney was granted parole effective July 5, 2021, but due to the issue described above, the state department of corrections was unable to process the parole grant until August 23, 2022.  Assuming the Bureau of Prisons awards credit for time served effective August 23, 2022, the proper variance request under this theory would be for roughly 13 and a half months, from July 5, 2021, to August 23, 2022.

At sentencing, the defense discussed its requests for a variance, including the credit for time served issue. 1-ER-25-36.

The court granted a 46-month variance from the low end of the guidelines range. 1-ER-59. When explaining its decision, the court referenced Mr. Whitney's education level, employment history, and family support. 1-ER-57. It mentioned his turbulent upbringing. *Id.* It noted the offense didn't involve violence or brandishing the firearm. 1-ER-58. It explained federal sentences for firearm possession are more severe than corresponding state sentences. *Id.* It discussed how Mr. Whitney's prior criminal history involved youthful convictions. *Id.* It concluded the 46-month variance was appropriate "based on overrepresentation of criminal history and in light of the factual circumstances of this case and the nature of the offense and in light of the defendant's personal circumstances and the lack of violence involved here and the significant family support that he has." 1-ER-58-59.

While the district court granted a variance, its explanation failed to address Mr. Whitney's separate argument for a variance based on the

credit for time served issue. The district court erred when it neglected to specifically address this argument. *See Rangel*, 697 F.3d at 805.

This mistake satisfies the plain error standard. The error is clear or obvious. *Johnson*, 979 F.3d at 636. It satisfies the other prongs of the plain error standard because there's a reasonable probability the court would've awarded a further variance had it adequately addressed this argument. *See Rosales-Mireles*, 138 S. Ct. at 1907. Indeed, Mr. Whitney served over a year in primary state custody unnecessarily because the magistrate judge refused to allow him to remain in physical state custody until the state department of corrections processed his parole grant. It's reasonably probable that if the district court specifically resolved this argument, it would've concluded an additional 19-month variance was appropriate to correct this presumably unintentional mistake. The Court should reverse and remand for resentencing.

**IV.  The district court imposed two improper special conditions of supervision.**

**A.  Standard of review.**

The Court "typically review[s] de novo whether a challenged supervised release condition illegally exceeds the permissible statutory penalty or violates the Constitution." *United States v. Nishida*, 53 F.4th 1144, 1150 (9th Cir. 2022) (cleaned up).  The Court "review[s] for plain error when a party fails to raise its illegality argument to the district court." *Id.*

**B.  The mental health treatment condition fails to specify outpatient treatment.**

The district court imposed a three-year term of supervised release. 1-ER-4.  It included a mental health treatment condition.  1-ER-6.  The condition states, "You must participate in a mental health treatment program and follow the rules and regulations of that program." *Id.* "The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.)." *Id.*  "You must pay the costs of the program based on ability to pay." *Id.*

This Court has invalidated materially analogous conditions on plain error review. *See Nishida*, 53 F.4th at 1155. In *Nishida*, the Court explained a sentencing court may not delegate to a probation officer the decision whether to require the defendant to participate in inpatient treatment. *Id.* at 1151. The conditions at issue in *Nishida*—like the condition here—gave the probation officer broad discretion to supervise the defendant's treatment, which "could include choosing inpatient or outpatient treatment." *Id.* at 1152. It was unclear whether the sentencing court "intended to give the probation officer such broad discretion." *Id.* The Court therefore found plain error; it vacated the conditions and remanded for the district court to "clarify the scope of authority delegated to the probation officer consistent with this opinion." *Id.* at 1155.

The Court should do the same here: it should vacate the mental health treatment condition and remand for clarification. Notably, the court imposed a separate substance abuse treatment condition in this case, and that condition is expressly limited to outpatient treatment. 1-ER-6.

58

**C.     The gang affiliation prohibition is vague.**

Defendants have a "due process right to conditions of supervised release that are sufficiently clear to inform [them] of what conduct will result in [them] being returned to prison." *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) (per curiam).  A supervised release condition is unconstitutionally vague when it requires the defendant "to guess about the intended meaning of the terms of his supervised release." *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007).  A condition is unconstitutionally overbroad if it restricts "more of the defendant's liberty than necessary." *United States v. Wolf Child*, 699 F.3d 1082, 1091 (9th Cir. 2012).

The district court imposed a special condition prohibiting Mr. Whitney from "gang affiliation."  1-ER-6 (cleaned up).  It states, "You must not communicate, or otherwise interact, with any known member of any criminal street gang, without first obtaining the permission of the probation officer."  This condition fails to satisfy constitutional requirements for two reasons.

First, the language "communicate, or otherwise interact" is impermissibly vague and/or overbroad because it appears to include

incidental contacts. The Court has previously construed a similar condition not to "reach unknowing or incidental contacts." *United States v. Evans*, 883 F.3d 1154, 1161 (9th Cir. 2018) (involving the phrase "no connection whatsoever"). Further clarification is nonetheless in order in an abundance of caution.

Second, the language "known member" is likewise impermissibly vague and/or overbroad because it's unclear whether the phrase requires *Mr. Whitney* to know the individual is a gang member. The Court has previously construed a similar condition to require *the defendant* to know the individual is a gang member. *See United States v. Soltero*, 510 F.3d 858, 867 n. 9 (9th Cir. 2007). Again, further clarification is nonetheless in order in an abundance of caution.

These errors meet the plain error standard for substantially the same reasons the improper condition in *Nishida* satisfied the plain error standard, or because the issue is a pure question of law. The Court should reverse and remand so the district court can clarify this condition. At the very least, the Court should explicitly construe the condition in the manner described above.

**V.  18 U.S.C. § 922(g)(1) is unconstitutional.**

**A.  Standard of review.**

The Court "review[s] the constitutionality of a statute as a matter of law de novo." *United States v. Chi Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012).  "[C]onstitutional issues not originally raised [below] are reviewed for plain error." *Id.*

**B.  The statute violates the Second Amendment.**

Mr. Whitney pled guilty to 18 U.S.C. § 922(g)(1), which criminalizes firearm possession by felons.  The statute violates Mr. Whitney's Second Amendment rights.

The U.S. Supreme Court developed a new test for assessing the constitutionality of firearms regulations in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  Under *Bruen*, courts must first analyze whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-30.  If so, "the Constitution presumptively protects that conduct." *Id.* at 2130.  "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*  When the regulation in question "addresses a general societal problem that

has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence" of unconstitutionality. *Id.*

Section 922(g)(1) fails this test. First, the Second Amendment's plain text covers the regulated conduct. The clause grants "the people" the right "to keep and bear Arms." Prior felons fall within the meaning of "the people." Thus, Mr. Whitney's possession of a firearm is within the plain text of the amendment. *See Range v. Att'y Gen.*, 69 F.4th 96, 101-03 (3d Cir. 2023) (en banc); *United States v. Bullock*, No. 3:18-cr-165-CWR-FKB, __ F. Supp. 3d __, 2023 WL 4232309, at *20-*21 (S.D. Miss. June 28, 2023).

Second, because the plain text of the amendment applies to Mr. Whitney's conduct, the government has the burden of demonstrating a historical tradition of restricting felons from owning firearms. Because the supposed problem of felons owning firearms is "a general societal problem that has persisted since the 18th century," the government must present a pattern of "distinctly similar historical regulation[s]" to demonstrate a sufficient historical tradition supporting the law. *Bruen*, 142 S. Ct. at 2130.

62

There's no such historical tradition of prohibiting felons from owning firearms. *See Range*, 69 F.4th at 103-06; *Bullock*, 2023 WL 4232309, at \*21-\*25. The government cannot meet its burden of demonstrating such a tradition. Section 922(g)(1) is thus unconstitutional.

This Court previously upheld the constitutionality of Section 922(g)(1) in a decision that predates *Bruen* by over a decade. *See United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). *Bruen* requires reconsideration of that precedent. An intervening Supreme Court decision abrogates this Court's precedent if the Supreme Court decision "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *United States v. Lindsey*, 634 F.3d 541, 548 (9th Cir. 2011) (cleaned up). *Bruen* upended Second Amendment jurisprudence by rejecting the means-end scrutiny previously adopted in the federal courts of appeals and by creating a new legal standard for determining the constitutionality of firearms regulations. *Bruen* is therefore irreconcilable with the analysis from *Vongxay*, so this Court should apply *Bruen*, not *Vongxay*. *See Teter v. Lopez*, No. 20-15948, __ F. 4th

__, 2023 WL 5008203, at *7 (9th Cir. Aug. 7, 2023) ("*Bruen* abrogated

the two-step approach we had adopted following *Heller* and *McDonald*

to analyze Second Amendment challenges."); *see also Range*, 69 F.4th at

101 ("*Bruen* abrogated our Second Amendment jurisprudence.");

*Bullock*, 2023 WL 4232309, at *4 (explaining *Bruen* "abrogated Fifth

Circuit precedent").

The Court may grant relief on plain error review because the

underlying statute of conviction is unconstitutional. *See, e.g.*, *United*

*States v. Heyward*, 3 F.4th 75, 85 (2d Cir. 2021) (explaining that if a

conviction is "premised on an unconstitutionally vague provision of [a]

statute . . . it would constitute plain error affecting [the defendant's]

substantial rights to permit that conviction to stand"); *cf. Class v.*

*United States*, 138 S. Ct. 798, 805 (2018) (concluding the entry of a

guilty plea doesn't waive a constitutional challenge to the statute of

conviction). Meanwhile, because this challenge raises a pure question

of law—the constitutionality of Section 922(g)(1)—the Court may

address the issue de novo, not under plain error review. *See Castillo*, 69

F.4th at 653.

Because Section 922(g)(1) is unconstitutional, the Court should reverse Mr. Whitney's conviction and remand with instructions to dismiss the indictment.

## Conclusion

The Court should reverse and remand for resentencing based on the three sentencing errors identified above. It should reverse and remand for clarification of the two supervised release conditions identified above. It should reverse Mr. Whitney's conviction because Section 922(g)(1) is unconstitutional.

Dated: August 11, 2023.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Jeremy C. Baron*
Jeremy C. Baron
Assistant Federal Public Defender

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-10326

I am the attorney or self-represented party.

**This brief contains** | 12,086 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Jeremy C. Baron | **Date** | Aug 11, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                                   *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** 22-10326

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are __NOT__ Registered for Electronic Filing:**

☑ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Stephon Whitney, #26534-509
> FCI Victorville Medium I
> P.O. BOX 3725
> Adelanto, CA  92301

**Description of Document(s)** *(required for all documents)*:

> Appellant Stephon Whitney's Opening Brief

**Signature** s/ Jeremy C. Baron          **Date** August 11, 2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                        *Rev. 12/01/18*