Case No. 22-10326

## United States Court of Appeals
## for the Ninth Circuit

United States of America,

        Plaintiff/Appellee,

v.

Stephon James Whitney,

        Defendant/Appellant.

D.C. No. 2:21-cr-00002-JAD-NJK

Appeal from the United States District Court
for the District of Nevada

## Appellant Stephon Whitney's
## Excerpts of Record
## Volume I of III

Rene L. Valladares
Federal Public Defender
*Jeremy C. Baron
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577
jeremy_baron@fd.org

*Counsel for Appellant Stephon Whitney

AO 245B (Rev. 09/20)    Judgment in a Criminal Case
                        Sheet 1

# UNITED STATES DISTRICT COURT

District of Nevada

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| STEPHON JAMES WHITNEY | Case Number: 2:21-cr-00002-JAD-NJK |
| aka; Stephone James Whitney | USM Number: 26534-509 |
| aka; Stef Bizzle | |
| aka; Stef B | Yi Lin Zheng, CJA |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    1 of the Indictment [ECF No. 1]

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § § 922(g)(1) and 924(a)(2) | Felon in Possession of a Firearm | 9/2/2020 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

12/5/2022
Date of Imposition of Judgment

Signature of Judge

Jennifer A. Dorsey, U.S. District Judge
Name and Title of Judge

12/13/2022
Date

**ER_2**

| | | | Judgment — Page | 2 | of | 7 |
|---|---|---|---|---|---|---|

DEFENDANT: STEPHON JAMES WHITNEY aka; Stephone Jame
CASE NUMBER: 2:21-cr-00002-JAD-NJK

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
54 MONTHS concurrent to revocation sentence in NV. Case No. C338650.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that the defendant be designated to either 1. Phoenix, AZ or 2. Terminal Island, CA based on proximity to family.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 12 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**ER_3**

AO 245B (Rev. 09/20)    Judgment in a Criminal Case
                        Sheet 3 — Supervised Release

Judgment—Page __3__ of __7__

DEFENDANT:   STEPHON JAMES WHITNEY aka; Stephone James
CASE NUMBER:   2:21-cr-00002-JAD-NJK

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

### 3 YEARS

and must comply with the following standard conditions, mandatory conditions, and special conditions:

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the specific risks posed by your criminal record and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the specific risks posed by your criminal record.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

AO 245B (Rev. 09/20)   Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

DEFENDANT:  STEPHON JAMES WHITNEY aka; Stephone James                    Judgment—Page    4    of    7
CASE NUMBER:  2:21-cr-00002-JAD-NJK

## MANDATORY CONDITIONS OF SUPERVISION

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court, not to exceed 104 tests annually.

      ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4.   You must cooperate in the collection of DNA as directed by the probation officer.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's                                                                            Date
Signature    _____              _____

**ER_5**

AO 245B (Rev. 09/20)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page  5  of  7

DEFENDANT:  STEPHON JAMES WHITNEY aka; Stephone James
CASE NUMBER:  2:21-cr-00002-JAD-NJK

## SPECIAL CONDITIONS OF SUPERVISION

1. Search and Seizure – You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition.

The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

2. Substance Abuse Treatment – You must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay the costs of the program based on ability to pay.

3. Drug Testing – You must submit to substance abuse testing to determine if you have used a prohibited substance. Testing shall not exceed 104 tests per year. You must pay the costs of the testing based on ability to pay. You must not attempt to obstruct or tamper with the testing methods.

4. Mental Health Treatment – You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay the costs of the program based on ability to pay.

5. No Gang Affiliation – You must not communicate, or otherwise interact, with any known member of any criminal street gang, without first obtaining the permission of the probation officer.

## ER_6

Judgment — Page ___6___ of ___7___

DEFENDANT: STEPHON JAMES WHITNEY aka; Stephone Jame
CASE NUMBER: 2:21-cr-00002-JAD-NJK

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/20)
Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  STEPHON JAMES WHITNEY aka; Stephone Jame
CASE NUMBER:  2:21-cr-00002-JAD-NJK

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $  100.00  due immediately, balance due

☐  not later than _____ , or
☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
_____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:21-cr-00002-JAD-NJK
4               Plaintiff,          )
                                    ) Las Vegas, Nevada
5    vs.                            ) December 5, 2022
                                    ) 1:37 p.m. - 12:38 p.m.
6    STEPHON JAMES WHITNEY,         ) Courtroom 6D
                                    ) IMPOSITION OF SENTENCE, DAY 2
7               Defendant.          )
     _____) C E R T I F I E D   C O P Y
8

9            REPORTER'S TRANSCRIPT OF PROCEEDINGS, DAY 2
               BEFORE THE HONORABLE JENNIFER A. DORSEY
10                UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government:  DANIEL COWHIG, AUSA
                          UNITED STATES ATTORNEY'S OFFICE
14                        501 Las Vegas Boulevard South, Suite 1100
                          Las Vegas, Nevada 89101
15                        (702) 388-6336

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:

 3         YI LIN ZHENG, ESQ.
           VEGAS GOLDEN LAW
 4         2801 South Valley View Boulevard, Suite 16
           Las Vegas, Nevada 89102
 5         (702) 385-7170

 6    Also Present:

 7         Michelle Cravotta, USPO

 8                        * * * * *

 9

10                     I N D E X

11                   E X H I B I T S

12    EXHIBIT NO.:        MARKED        RECEIVED      WITHDRAWN

13    Court's A           119           119

14

15                        * * * * *

16

17

18

19

20

21

22

23

24

25
```

```
1          LAS VEGAS, NEVADA; MONDAY, DECEMBER 5, 2022; 1:37 P.M.

2                              --o0o--

3                        P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  Now's the time set for

5   imposition of sentence in Case 2:21-cr-2-JAD-NJK, United

6   States of America versus Stephon James Whitney.

7          Counsel, please make your appearances for the record.

8          MR. COWHIG:  Good afternoon, Your Honor.  Dan Cowhig

9   from the U.S. Attorney's Office.  I'm here at counsel table

10  with the case agent and -- Officer Josh Costello.

11         MS. ZHENG:  And good afternoon, Your Honor.  Yi Lin

12  Zheng, counsel on behalf of Defendant Stephon Whitney.  He is

13  present in custody.

14         THE COURT:  All right.  Good afternoon.

15         And just to add to that record, this is actually more

16  of our continuation of the sentencing hearing.  We were here

17  last month, heard some testimony on one of the enhancements in

18  the sentencing guideline calculations, but the hearing had

19  started to go quite long, and I needed to continue it to

20  complete it.

21         So my recollection is that we concluded all of the

22  evidentiary presentation regarding the application of the

23  four-level enhancement under 2K2.1(b)(6)(B), which in the PSR

24  is paragraph Number 17.

25         Is that everyone else's recollection, too, we
```

Case: 22-10300, 06/02/2023, ID: 12727460, DktEntry: 6, Page 46 of 55
Case 2:21-cr-00002-JAD-NJK Document 60 Filed 05/01/23 Page 1 of 1

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
1   completed that portion of the hearing?
2           MR. COWHIG:  It is, Your Honor.
3           MS. ZHENG:  Yes, Your Honor.
4           THE COURT:  Ms. Zheng, is that your recollection,
5   too?
6           MS. ZHENG:  Yes, Your Honor.
7           THE COURT:  All right.  Great.
8           So before I rule on that, let's see what's left with
9   respect to objections to the PSR.  That was Objection
10  Number 4.  It was also Objection Number 5, I believe.  And
11  then I think we may have still had Objection Number 6 that was
12  at play?
13          Ms. Zheng, if you can let me know if you concur with
14  that.
15          MS. ZHENG:  I do concur with that, Your Honor.
16          THE COURT:  Okay.  So we've -- we've heard the full
17  presentation with respect to Objection 4 and Objection 5;
18  correct?
19          MS. ZHENG:  Correct.
20          THE COURT:  Okay.  So let's talk about Objection
21  Number 6 then.  This is to paragraph 33.  This is in the
22  criminal history computation.  Paragraph 33 is a 2017
23  conviction for possession of drug not for interstate commerce,
24  a misdemeanor.  And the objection -- Ms. Zheng, if you just
25  want to address the objection for me.
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1        **MS. ZHENG:**  Sure, Your Honor.

2        I think part of the objection was that paragraph 33

3    also needs to be changed because Mr. Whitney's conviction is

4    not for the possession of dangerous drugs not to be introduced

5    into interstate commerce.  It was subsequently amended, and so

6    that's part of what's in play here, is with respect to his

7    calculation as to whether or not he falls under criminal

8    history category of V or IV.

9        As we stand today, his conviction is based on

10   NRS 207.270, which is a loitering about public school or place

11   where children congregate charge.  And Probation is correct in

12   regards to the fact that that conviction was amended after the

13   PSR was completed.

14       That said, I don't think there's a dispute today

15   that, as we stand before this Court for sentencing, that the

16   conviction stands for loitering.  And quite frankly, with

17   respect to that, calculations for criminal history are

18   calculated as it is on the day of the sentencing,

19   modifications and all.  Because the conviction is for that of

20   loitering, specifically under U.S. Sentencing Guideline

21   4A1.2(c)(ii), loitering, in whatever its name and however form

22   it is known, it is not counted against Mr. Whitney's criminal

23   history points.

24       **THE COURT:**  Let me stop you there right quick.

25   Ms. Cravotta, let me ask that question.  If we were looking --

Case: 22-16300, 01/23/2024, ID: 12772146, DktEntry: 60, Page 6 of 55
Case 2:21-cr-00002-JAD-NJK Document 60 Filed 05/01/23 Page 6 of 55

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

 1    if it hadn't been amended and if the original conviction had

 2    been for loitering, would that be correct, not counted?

 3              **PROBATION OFFICER:**  It would not be counted,

 4    Your Honor.

 5              **THE COURT:**  Okay.  Thank you.

 6              All right.  You can continue, Ms. Zheng.

 7              **MS. ZHENG:**  And that said, I bring this to the Court

 8    because for years that's how it's been.  Criminal history has

 9    just been counted at the time of sentencing, regardless what

10    happened.  And I bring up, for example, if this had been some

11    other case, if there was a DUI case, often in state court I

12    negotiate cases where they enter a plea to the DUI; however,

13    subsequently, it's amended after they've completed the

14    requirements for reckless driving.  In that sense, it wouldn't

15    be counted.

16              So there are changes, and we do look at convictions

17    that have been changed by the time we come to sentencing.  It

18    seems a double-edged sword in this instance that the

19    Government or Probation would fight me on this and say that he

20    has to have the two levels from the conviction back in 2017.

21    It's just that it's so often that I have cases where I argue

22    an overrepresentation or that those facts did not accurately

23    reflect what the conviction stands for.  And in every other

24    case the Government tells me, well, if you don't like it or

25    you don't think it matches, go back and change the JOC.  And

 1   in this case, it was, in fact, changed.  The JOC was changed,

 2   and now they're saying, well, that doesn't count because you

 3   changed it.  Well, I want to be clear that's not disallowed.

 4   The guidelines do not in any way disallow me from doing this

 5   or it doesn't disallow that type of representation.

 6          So for those purposes, because it is allowed, because

 7   it stands today as loitering, and because loitering does not

 8   count and his criminal history, as it is today, makes him a

 9   criminal history category IV.

10          **THE COURT:**  So let's -- let's talk about that a

11   little more deeply, though.

12          So it's not just that they're arguing it shouldn't

13   count just because it -- or, I'm sorry, it must count despite

14   the fact that it got amended.  But we look at, for example,

15   4A1.2, Comment Number 6, which tells us what to do about

16   reverse, vacated, or invalidated convictions.  Sentences

17   resulting from convictions that have been reversed or vacated

18   because of errors of law or because of subsequently discovered

19   evidence exonerating the defendant or which have been ruled

20   constitutionally invalid in a prior case are not to be

21   counted.

22          And then, if we look also at *United States versus*

23   *Alba-Flores*, 577 F.3rd 1104, Ninth Circuit, 2009, this one --

24   although the facts aren't completely on point because that was

25   a revo case -- I'm sorry, not a revo case -- because that was

1  a case -- a safety valve case, that case essentially tells us

2  that a conviction in order to not be counted has to be

3  reversed or vacated due to innocence or errors of law under

4  4A1.2.

5        So where does this fall into all of that?

6       **MS. ZHENG:**  I would say that this is the exception.

7  I think the Court hit it on the head in terms of the fact that

8  the other case is a safety valve case.  Where safety valve is

9  concerned, the conduct and the convictions or the criminal

10  history points that the defendant has at the time of the

11  offense as to where and when safety valve would be counted is

12  the benchmark there.  So when we're saying whether or not

13  safety valve applies to a defendant, we look at what his

14  criminal history point was, whether or not he later then

15  debriefed, whether or not there was a gun used, whether or not

16  he was a major participant.  We look at that as to the time of

17  the facts of the case for which he stands to be sentenced on.

18  But in this case, this is different.

19        What happened in 2017 has no impact on the facts of

20  his case here, nor does it have an impact specifically on his

21  conduct at the time of this offense nor for the calculation.

22  This is specifically just a criminal history calculation only,

23  and criminal history should be calculated as it is at the time

24  that he stands before this Court for sentencing.

25       **THE COURT:**  All right.  Thank you.

```
 1        Mr. Cowhig.

 2        MR. COWHIG:  Your Honor, I want to be clear at the

 3   outset that the Government did not invite defendant to change

 4   the Judgment of Conviction here or the criminal history here.

 5        THE COURT:  I think she was talking in a general

 6   sense, not this case specifically.

 7        MR. COWHIG:  Certainly, Your Honor.

 8        There's not a significant difference between a safety

 9   valve case or any other case in terms of examining the

10   criminal history.  The reason the criminal history score and

11   categories are part of the formula for establishing a

12   guideline range is that it's the defendant's prior criminal

13   history, his prior bad acts, and the judgment of those prior

14   bad acts go into the formulation of what is an appropriate

15   sentence under 18 U.S. Code 3553.

16        It's very clear under the case law, including

17   Alba-Flores but also the decision that we cited in our brief,

18   Yepez and Lizarraga-Carrizales, that it is not appropriate for

19   a defendant to seek a change in his criminal history in order

20   to modify the calculation of the criminal history score or

21   category in order to reduce the sentence in the present case.

22        The change in this instance was not a result of any

23   type of change of facts, change of law, change of the

24   application of the constitution but, in fact, was simply a

25   matter of attempting to alter the defendant's criminal
```

1    history.  And that's, I think, apparent in the motion that was

2    filed in that case, which is Exhibit C to Government's 44

3    dash -- I'm sorry, 44 is the exhibits.  43 is our motion,

4    exhibit C.  Where Mr. Whitney does not assert that there is

5    any type of legal error or change in facts.  It's not a matter

6    of a conditional conviction of a DUI that will be altered or

7    diminished if he completes the appropriate requirements.  This

8    was a serious offense and, indeed, it was a drug trafficking

9    offense, that he was in possession of drugs not to be

10   introduced in interstate commerce.

11          The motion to change to another offense, to

12   loitering, bears no resemblance, particularly loitering about

13   a school bears no resemblance to that case or the facts

14   underlying that case.  As Your Honor knows, the County keeps

15   in their court records the underlying declaration of arrest.

16   That also is included in our filings.  That shows that the

17   facts had nothing to do with loitering about a school.  It was

18   simply the possession of that controlled substance.

19          We believe that the change to the criminal history is

20   inappropriate.  We believe that it runs contrary both to the

21   application notes of the guideline and to the case law, and we

22   believe that those two criminal history points are correctly

23   included in his criminal history as Probation Office has done.

24          **THE COURT:**  Thank you.

25          Rebuttal.

1    **MS. ZHENG:**  Response just briefly.

2         I don't think it's necessarily fair for the

3    Government in this case to argue what it reflects as to

4    whether or not it was a serious offense or not or how it

5    should be counted in this case.  This matter was brought

6    before the state, and the District Attorney's Office, after

7    having rereviewed the case, agreed that clerically it should

8    be changed to the loitering conviction and that, ultimately,

9    the state, in terms of looking at the case, the rationale was

10   that, given what it was in 2017 and where we stand now, had

11   this case come down, the likelihood of it was that it would

12   have been denied or that it would not have been charged at

13   all.  Quite simply, the amount that was involved in that case

14   was .1 grams.  And so I think that the change in terms of the

15   conviction and the state looking at it, the change is what

16   actually reflects how the state views the seriousness of the

17   case and what conviction they believe should stand or not

18   stand given those facts.

19        **THE COURT:**  Thank you.

20        All right.  With respect to this objection, Objection

21   Number 6, to the counting of this conviction, this prior

22   conviction that has since been amended, I'm going to overrule

23   the objection.  I believe that it -- it's the judgment of --

24   of the original conviction as it was originally determined,

25   not the amendment by agreement of the parties that controls

1    here under the Ninth Circuit authority of *U.S. versus*
2    *Alba-Flores* and also *United States versus Yepez*.  And so for
3    those reasons I -- that and also the notes, the commentary
4    under 4A1.2, particularly number -- Note 6, I think that I'm
5    bound by this Ninth Circuit authority which essentially says
6    that I have to go by the prior original conviction which
7    remains countable even despite the eventual state order
8    because the conviction was not reversed or vacated due to
9    innocence or errors of law within the meaning of the
10   guidelines.
11       So the two criminal history points do apply here.  I
12   don't find this -- the circumstances here distinguishable from
13   the safety valve situation in *Alba-Flores*.  Just to use the
14   language in *Alba-Flores*, to quote the language in *Alba-Flores*,
15   it is the same odor of gaming the federal sentencing system
16   that was emanating from that case.  That's the -- the way that
17   Judge Fernandez described it in *Alba-Flores*.
18       And I think that's essentially what we have here.
19   Not that there's any aspersions that I cast on that.  I
20   completely understand the motivation, but the net result is
21   that it doesn't change the fact that we count that original
22   conviction.  So I overrule the objection.  However, I will
23   consider those objections and everything that Ms. Zheng has
24   explained as essentially an argument about overrepresentation
25   of criminal history when I'm applying the 3553(a) factors.  So

1  I will keep that in mind when doing so.  I will -- I will

2  consider the nature of this offense and also the fact that it

3  does change this from a IV to a V in a criminal history

4  category.

5       Going, then, back to the objections in 4 and 5 --

6  Objections 4 and 5, with respect to the four-level enhancement

7  under 2K2.1(b)(6)(B), I'm ready to rule on that, and I'm going

8  to do so now so that we can work through the rest of the

9  sentencing calculations.

10      I first find by applying the factors under *United*

11 *States versus Jordan*, 256 F.3d 922, that the heightened

12 clear-and-convincing evidence standard does not apply to this

13 sentencing enhancement.  Rather, the standard is preponderance

14 of the evidence because there's not an extremely

15 disproportionate impact on the sentence caused by this

16 four-level increase which bumps the low-end guideline here

17 from a 70 to a 100 for an increase of 30 months.

18      I then conclude that the Government has established

19 by a preponderance of the evidence that the defendant

20 possessed this firearm in connection with the crime of

21 possession of marijuana with intent to distribute it.

22 Although the defendant certainly has an exculpatory

23 explanation for virtually every fact here, I do find that the

24 totality of the facts, when combined with the reasonable,

25 logical inferences from those facts, proves this

 1   in-connection-with offense by a preponderance of the evidence.

 2   The quantities, how the pot was stored, the baggies, the

 3   scale, and the cash stashed with the handgun, and the

 4   proximity of all of these items to one another in this small

 5   apartment lead me to the conclusion that the defendant was

 6   possessing this firearm in connection with the possession of

 7   marijuana with intent to distribute it.  I am not persuaded

 8   that the marijuana was the personal-use stock of the

 9   defendant's fiancée.  The manner and places in which it was

10   hidden are inconsistent with the way in which a mother who was

11   purportedly concerned with her children's safety would store

12   such a substance for personal use.  And even if I were to

13   apply a clear-and-convincing standard here, I would still find

14   that the enhancement would apply as the evidence reaches that

15   level for me as well.

16          And for the record, I do not consider the state court

17   revocation judge's findings or conclusions in making my own

18   with respect to this enhancement.

19          So I do find that the four-level increase applies.

20   So let's continue to -- let's pick up there and work through

21   the rest of the guideline calculations.

22          So that gives me an adjusted offense level of 28.

23   Probation has applied a three-level decrease for acceptance of

24   responsibility.  Does the Government move for the third point,

25   and if so, why, Mr. Cowhig?

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    **MR. COWHIG:**  Your Honor, we do because Mr. Whitney

2  announced his intention to plead guilty early in the process

3  avoiding the expenditure of resources in preparation of the

4  case for trial.

5    **THE COURT:**  All right.  And then I do find that all

6  the factors under 3E1.1(a) and (b) are satisfied by a

7  preponderance of the evidence so I apply the three-level

8  decrease, and that gives me a total offense level of 25.

9    Do we agree that that is correct?  Obviously you

10  reserve your objections to my -- my inclusion of the

11  four-level increase.

12    **MS. ZHENG:**  Yes, Your Honor.

13    **MR. COWHIG:**  Yes, Your Honor.

14    **THE COURT:**  Thank you.

15    Turning to the criminal history computation on

16  page 14, the criminal convictions result in a subtotal

17  criminal history score of nine, but because the defendant

18  committed this offense while under a criminal justice sentence

19  for possession of a controlled substance with intent to sell,

20  two points were added under 4A1.1(d) giving us a criminal

21  history score of 11 which establishes a criminal history

22  category of V.

23    Setting aside your objection, which is obviously

24  preserved, Objection Number 6 with respect to the amended

25  conviction, do we agree that that calculation is accurate?

1    **MR. COWHIG:**  The Government does, Your Honor.

2    **MS. ZHENG:**  Setting aside objections, yes, Your

3    Honor.

4    **THE COURT:**  Thank you.

5    The maximum term of imprisonment for this offense is

6    ten years.  The maximum term of supervised release is three

7    years.  The maximum fine is a quarter of a million dollars,

8    and a special assessment of $100 is mandatory.

9    Based on a total offense level of 25 and a criminal

10   history category of V, the guideline imprisonment range is 100

11   to 125 months.  But because the 125-month high end exceeds the

12   maximum sentence under statute, the guideline range is 100

13   months to 120 months.  The guideline supervised release range

14   is one to three years, and the guideline fine range is 20

15   to -- $20,000 to $200,000.  Do we agree those are accurate?

16   **MR. COWHIG:**  Yes, Your Honor.

17   **MS. ZHENG:**  Yes, Your Honor.

18   **THE COURT:**  Thank you.

19   All right.  So Probation recommends a sentence of 100

20   months to run consecutive to the state court case, C338650,

21   followed by three years of supervised release and no fine.

22   Mr. Cowhig, I will hear the Government's argument in

23   support of sentencing.

24   **MR. COWHIG:**  Your Honor, just very briefly, I believe

25   we expressed our recommendation and the reasons for that

 1   recommendation in our filing.  In recognizing that our filing

 2   recommended 100 months, I ask the Court sentence Mr. Whitney

 3   to 100 months consecutive to the state court case with three

 4   years of supervised release to follow on the conditions

 5   recommended by the Probation Office.  We ask that you not

 6   impose a fine as we don't believe that Mr. Whitney would be

 7   able to pay it.

 8        Mr. Whitney engaged in the possession of a firearm

 9   while involved in the possession of marijuana with the intent

10   to sell.  That is a particularly dangerous and deadly

11   combination in our society.  It was not unique to him in his

12   criminal history.  He was at the time serving probation for a

13   similar offense in the state, and we believe that continued

14   behavior, even while on state supervision, indicates that a

15   strong sentence is necessary to deter Mr. Whitney and to send

16   the message of general deterrence.  We ask that you sentence

17   him to 100 months custody followed by three years of

18   supervised release on the terms recommended by the Probation

19   Office.

20        Thank you, Your Honor.

21        **THE COURT:**  Ms. Zheng.

22        **MS. ZHENG:**  Your Honor, despite the calculations, I

23   stand by what I asked the Court for.  I'm asking the Court to

24   sentence him to 28 months because one of the things that was

25   brought up briefly last time in regards to Mr. Whitney is the

1  fact that, in actuality, he has been in continuous custody on

2  this case even though he was not indicted until later, since

3  September 2nd of 2022.  The Court is correct he was on

4  probation at the time as a result of the fact that initially

5  he was on a bus with other people and then subsequently

6  cleared from that, it triggered the fact that they had

7  executed the search clause and this case came to.

8          Despite the Court's ruling, I know that -- I stand by

9  the representations that Mr. Whitney has made to me as well as

10  that of Ms. Rodosh -- she's in court -- that they've made in

11  regards to the gun.  It was in the discovery.  I don't think

12  there's any dispute in this case that Ms. Rodosh was the

13  person who went out and purchased the gun.  It was then placed

14  in a house.  There were so many things that was going on for

15  them at the time that she'll tell you herself that, whether it

16  made sense or not and whether or not it was rational, it was a

17  choice that she made and it was a choice that he allowed.  It

18  was a choice that he certainly was aware of.

19          Ultimately, despite what the Government believes

20  about the presence of the marijuana and its intended use or

21  the fact that it intended to be distributed, there is no hard

22  evidence that that happened.  Ultimately, this is a case of

23  constructive possession.

24          He was revoked on the probation case, and I

25  represented him there.  I followed him through that case.  And

1    the reason why I ask for 28 months is because Probation is, in

2    essence, asking for this case to run consecutive to the state

3    case.  My argument to the Court is that, at this point, no

4    matter what sentence you give him now, it already is *de facto*

5    a consecutive sentence.

6              **THE COURT:**  Here, let me stop you for just a second,

7    and I'll let you get right back on that train.  But I just

8    want a little bit more information about that revo case.

9              **MS. ZHENG:**  Um-hum.

10             **THE COURT:**  How long did he get, and has he already

11   served that time?  Has he expired that time?

12             **MS. ZHENG:**  The answer's not entirely clear based

13   on --

14             **THE COURT:**  Okay.

15             **MS. ZHENG:**  -- what we last -- what we -- what we had

16   talked about at the last hearing.

17             So he was revoked for -- what was it? -- an 18 to 48.

18   That was the underlying sentence that he had.  It was either

19   an 18 to 48 or a 19 to 48.  When he was revoked, he was also

20   charged on the stateside for the same gun.  There was a state

21   ex-felon possession of firearm --

22             **THE COURT:**  Sure.

23             **MS. ZHENG:**  -- case, and that was pending.  Because

24   he went forward with the revocation, I had already spoken to

25   the district attorney on the state gun case, and that case

1    was, in effect, negotiated and resolved.

2          The maximum time that he could have been facing on

3    the state gun case was a 28 to 72.  That was going to be the

4    negotiation.  It was going to run concurrent to the revocation

5    proceeding.  At that point, the State was also waiting to file

6    on the complaint.

7          Given that the case was resolved already, that was

8    why I went forward with the revocation hearing.  Had I known

9    that the feds were looking at this, I would have done

10   everything in my power to keep this from going forward with

11   the revocation or to hold it open for as long as I could have

12   otherwise.

13         **THE COURT:**  So the revo on the state case, entirely

14   about this gun?

15         **MS. ZHENG:**  Yes.  Yes, entirely about this gun.

16         There were a few other minor violations in there.  I

17   think there was -- related to the stop on the party bus as to

18   whether or not he broke parole.  But all of those, otherwise

19   but for this gun, everything that was stated in his probation

20   violation would have been a technical violation.  So on the

21   stateside, because he had already done -- he was almost done

22   with probation.  I think he had six more months on probation.

23   However, anything that is a technical violation for the State,

24   it is now structured in regards to how those cases are

25   handled.  So most times we just stipulate to it because any

```
 1   technical violations on a first violation report is 30 days in
 2   custody, and he would have gladly done the 30 days.  But it
 3   became a nontechnical violation because of the gun and because
 4   he was pending the State's new gun case.
 5          After we had negotiated the state case, the State had
 6   filed it, we had set it for a preliminary hearing, and we were
 7   otherwise going to enter to a plea.  The State then withdrew
 8   the offer saying that the feds were looking at grabbing the
 9   case and that they couldn't negotiate it out from the feds
10   prior to finding out whether or not the feds were going to
11   pick up the case.
12          And as a result of that, we set a status check, and
13   subsequently the feds indicted him on the very same gun that
14   he was subject to the probation violation for, the very same
15   gun that he was charged in the state ex-felon possession of a
16   firearm for, and the feds took this case.
17          And on some level, I understand why.  Everyone has
18   their statistics, everyone has their convictions, and this
19   case is appealing to the federal authorities quite simply
20   because of the way that it was going to line up with
21   Mr. Whitney's criminal history calculations.  The feds' desire
22   to pursue that four-level enhancement, in so many ways it was
23   going to ratchet up his guideline range, his calculations, and
24   his sentence that he would be facing a substantially larger
25   amount of time in the federal system.
```

```
1            I know that this is a different court, and I know
2    that certainly this court is not bound by anything that would
3    have happened in the state.  But the reality is that, had this
4    case stayed a state case, he essentially would have been
5    looking at going to the Parole Board 28 months from basically
6    when the case was filed in October of 2020.  The case came
7    over federally, and I tried as hard as I could to get him over
8    to the federal system first -- to get him over to federal so
9    that he could start earning federal time.
10           And when we last talked about it at the last hearing,
11   we're all not quite sure where that is.  He had signed a
12   waiver asking to stay in state court so that he could complete
13   his state sentence.  Ultimately, it was ordered that he would
14   be allowed to go back to the state court and that he would be
15   allowed to attend his parole hearing.  However, as soon as he
16   was finished attending his parole hearing, he was to be
17   transported back to serve his federal sentence.
18           At that point, I had come on to the case.  I followed
19   him to the Parole Board and represented him there.  He went to
20   parole March of 2021 --
21           THE COURT:  And this is on the revo?
22           MS. ZHENG:  No.  This is on the state parole.
23           THE COURT:  Okay.
24           MS. ZHENG:  So he's already been revoked, and on that
25   case, because of the good-time credit and what -- he had gone
```

1    to the Parole Board.  He was revoked in September, and then he

2    was eligible for parole and went to the Parole Board

3    March 31st of 2021.  I followed him to the Parole Board, and

4    following that I followed up on the parole commissioner's

5    finding.  They did find sufficient reason to grant him parole,

6    and parole was granted.  However, that's where it all kind of

7    went askew.  Because even though parole commissioners had

8    decided that he was eligible for parole, because he had been

9    transported back to the federal system, there was no body to

10   parole.  He was physically not there to have done his exit

11   paperwork or to have parole granted to him.

12          And so, in essence, we're not sure whether or not

13   they let his parole -- let the sentence expire or at some

14   point granted him his mandatory parole.  And so, as to today,

15   I am not sure whether or not he is in primary state custody or

16   primary federal custody.  When I did call the marshals to try

17   to find out, exactly what I was told was simply was that he

18   was writted over from the state.  And so I can't give the

19   Court, with any certain answer, what that is.  But the truth

20   is, there's no dispute that it is effectively for the same gun

21   that he has been in custody since September 2nd of 2020.

22          I think, if the Court is going to take into

23   consideration the arguments that were made in regards to the

24   four levels and the criminal history calculations and the

25   overrepresentation as to the factors with Mr. Whitney, I

1    think, in my memory of practicing, I haven't had a sentencing

2    case where I was so at odds with the Government and Probation

3    on almost every single factor with sentencing.  And I think

4    much of that stems with how Mr. Whitney is perceived.  And I

5    understand why they picked up this case, because on paper it

6    looks terrible.

7            But in the time that this case has been open, in the

8    almost three years that I've had this -- in the three years or

9    two years -- almost three -- that I've known him, Mr. Whitney

10   has significantly changed my mind as to the character of his

11   person and who he is.  He is undoubtedly one of my most

12   respectful clients.  He is quiet.  He is introspective.  And

13   when he says to me and when he tells the Court that he's

14   looking to make a change in life -- and I don't think that a

15   100-month sentence, it's just excessively punitive, and I

16   don't think that it's going to teach him any better lesson

17   that he can learn.  And I think what he's looking forward to

18   is changing his life.

19           During his time in custody, because of the pandemic,

20   programming wasn't open to a lot of people.  But since it has

21   opened up, given his second supplemental exhibits that we

22   submitted to the Court, he is making every effort every day

23   while he is in custody to learn all the skills that he needs,

24   specifically targeting things that will help him form a better

25   life and be a better person.  And quite frankly, given his

1    past and everything that he has endured, I don't want to say

2    that anyone doesn't have a chance, but the odds were severely

3    against him from the start.  And I mean from the start, from

4    early childhood.  And I think much of that was detailed in the

5    sentencing memorandum and as he reported it to Probation, so I

6    don't want to rehash that again.

7        But it's such a difficult life going up to his

8    adolescence, and the first offense that he was implicated with

9    was an offense in which there were multiple co-defendants.  He

10   was 17.  He was picked up.  He didn't plan the offense.  He

11   didn't quite know that it was going to happen.  He didn't have

12   a gun in the offense.  He was the third person out of the car

13   or into the shop.  He was supposed to have been the lookout

14   co-defendant in that case; in an odd twist of fate was shot

15   with his own gun, died before Mr. Whitney, and he was 17 at

16   the time.  That case became an enhancement in this case

17   because it was considered a crime of violence.  However, it

18   wasn't the robbery portion of it.  It was the kidnapping

19   portion of it.  Yet, as to the specific facts of the case and

20   anything that was alleged to the kidnapping, in terms of

21   moving people around in the store or to the back area,

22   Mr. Whitney wasn't a part of.  He just wasn't a party to that.

23   He was a party to the crime.  And for someone who was 17,

24   going into prison, he served eight years for that.

25        He got out, and in the PSR it states that, as soon as

```
 1    he got out and he was granted parole, he basically started
 2    working.  He's worked either one job, multiple jobs.  He's
 3    left every job to pursue better opportunities for himself.
 4    There was a slipup in which he was then placed on probation,
 5    and we're here today.  But so many things in Mr. Whitney's
 6    life I would almost characterize as, if he didn't have bad
 7    luck, he'd have no luck at all.  And he is just at every turn
 8    at the cusp of being the worst-case scenario for something.
 9    And it keeps befalling on him.  And yet, for as long as I've
10    known him, he's not ever since -- he's not once ended a phone
11    call with me without telling me that he was thankful for the
12    fact that I was trying to do all that I could for him, that I
13    was trying to fight for him, that he accepted what went wrong
14    in this case, and that this case took as long as it did to
15    negotiate that he ultimately pled without the benefit of a
16    negotiation not because he had ever shied away from accepting
17    responsibility for the fact that there was a gun in the house
18    and that he knew it was there.
19            The bridge that we couldn't gap between the
20    Government and I in terms of trying to resolve this case is
21    that we were so far apart on the four-level enhancement.  And
22    as I stand here today, I -- all due respect to the Court's
23    decision, I still think that it's too vague.  That if there
24    was a case in my entire career where I thought it was so
25    close, this would be it; that we have an 87-page interview,
```

```
 1    and the only thing that we got out of the interview was that
 2    there was a black nine-millimeter semiautomatic gun in the
 3    house.  I -- for what was alleged and what the gun was
 4    supposed to have been used in connection with, I don't know a
 5    single drug dealer, generally, that can't tell you and doesn't
 6    know necessarily the make or the model of the gun.  And in 87
 7    pages of that, you can't get it.
 8            And, you know, I'm bringing this up only because I
 9    presented to the Court some documents that he had asked me to
10    pull out after the last hearing.  He had said to me that I
11    honestly don't know.  He didn't know the make and the model of
12    the gun.  He did know that it was a nine millimeter, and
13    ultimately what he said was that -- he's, like, they told me.
14    They told me before I even started the interview that it was a
15    nine millimeter.  He goes, not only did they tell me, they
16    handed me the piece of paper saying exactly that.  And because
17    he fought so hard about it, I was like, okay, I'll go pull
18    your picture from it.  And he's right.  In fact, he is holding
19    the search warrant for his buccal swab.  So it is the search
20    warrant for his buccal swab.  But in terms of holding it, it
21    tells him precisely on that search warrant that the reason why
22    they're getting a buccal swab from him was because there was a
23    nine-millimeter semiautomatic handgun that was either
24    discovered or that was what it was in relation to.
25            And in all of the 87 pages of an interview and this
```

1   supposed confession, all he says is that he knows that the gun

2   is a mostly black, nine-millimeter semiautomatic.  And with

3   that vagueness and the lack of information, all of that in its

4   totality, Your Honor, what I'm asking the Court to consider is

5   that -- to give him the 28-month sentence.  Because, in so

6   many ways, that's what he would have got.

7          And I know that we brought this over to Federal Court

8   because we can make a federal case out of it.  But in terms of

9   meting out a punishment and what he deserves, he doesn't

10  deserve a 100-month sentence at all.

11         And I'm going to submit it with that.  I know that

12  his fiancée, Ms. Rodosh, would like to address the Court on

13  his behalf.

14         **THE COURT:**  And certainly, Mr. Whitney has an

15  opportunity to address the Court, too.  You said on his

16  behalf.  I didn't know if that meant in lieu of him addressing

17  the Court.  But I wanted to give Mr. Whitney the opportunity,

18  if there was anything he wanted to say in his allocution.

19         Mr. Whitney, this is your opportunity to speak to the

20  Court directly and to tell me anything else that you think I

21  should consider in deciding what sentence to give you in this

22  case.  Is there anything that you would like to say, sir?

23         **THE DEFENDANT:**  I've been in this situation before,

24  and I never wanted to read off a paper because I didn't want

25  to look rehearsed.  But, I mean, at this point I tried to

1    figure out some type of pattern of what keeps going left.  So
2    I'll go back to the beginning.

3        And what I think about, if you took away all positive
4    role models or influences from a child's home, I don't even
5    think you can estimate the type of mistakes that that child
6    would make in a lifetime.

7        You may know from what you have on record already.  I
8    mean, I'm all of the cliches.  My father was in prison since I
9    was nine months old.  My mother worked graveyard in the
10   casinos.  My sister was a teenage mom.  My brother was living
11   with his foster parent.  My other brother was in the streets.
12   Nobody taught me nothing.  The first time I learned how to tie
13   my shoe, I was in the backseat of my mom's car coming to see
14   my father from prison, and I figured it out.

15       I'm saying that to say, you know... I don't think
16   anyone ever paid attention to me enough to take the
17   responsibility to guide me and teach me anything.  In
18   elementary school, I woke myself up for school.  I dressed
19   myself.  I made sure I got to school on time.  I was a
20   straight-A student.  But every day I remember, before school
21   got out, that the reality set in that nobody was going to be
22   home when I got there.

23       It wasn't that I was being neglected, I don't think.
24   When I got home, my mother would usually be running errands or
25   sleeping to get rest before work, which usually left me alone.

```
1    You know, when she was leaving for work, I would be on my way

2    to bed.  When I would wake up, she would be gone or she would

3    be sleeping.  So I signed myself up for youth football to fill

4    a void.

5          As -- as a nine-year-old, I had no positive male

6    examples, not one that I could think of.  Even as a child I

7    knew that the men in my mother's life didn't truly love her

8    because they didn't pay attention to me.  They ignored me.

9    And I remember what that felt like.

10         Truthfully, I didn't even think that I would live

11   this long.  So, for the most part, I'm kind of like a deer in

12   the headlights in most situations.  I'm completely exhausted.

13   I don't know what people expect people like me to look like

14   when they're trying to change, but if I had to make a guess, I

15   would be the example for what the transition looks like.  I

16   don't know what else anyone would advise me to do.

17         When I went to prison on that case, I was helping a

18   friend.  He asked me for his help.  I wasn't -- I didn't have

19   the -- the life experience to know that I was affecting people

20   on the other side of the decision.  All I thought about was

21   helping him, and I had to watch him die because of that.  And

22   then I went to prison for that.  That situation tore my

23   parents' marriage apart.  After my father came home and tried

24   to do the good things, then that happened.

25         So, I'm not really sure of the -- the process I went
```

 1   through while I was gone.  I don't know really.  It was kind

 2   of -- just felt like I was on another planet or something.  It

 3   wasn't no -- I was rebuilding, but I wasn't sure exactly what

 4   I was trying to fix.  But what I'm saying is, after that time

 5   was over and I got myself prepared to come home and to move

 6   forward in my life, it seemed like the same thing happened

 7   again.

 8          My mother was pretty much living in her car.  My

 9   sister was living with her friend.  They weren't in a position

10   to help me transition after that.  I was subject to the same

11   possibilities as before, only now it was -- it was more

12   critical for me because I had no life experience.  Here I am

13   in my mid 20s thrown back out into the world with -- with

14   nobody to help me but me.

15          I don't know -- I'm not an emotional person.  I don't

16   look for sympathy.  I don't ask people for anything.  But I

17   don't know, what's the message?  What are you trying to get

18   across to me?  What do you want me to do?  I did everything I

19   can do.  Right when I got off of parole, I kept trying to move

20   forward.  The only reason I quit that job was because the

21   place that I moved to, the only place I had to go to, was

22   completely far out of my transport range.  There was no way I

23   could get to that place of work.  And then I met her.

24          When I met her, she was going through her own

25   tragedy.  She was losing her father to cancer.  The only value

```
 1   I had towards her that I felt was that I knew how to cope with
 2   death for the most part.  It was too familiar to me.  So I
 3   think me just trying to help her get through that is where she
 4   saw the value in me.  But it wasn't because I wanted something
 5   from her or needed something from her.  I just knew what that
 6   change was going to be like and what she was going to be
 7   dealing with from that point on.  I know what death feels
 8   like.  That was -- that was my friend before anything.  I
 9   never wanted her for nothing.
10        It seems like everybody keep trying to save her from
11   me, like I'm some type of monster or something.  I never did
12   nothing but be there for her.  That's all I ever did.  I don't
13   know why the energy keeps coming across like somebody's trying
14   to save her from me or protect her from me when I give her
15   every opportunity to -- to go and find what I feel she
16   deserves.  I can't tell you how many times I -- in -- in a
17   month I would try to get her to find somebody that -- that's
18   maybe more deserving of her because I know that I'm -- I'm --
19   I'm complicated.  I don't -- I don't...
20        What I'm saying is, is right after that happened, my
21   brother was murdered in coldblood not even a year after me and
22   her started.  That was the only person that -- that even made
23   me feel strong.  I've never seen a stronger man in my life.
24   So to see him shot in his heart by the one -- the same heart
25   he loved this woman with, I don't even know how to describe
```

```
 1    that pain to get a phone call from my mother saying that my

 2    brother's laying in the parking lot...

 3            So what I'm saying is, even then I still stayed

 4    focused.  I was still hopeful.  I didn't let it unravel me.  I

 5    had to be there for my mother, my sister, those children.  It

 6    took everything in me to try to be positive, and then another

 7    storm happened.  We were expecting a child.  What I thought

 8    was a new beginning and maybe some clarity through a storm or

 9    some type of understanding that was coming out of all that, it

10    turned out to be another nightmare.  And it just keeps

11    trapping me in this place of I don't know what the expectation

12    is.

13            Ever since I caught that first case, the only thing

14    they banged into my head was victim empathy.  How you affect

15    people determines the severity of how we treat you.  How you

16    impacted people's life.  So that whole time I was gone, I

17    focused on how I affect people, how my decisions affect

18    people.  And I think I became a good person because of that.

19    I motivate people to be the best them they can be.  I'm -- I'm

20    respectful.  I'm positive.  I'm -- I'm optimistic whenever I'm

21    asked for advice.  I did everything in my power to push her to

22    be the best person she can be.  When I met her, she was

23    working in a storage unit, and now she's trying to get a real

24    estate license.  I just saw she had the potential to do it, so

25    I tried to help her believe in that.
```

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    So when we lost the child, it was like -- it felt

2  like I didn't have a reason to keep trying to be better

3  because everything I was trying to be better for kept getting

4  taken away from me.  Like, there's -- there's never been

5  anyone around me who cared enough to help me do anything.

6    Even after that, I still worked.  I moved us into a

7  better neighborhood -- or we moved us into a better

8  neighborhood, got a better car.  She got a better job, helped

9  fix our credit.  I did all the things that they say you're

10  supposed to do or try to do when you're changing.  True

11  enough, I had caught that case.  I was on probation.  But I

12  went to counseling.  I paid my fines.  I worked.  And then the

13  pandemic happened.

14    My trauma is bad enough alone.  I don't need help

15  being in a dark place.  Like, I don't know if people think

16  that it's serious or not, but I -- I think about death all

17  day, every day.  It's my reality, that at some point it's

18  going to be that time.  So when this pandemic thing happened,

19  every time I turned on the TV they're telling me to be afraid.

20  You're telling me that my peers will kill me.  You're telling

21  me that officers in the street will kill me.  You're telling

22  me that the suicide rates are up, that I can potentially kill

23  myself.  On top of me seeing all these things manifested at

24  one point in time in my life, I knew it to be real.  These

25  were real fears and real concerns.  In a global pandemic, what

1    was I supposed to do?  I don't even know -- out of all this

2    scrutiny and all this judgment that's been placed my way, I

3    still haven't had anybody say:  This is what you should have

4    did.

5         I'm still kind of shocked that I'm being so heavily

6    judged over something that happened in a once-in-a-lifetime

7    pandemic.  Like, I remember what was going on.  It was -- it

8    was -- it was a lot of political uprisings, and the tension

9    was crazy.  And me, as being young and black and that being

10   the -- the narrative, outside was terrifying at that time.

11   Like, there was -- I didn't know what to do.  The only reason

12   I stopped working was because of the pandemic.  I was a

13   full-time worker.  I don't know what -- what's the option?

14        Even after I lost my child, I still did everything in

15   my power to be the best father and example that I can be to

16   her child.  What was I supposed to do?  Just -- just -- the

17   only alternative I could think of was to leave them if I had

18   nothing to contribute to them.  I watched her lose my son, and

19   I still took on the responsibility to be an example to her son

20   when I didn't even know what the example looked like.  I've

21   never seen a father in a functional household before.  So I

22   took on that responsibility and didn't even know what it was

23   that I was supposed to be doing.

24        And I stayed.  I didn't leave.  I didn't cheat on

25   her.  I was faithful.  I cleaned.  I cooked.  I worked.  I --

1    I gave her advice to help her family and her friends with.

2    The advice that they seek from her in situations usually come

3    from our conversations.  So, in essence, me being the good man

4    to her is helping everyone around her.

5          And then, in these type of situations it still comes

6    across like everybody's trying to save her from me, like I'm

7    so -- what am I doing that's so bad?

8          I'm just exhausted.  I don't really know -- I don't

9    really know what to do next.  What -- what's the formula for

10   change?  I don't know.  Working?  Going to counseling to try

11   to fix your trauma?  Getting a relationship?  Being faithful?

12   Taking care of your responsibilities?  Everything they told me

13   a man is supposed to do I've done it, and I can prove I've

14   done it.  And still, because I went out one night -- and,

15   truthfully, my only motivation for going out that night, my

16   family completely split apart after my brother's death.

17         Me and one of my favorite cousins had a falling out

18   over the circumstances behind my brother's death, and we

19   repaired it.  And I was going out that night just to be with

20   him.  I was so far removed from my whole world and everything

21   I knew that it was tearing me apart to not have any type of

22   friendships from my past, including family and everything.  I

23   was in a completely new environment, space, life.  Everything

24   was completely different.  And it was hard for me to adjust

25   because I had nothing to bring from my old world into the new

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

1    world.  I went out with him that night just to hang out with

2    him, and it turned into this.

3           So, I mean, I don't -- I always take responsibility

4    for -- for everything that comes my way.  I make excuses for

5    nothing.  But at this point I'm just curious of what exactly

6    is it that's expected of me?

7           What does anybody want me to do?  Do they want me to

8    settled down and be married and be faithful and a good man and

9    work and -- I did all those things, and I'm still here in

10   the -- in the worst situation again.

11          If nothing else, I feel like this is what effort

12   looks like.  If nothing else, I tried.  I don't know what else

13   to say.  That's the only thing that helps me fall asleep at

14   night is replaying everything and knowing that I put the

15   effort in.  If things out of my control happen and a mishap or

16   two of mines, you know, became a bad recipe, then I can't

17   fight the universe.  I'm not in control of the elements and

18   the possibilities.

19          So I fall right to sleep at night.  I tried.  I did

20   everything in my power.  It's -- it's -- I don't...

21          **THE COURT:**  Thank you, Mr. Whitney.

22          All right.  Who wanted to speak, Ms. Zheng?

23          **MS. ZHENG:**  I think Ms. Rodosh would like the

24   opportunity to address the Court.

25          **THE COURT:**  Sure.  And there's a microphone right

1    there at the front of the gallery.

2              Hi, there.  You can tilt that up, too.

3         **MS. RODOSH:**  Okay.

4         **THE COURT:**  There you go.

5         **MS. RODOSH:**  Can you hear me?

6         **THE COURT:**  I can.  Can you just -- can you spell

7    your last name for the record?

8         **MS. RODOSH:**  It's R-o-d-o-s-h.

9         **THE COURT:**  And your first name is?

10        **MS. RODOSH:**  Jessica.

11        **THE COURT:**  All right.  Ms. Rodosh, what would you

12   like to say?

13        **MS. RODOSH:**  I stand by everything I wrote in my

14   letter.  That day that everything happened, I was extremely --

15   I was scared.  As Stephon said and Ms. Zheng said, we lost a

16   child.  So when they came to the house that day and I was told

17   that I would lose -- I could have my son taken away and they

18   were going to destroy my house, I did what any other -- what a

19   mother who's already lost a baby would do.  I don't want to

20   lose my son.  I didn't want to lose any of my sons.  And it

21   was so traumatizing when we did lose our baby that, when I was

22   told that they were going to take my son if there's anything

23   in the house, I said that there was nothing.  I was scared.  I

24   was scared.  I would do anything to protect my children.

25              The way we lost our child was an extremely

1   traumatizing situation for me, for him, for both of us.  I

2   didn't want to take pills to numb the pain.  The doctor said

3   my depression and anxiety gets so bad, it feels like someone's

4   sitting on my chest, like I can't breathe.  To have that is --

5   I've never experienced that until we lost our child.  I did

6   find smoking marijuana or even taking edibles helped me.  I

7   was able to be happy for my oldest son.  I was able to

8   function and cook dinner.  And even going to counseling didn't

9   help that much.

10          He didn't know I smoked.  I mean, he -- not like I

11  did.  I would always go outside and smoke.  I never did it in

12  the house.  Go for a walk around the block.  I -- I would --

13  honestly, I would roll it, and then I would put it in an empty

14  container and put it above the stove in the kitchen.  I had it

15  in little containers everywhere just because sometimes I

16  didn't want to walk back and put it back in the bag.  It was

17  so big, I didn't -- and that was my fault.  I -- I honestly

18  didn't think he would get in trouble.  I didn't think it would

19  get to this aspect as it is right now.

20          He's not a bad man at all.  He -- people look at him

21  and they look at his past, and because he's tattooed and he's

22  black and dreads and he got in trouble when he was younger,

23  it's an automatic judge.  And he's not like that.

24          When he found out I was pregnant, he got a job.  He

25  got his OSHA certs for being a flagger.  He went to every

1  parent-teacher conference with me for my son, Michael.  He --

2  sometimes I even say he was probably a better parent I felt

3  than I was.  Because when he went to the parent-teacher

4  conferences, he was the one talking to the teachers asking

5  what we need to do because my son had a little bit of a speech

6  impediment, asking, you know -- and he can't focus.  So he was

7  the one asking what can we do to help him focus, what can I do

8  at home.

9      He did -- he sat down and did his projects with him.

10  I came in the house one day, and they were doing a live art

11  museum.  I didn't ask him to.  He just sat down with him and

12  did it, and it was something that they did together.  He took

13  him to flag football practice.  I'd be at work.

14      For someone who didn't have that growing up, he was a

15  great role model for my son.  My son loves him.  He loves his

16  stepdad.  He says he can't wait for him to come home because

17  he can talk to him because he understands him, he gets him.

18  He's not a bad person.

19      Everything that has happened, I don't know why.  I

20  don't, and I wish I did.  Like I said, us losing our son

21  was -- was a traumatic experience.  You know, he went to every

22  doctor's appointment.  He -- he was everywhere with me.  He's

23  been an amazing -- an amazing man.  He helped me get through

24  so much.  Like he said, when my dad was going -- sick with

25  cancer, he checked on me every day.  He was there making sure

```
 1   I was okay.
 2          He's just -- he has helped me become a better person.
 3   I -- like he said, I'm doing real estate school.  I also went
 4   from a 13-dollar-an-hour job to now I'm at 18, and I'm getting
 5   another raise in January to 20.  I wouldn't have had that much
 6   confidence if I -- I feel if I didn't have him there
 7   supporting me.  He's been a great support staff for me and,
 8   like I said, for my son.  He's been there, like, every step of
 9   the road with him.  And that -- you know, it was -- it was my
10   fault.  I was scared.  I -- like I said, I didn't want to lose
11   another child.  I didn't want to lose another family member.
12   I lost my dad and then we lost our son and then this happened.
13          You know, and I'm not going to lie, in the middle of
14   COVID I did buy a gun.  I was scared.  There was a lot going
15   on.  I mean, and in our neighborhood, even after he left,
16   someone tried to break in my house while I was there with
17   Michael.  They came in there, opening the door, and the guy's
18   saying, oh, I'm -- I think I'm -- I thought this was my house.
19   You know, it's scary.  And being a woman and, like I said,
20   already losing so many people, I had a momentary lapse of
21   insanity.  I can say that.  And there's times I do still
22   because I'm not sure if I'm doing it right, and I feel like
23   I've made such a big mistake that now he's suffering for it.
24          I mean, I did -- I did purchase it.  You can -- you
25   can purchase a pound in a dispensary.  Granted, I didn't
```

1    know -- that dispensary ended up getting shut down I think two

2    months later.  It was a part of I think five in a raid.  I

3    didn't know.  We walked in -- I walked in and it was a legal,

4    operating dispensary, and I was able to purchase a large

5    amount.  I did it because, like I said, I didn't want to have

6    to keep going back.

7         I just wanted something to help with my anxiety that,

8    like, wasn't going to be pill wise.  That -- where I'm going

9    to be so knocked out I'm not going to function.  At least

10   smoking I could function.  I mean, everybody's different.

11   Some people can't.  But like I said, for me, I was able to be

12   a happy mother for my child and for my family.  I can sit

13   there, and I can smile.  I can eat.  Because, without it,

14   there's times I can't.  Like I said, that panic, those anxiety

15   attacks are so bad.  And after what we've been through, it's

16   just... it has to end.  I feel like it just -- it hasn't

17   stopped.  It just -- it keeps going and going, and we need to

18   heal.  He needs to heal.  My son, his family, all of us.

19        He doesn't -- he doesn't deserve all of this.  He's

20   not a bad person.  He worked.  He was trying.  Like I said, he

21   was great with my son.  Every morning they have WWE wrestling

22   matches before school.  I'm the one yelling at them to come

23   on.  You know, I mean, if someone was such a bad person, why

24   would they be -- have such a good impact on everybody around

25   them?

 1          He made mistakes when he was younger, but he was
 2   changing.  He had changed.  He had changed.  He never did
 3   anything wrong to me.  He didn't cheat on me.  He didn't -- he
 4   never hit me.  He's never done anything wrong.  He's someone
 5   my dad, yes, would have been proud of because he took care of
 6   my -- his daughter.  My mom sat there and talked to him when
 7   she found out I was pregnant.  And she -- after she talked to
 8   him, she -- my whole family loves him.  My cousin has a
 9   company.  He wants to give him a job.  He was already getting
10   ready to give him a job when this happened.  So it's not like
11   he would come home to nothing.  He would come home to at least
12   a job, a family.  He'd have a lot more opportunities than he's
13   had before.

14          I just -- I would just love him to just get a second
15   chance and just all this end.  And, like I said, he's not a
16   bad person at all.  He's not.  I know it looks horrible on
17   paper, and I know everybody, like I said, just they look at
18   him and it's an instant, you know -- he's not.  He's really
19   not.  I mean, people can change.  They really can.  People
20   have an opportunity to change, and he took that opportunity.

21          This was my fault, and I can admit that.  And I
22   understand how it's hard.  But you guys weren't in my shoes
23   when I lost that baby.  Nobody was there.  He was there with
24   us that night.  What we went through when we lost our son is
25   something I have to relive every day, and so does he.  And

```
 1   it's -- it just -- it needs to end.  And like I said, I can
 2   admit I -- I had a break.  I did.  I lost my son.  I have one
 3   now.  I try every day.
 4          This is the end of it, though, and it is so hard
 5   knowing that, because of my actions, these are his
 6   consequences.  And it's not fair because it's just something
 7   that we keep reliving.  I just -- I want to be able to get
 8   through this, and I want him to be able to get through this.
 9          Everybody says -- people say that, when couples lose
10   a child, they don't survive.  But we did.  He didn't leave me.
11   He didn't.  And not that I expected him to, but I -- I was
12   surprised that he stood through everything with me.  But that
13   was my own insecurities.  Because he never once faltered from
14   everything he showed me.  Like I said, he was there for my
15   son.  For the first day of school, I mean, he was -- picked
16   him up, took him, everything.  And Mikey loves him.  Like,
17   that is his -- that's his best friend beyond just stepdad.
18   Like, he would do anything, you know?
19          And my family, we just need this to end now.
20          THE COURT:  Thank you, Ms. Rodosh.  And I'm sorry for
21   your loss.
22          MS. RODOSH:  Thank you.
23          THE COURT:  Ms. Zheng, anyone else?
24          Hi, there.  Tell me your name.
25          MS. WHITNEY:  Janice Whitney.
```

```
 1            THE COURT:  And your relationship for the record,
 2   Ms. Whitney?
 3            MS. WHITNEY:  I'm Stephon's mother.
 4            THE COURT:  Okay.  What would you like to say?
 5            MS. WHITNEY:  I just want to say that Stephon is the
 6   child -- he's the third -- my last -- my last child.  And I've
 7   been a single mother since he was born off and on.  I had to
 8   work, come home, and take -- I worked graveyard so that no one
 9   would have to deal with my children through the daytime, feed
10   them, yell at them.  I worked graveyard all my life just so my
11   children wouldn't have to go through other people's trauma to
12   be yelled at or fed through the day.  I could come home and
13   make sure my children is fed, go to school.  My son -- I would
14   fall asleep.  My son would wake me up so that he can get to
15   school.  He would already be dressed.  He was humble, never
16   gave me any problems.  Always a respectful child, straight-A
17   student.  Until I got married in 2002.
18            I lost my oldest son to his foster parents, and I
19   fought, I fought, and I fought for my oldest son.  So I had my
20   son and my daughter that I had to protect.  I had to shield
21   them.
22            Me and my husband got married in 2002, got divorced
23   in 2021 but we was already separated.  And things kept going
24   on in the home to, well, my son is not a talkative child.
25   He's not an argumentative child.  He don't want to be in the
```

1    midst of chaos, drama, whatever.  And I wish I would have just
2    left my husband to keep my son and my children.
3         And in the midst of me being a single mother raising
4    my children, my daughter, she had to be a teenage mother
5    because it was just us.  And me being as a single mother
6    trying to raise a son, women can't raise a child to be a --
7    a -- a little boy to be a man.  I tried.  And I'd tell my son
8    all the time, I don't know where I failed.  I don't know what
9    happened, but I wish I could have saved him.
10        And my son is not what society think he is.  My son
11   gives me guidance.  My son tells me things that I need to
12   hear.  My son give me correction that I need, that he see that
13   I need.  Me and my son have talks all the time.  My son is --
14   all I'm asking is -- my son don't deserve what he's going
15   through.  He tried.  He tried.  He tried.  He tried.
16        And losing a child is hard.  My child didn't die, but
17   I lost him to the system.  And that's hard enough.  It is hard
18   enough when your child goes through the system, and I'm the
19   only one that's stuck trying to fight.
20        It traumatized my children because their brother was
21   gone, and I just -- if he could just get a chance to show how
22   great he is in society, my son is not a bad person.  He's
23   humble.  Like me, he never talk.  He never have a lot of
24   friends.  I just -- just please be remorseful for my son.
25   Just please be -- give him... that's all I have to say.

1      **THE COURT:**  Thank you so much.

2      **MS. WHITNEY:**  You're welcome.

3      **THE COURT:**  All right.  Does Probation have anything

4  to add?

5      **PROBATION OFFICER:**  No, Your Honor.  Thank you.

6      **MR. COWHIG:**  Your Honor, defense had referenced some

7  images.  Would those be made part of the record?

8      **THE COURT:**  Oh.  I appreciate you keeping the record

9  clean for me there.

10     So I was handed some images.  Did you -- Ms. Zheng,

11  did you want to move those into the record?

12     **MS. ZHENG:**  If we could, please, Your Honor.

13     **THE COURT:**  Mr. Cowhig?

14     **MR. COWHIG:**  I believe the most appropriate course

15  would be to include them as demonstratives rather than as

16  fully admitted exhibits as we don't have the foundation for

17  them.

18     **MS. ZHENG:**  I agree, Your Honor.

19     **THE COURT:**  Do we need to seal them?

20     **MS. ZHENG:**  I don't think so.

21     **MR. COWHIG:**  I don't believe so, Your Honor.  I don't

22  think there's any -- there was one appearance of PII that has

23  been redacted.  And they -- they only refer to this case, no

24  other ongoing proceedings anywhere.

25     **THE COURT:**  All right.  Summer, I'm going to hand

```
 1    this to you and ask that it be placed in the docket.  It's
 2    going to be noted as Demonstrative Exhibit A.
 3         (Court's Demonstrative Exhibit A, marked and received.)
 4              MS. ZHENG:  Thank you, Your Honor.
 5              THE COURT:  Thank you, both.
 6              Is there any reason, legal or just, why I should not
 7    proceed with sentencing at this time?
 8              MR. COWHIG:  No, Your Honor.
 9              MS. ZHENG:  No, Your Honor.
10              THE COURT:  Just to reiterate, I have agreed with
11    Probation's guideline calculations that this is a total
12    offense level of 25 with a criminal history category of V.
13    The guideline range is 100 months to 120 months, and Probation
14    is recommending a sentence of 100 months consecutive to Docket
15    Number C338650.  That's the state revo case; is that right,
16    Ms. Zheng?  The state revo case?
17              MS. ZHENG:  Yes.
18              THE COURT:  The Government concurs with that
19    recommendation and asks the Court to sentence the defendant to
20    100 months in custody consecutive to any remaining state time,
21    followed by three years of supervised release.  And the
22    defense, who entered a guilty plea without the benefit of a
23    plea agreement -- a written plea agreement in this case is
24    asking for a sentence of 28 months in custody.
25              There -- I have heard and considered the charging
```

1   document, my notes from the plea hearing, the Presentence

2   Investigation Report, the parties' various sentencing memos

3   and responses and objections and all of the attachments to

4   those, the statements and arguments of counsel, the

5   defendant's statements to the Court today, Ms. Rodosh's

6   statements, his mother's statements to the Court today, and,

7   of course, all of the factors and considerations under

8   § 3553(a).

9         Mr. Whitney pled guilty to the offense of felon in

10  possession of a firearm, and he admitted the facts necessary

11  to support that conviction here.

12        To his credit, he is educated, has some employment

13  history, and certainly has the love and support of his family

14  as demonstrated by their support here today.

15        There's no question that he experienced an extremely

16  turbulent upbringing and a great number of tragedies.  But the

17  record also reflects that he has established quite a criminal

18  history placing himself in one of the higher criminal history

19  categories.  He has sustained felony convictions for

20  first-degree kidnapping, conspiracy to commit robbery, robbery

21  with use of a deadly weapon, and possession of controlled

22  substance with intent to sell.  He's had failed opportunities

23  for community supervision.  His history includes violence and

24  a disregard for the law as he was on probation at the time

25  that he was discovered in possession of the firearm that forms

1   the basis for this case.  And whether or not it was his or he

2   was also selling marijuana, there was certainly a large

3   quantity of it in this home.

4          But on the plus side, this offense itself does not

5   involve violence or the use of brandishing -- the use or

6   brandishing of the firearm.  And he has a great deal of family

7   support and has endured a number of tragedies and certainly

8   made steps to better his life throughout the opportunities

9   that he did have.

10          I am sympathetic that -- had this case not been

11   picked up by the Federal Government.  The reality

12   unfortunately is, though, that it was and the offense conduct

13   is a federal offense regardless.  And the types of sentences

14   imposed on these facts in Federal Court I think we all

15   recognize are just more severe than they are in state court,

16   and that is one of the realities that we face here.

17          And although I agree with Probation's guideline

18   calculations under the letter of the law, I do consider the

19   nature of those criminal convictions and the youthfulness of

20   so much of his criminal history, and I take all of that into

21   consideration in finding that a guideline sentence of 100

22   months or more on these facts is far greater than necessary,

23   than needed to effectuate the goals and objectives of

24   sentencing.

25          So, based on overrepresentation of criminal history

2:21-cr-00002-JAD-NJK-1 - December 5, 2022

```
 1   and in light of the factual circumstances of this case and the
 2   nature of the offense and in light of the defendant's personal
 3   circumstances and the lack of violence involved here and the
 4   significant family support that he has, I am going to vary
 5   down significantly and find that a sentence of 54 months
 6   concurrent to the revocation sentence, if any remains, in the
 7   state court case, C-19-338650, followed by three years of
 8   supervised release is sufficient but not greater than
 9   necessary to accomplish the goals and objectives of
10   sentencing.
11           I find that this sentence takes into account the
12   nature and circumstances of the offense, the history and
13   characteristics of the defendant, the kinds of sentences
14   available, the sentencing range, and the policy statements of
15   the Sentencing Commission.  I believe it reflects the
16   seriousness of this crime, promotes respect for the law,
17   provides just punishment, affords adequate deterrence to
18   criminal conduct, will help protect the public from further
19   crimes by this defendant, will avoid sentencing disparities as
20   well.
21           So the defendant is committed to the Bureau of
22   Prisons for a term of 54 months.
23           Let's talk about supervised release conditions.
24   Ms. Zheng, in the PSR Probation recommends a number of
25   supervised release conditions.  They begin on page 25.  Do you
```

1    have any objections to any of those?

2              **MS. ZHENG:**  Court's indulgence, please.

3         *(Defendant conferring with counsel.)*

4              **MS. ZHENG:**  No objection, Your Honor.

5              **THE COURT:**  While on supervised release, the

6    defendant will be required to comply with the standard

7    conditions of supervision recommended by the Sentencing

8    Commission.  The mandatory conditions of not committing

9    another federal, state, or local crime; not unlawfully

10   possessing a controlled substance; and refraining from use of

11   a controlled substance; and submit to the drug testing

12   protocol.  He also must cooperate in the collection of DNA as

13   directed by the probation officer.

14             Additionally, the search and seizure condition, the

15   substance abuse treatment and mental health treatment

16   conditions, the drug testing condition, and the no-gang

17   affiliation will apply.

18             I find that all of these conditions are reasonably

19   related to the goals of deterrence, protection of the public,

20   or rehabilitation; that they involve no greater deprivation of

21   liberty than is reasonably necessary to achieve those goals;

22   and that they are consistent with the pertinent policy

23   statements issued by the Sentencing Commission.

24             Do we have a copy of those for the defendant, please?

25             **PROBATION OFFICER:**  Yes, Your Honor.

1          THE COURT:  Mr. Whitney, you're being handed a copy

2    of the written conditions of supervised release.  Can you

3    acknowledge for the record that you've received those?

4          THE DEFENDANT:  Yes, I have.

5          THE COURT:  Thank you.

6          A mandatory penalty assessment of $100 is required by

7    statute.  It's hereby imposed, and it is due immediately.  No

8    fine will be imposed based on a demonstrated inability to pay.

9          Not a restitution or forfeiture case; is that right,

10   Mr. Cowhig?

11         MR. COWHIG:  That's correct, Your Honor.

12         THE COURT:  Thank you.

13         Sir, in your -- I'm advising you that you have 14

14   days to file a notice of appeal.  If you cannot afford an

15   attorney to handle your appeal, one will be appointed to

16   represent you.  If you cannot afford a transcript of the

17   record in this case, one will be prepared for appeal at the

18   Government's expense.

19         Do you understand all of that, sir?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Thank you.

22         He pled straight up to a single-count indictment; is

23   that correct?

24         MR. COWHIG:  Yes, Your Honor.

25         THE COURT:  All right.  So nothing to dismiss.

1         And, Ms. Zheng, does your client request a

2 recommendation to be designated to serve his sentence at a

3 specific facility or one was a particular program?

4        **MS. ZHENG:**  Your Honor, my client's asking for a

5 designation to Phoenix, Arizona, if that's possible.  And as a

6 second choice, we're asking for Terminal Island.

7        **THE COURT:**  And would both of those requests be based

8 on proximity to family and support?

9        **MS. ZHENG:**  Yes.

10        **THE COURT:**  Okay.  Those will be the recommendations;

11 primarily Phoenix and secondarily, Terminal Island, all --

12 both based on proximity to family and support.

13        Is there anything else that we need to address?

14 Mr. Cowhig?

15        **MR. COWHIG:**  No, Your Honor.  Thank you.

16        **THE COURT:**  Ms. Zheng?

17        **MS. ZHENG:**  Not at this time, Your Honor.

18        **THE COURT:**  Ms. Cravotta?

19        **PROBATION OFFICER:**  No, Your Honor.  Thank you.

20        **THE COURT:**  All right.  Thank you.

21        Mr. Whitney, I wish you the best of luck, sir.

22 Defendant's remanded to the custody of the Marshal to await

23 designation by the Bureau of Prisons, and we are adjourned.

24      *(Proceedings adjourned at 3:16 p.m.)*

25               --o0o--

1              COURT REPORTER'S CERTIFICATE

2        I, AMBER M. McCLANE, Official Court Reporter, United
   States District Court, District of Nevada, Las Vegas, Nevada,
3   do hereby certify that pursuant to 28 U.S.C. § 753 the
   foregoing is a true, complete, and correct transcript of the
4   proceedings had in connection with the above-entitled matter.

5   DATED:   5/1/2023

6

7                          /s/ *Amber M. McClane*
                               _____
8                          AMBER McCLANE, RPR, CRR, CCR #914

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )
                                   ) Case No. 2:21-cr-00002-JAD-NJK
4              Plaintiff,          )
                                   ) Las Vegas, Nevada
5   vs.                            ) November 7, 2022
                                   ) 11:02 a.m. - 12:38 p.m.
6   STEPHON JAMES WHITNEY,         ) Courtroom 6D
                                   ) IMPOSITION OF SENTENCE, DAY 1
7              Defendant.          )
    _____)   *CERTIFIED COPY*

8

9          REPORTER'S TRANSCRIPT OF PROCEEDINGS, DAY 1
            BEFORE THE HONORABLE JENNIFER A. DORSEY
10             UNITED STATES DISTRICT COURT JUDGE

11

12   APPEARANCES:

13   For the Government: **DANIEL COWHIG, AUSA**
                         *UNITED STATES ATTORNEY'S OFFICE*
14                       *501 Las Vegas Boulevard South, Suite 1100*
                         *Las Vegas, Nevada 89101*
15                       *(702) 388-6336*

16

17   (Appearances continued on page 2.)

18

19

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant:

 3        YI LIN ZHENG, ESQ.
          VEGAS GOLDEN LAW
 4        2801 South Valley View Boulevard, Suite 16
          Las Vegas, Nevada 89102
 5        (702) 385-7170

 6   Also Present:

 7        Sunny Cascio, USPO

 8                            * * * * *

 9                          I N D E X

10   Government's Witness:                            Page

11   JOSH COSTELLO

12        Direct Examination by Mr. Cowhig              8

13        Cross-Examination by Ms. Zheng              35

14        Redirect Examination by Mr. Cowhig          57

15        Recross-Examination by Ms. Zheng            58

16

17                           * * * * *

18                      E X H I B I T S

19   EXHIBIT NO.:          OFFERED      RECEIVED     WITHDRAWN

20   Gov't 1                 33            33

21   Gov't 2                 28            28

22   Gov't 3 - 17            23            23

23   Gov't 18                33            34

24

25                          * * * * *
```

2:21-cr-00002-JAD-NJK-1 - *November 7, 2022*

1      LAS VEGAS, NEVADA; MONDAY, NOVEMBER 7, 2022; 11:02 A.M.

2                            --o0o--

3                    P R O C E E D I N G S

4          **COURTROOM ADMINISTRATOR:**  Now's the time set for an

5    imposition of sentence in Case Number 2:21-cr-02-JAD-NJK,

6    United States of America versus Stephon James Whitney.

7          Counsel, please state your appearances.

8          **MR. COWHIG:**  Good morning, Your Honor.  Dan Cowhig

9    from the U.S. Attorney's Office.  I have here at counsel table

10   the case agent, LVMPD Detective Josh Costello.

11         **MS. ZHENG:**  And good morning, Your Honor.  Yi Lin

12   Zheng, counsel on behalf of Defendant Stephon Whitney who is

13   present in custody.

14         **THE COURT:**  All right.  Good morning.

15         This is the hearing set for the imposition of the

16   sentence on Mr. Whitney in this case.  Back in June he

17   appeared before the Court and he pled guilty to being a felon

18   in possession of a firearm.  He did so without the benefit of

19   a plea agreement.  I accepted his guilty plea and adjudicated

20   him guilty of that charge.

21         In the PSR Probation has calculated the offense level

22   to be a 25 and recommends a sentence of 100 months.  The

23   defense has filed a sentencing memo, and it argues for a

24   sentence of 28 months.  The Government filed a sentencing memo

25   in which it argues for a sentence of 110 months followed by

Case: 22-10306, 04/23/2024, ID: 12877459, DktEntry: 9, Page 4 of 34
Case 2:21-cr-00002-JAD-NJK  Document 159  Filed 05/01/23  Page 67 of 134

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
1    three years of supervised release.
2           It appears that virtually every aspect of this
3    sentencing is objected to or disputed.  So I think this is
4    going to be an extensive hearing, but I'm going to let
5    everyone know that I have a number of other hearings today.
6    So my assumption at this point -- and I'm not certain this
7    will go this way.  But if we go beyond the noon hour or it
8    looks like it's going to go beyond the noon hour, we will have
9    to extend this sentencing.  There are so many issues here, and
10   it's possible, based on whatever additional evidence that is
11   received today, that I might need to do some additional
12   research or investigation on my own into the sentencing file
13   regardless.  So just giving everyone a heads-up that there's a
14   lot going on here.
15          So let's go ahead, though, and start with the PSR and
16   see where that leads us.
17          Ms. Zheng, you have reviewed the PSR carefully with
18   your client; is that correct?
19          MS. ZHENG:  I have, Your Honor.
20          THE COURT:  And let's talk about unresolved
21   objections so that I'm -- I'm clear on where we need to go.
22          So if you want to walk me through the still
23   unresolved objections, please.
24          MS. ZHENG:  Sure, Your Honor.
25          So Objections 1 and 2 were in -- I'd asked that the
```

 1  language be corrected to reflect that Mr. Whitney has been in

 2  continuous custody since his arrest on September 2nd, 2020.

 3  That has been resolved.

 4       **THE COURT:** Okay. Hang on one second. Let me just

 5  mark that.

 6       Okay. Next.

 7       **MS. ZHENG:** As to Objection 3, as to the information

 8  regarding Kevin Lay, I have no reason to dispute or not

 9  dispute that. I just thought it was unrelated to the case,

10  but if I stand corrected, then...

11       **THE COURT:** Let me ask Probation, what is that

12  information based on? So information from the detention

13  center?

14       **PROBATION OFFICER:** It looks like, yes, information

15  from the detention center.

16       **THE COURT:** Okay. And so, Ms. Zheng, do you have any

17  information or documents or evidence to refute that at this

18  point?

19       **MS. ZHENG:** I don't. I think we can let that stand.

20  I -- it was an incident that I think happened while he was in

21  custody. I've no reason to dispute that they were given just

22  a warning.

23       **THE COURT:** Okay. Do you withdraw the objection?

24       **MS. ZHENG:** Yes.

25       **THE COURT:** Okay. Next?

1      **MS. ZHENG:**  Primarily the remainder -- the other

2  objections relate to what I think will later on be discussed

3  into the four-level enhancement, in connection with

4  enhancement.  So, as of right now, those are still... in

5  dispute.  So that goes to Objection Number 4, Objection

6  Number 5...

7      **THE COURT:**  Okay.

8      **MS. ZHENG:**  ...is predominantly with the four level

9  in connection with enhancement.

10      Objection Number 6 is still pending, dispute as to

11  the change of his criminal history, in which case it would

12  also coincide with the fact that, regardless of what happens

13  and the Court's calculation of Stephon's criminal history

14  points, ultimately paragraph 33 in the amended PSR will also

15  have to change to reflect the subsequent history of the case.

16      And I think that's it.  So Objections 1 and 2 are

17  resolved.  Objection 3 is withdrawn.  Four and -- 4, 5, and 6

18  are still in dispute.

19      **THE COURT:**  Okay.  Does the Government have any

20  position on those other than to address -- I know the

21  Government intends to present some evidence regarding the

22  four-level enhancement, and how about with respect to the

23  criminal history point?

24      **MR. COWHIG:**  Your Honor, with respect to the criminal

25  history point, we submitted documentary evidence to the Court

1    showing the history of that case and the changes to the case.

2    We believe that the Probation Office has appropriately

3    addressed that change in their response to that objection.  We

4    believe that change is ineffective to change Mr. Whitney's

5    criminal history in terms of this Court's calculations.  Very

6    clearly, a state court cannot simply at a whim wipe out a

7    conviction to alter the sentencing guidelines in a federal

8    case.

9         **THE COURT:**  All right.  So let's -- I mean, really,

10   the key issue here is that four-level enhancement.

11        So I understand, Mr. Cowhig, that you intend -- the

12   Government intends to present evidence today in support of

13   that four-level enhancement; is that right?

14        **MR. COWHIG:**  Yes, Your Honor.

15        **THE COURT:**  All right.  I'll let you go ahead and

16   start with that then.  I assume you are calling the case

17   agent?

18        **MR. COWHIG:**  Yes, Your Honor.

19        **THE COURT:**  All right.  Go ahead.

20        **MR. COWHIG:**  The Government will call Las Vegas

21   Metropolitan Police Department Detective Josh Costello.

22        **COURTROOM ADMINISTRATOR:**  Please raise your right

23   hand.

24    *(The witness is sworn.)*

25        **THE WITNESS:**  Yes, ma'am, I do.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   **COURTROOM ADMINISTRATOR:**  Thank you.

2       Please have a seat.  And will you please state and

3   spell your name for the record.

4       **THE WITNESS:**  My name is Josh, J-o-s-h.  Last name is

5   Costello, C-o-s-t-e-l-l-o.

6       **THE COURT:**  You may inquire.

7       **MR. COWHIG:**  Thank you, Your Honor.

8                    **DIRECT EXAMINATION**

9   BY MR. COWHIG:

10  Q.   Good morning, Detective Costello.

11  **A.**   Good morning, sir.

12  Q.   Where do you work?

13  **A.**   I work for the Las Vegas Metropolitan Police Department.

14  Q.   And what's your duty position there?

15  **A.**   I'm currently assigned as a detective in the Central

16  Intelligence Unit.

17  Q.   What does the Central Intelligence Unit cover?

18  **A.**   A myriad of things.  We gather and disseminate

19  information and intelligence related to any and all crimes

20  occurring within our respective area of responsibility here in

21  Clark County.

22  Q.   Could you tell the Court a little bit about your

23  background, training, and experience.

24  **A.**   I worked for Las Vegas Metro now for about 16 and a half

25  years, coming up on 17 in April.  I was in patrol for six

 1   years.  I then went to the gang unit where I became a

 2   detective with gang enforcement.  I later became a detective

 3   for the gang intelligence unit where I remained until 2015

 4   when the gang unit was at that time disbanded.  Then, from

 5   2015 until 2017, I worked as an intel detective in our

 6   criminal intelligence unit.  And then, in 2017, they created

 7   the central intelligence unit, and at that point I came back

 8   to the central intelligence unit where one of my major

 9   functions still remains the gang intelligence component.

10   Q.  Did you have essentially identical duties on September

11   2nd, 2020?

12   **A.**  Yes, sir, I did.

13   Q.  Do you know the defendant, Stephon Whitney?

14   **A.**  I do.  He's seated there at the defendant's table wearing

15   the gray shirt and white sleeves.

16        **MR. COWHIG:**  Your Honor, if the record can reflect

17   the witness has identified the defendant?

18        **THE COURT:**  It will so reflect.

19        **MR. COWHIG:**  Thank you, Your Honor.

20   **BY MR. COWHIG:**

21   Q.  How did you come to know Stephon Whitney?

22   **A.**  On August 28th, my team was working with marked uniform

23   officers conducting surveillance related to a gang hood day

24   party that was occurring --

25   Q.  I'm sorry, was that August 28th of 2020?

1   **A.**   I apologize.  Yes, it was August 28th, 2020.

2          And during that time the patrol officers conducted a

3   traffic stop on a -- like a multi-person, like party bus kind

4   of vehicle.  Ultimately, as a result of that traffic stop,

5   three firearms were located inside of the vehicle, and all the

6   occupants were to be identified and then ultimately released.

7          During that time, in 2020, it was a period of social

8   unrest across the country.  Tensions were very high.  There

9   had been numerous incidents around town.  During that traffic

10  stop an individual turned on Facebook Live and began to

11  broadcast the location of the stop and asked additional people

12  to please come to the location of the stop to try to ask law

13  enforcement to let them go.  Ultimately, people did begin to

14  arrive, and the decision was made that evening that we would

15  arrest the few people that we had currently already

16  established probable cause on, we would identify the other

17  subjects in the vehicle, and follow up at a later time because

18  we didn't want to escalate the situation any further and

19  endanger the officers or the citizens.

20  **Q.**   Was the defendant one of the individuals in that vehicle?

21  **A.**   He was one of the subjects in the vehicle.  However, on

22  the night in question he did not identify himself correctly.

23  He provided a false name, which in the following days I was

24  able to positively identify him as being Stephon Whitney,

25  which then led to our second interaction.

Josh Costello - Direct
2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1    Q.   What did you decide to do as a result of that

2    information?

3    **A.**   I learned that Mr. Whitney was currently on probation,

4    and at that point I knew he was a convicted person and I

5    needed to get a sample of his DNA to compare to the firearms

6    that were on the bus due to no one claiming ownership.

7         So I notified his probation officer of record,

8    Officer Vargas, and advised him that I had probable cause to

9    obtain a search warrant from Mr. Whitney.

10        Based on that information, Officer Vargas indicated

11   that he was newly appointed as the officer for Mr. Whitney,

12   and he asked if I would be willing to accompany him at a later

13   time when he went to go do a house check at Mr. Whitney's

14   residence.

15   Q.   And did you do that?

16   **A.**   I did.

17   Q.   What date was that?

18   **A.**   That was on September the 2nd of 2020.

19   Q.   What happened on September 2nd of 2020?

20   **A.**   We met with parole and probation officers in advance of

21   the house visit.  We informed them that we had the probable

22   cause to obtain the search warrant for Mr. Whitney's DNA.

23   Detective Cook from North Las Vegas was with us as well as

24   part of my task force.  Mr. Cook had probable cause to arrest

25   Mr. Whitney for providing false information to him the night

1   of the traffic stop.  We went to the residence.  The LVMPD and

2   North Las Vegas task force personnel remained inside of our

3   vehicle while parole and probation approached the residence.

4   They contacted Mr. Whitney by phone.  He exited the residence.

5   They then took him and went back into the house, and --

6   Q.   Was that process based upon COVID protocols at the time?

7   **A.**   Yes.  During that time, they were meeting in person

8   outside due to COVID protocols.  Mr. Vargas determined that he

9   wanted to do a home search of Mr. Whitney's home, and so he

10   took Mr. Whitney inside of the residence while we remained

11   outside.

12          After a period of time, I received a phone call from

13   Mr. Vargas stating that he had located two firearms magazines

14   inside Mr. Whitney's bedroom, and he asked me to please come

15   into the residence.

16   Q.   Just to clarify, that was two magazines for a firearm,

17   not two firearms?

18   **A.**   Yes, two magazines for a firearm.

19   Q.   Would you look at the binder of exhibits there in front

20   of you?

21   **A.**   Yes, sir.

22   Q.   Have you previously reviewed those documents?

23   **A.**   Yes, sir, I have.

24   Q.   What happened when you went into the residence?

25   **A.**   I went and I met with Officer Vargas in Mr. Whitney's

1  bedroom.  Mr. Vargas was holding two firearms magazines in his

2  hand.  The magazines for -- two magazines for a firearm, no

3  firearm, in his hand, and he indicated to me that he had found

4  those on the top shelf of the closet.  I then instructed him

5  to place those magazines on the bed and let's walk out, we're

6  going to freeze the residence pending the issuance of a search

7  warrant.

8  Q.  And which bedroom was this?

9  **A.**  This is the -- the adult bedroom.  There's two bedrooms

10  in the residence; a small child's bedroom and then the adult

11  bedroom.  It would be the southern-most bedroom in the

12  residence, if I recall correctly.

13  Q.  How would you characterize the size of the apartment

14  overall?

15  **A.**  It was very small.  It's a duplex.  It's one half of a

16  single-story family home.  Very small.  A small living room,

17  kitchen area when you first initially enter, and then to the

18  right is a very short hallway, which is the little boy's

19  bedroom, a bathroom, and then the bedroom of Mr. Whitney and

20  his girlfriend.

21  Q.  And there's also a laundry facility as part of that

22  apartment?

23  **A.**  Yes.  It's directly outside of the master -- I -- the

24  master bedroom, if you want to call it that, door.  There's a

25  laundry area.  It had no doors.  It was just right there, a

1  little nook built into the wall that only fits a washer and a

2  dryer.

3  Q.   And did Officer Vargas relate to you which bedroom

4  Mr. Whitney identified as his bedroom to him?

5  **A.**   Yes.  He indicated that the bedroom that he was standing

6  in was the one that Mr. Whitney told him that he and his

7  girlfriend were residing in.

8  Q.   Do you recall the girlfriend's name?

9  **A.**   Ms. Rodosh, Jessica Rodosh.

10  Q.   And was there something about the second bedroom that

11  made it clear that that was a child's bedroom?

12  **A.**   Yes.  There was children's toys.  There was, like, a

13  Batman, I believe, bedspread.  Just very obviously it was the

14  bedroom of a small child.  Children's clothes.

15  Q.   After learning about the two magazines, what did you then

16  do?

17  **A.**   That's when I applied for the telephonic search warrant

18  for the residence and was granted a warrant by the Honorable

19  Judge Zimmerman.

20  Q.   And you executed that search?

21  **A.**   I did.

22  Q.   What did -- were there other officers with you who also

23  executed the search?

24  **A.**   There were.  At this time the parole and probation

25  officers had left, and my team remained as well as a patrol

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  supervisor who responded to supervise the service of the

2  warrant.

3  Q.   If I could direct you to what's been marked as

4  Government's Exhibit 3 in that binder.

5  **A.**   Yes, sir.

6  Q.   Could you describe to the judge what that 3, 4, and 5

7  show?

8  **A.**   Yes.

9  Q.   The judge has it --

10  **A.**   Oh --

11  Q.   -- a set of the exhibits --

12          **THE WITNESS:**  -- show you, Your Honor.

13      *(Reporter instruction.)*

14          **THE WITNESS:**  Oh.

15          **THE COURT:**  Go ahead.

16          **THE WITNESS:**  So Exhibit 3 is the bed frame and the

17  headboard for what did contain the mattress prior to the

18  service of the search warrant beginning.

19          Jumping over to 4, you have a view there looking down

20  behind the bed showing the back of the headboard there.

21          **THE COURT:**  And this is all in the adult -- what

22  you've described as the adult bedroom?

23          **THE WITNESS:**  Yeah.  If you want to just call it a

24  master bedroom, if you want to call it that, yes.

25          **THE COURT:**  Okay.

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1        **THE WITNESS:**  In the adults' bedroom.

2        And then this is -- 5 is going to be a picture

3   looking inside of the headboard.  So the headboard has that

4   weird, like, black fibrous cloth that kind of covers the back

5   of -- well, headboards in this case or underneath of couches

6   or whatever.  And it had a zipper on it.  And when I unzipped

7   the zipper to look inside, there's approximately maybe a

8   three-inch wide gap of the headboard.  And what you see there

9   is the firearm and the magazine laying at the bottom of the

10  headboard.  It's just been placed in there, sitting in there.

11  **BY MR. COWHIG:**

12  Q.   What does Government Exhibit 6 show?

13  **A.**   Six is -- at this point I have recovered that firearm

14  from inside of that headboard, and I'm holding it there prior

15  to placing it inside the evidence bag.

16  Q.   Government Exhibit 7?

17  **A.**   Seven is the additional magazine that was also located

18  inside of the headboard next to the firearm which was fully

19  loaded.

20  Q.   And Government Exhibit 8?

21  **A.**   Eight is a paper sleeve containing money.  Kind of like

22  when you go to a bank, if you make a deposit or withdrawal,

23  they put it inside that little paper sleeve.  That's what that

24  is.

25  Q.   These images show no mattress on the bed frame and a

 1   bunch of other stuff moved around.  Is that a result of your

 2   search?

 3   **A.**   Yes, sir, it is.

 4   Q.   If someone knew that firearm was inside the headboard,

 5   would it be hard for them to access?

 6   **A.**   No.  It literally took just a moment to zip open the

 7   zipper, and you can reach right in and grab it.

 8   Q.   And how far in terms of feet was this from the closet

 9   where the initial magazines were found?

10   **A.**   The room wasn't very big.  Maybe 10 feet.  It was just

11   across.  So if you're looking at the bed (indicating) this way

12   as the court lies, like Your Honor and I are looking --

13   there's a men's and women's side of the bed; right?  We all

14   know that if we're married or we have a significant other.  So

15   the right side of the bed was the men's side.  It had

16   Mr. Whitney's prescriptions and other things belonging to him

17   on that side.  And then this side (indicating), items

18   belonging to Ms. Rodosh.  And then directly next to that there

19   was a small walkway between what would have been a closet and

20   the bed.  And so maybe 10 feet across from where the -- where

21   those magazines were located on the top shelf to where -- in

22   the lower right-hand corner of the bed frame is where the --

23   if you're looking at it, the lower right-hand corner of the

24   bed frame is where the firearm was located.

25   Q.   Would you look at Government Exhibit 9, please, and tell

1    the Court what that shows.

2           **THE COURT:**  And when you say, so lower right-hand

3    corner of the bed frame where the firearm was located, that

4    was the side of the bed you were attributing to Mr. Whitney?

5           **THE WITNESS:**  Yes.

6           I'm sorry.  Government Exhibit 9 is a clothes hamper,

7    and you can see the top of a large glass jar there.

8    **BY MR. COWHIG:**

9    Q.    And does 10 show that same jar in a closeup?

10   **A.**    It does.  There's a closeup photo, and you can see the

11   green, leafy substance believed to be the marijuana there.

12   Q.    And Government Exhibit 11?

13   **A.**    That is the jar showing that it's about two and a half,

14   three-quarters of the way full of marijuana when we removed

15   it.

16   Q.    And was this jar in that same room?

17   **A.**    Yes.  It was inside that clothes hamper, yes.

18   Q.    What does Government Exhibit 12 show?

19   **A.**    Twelve shows that, when additional clothing was removed,

20   there was another jar and another plastic bag with marijuana

21   in it.

22   Q.    And does 13 show that other jar and the other plastic

23   bag?

24   **A.**    Yes, it does.

25   Q.    And that other jar has marijuana within a plastic bag

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    inside it as well as lose marijuana?

2    **A.**    Yes.  There's a small amount of loose marijuana in the

3    bag that contains it, and you can kind of see the label of

4    whatever strain of marijuana it was that was there on the side

5    of the bag.  And then the other plastic bag with additional

6    marijuana in it.

7    Q.    And was this marijuana tested?

8    **A.**    No, it was not.

9    Q.    Did Mr. Whitney identify this as marijuana?

10   **A.**    Yes, he did.

11   Q.    Would you tell the Court what Government Exhibit 14

12   shows, please.

13   **A.**    Government Exhibit 14 is a box of sandwich bags with a

14   digital scale sitting on top of them, and that's on top of the

15   dryer.

16          **THE COURT:**  Can I go back one --

17          **THE WITNESS:**  Yes, ma'am.

18          **THE COURT:**  -- quick second?  When you said

19   Mr. Whitney identified this as marijuana, what -- how did he

20   do that?

21          **THE WITNESS:**  Later on, I conducted a post-Miranda

22   interview with him at the North Las Vegas Jail, and during

23   that conversation he identified it as being marijuana.

24          **THE COURT:**  Okay.  Go ahead, Mr. Cowhig.

25          **MR. COWHIG:**  Thank you, Your Honor.

1    **BY MR. COWHIG:**

2    Q.   Was there anything noted about that scale in Government

3    Exhibit 14?

4    **A.**   Yes.  It had small, green, leafy residue on top of it.

5    Q.   And where did you say that this box with baggies and

6    scale was found?

7    **A.**   Directly outside of the -- we'll just call it the master

8    bedroom.  The adult bedroom door, as you're leaving the room,

9    on your left-hand side there was immediately that little

10   laundry nook that contained the washer and dryer.  And it had

11   a shelf above the washer and dryer, like where you would have

12   a -- have laundry detergent, dryer sheets, things like that,

13   it was sitting there on that shelf.

14   Q.   And Government Exhibit 15?

15          **THE COURT:**  And, I'm sorry, can I just go back before

16   we do that?

17          **THE WITNESS:**  Certainly, Your Honor.

18          **THE COURT:**  Where was this laundry basket that we see

19   in photos... 9, 10, and 12?

20          **THE WITNESS:**  So the laundry basket is sitting

21   directly next to the television.  The television's on, like, a

22   small stand.  The laundry basket is located directly next to

23   it.  So if you were lying on the bed, like the headboard is

24   behind us here, this granite wall, and that's the foot of the

25   bed, just beyond that is the far wall of the bedroom.  There's

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  a television, and then immediately to the right of it was the

2  clothes hamper that contained the marijuana.

3          **THE COURT:**  All of this then was in the master

4  bedroom?

5          **THE WITNESS:**  All of it was in the bedroom, yes,

6  ma'am.

7          **THE COURT:**  Thank you.

8  **BY MR. COWHIG:**

9  Q.   And then the box of baggies and digital scale was

10  immediately outside of the bedroom?

11  **A.**   Just outside of the bathroom in that -- we'll call it the

12  laundry nook where the little cutout was where the washer and

13  dryer are.

14  Q.   I'm sorry, bathroom or bedroom?

15  **A.**   Just outside the bedroom.

16  Q.   And then Government Exhibit 15?

17  **A.**   Fifteen are the two magazines that I made mention of that

18  the probation officer was holding in his hands when I entered.

19  Q.   That doesn't show where they were found, just where the

20  probation officer put them down?

21  **A.**   Exactly.  I told him to place them there on the bed.

22  Q.   And then Government Exhibit 16 and 17, what do those

23  show?

24  **A.**   16 and 17 show two boxes of Winchester nine millimeter

25  ammunition with a receipt, and I'll let you --

1   Q.   Are you able to read the receipt in Government Exhibit 17

2   or at least portions of it as to who the buyer was?

3   **A.**   On 16, no.  On 17, yes.  You can see the name Jessica R.

4   Rodosh about halfway down on the receipt just below the total

5   charged.

6   Q.   And where -- these were found in a bag?

7   **A.**   So as you're standing looking into the laundry nook -- so

8   as you exit out of the master bedroom, immediately to your

9   left is that laundry nook.  If you turn and look to your left

10  into the laundry nook, you have a washer and a dryer, and

11  above it is that shelf where you put soaps, detergents, things

12  like that.  There was a shoebox that was sitting on that

13  shelf.  When that shoebox was pulled down and looked inside,

14  there was the black plastic bag.  You see a portion of that

15  there in Government Exhibit 16.  Inside that bag was the

16  ammunition and the receipt.

17  Q.   And this was the same area where the box of baggies and

18  digital scale was found?

19  **A.**   Yes.  It was sitting a washer's width away to the -- just

20  to the right of it.

21       **MR. COWHIG:**  Your Honor, I'd like to offer Exhibits 3

22  through 17 into evidence.

23       I'm sorry.  I should ask the obvious evidentiary

24  question.

25  **BY MR. COWHIG:**

1  Q.  Do these images depict the search and the items you

2  described as they appeared on that day?

3  **A.**  Yes, sir, they do.

4  Q.  And they're a fair and accurate representation of that?

5  **A.**  Yes, sir, they are.

6          **THE COURT:**  Now you move them in?

7          **MR. COWHIG:**  Yes, Your Honor.

8      *(Government Exhibit Numbers 3 through 17, offered.)*

9          **THE COURT:**  Any objection?

10         **MS. ZHENG:**  No, Your Honor.

11         **THE COURT:**  All right.  They will come in.

12     *(Government Exhibit Numbers 3 through 17, received.)*

13 **BY MR. COWHIG:**

14 Q.  Regarding the marijuana, what did you note about how this

15 marijuana was packaged?

16 **A.**  There was a large quantity.  It was in a -- in a jar.

17 There was a significant amount of marijuana, much beyond what

18 I know to be consistent with personal use.

19 Q.  Was there something about the packaging that told you

20 where it may have come from?

21 **A.**  We consistently see in our line of work those large

22 plastic bags like we saw there in that second jar where

23 they're inside of that plastic bag, and then they have that

24 label either on the outside or the piece of paper on the

25 inside that indicates the particular strain of marijuana that

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  it is, which is not how marijuana is purchased if you purchase

2  it legally at a dispensary.

3  Q.  So this packaging is consistent with what you're used to

4  seeing on the illicit market?

5  **A.**  That is correct, sir.

6  Q.  And the quantity of marijuana that you saw here, this --

7  I think you already said this would not be typical for an

8  individual user?

9  **A.**  No.

10  Q.  Would the cost of this amount of marijuana be potentially

11  out of reach for someone who's out of work and struggling to

12  pay their bills?

13  **A.**  Yes, that would be an accurate representation.

14  Q.  Did you find anywhere else in the apartment any

15  indications of marijuana being purchased from a dispensary?

16  **A.**  No, sir, we did not.

17         **THE COURT:**  Let me back you up for just a second.

18  You --

19         **THE WITNESS:**  Yes, Your Honor.

20         **THE COURT:**  -- just testified that the cost of this

21  marijuana would be potentially out of reach for someone who's

22  out of work and struggling to pay their bills.  Do you know

23  the estimated value of that marijuana?

24         **THE WITNESS:**  Not a narcotics dealer, but based on

25  market price at the time -- it just depends on the strain or

 1   the THC content.  I would estimate probably somewhere there

 2   around --

 3          **MS. ZHENG:**  Your Honor, I'm going to object to the

 4   speculation of it.  Either the detective knows or doesn't.

 5   But as to the speculation of the cost of the market value --

 6          **THE COURT:**  All right.

 7          **MS. ZHENG:**  -- of it and what's within the bounds --

 8          **THE COURT:**  I'm going to sustain that for right now.

 9          Mr. Cowhig, I'm going to ask, if you want me to

10   consider that testimony about the value of this marijuana, if

11   you can lay a greater foundation for the knowledge of this

12   witness about such costs.

13          **MR. COWHIG:**  Certainly, Your Honor.

14   **BY MR. COWHIG:**

15   Q.   During the course of your investigations, do you

16   frequently investigate individuals who are selling illicit

17   drugs, particularly marijuana?

18   **A.**   Yes, sir, I do.

19   Q.   Those prices have a substantial range and vary over time?

20   **A.**   That is correct.

21   Q.   Do you know, during this time frame of September of 2020,

22   during COVID, what the approximate price of this quantity of

23   marijuana would be?

24          **MS. ZHENG:**  Your Honor, I'm going to object again.  I

25   don't think that that's a sufficient foundation in regards to

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   that.  The testimony is that it depends on the quantity and

2   the strain.  We have neither information about the strain or

3   the type of marijuana that it is.  I don't believe that the

4   detective should testify based on pure speculation as to the

5   value.

6          **THE COURT:**  Mr. Cowhig, can you -- does this witness

7   know the quantity of this marijuana?  Can he testify to that?

8   I just don't know if this is within his knowledge.

9   **BY MR. COWHIG:**

10  Q.   Did you seize the marijuana in this case?

11  **A.**   Yes, we did.

12  Q.   Did you make a record of that seizure?

13  **A.**   We did.

14  Q.   Would you look at Government Exhibit 2 for

15  identification, please.

16  **A.**   You said 2, Counselor?

17  Q.   Yes.

18  **A.**   Two... yes, sir.

19  Q.   Did you complete that form?

20  **A.**   Yes.  This is the LVMPD property report.

21  Q.   What does that form say?

22  **A.**   It lists all the items that were taken as evidence during

23  the service of the search warrant.

24  Q.   Does it include the quantity of marijuana that was

25  seized?

1    **A.**   It does in multiple -- multiple different packages,

2    multiple weights.

3    Q.   The first item that is seized there is 140 grams net of

4    marijuana?

5    **A.**   That is correct.

6         **MS. ZHENG:**  Your Honor, I'm going to object to that

7    categorization.  It says it's 140 grams net.  That includes

8    the container that it was in.  It does not give us an

9    indication of the marijuana in itself.

10        **THE COURT:**  You filled this out; correct?

11        **THE WITNESS:**  Yes, ma'am.

12        **THE COURT:**  You can ask him about what he seized and

13   what his recollections of the amounts were.

14   **BY MR. COWHIG:**

15   Q.   What did you seize in terms of marijuana?

16   **A.**   In this case, you see here an item one, package one,

17   quantity one, green, leafy substance, marijuana, 140 grams

18   net.  That is net weight.  That is raw marijuana, no

19   packaging.

20        However, if you move down below it, you see package

21   one, item two, 69.1 grams gross.  That is gross weight.  Gross

22   weight indicates that it's the marijuana and the packaging

23   that is with it.

24        So that's the differentiation between the net and the

25   gross weights that you see there.

Josh Costello - Direct
2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1   Q.   And then looking on to the second page of that, there's

2   also another weight for net?

3   A.   There's an additional -- at the very bottom of the first

4   page where there's 55.4 grams gross, and then on the back page

5   there's another 8.4 grams net.

6   Q.   Would this total amount be consistent with someone who is

7   simply using marijuana?

8   A.   Based on my training and experience, no, sir, it would

9   not.

10       **MR. COWHIG:**  Your Honor, I move Government Exhibit 2

11  into evidence.

12       (Government Exhibit Number 2, offered.)

13       **MS. ZHENG:**  No objection.

14       **THE COURT:**  All right.  2 will come in.

15       (Government Exhibit Number 2, received.)

16  **BY MR. COWHIG:**

17  Q.   During -- or preceding your search, did you talk with

18  Ms. Rodosh who was there at the apartment?

19  A.   I did very briefly, yes, sir.

20  Q.   Did you ask her questions about what was found in the

21  apartment?

22  A.   I did.  I briefly asked her if she had any firearms or

23  any narcotics inside of the residence prior to my application

24  of the search warrant -- or applying for the search warrant,

25  and she indicated to me that she did not have any firearms or

*Josh Costello - Direct*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    narcotics located inside of the residence.

2    Q.    Did she tell you why she wouldn't have any firearms or

3    narcotics in the residence?

4    **A.**    Yes.  Because she has a small child inside the home.

5    Q.    And for that reason, she would not have either firearms

6    or narcotics in there?

7    **A.**    Yes.

8    Q.    Did you then interview Mr. Whitney?

9    **A.**    The following day, I went to the North Las Vegas

10   Community Correctional Center with Detective Cook, and we

11   conducted an interview with Mr. Whitney.

12   Q.    Was that interview recorded?

13   **A.**    Yes, sir, it was.

14   Q.    Was a transcript prepared?

15   **A.**    Yes, sir, it was.

16   Q.    Is Government 18 a transcript of that recording?

17   **A.**    Yes, sir, it is.

18   Q.    Have you reviewed that for accuracy?

19   **A.**    I have.

20   Q.    And is it accurate?

21   **A.**    Yes.  There are a few minor grammatical errors, but it is

22   accurate.

23   Q.    At the outset of the interview, did you advise

24   Mr. Whitney of his rights under Miranda?

25   **A.**    Yes, sir, I did.

1    Q.   And did he indicate that he understood those rights?

2    **A.**   Indicated he understood and he agreed to speak with me.

3    Q.   Did you ask him about the firearm at the beginning of the

4    interview?

5    **A.**   I did.

6    Q.   What did he tell you?

7    **A.**   He told me he had no knowledge of the firearm and that

8    his fingerprints and DNA would not be located on it.

9    Q.   Would not be found on it?

10    **A.**   Yes.

11    Q.   Did you ask him about the marijuana?

12    **A.**   I did.

13    Q.   What did he say about the marijuana?

14    **A.**   Initially he stated he knew nothing of it.

15    Q.   Could you walk the Court through the course of that

16    interview.

17    **A.**   The interview was a little bit more than an hour and a

18    half in length, and over the course of the interview

19    Mr. Whitney changed his story a few different times, initially

20    indicating that he had no knowledge of the items located

21    inside the apartment.  Then we went into a portion of the

22    interview where we discussed his history and his upbringing,

23    and ultimately, over the course of the interview, he indicated

24    that he didn't want Ms. Rodosh to be implicated in anything

25    that was located inside the apartment.

```
 1              I asked him on numerous occasions to take
 2    accountability for only those things that he was responsible
 3    for, for nothing else.  Ultimately, he tells me that he
 4    reverted back to what he's known to do his entire life and
 5    that was sell drugs.  And then he explained that beginning at
 6    age 9 he began by selling a small quantity of marijuana, and
 7    then later ultimately sold harder drugs.  He admitted to
 8    selling cocaine, which is what he was on probation for at the
 9    time of his arrest that day.  And when we came back to the
10    firearm, he indicated that he knew that the firearm was there,
11    he knew that the firearm was there with the money.  He
12    indicated that his DNA would be on the firearm.  He described
13    the caliber of the firearm and the color of the firearm.  And
14    he also described to me that the marijuana would be located
15    next to the TV, which is where it was located, directly next
16    to the TV inside of the clothes hamper.
17    Q.   And why did you ask him these questions about where
18    things were or the characteristics of the firearm?
19    A.   Because, in my training and experience, individuals would
20    oftentimes try to take charges for other people to help them
21    avoid in getting prosecuted, but I asked him specific
22    questions that only individuals who are involved in possessing
23    or handling those items would know exactly where those items
24    were located.
25    Q.   And Mr. Whitney, I think you already told the Court, was
```

1  gone by the time you executed your search warrant?

2  **A.**   Yes.  Once the residence was frozen and the application

3  was being made for the service of the search warrant,

4  Detective Cook had transported -- or I believe it was parole

5  and probation, when they left, they loaded him into their

6  vehicle and they transported him to North Las Vegas for

7  Detective Cook so that he could complete that booking.

8  Mr. Whitney was not present during the service of the search

9  warrant.

10  Q.   So he did not see any of the search that you described

11  here for the Court?

12  **A.**   No, sir, he did not.

13  Q.   During a significant portion of the interview,

14  Mr. Whitney is talking about whether someone else would take

15  responsibility for the gun and the marijuana.  Could you

16  explain that a little bit to the Court?

17  **A.**   Could you elaborate slightly further?

18  Q.   There's a discussion during the interview where

19  Mr. Whitney is talking about whether Ms. Rodosh is the one who

20  possesses the firearm and the marijuana.

21  **A.**   Yes.  There's extensive conversation about him not

22  wanting her to be involved in any way, that she's not involved

23  in that, that she's a great mother, and she takes great care

24  of her child, that she was not raised -- she's not involved in

25  any of that.  We have extensive conversation about his

1   childhood and how he was brought up around narcotics dealing

2   and the life that he had lived growing up.  And through that

3   he said he could never ask her to try to take responsibility

4   for something that he was involved in.

5   Q.   Did you write up a final report, a declaration of arrest

6   report in this incident?

7   **A.**   Yes, sir, I did.

8   Q.   Would you look at Government Exhibit Number 1 for

9   identification, please.

10  **A.**   That is my declaration of arrest for Stephon Whitney in

11  reference to this incident.

12  Q.   Is that a fair and accurate representation of this

13  incident and the investigation?

14  **A.**   Yes, sir, it is.

15       **MR. COWHIG:**  Your Honor, I'd move Government

16  Exhibit 1 into evidence.

17       *(Government Exhibit Number 1, offered.)*

18       **MS. ZHENG:**  No objection, Your Honor.

19       **THE COURT:**  All right.  1 will come in.

20       *(Government Exhibit Number 1, received.)*

21       **THE COURT:**  I don't think you moved in 18.  Did you

22  intend to move in 18?

23       **MR. COWHIG:**  Yes, Your Honor.  I'm sorry.

24       *(Government Exhibit Number 18, received.)*

25       **THE COURT:**  So 18's the transcript.  Any objections

Josh Costello - Direct
2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1   to that one?

2           **MS. ZHENG:**  Likewise, no objection.

3           **THE COURT:**  All right.  18 will come in.

4      *(Government Exhibit Number 18, received.)*

5   **BY MR. COWHIG:**

6   Q.   With regard to the drugs and the drug paraphernalia and

7   the firearm and the magazines and the ammunition, were these

8   all essentially located in the same part of that apartment?

9   **A.**   Yes.  They were all located either within or immediately

10  outside of what we've been referring to as the master bedroom.

11  Q.   And in your experience as a law enforcement officer, is

12  it common to see firearms and drugs that are being sold

13  together in the same place?

14  **A.**   Yes.  Individuals who engage in narcotics sales

15  oftentimes possess firearms to protect themselves for fear of

16  being robbed during narcotics transactions.

17          **MR. COWHIG:**  No further questions, Your Honor.

18          **THE COURT:**  Thank you.

19          Cross?

20          **THE WITNESS:**  Before we begin, do we have a bottle of

21  water or something?

22          **COURTROOM ADMINISTRATOR:**  I'll go grab one.

23          **THE COURT:**  Danielle will go grab you one.

24          **THE WITNESS:**  Thank you so much, Your Honor.

25          Thank you so much, ma'am.  Thank you.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

**ER_97**                    *Page 34*

1    **CROSS-EXAMINATION**

2    **BY MS. ZHENG:**

3    Q.   Good morning, Detective Costello.  I'm going to try to

4    track as close as I can to the testimony that was previously

5    given.

6         So let's go back and start with the August 28th

7    incident.  Were you involved in that incident?

8    **A.**   Yes, I was.

9    Q.   You were physically present during the stop of the party

10   bus?

11   **A.**   Yes.  However, in a covert manner.  I remained inside my

12   vehicle down the street watching the traffic stop occur and

13   the crowd beginning to grow.

14   Q.   And with respect to that incident, there were allegedly

15   firearms that were found within the bus; correct?

16   **A.**   Yes, ma'am.  There were three firearms located inside the

17   bus.

18   Q.   None of those firearms were physically on Mr. Whitney?

19   **A.**   No.  They physically remained on the bus when all the

20   subjects exited the bus.

21   Q.   And, ultimately, there's no determination that

22   Mr. Whitney possessed any of those guns that were associated

23   with that bus?

24   **A.**   A DNA comparison was requested, and his DNA was not

25   definitively located on any of those three firearms.

1  Q.   And, ultimately, in the course of that investigation he

2  was identified, and then it was a requested follow-up which is

3  what led to the September 2nd home inspection?

4  **A.**   Yes.  I contacted parole and probation after I learned

5  that he had provided a false name that night.

6  Q.   And so, in essence, the home inspection on September

7  7th -- I'm sorry, September 2nd was an assist to your

8  investigation?

9  **A.**   It was -- it was two part.  So -- I don't want to mess up

10  his name.  I believe it was Officer Vargas said that he had

11  just taken over as being the supervising officer for

12  Mr. Whitney.  He indicated that he needed to go out and do his

13  duty and conduct a home inspection, and he asked if I would --

14  if I wanted to do my warrant, if I would just accompany him so

15  that we could handle two things at one time.

16  Q.   Okay.  And at that point had you already received the

17  warrant for the buccal swab?

18  **A.**   I don't recall.

19  Q.   During the home inspection, you had testified that you

20  did not go into the house first?

21  **A.**   Initially I did not.  It was only parole and probation

22  personnel.

23  Q.   Okay.  And of the parole and probation personnel, was it

24  just Officer Vargas or were there other officers present with

25  him also?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    **A.**    He had other officers with him.

2    Q.    Do you recall how many officers there were?

3    **A.**    There was more than one.  I -- I can't testify to exact

4    number.

5    Q.    And as to the entry into the house and any contact that

6    they made with either Mr. Whitney or anyone that lived in the

7    house, you were not privy to it?

8    **A.**    No, I was not.

9    Q.    So you would have no information as to whether or not, if

10    any of the items were found, if anybody in the house were told

11    that they were going to be charged with a crime or otherwise?

12    **A.**    I have no knowledge of their conversation with those

13    individuals.

14    Q.    Okay.  As to the two magazines that were found, were you

15    ever shown specifically what location the two magazines came

16    from?

17    **A.**    Yes.  He pointed to the closet where he saw them sitting

18    on the top shelf.

19    Q.    Do you recall, in regards to the master bedroom, there

20    was actually two closet areas in the house?

21    **A.**    You're saying there's two separate closets within the

22    master bedroom?

23    Q.    There's two separate spaces.

24    **A.**    Okay.

25    Q.    Do you recall that?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  **A.**  Not off the top of my head, no.

2  **Q.**  Okay.  And you wouldn't be able to testify as to whether

3  or not it was in his closet specifically or her closet?

4  **A.**  There's other photographs of the closets.  I don't have

5  them here before me.  I just know that, when we were standing

6  and looking at the closet, he pointed and said, Hey, I found

7  those magazines right here on the top shelf.

8  **Q.**  At the time that any of the evidence was found, in this

9  case as it appears before us, you have no direct evidence that

10  Mr. Whitney was, in fact, engaged in the sale of marijuana?

11  **A.**  Could you repeat the question?

12  **Q.**  There's no direct evidence that he has engaged in the

13  sale of marijuana?

14  **MR. COWHIG:**  Objection, Your Honor.  I think that's

15  calling for a legal characterization.

16  **THE COURT:**  Sustained.  Rephrase.

17  **BY MS. ZHENG:**

18  **Q.**  In regards to the marijuana that was found, this was not

19  specifically an investigation into marijuana sales; correct?

20  **A.**  It was not.

21  **Q.**  There is no indication that -- or surveillance that

22  anyone had come to the home and purchased marijuana?

23  **A.**  I have no evidence of that.

24  **Q.**  There's no evidence that there was any hand-to-hand sale

25  that was conducted that you know of?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  **A.**   I have no evidence of that.

2  Q.   You initially booked him for marijuana -- for the

3  possession of marijuana also?

4  **A.**   When -- so his initial arrest was for the probation

5  violation and the false info or obstructing, and that was done

6  by North Las Vegas Detective Cook.  I then follow up and later

7  rebooked him for the ex-felon in possession of a firearm and

8  the possession with intent to sell marijuana.

9  Q.   And are you aware if he's ever been charged for the

10  marijuana, for the possession with intent to sell?

11  **A.**   I know what I arrested on.  I don't know if the district

12  attorney chose to file those charges or not.

13  Q.   Okay.  Do you know that there was a state case filed

14  against Mr. Whitney?

15  **A.**   I made the initial arrest.  Yes, I'm aware of that.

16  Q.   Okay.

17  **A.**   As far as the DA's charging, I don't know what the -- the

18  charging was.

19  Q.   Okay.  So you don't know that the marijuana charges were

20  denied as it pertains to him?

21  **A.**   I learned that just now, ma'am.

22  Q.   Okay.  And in regards to the items that was found -- I'm

23  now tracking into the exhibits that were provided.  When they

24  came in, I guess -- you called for a telephonic search

25  warrant; correct?

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   **A.**   I did, yes.

2   Q.   And when the search warrant is executed, are you

3   specifically the person that is executing?  So in the

4   Government's Exhibit 3.

5   **A.**   The picture of the bed frame?

6   Q.   Correct.

7   **A.**   Yes, ma'am.

8   Q.   Were you involved in removing the mattress --

9   **A.**   Yes, ma'am, I was.

10   Q.   -- on the bed?

11       And at the time of -- where the bed frame was, was it

12   pushed up against the wall, or it wasn't free-floating in the

13   room, was it?

14   **A.**   No.  What you're seeing here is we've already begun the

15   search, and so things had been moved at this point as we began

16   searching.  So, again, there's photographs that are taken

17   before the search began.  That is it our standard protocol.

18   We take pre-search warrant photos.  We take post-search

19   warrant photographs to show the condition of the residence

20   when we leave.  And so in the initial you would see that the

21   bed was more off the wall and that there was a nightstand over

22   there next to the bed.

23   Q.   On both sides of the bed there was a nightstand?

24   **A.**   I believe so, yes.  I know for certain there was on

25   Mr. Whitney's side because of the -- the pill bottles and such

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   that were located right there.

2   Q.   And since in these pictures they were already moved, was

3   the bed initially -- prior to the execution of the search

4   warrant, was the bed pushed up against the wall, do you

5   recall?

6   **A.**   No, ma'am, it was not.

7           I'm sorry.  When you say pushed up against the wall,

8   do you know like we see it here where it's all the way up to

9   the wall to the right and all the way back, or are you talking

10  about the headboard being against the wall?

11  Q.   The headboard being against the wall, being back against

12  the wall.

13  **A.**   The headboard was against the wall, yes, ma'am.

14  Q.   Okay.

15  **A.**   I'm sorry.  I apologize.  I thought you were referring to

16  where you see in Government's Exhibit 3 where it's pushed all

17  the way to the right --

18  Q.   Into the corner --

19  **A.**   -- up against the wall --

20       *(Reporter instruction.)*

21           **MS. ZHENG:**  I'm sorry.

22  **BY MS. ZHENG:**

23  Q.   Your testimony is that the bed was not pushed up against

24  the corner of the room --

25  **A.**   It was --

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

**ER_104**                                    *Page 41*

1    Q.   -- correct?

2    **A.**   -- not pushed into the corner, but the headboard was

3    against the wall.

4    Q.   Okay.  And moving to Government's Exhibit 4, there is a

5    ledge against the headboard wherein the zipped compartment

6    sits; correct?

7    **A.**   I'm sorry?  I'm not understanding your question.

8    Q.   So where the headboard is, there's a ledge that comes

9    out, and the zippered compartment sits within that ledge area

10   of the headboard?

11   **A.**   Yes.  So there's -- the headboard -- you see the top

12   board there.  It's maybe three to -- three and a half inches,

13   4 inches wide.  And then there's that fabric that's affixed to

14   it that is away from the front portion of the headboard so it

15   leaves that -- that cavity that's in there, and that's

16   accessible with a zipper.

17   Q.   Sure.

18        But that zipped portion is nestled within the cavity

19   of the headboard is your testimony; correct?

20   **A.**   It's inside of the headboard, yes.

21   Q.   And when you walked into the room, however that headboard

22   was pushed up against the wall?

23   **A.**   Yes, ma'am, it was.

24   Q.   And so in order then to access the gun or the money, the

25   bed would have to be slightly pulled away from the wall in

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   order to access the compartment?

2   **A.**   That is correct.

3   Q.   And within that compartment you found the gun, a

4   magazine.  Was the gun loaded?  The magazine was separate from

5   the gun; correct?

6   **A.**   There was a magazine in the firearm, which is depicted in

7   Government Exhibit Number 6.  You see there that there's a

8   firearm in the magazine.  And then there was a separate

9   magazine that was loaded as well that I believe you see in

10  Government's Exhibit -- yes, Government's Exhibit 7.

11  Q.   And then, along with those two items, you found the bank

12  sleeve of cash?

13  **A.**   Yes.  Government's Exhibit 8, the paper envelope with the

14  money in it, yes, ma'am.

15  Q.   Do you remember laying out the cash and taking inventory

16  for it?

17  **A.**   Yes, ma'am.  We took a photograph of it, and then we

18  counted it to be impounded.

19  Q.   And predominantly the monies were large denominations;

20  correct?

21  **A.**   I believe there were multiple hundred-dollar bills in

22  there.

23  Q.   Okay.

24  **A.**   I'd have to refer to my money accounting form which

25  breaks it down specifically.

```
 1   Q.   And the monies were seized in connection with the
 2   marijuana that were found -- that was found presumably to be
 3   proceeds of marijuana sales; correct?
 4   A.   Yes, ma'am.
 5   Q.   Were you aware ultimately that in a state forfeiture
 6   proceeding the entirety of those proceeds were returned to
 7   Mr. Whitney and Ms. Rodosh?
 8   A.   I was not aware of a state forfeiture proceeding.
 9   Q.   Okay.  And so you -- in the course of the search warrant,
10   you were neither looking for documentation that would verify
11   the source of funds for the monies?
12   A.   The search warrant was for the firearm, firearms
13   paraphernalia, and the DNA of Mr. Whitney.
14   Q.   Okay.  With respect to marijuana, Government's Exhibit 9
15   to 13, you testified that all of that was found within the
16   laundry hamper?
17   A.   The jars and the plastic bag, yes.
18   Q.   Okay.  So, in essence, the bulk of the marijuana
19   itself --
20   A.   Was located inside --
21   Q.   -- was all within the laundry hamper?
22   A.   Yes, ma'am.
23   Q.   And then --
24        THE COURT:  Wait.  Was the bulk or all of it?
25        THE WITNESS:  There was one additional small plastic
```

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   vial that was, I believe, on the bathroom counter.  Like a

2   small little snap-top bottle, and that was listed on the

3   property report.  I think it had maybe 8 grams or something in

4   it.  It was near the end of the property report.

5          **THE COURT:**  Thank you.

6   **BY MS. ZHENG:**

7   Q.   And you're referring to Government's Exhibit 2 wherein

8   you're talking about package one, item four?

9   **A.**   One moment.  Let me get there.

10         Yes.  Package one, item four:  A green, leafy

11  substance, marijuana, 8.4 grams net in gray bottle.

12  Q.   But for the 8.4 grams, everything was found in the

13  laundry hamper?

14  **A.**   Yes, ma'am.

15  Q.   And you testified that there were other items that were

16  found by the laundry area; correct?

17  **A.**   Yes, ma'am.

18  Q.   And in this case it was the digital scale, and it was in

19  a sandwich bag box; correct?

20  **A.**   Yes, ma'am.

21  Q.   And we are talking about the fact that these are, like,

22  lunch bags, sandwich bags with the roll-up, not with the zip

23  top or the Ziploc top?

24  **A.**   Yes, ma'am.

25  Q.   Okay.  Other than that one container for 8.4 grams, all

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1    of the marijuana was packaged in bulk?

2    **A.**    Yes, ma'am.

3    Q.    In -- anywhere in the house, did you find any small bags

4    of marijuana that were packaged for sale?

5    **A.**    No, I did not find any small bags.

6         Am I making the correct assumption, when you're

7    talking about, like, the -- what they sometimes refer to as

8    jewelry bags, like the small, square --

9    Q.    Correct.

10   **A.**    Okay.  So, no, never did I find any small bags that would

11   be consistent with either personal-use consumption or with the

12   packaging in that manner.

13   Q.    And then, also, in the laundry area, the ammunition that

14   was found that was contained in Government's Exhibit 16 and

15   17, that was also found near and around the laundry area?

16   **A.**    Yes, ma'am.  It was found on the same shelf as the scale

17   and the baggies.

18   Q.    Okay.

19        **MS. ZHENG:**  Court's indulgence, please.

20   **BY MS. ZHENG:**

21   Q.    On the day of the search, did you interview Ms. Rodosh?

22   **A.**    Formally, no.  It was a brief interaction.  She said she

23   needed to leave to attend to her son.  I don't remember.  She

24   had to take him somewhere or she had to pick him up from

25   somewhere, but she left.

1   Q.   Okay.  Did you indicate to her that you would need to

2   speak to her later in regards to the investigation?

3   **A.**   At that time I did not because I did not know what I was

4   going to find inside the residence.  I told her I would

5   contact her again when the search warrant was over so that I

6   could turn the residence back over to her so we didn't have to

7   board up the door.  We wanted to make sure the residence was

8   secure.

9   Q.   Okay.  And you did not testify at the state revocation

10  proceedings; correct?

11  **A.**   No.

12  Q.   You were... you would otherwise be unaware that

13  Ms. Rodosh had called Officer Vargas, Mr. Whitney's probation

14  officer --

15         **MR. COWHIG:**   Your Honor, I'm going to object at this

16  point.  I think counsel's essentially testifying.

17         **THE COURT:**   Please rephrase.

18  **BY MS. ZHENG:**

19  Q.   Were you aware that Ms. Rodosh had contacted

20  Officer Vargas?

21  **A.**   I have no knowledge of their interaction.

22  Q.   Okay.  Were you aware as to whether or not any charges

23  were filed against Ms. Rodosh in relation to what was found in

24  the house?

25  **A.**   I only know what charges I filed.  As far as my case, my

 1    charges were solely for Mr. Whitney.  I don't know if anyone
 2    else followed up or filed any charges against Ms. Rodosh.
 3    Q.   The day after the search warrant was executed, you went
 4    to North Las Vegas Jail to interview Mr. Whitney?
 5    **A.**   That is correct.
 6    Q.   And you had testified earlier that much of his
 7    conversation with you is that he absolutely did not want her
 8    implicated; correct?
 9    **A.**   Yes.
10    Q.   And in the course of the interview, it spanned an hour
11    and a half?
12    **A.**   A little bit longer than that, yes, ma'am.
13    Q.   About.
14         And the transcribed document showed that it was
15    approximately 88 pages?
16    **A.**   Yes.
17    Q.   Initially, in the course of the interview, there were
18    several mentions that were made by you or Detective Cook,
19    who's also present for the interview?
20    **A.**   Correct, he was present.
21    Q.   That you were also investigating Ms. Rodosh, and the
22    likelihood was that she would be charged with the items in the
23    house?
24    **A.**   Is that a question?  I apologize.
25    Q.   Do you remember that?  Did that happen?

1    **A.**   We discussed that she could potentially be arrested or

2    charged, yes.

3    Q.   And, in fact, that was how the interview started;

4    correct?

5    **A.**   I believe it started with me saying I don't want you to

6    take credit for anything that you're not involved in; however,

7    I have to do my due diligence and I have to speak to all

8    parties, and I'm speaking to you today.

9    Q.   And you did tell him that there was a good possibility

10   coming down the line that there would be charges for both

11   Mr. Whitney and her?

12   **A.**   I did indicate that was a possibility, yes.

13   Q.   Okay.  And then that continues.

14        And then later on, in the next breath, you tell him

15   that she's looking at charges coming down against her for

16   child abuse?

17   **A.**   That was possible, yes.

18   Q.   And then, immediately at the start of the interview you

19   had asked him about the marijuana, and he had -- he was

20   actually unclear as to what was present in the house; isn't

21   that correct?

22   **A.**   I'd have to refer to the exact transcript.  Again, it

23   was --

24   Q.   So if it helps --

25   **A.**   -- a lengthy interview.

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  Q.   If it helps to refresh your recollection, I'm referring

2  to what's on pages 7 and 8.

3  **A.**   You say 7 and 8?

4  Q.   Um-hum.

5  **A.**   Where are you starting at here on 7, ma'am?

6  Q.   On the bottom of 7.

7  **A.**   On the bottom of 7... we're talking about selling

8  cocaine?

9  Q.   No -- yes.  Well, he was talking about a prior felony,

10  but then it starts at the bottom of 7, rolling into page 8.

11  **A.**   So we talk about his past with him --

12  Q.   I just need you to refresh your recollection --

13  **A.**   Oh.

14  Q.   -- if you want to just look at it.

15       So have you had a chance to review pages 7 and 8?

16  **A.**   I'm finishing just now, ma'am.  Yes, I have.

17  Q.   So initially he was not very clear as to whether or not

18  there was shake in the bag or there was actual whole-leaf

19  marijuana.  And his initial claim was that, if there was

20  marijuana in the house, it was marijuana that she smoked;

21  correct?

22  **A.**   He was ambiguous about the marijuana and indicated that

23  she smoked marijuana, yes.

24  Q.   And then you testified, in fact, that a large portion of

25  the interview you go into his criminal history, his prior

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  criminal history, his upbringing.

2  **A.**    Yes, we discussed that.

3  Q.    And then, midway into the interview there was another

4  inference that, as a result of her connection with him, that

5  Ms. Rodosh was now caught up in this investigation; is that

6  correct?

7  **A.**    Again, from the very beginning there was no hiding the

8  fact that she was potentially being investigated for the

9  marijuana charges and the potential child abuse charges as

10  well.

11  Q.    And, again, his response to you was he didn't want her

12  implicated, and his answers to you were:  So you're basically

13  saying, unless I own up to all that shit -- and testify

14  multiple times that she was a good girl, she didn't need

15  that -- meaning she didn't need to be charged -- she don't

16  need that, man.  And then he kept asking you whether or not,

17  if he claimed responsibility for it, it would prevent her from

18  being charged; correct?

19  **A.**    He did ask that.  However, when I answered, I told him I

20  don't want her side of the story.  I need his side of the

21  story.  And I asked him to only testify and give me comment

22  regarding his involvement, not hers.  At no time did I promise

23  him that, by him taking this charge or accepting guilt, would

24  she be not implicated in any way.

25  Q.    Sure.  But your answer and the implication was, unless

1   there's some type of mitigating circumstance or some

2   additional information that I've learned through the course of

3   my investigation, then those facts have to be presented in

4   court.  And his response was:  And you mean that as in what,

5   to me owning up to everything?

6   **A.**   I don't know what --

7         **THE COURT:**  I'm sorry.  What's the --

8     *(Simultaneous crosstalk.)*

9         **MR. COWHIG:**  -- where we are in the transcript?

10        **MS. ZHENG:**  Oh.  I'm sorry.  We're on page 49.

11        **THE COURT:**  And -- and is there a question?

12  **BY MS. ZHENG:**

13  Q.   Was that the implication, that there was -- if mitigating

14  circumstances were presented to you that she was not the owner

15  of those items, then that would be the way to see her out of

16  the case?

17  **A.**   My indication was to him that the facts are the facts.  I

18  have to present the facts.  This is what I know right now.

19  I'm here to get your side of the facts.  He continually asked

20  me, if he would -- if he would take the charge, if she'd been

21  left alone.  I indicated to him at no time that she would ever

22  receive any type of immunity or not be charged.  He repeatedly

23  asked.  I repeatedly refused to give him that answer because

24  that's ultimately not how the investigation goes.  I'm there

25  to discuss his involvement in the investigation that day, not

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1   Ms. Rodosh's involvement.

2   Q.   Sure.  But when he did accept responsibility to it, did

3   he continue to remain ambiguous as to the details of where the

4   items were?

5   **A.**   No.  He was a very -- in fact, he was detailed.  It's

6   located at this location.  It's by this.  It's located here.

7   There was --

8   Q.   But he answered -- did it seem as if he answered all of

9   your questions with a question?

10  **A.**   No.  He and I had the conversation multiple times

11  throughout the hour and I believe 42-minute conversation.  In

12  the end, when he ultimately accepted guilt, I told him I had

13  some very pointed questions I had to ask regarding specific

14  details, and he answered them.

15  Q.   What's saying I think it was this or I think it was that

16  or I don't know where specifically -- so I'm referring to --

17  **A.**   May I follow along in the transcript so I see what you're

18  speaking to?

19  Q.   Sure.

20  **A.**   Where are you at, ma'am?

21  Q.   I'm on page 66.

22  **A.**   66.  Okay.

23  Q.   So you asked him what the gun looks like; he wasn't sure.

24  The question was just generically.  He says:  I think it was

25  all black.  He wasn't even specifically sure as to the

*Josh Costello - Cross*
*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

1  difference between a revolver and a semiautomatic.  His guess

2  was that a revolver has the spinny thing --

3       **MR. COWHIG:**  Objection to the characterization as a

4  guess.

5       **MS. ZHENG:**  I mean, they are, in fact, written with a

6  question attached to it.

7       **THE COURT:**  Overruled.  You can continue.

8  **BY MS. ZHENG:**

9  Q.   He continues to say:  I think it was all black, though.

10  Well, the majority of it black.

11       And then, when we moved on to the marijuana, he

12  believed that the marijuana predominantly was in the bathroom.

13  You had to ask him where else it was.  Then he said it was by

14  the TV.  He couldn't tell you how it was packaged.  I'm now

15  rolling on to page 67.

16       **THE COURT:**  And I hope there's a question in there

17  somewhere, Counsel.

18  **BY MS. ZHENG:**

19  Q.   You're directing -- so he was not specific as to the

20  details, the location of the items found that were considered

21  contraband, correct, in this exchange?

22  **A.**   Not correct.  During the totality of the -- this line of

23  questioning, he identified it as being a semiautomatic, not a

24  revolver.  He identified it as being black.  He told me that

25  it was a nine millimeter; he knew that.  He discussed where

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

**ER_117**                                    *Page 54*

1    the marijuana would be by the TV.  He then mentioned that it

2    was in the jar or, like, bulk package.  He had very

3    specific -- and, again, as he was trying to answer the

4    questions, I would come back with another clarifying question

5    to make sure -- again, my -- my attempt is not to get this man

6    to take a charge that he's not responsible for.  I'm looking

7    for clarifying questions to make sure that he does have that

8    knowledge of these items before I charge him with them.

9              Does that make sense, Counselor?

10   Q.   I understand.  Yes, what you're saying makes sense.

11             But in terms of the characterization of his responses

12   to you, predominantly they're categorized in this interview as

13   he is responding to your question with the question, and there

14   are a lot of I don't really knows.  But some of this

15   information was given to him prior to us getting I'm going to

16   guess probably an hour into the interview at this point.

17             I mean, he was previously told what items were found

18   in the house.  So he would have those details as a result of

19   what was told to him earlier; correct?

20   A.   Who would have told him what items were found?

21   Q.   In the course of the interview it was mentioned.

22   A.   I mentioned that we'd found a firearm, and I mentioned

23   that we'd found narcotics.  But never did I tell him that the

24   gun would be hidden in the headboard.  Never did I tell him,

25   that I recall, that the gun -- or that the marijuana was in

1    the basket.  He even went so far as to say it's by the TV.

2    And I said, Well, which TV?  Because there was multiple TVs in

3    the residence.  He said, "The TV in our room," which is

4    exactly where it was found next to.

5          **MS. ZHENG:**  Court's indulgence, please.

6    **BY MS. ZHENG:**

7    Q.    Detective Costello, do you remember or recall showing

8    Mr. Whitney the search warrant return at any point prior to

9    the interview?

10   **A.**    No.  What I had for Mr. Whitney for the search warrant

11   return is I was serving a DNA buccal swab on him that day.  So

12   prior to the interview beginning at the very beginning, if you

13   listen to it, you can hear me opening the package and such.  I

14   am fulfilling the second half of the search warrant, which was

15   the collection of the DNA swab.  So when he was presented a

16   search warrant and a return, he was given the -- the portion

17   of the return and the warrant regarding his DNA collection,

18   not the -- not the warrant in the return that were left at the

19   apartment or the house, if that makes sense.

20   Q.    You don't recall whether or not if preinterview he had

21   seen a copy of the search warrant return from the house?

22   **A.**    He would have no way to see it because he's been

23   incarcerated.  The search warrant return wasn't generated

24   until after he was in custody in North Las Vegas.  The return

25   that I gave him was the warrant and the return for the

1  collection of his DNA.  He was photographed holding that

2  return just showing that I collected two buccal swabs from his

3  mouth.

4         **MS. ZHENG:**  Court's indulgence.

5         I have no further questions, Your Honor.

6         **THE COURT:**  Thank you.

7         Rebuttal?

8         **MR. COWHIG:**  Very briefly, Your Honor.

9                   **REDIRECT EXAMINATION**

10  **BY MR. COWHIG:**

11  Q.   Detective Costello, with regard to the search warrant

12  return for the search of the residence, did that search

13  warrant return say where things were found or just what was

14  seized?

15  **A.**   Just the items seized.

16  Q.   So it wouldn't have answered the question as to where the

17  marijuana was, where the gun was?

18  **A.**   No.  We just list an itemized list:  Firearm, ammunition,

19  money, marijuana.

20  Q.   And with regard to accessing the firearm in the

21  headboard, how difficult would it be for a person to get into

22  that headboard and get the firearm out if they knew it was

23  there?

24         **MS. ZHENG:**  Your Honor, I'm going to object to that

25  as a cause of speculation.  He neither lived in the house nor

*Josh Costello - Recross*
2:21-cr-00002-JAD-NJK-1 - November 7, 2022

```
 1    was he there to move the bed.
 2            THE COURT:  And you actually asked that question
 3    during your direct.
 4            MR. COWHIG:  Certainly, Your Honor.
 5    BY MR. COWHIG:
 6    Q.   And then, the false name that Mr. Whitney provided on
 7    August 28th, was that also a violation of his parole and
 8    probation conditions?
 9    A.   He has a general condition -- I don't want to speak to
10    all the terms of his probation agreement, but a general
11    condition of parole and probation is to cooperate with law
12    enforcement and not commit new crimes.  And in doing so, he
13    violated that, and that's why his officer initiated the -- the
14    initial violation.  The secondary violation was what we
15    discovered during the service of the search warrant.
16            MR. COWHIG:  Thank you.  No further questions,
17    Your Honor.
18            THE COURT:  Anything else?
19            MS. ZHENG:  Just very briefly.
20                        RECROSS-EXAMINATION
21    BY MS. ZHENG:
22    Q.   Just to follow up on the line of question that I had
23    asked in regards to direct evidence of drug sales --
24            MR. COWHIG:  Objection, Your Honor.  Beyond the
25    scope.
```

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1          THE COURT:  Let me hear the question, and then I'll
2     rule on it.
3     BY MS. ZHENG:
4     Q.   You didn't find any owe sheets in the house during the
5     execution of the search warrant?
6          THE COURT:  I'll just allow it.  Go ahead.
7          THE WITNESS:  No, ma'am, I did not.
8          MS. ZHENG:  Okay.  I'll just leave it at that.  Thank
9     you.
10         THE COURT:  Thank you.
11         MR. COWHIG:  Nothing further, Your Honor.  Thank you.
12         THE COURT:  Thank you.
13         May I excuse this witness?
14         MR. COWHIG:  Please, Your Honor.
15         MS. ZHENG:  Yes, please.
16         THE COURT:  All right.  You can step down.  Thank
17    you, sir.
18         THE WITNESS:  Thank you, Your Honor.
19         THE COURT:  Any other witnesses or evidence,
20    Mr. Cowhig?
21         MR. COWHIG:  No, Your Honor.  Out of an abundance of
22    caution, though, I'd like to clarify, in case at some point in
23    the filings I identified the two magazines in the closet as
24    fitting the Canik, I think it's obvious from the testimony
25    they did not.  I was searching through my filings to see if I

```
 1    had made that representation because I have some recollection
 2    of writing that.  If I did, that is not accurate.  The
 3    testimony here --
 4           THE COURT:  So the magazines found in the closet did
 5    not fit the gun?
 6           MR. COWHIG:  Yes, Your Honor.
 7           THE COURT:  All right.  Ms. Zheng, anything in
 8    response?  Did you want to put on any evidence?
 9           MS. ZHENG:  No, Your Honor.  I think with the
10    remainder of it I'll just argue.
11           THE COURT:  All right.  So here's what we're going to
12    do.  It's now 12:20.  I'm going to let each of you argue the
13    effect of the evidence that we've just seen today on the
14    four-level enhancement.  So I will start with Mr. Cowhig.  But
15    then we'll -- we'll have to break after that, and we'll pick
16    this back up at a continued hearing.  So -- but I want to make
17    sure that we close out all the evidence and argument on this
18    point so that I don't have to try to go back and -- and pick
19    up where we left off.
20           So, Mr. Cowhig, argument in support of the
21    enhancement and in response to any of the further objections
22    that were raised to the PSR with respect to --
23           MR. COWHIG:  This point.
24           THE COURT:  -- this point.
25           MR. COWHIG:  Yes, Your Honor.  And I believe we've
```

1    covered most of the points that I would make in our briefings.

2    One that I addressed tangentially, not directly, is that the

3    correct standard is preponderance of the evidence, not clear

4    and convincing evidence here.  Under the case law applicable,

5    we don't really get into the question of whether a higher

6    burden is needed until you get above four -- I'm -- above four

7    levels, five or greater.  Even if, however, the higher

8    standard of proof were applicable, the evidence here meets

9    that standard of proof.

10            Just summarizing very quickly the evidence that shows

11   that Mr. Whitney was involved in the sale of marijuana during

12   the time frame and the firearm was connected with that, all of

13   these items we've been discussing have been found inside a

14   very small apartment.  The application of the enhancement does

15   not depend upon a witness or a video or some other direct

16   evidence showing that he was engaged in marijuana, simply

17   evidence to show that he was engaged in the trafficking of

18   marijuana and that the firearm was found in close connection

19   with that.

20            The law recognizes and the experience of law

21   enforcement recognizes that persons who sell illicit

22   substances very often do so with a firearm available to them.

23   They have to do so because they have to protect themselves

24   both from theft of the illicit substances and theft of the

25   money because they obviously cannot have recourse to law

```
1    enforcement if that were to happen to them.
2           Here the marijuana was found in bulk.  It was not
3    small -- small items or small amounts that were purchased for
4    one individual's use, but it was in bulk in the apartment.
5           Detective Costello did not find prepackaged, multiple
6    small amounts for sale.  That's not an indication that there
7    wasn't distribution of marijuana going on.  It simply means
8    that Mr. Whitney and/or Ms. Rodosh were not at that point
9    ready to walk out the door and sell those small amounts.  The
10   bulk amounts that were there were packaged the way that
11   illicit marijuana is packaged, not the way that marijuana that
12   is purchased from a dispensary for individual use is packaged.
13   There were no wrappings, no containers, no -- nothing to
14   indicate that this marijuana had been purchased from a
15   dispensary for individual use.
16          As to the argument that it was illicitly purchased
17   for individual use, the quantity of marijuana is simply too
18   large for that.  Mr. Whitney, in his interview with
19   Detective Costello and in the testimony that was presented by
20   defense as part of their filings in the revocation proceedings
21   before the state indicated that they were going through
22   financial hard times, they were having trouble making ends
23   meet.  The claim was that the cash that was found in the
24   headboard was cash that they had recently received and backed
25   up unemployment benefits.  All of that evidence would tend to
```

 1    indicate that Ms. Rodosh and Mr. Whitney did not have a lot of

 2    available income for buying a large quantity of marijuana

 3    simply for personal use.

 4            It's possible Ms. Rodosh was using marijuana

 5    personally, but that does not eliminate the evidence that

 6    shows that there was sale of marijuana going on or

 7    distribution of marijuana going on.

 8            Defense argues in their brief about the firearm

 9    needing to be essentially used in the course of a marijuana

10    distribution or distribution of the drugs.  That's simply not

11    what the case law indicates.  The case law indicates clearly

12    that the possession of the firearm simply would need to

13    support that illicit activity, and here it clearly did support

14    that illicit activity.  The gun, the ammunition, the magazines

15    were all stored in the same general area where the marijuana

16    was stored.  The ammunition was stored on the shelf next to

17    the baggies for breaking down those large quantities of

18    marijuana with the scale.

19            Defense, in their filings, makes a representation

20    that that scale was used for marijuana but it was used to

21    portion out essentially a portion for consumption.  I think

22    that's such common sense that that's not a necessary step in

23    the process of consuming marijuana that that argument should

24    be given no weight.

25            Your Honor, I believe that we've shown both by a

1   preponderance of the evidence and by clear and convincing

2   evidence that Mr. Whitney was involved in the distribution of

3   marijuana.  And that that distribution of marijuana is

4   connected with his possession of the firearm and the

5   four-level enhancement should apply.

6        **THE COURT:**  Response?

7        **MS. ZHENG:**  Your Honor, I believe that the Court

8   should apply the higher clear-and-convincing-evidence

9   standard.  It's a four-level increase.  It just reaches the

10  threshold.  However, this four-level increase represents such

11  a significant jump in Mr. Whitney's sentence that he -- it

12  would be a 30-month distinction with where Probation and the

13  Government has him calculated.  And, in essence, this

14  enhancement alone represents 43 percent of his sentence.

15       And as a result of that heightened standard or even

16  if it was a preponderance-of-evidence standard, I'm not sure

17  that we can specifically just rely on the findings of the

18  judge as to the revocation proceedings.  The revocation

19  proceedings are a much lower standard than what is called for

20  here in regards to the fact that whether there were other

21  factors involved or specifically as it pertains to the gun in

22  this case, the uncharged marijuana, or otherwise, whether or

23  not his conduct the judge believed was sufficiently good

24  enough for a probationer is the standard that's applied there.

25       So that finding and the Court's finding there does

```
1    not bind this Court in any way from reaching an independent
2    determination.  Quite frankly, I just don't think that the
3    Government can get there.  The Government's argument is very
4    much that of a predetermined conclusion.  That in order to
5    support the four-level enhancement, it has to be that Stephon
6    is selling the marijuana.  And quite frankly, that's not the
7    case.  There is no direct evidence here that there was any
8    type of marijuana sales that was going on.  In regards to the
9    fact that we have no evidence that there were hand-to-hand
10   sales.  There were no evidence that any of the marijuana was
11   broken up within the house and packaged to be resold.  There
12   was no owe sheets of any kind.  I don't deny that the
13   marijuana is in bulk, but in a state that allows for
14   recreational use and medical use, it is not uncommon that
15   people don't buy marijuana specifically from a dispensary.
16   Just because marijuana is not purchased for -- from a
17   dispensary as it should be, that said, it doesn't mean that
18   they're not personally using.  And just because it's not
19   purchased from a dispensary does not mean that the marijuana
20   was necessarily purchased in anticipation of repackage for
21   sales.  We simply don't have that here.
22           On many levels, I'm sure -- later on, I know that
23   Ms. Rodosh is going to wish to speak on Mr. Whitney's behalf
24   in mitigation, but she did testify at the revocation hearing.
25   She also tried to contact Officer Vargas before the revocation
```

1    hearing happened in regards to what had happened in their life

2    and what was going on with her as to the presence of the gun

3    and the marijuana in the house.

4          Her testimony simply is -- and much of this stuff is

5    all located around the laundry area --

6          **MR. COWHIG:**  Your Honor, I believe defense is arguing

7    material that's not in evidence at this point.

8          **THE COURT:**  This is in their sentencing materials.

9          **MS. ZHENG:**  That... because most of the things were

10   in a general area, the detective testified that this is a very

11   small residence, and it's hard necessarily not to know what

12   was there.  But her testimony is and the physical evidence

13   supports the fact that all of the stuff is found directly in

14   or about or related to the laundry area.  And quite frankly,

15   that kind of comes down to a division of labor in the home.

16   She does the laundry; he doesn't.  Whatever her intent was to

17   perhaps hide it from him, keep it from him, or keep it

18   individually hers, laundry was her way to do that.  Everything

19   is either found above the dryer, in the laundry hamper for its

20   use.

21         I know Detective Costello has had a sterling record

22   of working for the state, and it's certainly not my argument

23   that he's trying to get Mr. Whitney to admit to something that

24   is contrary to the truth.  However, in that interview and in

25   what was said to them, there was more than just the

*2:21-cr-00002-JAD-NJK-1 - November 7, 2022*

 1    implication that both people would be charged.  And right,
 2    wrong, or otherwise, in his head he's always accepted
 3    responsibility for this crime.  But I think what's important
 4    to remember here is that there's no indication, one, that he
 5    was selling marijuana, at least not definitively, or that the
 6    marijuana existed in that house to be resold.  I don't think
 7    that the Government can clearly establish that.

 8          But beyond that, there's no indication that that gun
 9    was used in connection or possessed in connection with the
10    marijuana in any way to embolden him.  Ultimately, what it
11    comes down to is that the possession of the gun in the house
12    does not necessarily mean that it was used in facilitation of
13    any type of marijuana sales, if that could even be
14    established.  Ultimately, the key consideration is that the
15    gun was not easily accessible, and the detective -- so much as
16    to testify to that.  It was hidden within a zipped compartment
17    that is nestled in a bed frame, and that bed frame is pushed
18    up against the wall.  And that's how it was, and that's how it
19    existed in that house.  It wasn't something that they were
20    going to -- if he -- if there were either alleged drug sales
21    at the house, outside of the house, that there was any
22    indication that it was consistently moved or that the gun was
23    retrieved.  Other than the fact that there was possession of
24    it and its presence of it, there's no connection that
25    emboldened any type of another offense, if another offense

1    could even be established in this case.

2            As to his statements, he believed that -- he knew the

3    gun was in the house.  He knew the marijuana was in the house.

4    The possession of it for him being a felon is that it's

5    constructive.  He knew about the gun.  It shouldn't have been

6    there, and it's as simple as that.  That doesn't mean that the

7    presence of the gun being there was something that he asked

8    for and that the gun was used in any way in connection with

9    any other type of crime.

10           And for those reasons, Your Honor, I'm going to ask

11   that the four-level enhancement does not apply in this case

12   because the lack of the accessibility and the lack of ability

13   to establish that there, in fact, was another felony that was

14   happening.

15           **THE COURT:**  Thank you.

16           All right.  Just two -- or just, yeah, two quick

17   questions before I give a new date for the continuation of

18   this hearing.

19           Is he still in primary state custody, or has he been

20   transferred over to federal?

21           **MS. ZHENG:**  My belief is that at this point he has

22   been.  I asked for an in-custody calculation of it, and his

23   expiration date in full from the state sentence should have

24   been September 6th, 2022.

25           **THE COURT:**  Okay.  And with -- I just want to clarify

2:21-cr-00002-JAD-NJK-1 - November 7, 2022

1    that the defense is not disputing that the two felony

2    convictions of either a crime of violence or controlled

3    substance offense applies when calculating the base offense

4    level; is that right?

5           **MS. ZHENG:** I'm sorry, say that again, Your Honor.

6           **THE COURT:** Right. So just so that I know going

7    forward, so the base offense level that Probation has

8    calculated is 24 because the defendant committed the offense

9    subsequent to sustaining two felony convictions of either a

10   crime of violence or a controlled substance offense. There's

11   not an objection to that paragraph; is that correct?

12          **MS. ZHENG:** Correct.

13          **THE COURT:** Okay.

14          **MS. ZHENG:** There's no objection to the fact that he

15   has, in fact, sustained two prior felonies --

16          **THE COURT:** Those are --

17          **MS. ZHENG:** -- that qualify as enhancements.

18          **THE COURT:** -- qualifying offenses. Okay.

19          **MS. ZHENG:** With that said, there was a statement.

20   There was an argument that -- as to his involvement with one

21   of those offenses, that it would seem to overrepresent his

22   involvement.

23          **THE COURT:** So -- but that would just be a 3553(a)

24   factor?

25          **MS. ZHENG:** Correct.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

**ER_132**                                    *Page 69*

```
1          THE COURT:  Okay.  All right.  We're going to stop
2   here and pause.  I will pick up -- when we return, I will rule
3   on the objections to the four-level enhancement and its
4   application and move forward with the rest of the issues,
5   including the criminal history computation.
6          Mr. Cowhig, did you have something to say before I
7   give a new date?
8          MR. COWHIG:  Yes, Your Honor, just briefly.
9          I don't have direct information from the state on
10  whether he rolled over into federal custody on September 6th.
11  I know that that was the projected expiration date of his
12  sentence, but I don't know that that actually occurred on the
13  date that was anticipated.
14         THE COURT:  Sure.
15         And Ms. Zheng said she -- but likely.  So I know she
16  wasn't definitively making that representation.
17         All right.  So, unfortunately, I've got some trials
18  that are going to be taking up a significant portion of my
19  time in the next couple weeks.  So I am continuing this to
20  December 5th at 1:30.  So we will pick this up again December
21  5th at 1:30.  And I anticipate we'll be able to complete it
22  then.
23         Anything else before we continue this?  Mr. Cowhig,
24  anything else?
25         MR. COWHIG:  No, Your Honor.  Thank you.
```

1          **THE COURT:**  Ms. Zheng?

2          **MS. ZHENG:**  Not at this time, Your Honor.  Thank you.

3          **THE COURT:**  All right.  We'll see you in December.

4    We're adjourned.  Defendant's remanded to the custody of the

5    Marshal.

6          *(Proceedings adjourned at 12:38 p.m.)*

7                          --o0o--

8                  COURT REPORTER'S CERTIFICATE

9

10       I, AMBER M. McCLANE, Official Court Reporter, United

11   States District Court, District of Nevada, Las Vegas, Nevada,

12   do hereby certify that pursuant to 28 U.S.C. § 753 the

13   foregoing is a true, complete, and correct transcript of the

14   proceedings had in connection with the above-entitled matter.

15

16   DATED:  5/1/2023

17

18                  /s/  *Amber M. McClane*

19                       AMBER McCLANE, RPR, CRR, CCR #914

20

21

22

23

24

25