Case No. 22-10326

# United States Court of Appeals
## for the Ninth Circuit

United States of America,

        Plaintiff/Appellee,

v.

Stephon James Whitney,

        Defendant/Appellant.

D.C. No. 2:21-cr-00002-JAD-NJK

Appeal from the United States District Court
for the District of Nevada

## Appellant Stephon Whitney's
## Excerpts of Record
## Volume II of III

Rene L. Valladares
Federal Public Defender
*Jeremy C. Baron
Assistant Federal Public Defender
411 E. Bonneville Ave. Suite 250
Las Vegas, NV 89101
(702) 388-6577
jeremy_baron@fd.org

*Counsel for Appellant Stephon Whitney

**ER_135**



EXHIBIT LIST

Case No.: 2:21-cr-00002-JAD-NJK                                    Page   1   of 2

USA v. STEPHON JAMES WHITNEY

Exhibits on behalf of Defendant

| DATE ADMITTED | DATE MARKED | EXHIBIT NUMBE | WITNESS | DESCRIPTION |
|---|---|---|---|---|
| 12/5/2022 | 12/5/2022 | A | | Picture of Defendant |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |



EXHIBIT

Page 1 of 2

Event Number: LLV 20090000 7194

## LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## DUPLICATE ORIGINAL SEARCH WARRANT

STATE OF NEVADA      )
                     ) ss:
COUNTY OF CLARK      )

The Stat of Nevada, to any Peace Officer in the County of Clark. Proof having been made before me by Detective/Officer _COSTELLO_, by oral statement given under oath that there is probable cause to believe that certain evidence, to wit:

1. Any and all firearms, to include but not limited to _9 MM SEMI AUTOMATIC HANDGUNS_
2. All Firearms related accessories to include but not limited to holsters, cleaning kits, gun parts, magazines, and ammunition.
3. Receipts for ammunition, firearms and firearm accessories.
4. An undetermined amount of controlled substance, _____.
5. The Paraphernalia commonly associated with the ingestion and distribution of the controlled substance_____, such as scales, packaging materials, and "cut", grinders, customer and source lists, records of purchases and sales, to include "owe" sheets reflecting transactions in the controlled substance _____
6. An unknown quantity of US Currency which would be proceeds from the sale of a controlled substance _____
( √ ) _DNA FROM THE PERSON OF STEPHON WHITNEY DOB 5/33/90_
( ) _____
( ) _____
( √ ) Articles of personal property which would tend to establish the identity of persons in control of said premises or in control of specific areas within the premises where items set forth above are located such as; canceled mail envelopes, rental agreements and receipts, utility bills, vehicle registration.
( ) Items which tend to show a possessory interest in the items sought such as photographs, undeveloped film, digital media storage devices, diaries or letters.

Are presently located at:

1. ▮▮▮▮▮▮▮▮▮▮▮▮▮ _LV 89142 FURTHER DESCRIBED AS A SINGLE STORY DUPLEX THAT IS TAN IN COLOR WITH RED TRIM. THE NUMBERS 1888 ARE AFFIXED TO THE SOUTH FACING WALL IN APPROX 3" HIGH BLACK NUMBERS. THE DOOR IS YELLOW IN COLOR AND ALSO FACES SOUTH_

2. _PESON OF STEPHON WHITNEY DOB: ▮▮▮/1990 ID# 2647736 BMA APPROX 5'10" 180lbs_

000042

# ER_138

Page 2 of 2                          Event Number: _LLV20090600 7194_

And I am satisfied that there is probable cause to believe that said property is located as set
forth above and that based upon the oral statement of Detective/Officer _COSTELLO_ ,
that there is sufficient grounds for the issuance of the Search Warrant.

You are hereby commanded to search forthwith said premises for said property, serving this
warrant at (any hour of the day or night r between the hours of 0700 hours and 1900 hours),
and if the property is there to seize it, prepare a written inventory of the property seized and
make a return to me within ten (10) days.

DATED this _2nd_ day of _SEPTEMBER_ , 20_20_ at _1811_ hours.

Judge's name (affixed by officers) _____A. ZIMMERMAN_____.

Signed by _____ J. COSTELLO ____ P# _9139_ , acting upon oral
authorization of Judge _A. ZIMMERMAN_ .

Witnessed by _____T. BROSNAHAN_____ P# _13732_ .


Endorsed this _____ day of _____, 20___ .




_____
Judge
**(TO BE AFFIXED BY JUDGE)**

000043

ER_139

1  YI LIN ZHENG, ESQ.
   Nevada Bar No. 10811
2  VEGAS GOLDEN LAW
3  2801 S Valley View Blvd, Ste 16
   Las Vegas, NV 89102
4  Phone (702) 385-7170
   VegasGoldenLaw@gmail.com
5  Attorney for Defendant
6  Stephon Whitney

7              **UNITED STATES DISTRICT COURT**

8                  **DISTRICT OF NEVADA**

9  UNITED STATE OF AMERICA,        |  Case No. 21-cr-0002-JAD-NJK

10             Plaintiff,          |  **SECOND SUPPLEMENTAL**
11                                 |  **SENTENCING MEMORANDUM**
      v.
12
13  STEPHON WHITNEY,

14             Defendant.

15

16      Yi Lin Zheng, counsel for defendant Stephon Whitney, hereby files this second

17  supplemental sentencing memorandum in conjunction with the sentencing memorandum (ECF

18  #41) and supplemental sentencing memorandum (ECR #42) respectfully requesting a sentence

19  of 28 MONTHS as sufficient, but not greater than necessary to achieve the goals of sentencing.

20            **SUPPLEMENTAL EXHIBITS IN AID OF SENTENCING**

21      Attached hereto, please find a list of additional exhibits in support of Mr. Whitney's

22
   arguments in mitigation of sentence:
23

24  **O.**  Letter from C. Fletcher, Unit Manager at Nevada Southern Detention Center,
         stating Mr. Whitney is a detainee in good standing;
25

26  **P.**  Certificates of Completion for successfully completing:

27      • Skillsoft: Receiving Feedback, June 27, 2022;
        • Skillsoft: Uncovering and Utilizing Your Talents and Skills, June 27, 2022;
28      • Skillsoft: Take a Deep Breath and Manage Your Stress; June 27, 2022;

                        **ER_140**

- Skillsoft: Solving Problems: Generating and Evaluating Alternatives, June 27, 2022;
- Skillsoft: Reaching Sound Conclusions, June 27, 2022;
- Skillsoft: Planning an Effective Presentation, June 27, 2022;
- Skillsoft: Making and Carrying Out Tough Decisions, June 27, 2022;
- Skillsoft: The Art of Staying Focus, June 27, 2022;
- Skillsoft: Understanding Unconscious Bias, June 27, 2022;
- Skillsoft: Overcoming Unconscious Bias in the Workplace, June 20, 2022;
- Skillsoft: Overcoming Your Own Unconscious, June 20, 2022;
- Skillsoft: Managing Pressure and Stress to Optimize Your Performance, June 18, 2022;
- Skillsoft: Interaction with Customers, June 16, 2022;
- Skillsoft: Establishing Self-Confidence for Life, June 16, 2022;
- Skillsoft: Ensuring Successful Presentation Delivery, June 15, 2022;
- Skillsoft: Difficult People: Why They Act That Way and How to Deal with Them, June 15, 2022;
- Skillsoft: Cultivating Relationships with Your Peers, June 14, 2022;
- Skillsoft: Choosing and Using the Best Solution, June 14, 2022;
- Skillsoft: Building Your Presentation, June 13, 2022;
- Skillsoft: Become a Great Listener, June 13, 2022;
- Skillsoft: Time Management, June 11, 2022;
- Skillsoft: Substance Abuse Education, June 11, 2022;
- Skill Based Education, June 10, 2022;
- Presentation Skills, June 10, 2022;
- My SWOT – How to Use Your Knowledge, June 9, 2022;
- Identification Package, June 8, 2022;
- Job Readiness, June 8, 2022;
- Healthy Coping Skills, June 7, 2022;
- Health Education, June 6, 2022;
- Financial Literacy; June 6, 2022;
- Family and Community Reunification, June 4, 2022;
- Expectations and Outcomes, June 3, 2022;
- Exercising, June 2, 2022;
- Entrepreneurship, June 2, 2022;
- Contemporary Technology Skills – v2, June 2, 2022;
- Conflict Resolution, June 1, 2022;
- Career Resources, May 31, 2022;
- Basic Education, May 31, 2022;
- Behavior Change, May 31, 2022; and
- Anger Management, May 30, 2022.

DATED: October 31, 2022.

Respectfully submitted,

By:   _/s/ Yi Lin Zheng_
       Yi Lin Zheng, NV #10811
       Vegas Golden Law
       Attorney for Stephon Whitney

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers.

That on the 30th day of November, 2022, she served an electronic copy of this **SECOND SUPPLEMENTAL SENTENCING MEMORANDUM** by electronic service (ECF) to the persons named below:

       JASON FRIERSON
       United States Attorney
       DANIEL COWHIG
       Assistant United States Attorney
       501 Las Vegas Blvd. South
       Suite 1100
       Las Vegas, NV 89101

       _/s/ Yi Lin Zheng_
       Employee of Vegas Golden Law

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 9 of 284

Fletcher, C

2190 East Mesquite Ave
Pahrump, NV 89060
Phone: 775-751-4500
Fax: 775-751-8763



**Nevada Southern Detention Center**

**PILB Lic #2135B**

**To whom it may concern,**

I am a Unit Manager at Nevada Southern Detention Center in Pahrump, NV.  Detainee Whitney, Stephon ID # 26534509 has been in custody since April 2nd 2021. Detainee Whitney is currently a Unit Porter in good standing, and has been working since July 2022. During his detention here he has received one disciplinary for fighting 5/17/21. Currently he is housed in our wellness unit which offers additional programming for detainees that wish to pursue a healthier lifestyle. This unit requires that all detainees participating, refrain from getting any write ups. Since his placement in the unit Detainee Whitney has not received any disciplinary actions against him.

Thank You

Fletcher, C
Unit Manager
Nevada Southern Detention Center
8/24/2022

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 10 of 284

# Certificate of Completion

skillsoft

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*
**Skillsoft: Receiving Feedback**

Course Location :
GTL LMS

Skillsoft

Completion Date :
June 27, 2022

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 11 of 284

# skillsoft

# Certificate of Completion

### Presented To

## STEPHON WHITNEY

*For Successfully Completing*

**Skillsoft: Uncovering and Utilizing Your Talents and Skills**

Completion Date :
June 27, 2022

Course Location :
GTL LMS

*Skillsoft*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 12 of 284

# Certificate of Completion

**skillsoft**

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Take a Deep Breath and Manage Your Stress**

Completion Date :
June 27, 2022

Course Location :
GTL LMS

*Skillsoft*

**ER_146**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 13 of 284

# Certificate of Completion

## skillsoft

Presented To

### STEPHON WHITNEY

For Successfully Completing

**Skillsoft: Solving Problems: Generating and Evaluating Alternatives**

Course Location :
GTL LMS

Completion Date :
June 27, 2022

Skillsoft

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 14 of 284

# skillsoft®

# Certificate of Completion

Presented To

**STEPHON WHITNEY**

For Successfully Completing
**Skillsoft: Reaching Sound Conclusions**

Completion Date :
June 27, 2022

Course Location :
GTL LMS

Skillsoft

ER_148

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 15 of 284

**skillsoft**

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Skillsoft: Planning an Effective Presentation**

*Course Location :*
*GTL LMS*

*Skillsoft*

*Completion Date :*
*June 27, 2022*

**ER_149**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 16 of 284

# Certificate of Completion

Presented To

## STEPHON WHITNEY

For Successfully Completing

**Skillsoft: Making and Carrying Out Tough Decisions**

Course Location :
GTL LMS

Completion Date :
June 27, 2022

Skillsoft

**ER_150**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 17 of 284

# skillsoft

# Certificate of Completion

Presented To

**STEPHON WHITNEY**

For Successfully Completing
**Skillsoft: The Art of Staying Focused**

Course Location :
GTL LMS

Skillsoft

Completion Date :
June 27, 2022

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 18 of 284

# Certificate of Completion

## skillsoft

Presented To

### STEPHON WHITNEY

For Successfully Completing

**Skillsoft: Understanding Unconscious Bias**

Completion Date :
June 27, 2022

Course Location :
GTL LMS

Skillsoft

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 19 of 284

# Certificate of Completion

**skillsoft®**

Presented To

## STEPHON WHITNEY

*For Successfully Completing*

**Skillsoft: Overcoming Unconscious Bias in the Workplace**

Completion Date :
June 20, 2022

Course Location :
GTL LMS

Skillsoft

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 20 of 284

# Certificate of Completion

skillsoft®

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Overcoming Your Own Unconscious Biases**

*Completion Date :*
June 20, 2022

*Course Location :*
GTL LMS

*Skillsoft*

ER_154

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 21 of 284

skillsoft®

# Certificate of Completion

Presented To

## STEPHON WHITNEY

*For Successfully Completing*

**Skillsoft: Managing Pressure and Stress to Optimize Your Performance**

*Completion Date :*
June 18, 2022

*Course Location :*
GTL LMS

*Skillsoft*

**ER_155**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 22 of 284

# Certificate of Completion

**skillsoft**

Presented To

## STEPHON WHITNEY

For Successfully Completing
**Skillsoft: Interacting with Customers**

Course Location :
GTL LMS

Completion Date :
June 16, 2022

Skillsoft

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 23 of 284

# Certificate of Completion

**skillsoft**

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Establishing Self-confidence for Life**

*Completion Date :*
June 16, 2022

*Course Location :*
GTL LMS

*Skillsoft*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 24 of 284

# Certificate of Completion

skillsoft®

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Ensuring Successful Presentation Delivery**

Course Location :
GTL LMS

Skillsoft

Completion Date :
June 15, 2022

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 25 of 284

# Certificate of Completion

**skillsoft**

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Difficult People: Why They Act That Way and How to Deal with Them**

*Completion Date :*
June 15, 2022

*Course Location :*
GTL LMS

*Skillsoft*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 26 of 284

# skillsoft®

# Certificate of Completion

Presented To

## STEPHON WHITNEY

For Successfully Completing

**Skillsoft: Cultivating Relationships with Your Peers**

Completion Date :
June 14, 2022

Course Location :
GTL LMS

Skillsoft

ER_160

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 27 of 284

# Certificate of Completion

**skillsoft**

Presented To

**STEPHON WHITNEY**

*For Successfully Completing*

**Skillsoft: Choosing and Using the Best Solution**

*Course Location :*
*GTL LMS*

*Skillsoft*

*Completion Date :*
*June 14, 2022*

**ER_161**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 28 of 284

# Certificate of Completion

**skillsoft**

Presented To

**STEPHON WHITNEY**

For Successfully Completing
**Skillsoft: Building Your Presentation**

Course Location :
GTL LMS

Skillsoft

Completion Date :
June 13, 2022

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 29 of 284

**skillsoft**

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Skillsoft: Become a Great Listener**

*Course Location :*
*GTL LMS*

*Skillsoft*

*Completion Date :*
*June 13, 2022*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 30 of 284



# Certificate of Completion

**CRi**

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Time Management**

*Completion Date :*
June 11, 2022

*Course Location :*
GTL LMS

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 31 of 284



**CRI**®

Corrections Rehabilitation Institute

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Substance Abuse Education**

*Completion Date :*
June 11, 2022

*Course Location :*
*GTL LMS*

*Corrections Rehabilitation Institute*

**ER_165**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 32 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

Presented To

## STEPHON WHITNEY

For Successfully Completing

**Skill Based Education**

Completion Date :
June 10, 2022

Course Location :
GTL LMS

Corrections Rehabilitation Institute

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 33 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Presentation Skills**

*Completion Date :*
*June 10, 2022*

*Course Location :*
*GTL LMS*

*Corrections Rehabilitation Institute*

**ER_167**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 34 of 284



**CRI**

Corrections Rehabilitation Institute

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**My SWOT - How to use your Knowledge**

*Completion Date :*
June 9, 2022

*Course Location :*
GTL LMS

*Corrections Rehabilitation Institute*

**ER_168**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 35 of 284



Corrections Rehabilitation Institute

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Identification Package**

*Completion Date :*
June 8, 2022

*Course Location :*
GTL LMS

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 36 of 284



**Certificate of Completion**

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Job Readiness**

*Completion Date :*
June 8, 2022

*Course Location :*
GTL LMS

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 37 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

***Healthy Coping Skills***

*Course Location :*
*GTL LMS*

*Completion Date :*
*June 7, 2022*

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 38 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Health Education**

*Course Location :*
GTL LMS

*Completion Date :*
June 6, 2022

*Corrections Rehabilitation Institute*

ER_172

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 39 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
*Financial Literacy*

*Course Location :*
GTL LMS

*Completion Date :*
June 6, 2022

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 40 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Family and Community Reunification**

*Course Location :*
*GTL LMS*

*Completion Date :*
*June 4, 2022*

*Corrections Rehabilitation Institute*

ER_174

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 41 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

## STEPHON WHITNEY

*For Successfully Completing*

**Expectations and Outcomes**

*Course Location :*
*GTL LMS*

*Completion Date :*
*June 3, 2022*

*Corrections Rehabilitation Institute*

**ER_175**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 42 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

## STEPHON WHITNEY

*For Successfully Completing*
**Exercising**

Completion Date :
June 2, 2022

Course Location :
GTL LMS

Corrections Rehabilitation Institute

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 43 of 284



**CRI**

Corrections Rehabilitation Institute

# Certificate of Completion

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Entrepreneurship**

*Completion Date :*
June 2, 2022

*Course Location :*
GTL LMS

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 44 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Contemporary Technology Skills - v2**

Course Location :
*GTL LMS*

Completion Date :
*June 2, 2022*

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 45 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Conflict Resolution**

*Completion Date :*
*June 1, 2022*

*Course Location :*
*GTL LMS*

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 46 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Career Resources**

Course Location :
*GTL LMS*

Completion Date :
*May 31, 2022*

*Corrections Rehabilitation Institute*

**ER_180**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 47 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*

**Basic Education**

*Course Location :*
*GTL LMS*

*Issued Date :*
*May 31, 2022*

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 48 of 284



Corrections Rehabilitation Institute

# Certificate of Completion

*Presented To*

## STEPHON WHITNEY

*For Successfully Completing*

**Behavior Change**

*Completion Date :*
*May 31, 2022*

*Course Location :*
*GTL LMS*

*Corrections Rehabilitation Institute*

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 49 of 284



# Certificate of Completion

Corrections Rehabilitation Institute

*Presented To*

**STEPHON WHITNEY**

*For Successfully Completing*
**Anger Management**

*Completion Date :*
*May 30, 2022*

*Course Location :*
*GTL LMS*

*Corrections Rehabilitation Institute*

## Exhibit List

*United States of America v. Stephon James Whitney*, 2:21cr2-JAD-NJK

Sentencing Exhibits on behalf of the United States

| O | A | Identification | | Description |
|---|---|---|---|---|
| | | No. | Witness | |
| | 11/7 | 1 | J. Costello | Declaration of Arrest Report (DOAR), Las Vegas Metropolitan Police Department (LVMPD) Event No. LLV200900007194, Sept. 2, 2020 (ECF No. 36, Ex C) |
| | | 2 | | LVMPD Property Report, Search Warrant in Event No. LLV200900007194 (ECF No. 41, Ex A) |
| | | 3 | | Image 000452_2368514-0029_1 (ECF No 36, Ex D) |
| | | 4 | | Image 000452_2368514-0030_1 (ECF No 36, Ex D) |
| | | 5 | | Image 000452_2368514-0031_1 (ECF No 36, Ex D) |
| | | 6 | | Image 000452_2368514-0032_1 (ECF No 36, Ex D) |
| | | 7 | | Image 000452_2368514-0033_1 (ECF No 36, Ex D) |
| | | 8 | | Image 000452_2368514-0034_1 (ECF No 36, Ex D) |
| | | 9 | | Image 000452_2368514-0051_1 (ECF No 36, Ex D) |
| | | 10 | | Image 000452_2368514-0052_1 (ECF No 36, Ex D) |
| | | 11 | | Image 000452_2368514-0053_1 (ECF No 36, Ex D) |
| | | 12 | | Image 000452_2368514-0059_1 (ECF No 36, Ex D) |
| | | 13 | | Image 000452_2368514-0060_1 (ECF No 36, Ex D) |
| | | 14 | | Image 000452_2368514-0062_1 (ECF No 36, Ex D) |
| | | 15 | | Image 000452_2368514-0028_1 (ECF No 36, Ex D) |
| | | 16 | | Image 000452_2368514-0070_1 (ECF No 36, Ex D) |
| | | 17 | | Image 000452_2368514-0069_1 (ECF No 36, Ex D) |
| | | 18 | | Transcript of Sept. 3, 2020, Voluntary Statement of Stephon Whitney (ECF No 36, Ex E; ECF No. 41, Ex F) |

Page 1 of 1

1   JASON M. FRIERSON
    United States Attorney
2   District of Nevada
    Nevada Bar No. 7709
3   DANIEL J. COWHIG
    Assistant United States Attorney
4   501 Las Vegas Boulevard South, Suite 1100
    Las Vegas, Nevada 89101
5   702-388-6336
    daniel.cowhig@usdoj.gov
6   *Attorneys for the United States of America*

7

                   **UNITED STATES DISTRICT COURT**
8                **FOR THE DISTRICT OF NEVADA**

9   UNITED STATES OF AMERICA,        Case No. 2:21-cr-2-JAD-NJK

10          Plaintiff,          Index of Exhibits to ECF No. 43,
                           United States' Response to Defendant
11      vs.                  Stephon Whitney's Sentencing
                           Memorandum on the Four-Level
12   STEPHON JAMES WHITNEY,      Enhancement Under § 2K2.1(b)(6)(B)
          a.k.a. Stephone James Whitney,  [ECF No. 41] and Supplemental Sentencing
13          a.k.a. Steff Bizzle,         Memorandum [ECF No. 42]
          a.k.a. Stef B,
14

              Defendant.
15

16

17        United States of America, through the United States Attorney, Jason M. Frierson, and

18   the undersigned Assistant United States Attorney, Daniel J. Cowhig, respectfully submits this

19   Index of Exhibits to ECF No. 43, United States' Response to Defendant Stephon Whitney's

20   Sentencing Memorandum on the Four-Level Enhancement Under § 2K2.1(b)(6)(B) [ECF No.

21   41] and Supplemental Sentencing Memorandum [ECF No. 42].

22

23

24

                         **ER_185**

Index of Exhibits

A.  Amended Judgment in *Nevada v. Whitney*, Las Vegas Justice Court Dept 11, Case No. 17F06735X

B.  Probable Cause Arrest Documents, Criminal Complaint, Minute Order at Initial Appearance, Judgment of Conviction and previous Register of Actions

C.  Motion to Amend the Judgment

D.  Minute Order Amending the Judgment to "Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]"

E.  Minute Order Amending the Judgment to "loitering about a school or public place."

Respectfully submitted this November 4, 2022.

                                        JASON M. FRIERSON
                                        United States Attorney


                                        //s// Daniel J Cowhig
                                        DANIEL J. COWHIG
                                        Assistant United States Attorney

**ER_186**

Exhibit A

Amended Judgment in *Nevada v. Whitney*,
Las Vegas Justice Court Dept 11, Case No. 17F06735X

**JUSTICE COURT, LAS VEGAS TOWNSHIP**
**CLARK COUNTY REGIONAL JUSTICE CENTER**
**200 LEWIS AVENUE**
**LAS VEGAS,NEVADA 89101**
**COURT 128**

## DISPOSITION NOTICE AND JUDGMENT

**Court Case Number: 17F06735X**

| | |
|---|---|
| State of Nevada vs. WHITNEY, STEPHON | ID#: 2647736 |
| AKA: WHITNEY, STEPHON | Arrest Date: 4/14/2017 |
| Citation: | Submit Date: 9/22/2022 |
| Department: 11 | Disposition Date: 9/21/2022 |

**Sentencing Information**

**001   Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]  (4/14/2017) (M)**
**PCN/SEQ: 0025681210 001**

Filed As:          Possess schedule I, II, III or IV controlled substance, first or second offense [51127]  (F)

Plea: Nolo Contendere (9/21/2022)                              Disp: Guilty as Amended (9/21/2022)

**Misdemeanor Sentence**                                                                            9/21/2022

Credit for Time Served

_____

Justice Of The Peace

**ER_188**

# REGISTER OF ACTIONS
## CASE NO. 17F06735X

| | | | |
|---|---|---|---|
| State of Nevada vs. WHITNEY, STEPHON | § § § § § | Case Type: | **Felony** |
| | | Date Filed: | **04/18/2017** |
| | | Location: | **JC Department 11** |

---

### PARTY INFORMATION

| | | |
|---|---|---|
| **Defendant** | **WHITNEY, STEPHON** *AKA* **WHITNEY, STEPHON JAMES** | **Lead Attorneys**<br>Yi Lin Zheng, ESQ<br>*Retained*<br>702-385-7170(W) |
| State of Nevada | **State of Nevada** | |

---

### CHARGE INFORMATION

| Charges: WHITNEY, STEPHON | Statute | Level | Date |
|---|---|---|---|
| 1.  Loiter about school/place children congregate [53176] | 207.270 | Misdemeanor | 04/14/2017 |

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

| | |
|---|---|
| 04/19/2017 | **Plea** (Judicial Officer: Goodman, Eric)<br>1. Loiter about school/place children congregate [53176]<br>Guilty |
| 04/19/2017 | **Disposition** (Judicial Officer: Goodman, Eric)<br>1. Loiter about school/place children congregate [53176]<br>Guilty of Lesser Offense |
| 04/19/2017 | **Misdemeanor Sentence** (Judicial Officer: Goodman, Eric)<br>1. Loiter about school/place children congregate [53176] |
| 09/21/2022 | **Amended Plea** (Judicial Officer: Goodman, Eric) Reason: Court Ordered<br>1. Loiter about school/place children congregate [53176]<br>Nolo Contendere |
| 09/21/2022 | **Amended Disposition** (Judicial Officer: Goodman, Eric) Reason: Court Ordered<br>1. Loiter about school/place children congregate [53176]<br>Guilty as Amended |
| 09/21/2022 | **Amended Misdemeanor Sentence** (Judicial Officer: Goodman, Eric) Reason: Court Ordered<br>1. Loiter about school/place children congregate [53176]<br><br>Condition - Adult:<br><br>  1. Credit for Time Served, 09/21/2022, Satisfied 09/21/2022 |

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 04/14/2017 | **Standard Bail Set**<br>*Ct1: $3000 Cash/$3000 Surety* |
| 04/14/2017 | **CTRACK Track Assignment JC11** |
| 04/15/2017 | **48 Hour Probable Cause Review**  (7:20 AM) (Judicial Officer Kern, Rebecca)<br><br>Result: Signing Completed |
| 04/15/2017 | **Probable Cause Found** |
| 04/15/2017 | **Bail Reset - Cash or Surety**<br>*Counts: 001 - $0.00/$0.00 Total Bail SET IN COURT* |
| 04/15/2017 | **Probable Cause Arrest Documents** |
| 04/15/2017 | **Bail Set - No Bail**<br>*Ct1: $0 Cash/$0 Surety Set in Court* |
| 04/17/2017 | **CTRACK Case Modified**<br>*Jurisdiction/DA;* |
| 04/18/2017 | **Criminal Complaint** |
| 04/19/2017 | *CANCELED*  **72 Hour Hearing**  (7:30 AM) (Judicial Officer Goodman, Eric)<br>*Vacated*<br>*IN CUSTODY* |
| 04/19/2017 | **Initial Appearance**  (7:30 AM) (Judicial Officer Goodman, Eric) |

*In Custody*

Result: Matter Heard
04/19/2017 | **Initial Appearance Completed**
*Advised of Charges on Criminal Complaint, Waives Reading of Criminal Complaint*
04/19/2017 | **Public Defender Appointed**
04/19/2017 | **Bail Stands - Cash or Surety**
*Counts: 001 - $0.00/$0.00 Total Bail*
04/19/2017 | **Minute Order - Department 11**
04/19/2017 | **Judgment Entered**
04/19/2017 | **Case Closed - Court Order**
04/19/2017 | **Notice of Disposition and Judgment**
09/14/2022 | **Motion**
*MOTION TO AMEND JUDGMENT*
09/21/2022 | **Motion**  (7:30 AM) (Judicial Officer Goodman, Eric)
*No bail posted*

Result: Matter Heard
09/21/2022 | **Side Bar Conference Held**
09/21/2022 | **Motion**
*By defense to amend the judgement to a loitering charge-no objection by the State-Motion is granted*
09/21/2022 | **Judgment Entered**
09/21/2022 | **Minute Order - Department 11**
09/21/2022 | **Amended Minute Order - Department 11**
09/22/2022 | **Notice of Disposition and Judgment**

ER_190

Exhibit B

Probable Cause Arrest Documents, Criminal Complaint, Minute Order at Initial
Appearance, Judgment of Conviction and previous Register of Actions

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**TEMPORARY CUSTODY RECORD**

Page: 1 of ___

I.D. #: 2647736    Event #: 170414-3070

I.D. ESTAB. BY: SCOPE

DATE OF ARREST: 4/14/17    TIME OF ARREST: 1653

INTAKE NAME (AKA, ALIAS, ETC.)
Last: WHITNEY    First: STEPHON    Middle: _____    BLDG/APT #: _____

TRUE NAME
Last: WHITNEY, STEPHON JAMES    First: _____    Middle: _____

ADDRESS
NUMBER & STREET: _____

DATE OF BIRTH: _____    RACE: B    SEX: M    HEIGHT: 5'10    WEIGHT: 160    HAIR: BLK    EYES: BRO

CITY: NORTH LAS VEGAS    STATE: NV    ZIP: 89136

SOCIAL SECURITY #: _____

Speak English? ☒Yes ☐No    PLACE OF BIRTH: NV, NV    STATE: NV    ZIP: 89136

Sector/Beat: _____    PCN #: _____

LOCATION OF CRIME (# Street, City, State - Zip):
LAS VEGAS BLVD / FASHION SHOW DR    LWW 89109

LOCATION OF ARREST: _____

| BKG CODE | CHARGE ORD / NRS # | ARR TYPE | EVENT NUMBER | WARR / NCIC NUMBER | APPROVAL CONTROL # FOR ADDITIONAL CHARGES | OTHER COURT: | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | LV | JC | DC | OTHER |
| 51127 | POSS SCH I OR II OR CONT SUBSTANCE / NRS 453.336 2A | PC | 54 | 17110588X | | ☒ | ☐ | ☐ | ☐ | ☐ |
| 50635 | DUI 1ST / NRS 200.485, IA/B/AR 3000 | PC | — | 171052358X | | ☒ | ☐ | ☐ | ☐ | ☐ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |
| | | | | | | ☐ | ☐ | ☐ | ☐ | ☐ |

DNS

ARREST TYPE:
☒ PC – PROBABLE CAUSE    BS – BONDSMAN SURRENDER    BW – BENCH WARRANT    WA – WARRANT    RM – REMAND    GJI – GRAND JURY IND.

PC17F067J5X
PC/IP
Probable Cause Arrest Documents
7873621

☐ FOR PROBABLE CAUSE/NCIC HIT ARREST SEE FACE FOR DETAILS.

☒ – PROBABLE CAUSE    Arresting Officer's Signature: _____    (Print Name) J. CHAMBERS    P #: 5536    Agency: LWMPD

☒ – BENCH WARRANT SERVED ON 4/14/17    Transporting Officer's Signature: _____    (Print Name) _____    P #: _____    Agency: _____

☐ – WARRANT SERVED ON _____

☐ GRAND JURY INDICTMENT SERVED ON _____

TYPE OF I.D. FOR VERIFICATION _____

FIRST APPEARANCE: DATE: APR 15 2017    TIME: 2:30 pm

COURT:
☒ JUSTICE
☐ MUNICIPAL
☐ JUVENILE

JUDGE: _____

☒ S.O.C. STANDARD BAIL
☐ O.R. RELEASE
☐ PROBABLE CAUSE
☐ I.A.D.

LVMPD 22 (REV. 3-05)    (2) COURT - ORIGINAL

**Time Stamp at BOOKING**
04-14-17 23:00 DSD RECORDS

P #: _____

DNA NOT REQ—

THUMBS I.N—
9999 to 2647736

ER_192

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

# DECLARATION OF ARREST

**"Click here to add/edit Event# and ID# on all pages"**

Event #: **LLV170414003090**

I.D. #: **2647736**

### *"PRINT"*

True Name: **WHITNEY, STEPHON**     Date of Arrest: **04/14/17**     Time of Arrest: **1853**

| OTHER CHARGES RECOMMENDED FOR CONSIDERATION: |
| Other Charges |

THE UNDERSIGNED MAKES THE FOLLOWING DECLARATIONS SUBJECT TO THE PENALTY FOR PERJURY AND SAYS: That I am a peace officer with the Las Vegas Metropolitan Police Department, Clark County, Nevada, being so employed for a period of 1.5 yrs.

That I learned the following facts and circumstances which lead me to believe that the above named subject committed (or was committing) the offense(s) of PCS - Cocaine at the location of Las Vegas Blvd / Fashion Show Dr Las Vegas NV 89109, and that the offense(s) occurred at approximately 1853 hours on the 14 day of April, 2017, in  the:

[X] County of Clark          [ ] City of Las Vegas

DETAILS FOR PROBABLE CAUSE:
BWC Available

On 04/14/17 at 1846 hours I, Officer J. Chambliss P# 15336 operating as marked patrol unit 8M71, was conducting patrol in the area of Las Vegas Blvd and Convention Center Dr. While on patrol I witnessed a gold Chevy Malibu traveling southbound on Las Vegas Blvd with no license plate. I conducted a vehicle stop at Fashion Show Dr and Las Vegas Blvd in Las Vegas NV 89109. The driver of the vehicle verbally identified himself as Whiney, Stephon DOB_____Whitney's identity was confirmed through Scope. A records check was performed on Whitney and he was found to have an electronically confirmed warrant out of Las Vegas Justice Court for Dom Battery, 1st NRS 200.485.1 with a bail of $3000.00. Whitney was placed under arrest for his outstanding warrant.

During search incident to arrest Officer A. Frazier P# 9152 was searching through Whitney's clothes. Officer Frazier lifted Whitney's right foot up to take Whitney's sock off. While taking Whitney's sock off a one inch by one inch clear plastic baggie fell onto the street. Inside the baggie were small white rocks with white a powdery substance surrounding it. Through my training and experience I immediately recognized the substance to be cocaine. The baggie was picked up and held as evidence. Miranda was read at 2129 hours from a yellow LVMPD 148 Miranda card to which Whitney stated "Yeah" to understanding his rights. Whitney declined to comment on the substance and to whether or not it was cocaine.

Upon arriving at CCDC, the white powdery substance was tested in a sterile environment, while wearing blue nitrile plastic

Wherefore, Declarant prays that a finding be made by a magistrate that probable cause exists to hold said person for preliminary hearing (if charges are a felony or gross misdemeanor) or for trial (if charges are misdemeanor).

| Declarant must sign all page(s) with an original signature. | J. CHAMBLISS |
| | Print Declarant's Name |
| | 15336 |
| | Declarant's Signature          P# |

LVMPD 22A (Rev. 7/12) WORD 2010

ER 193

(1) ORIGINAL - COURT

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# CONTINUATION REPORT

Event #: **LLV170414003090**

ID#: **2647736**

gloves, inside CCDC. The Cocaine (904B) ODV test was conducted, yielding a positive result for cocaine. The cocaine was weighed and amounted to .9g gross weight. The test was conducted by Officer T. Gower P# 15490 who was certified in ODV testing in February of 2016, and was witnessed by Officer Chambliss who was certified in ODV testing in September of 2015. The narcotic substance was impounded as evidence at CCAC.

Due to the above facts and circumstances, it was be determined that Whitney did knowingly and intentionally possess, either actually or constructively, a controlled substance in violation of NRS 453.336.

Whitney was transported and booked into CCDC without incident for PCS – Cocaine (NRS 453.336) and his outstanding warrant.

---

**Declarant must sign all page(s) with an original signature.**

J. CHAMBLISS
*Print Declarant's Name*

15536
*P#*

*Declarant's Signature*

**ER_194**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# ARREST REPORT

☐ City    ☒ County    ☒ Adult    ☐ Juvenile    Sector/Beat   M2

| ID/EVENT# | ARRESTEE'S NAME (Last) | (First) | (Middle) | S.S.# |
|---|---|---|---|---|
| 2647736 | Whitney | Stephon | | |

| ARRESTEE'S ADDRESS | (Number, Street, City, State, Zip Code) |
|---|---|
| | North Las Vegas NV 89130 |

**CHARGES**
PCS - Cocaine

| OCCURRED | DATE | DAY OF WEEK | TIME | LOCATION OF ARREST (Number, Street, City, State, Zip Code) |
|---|---|---|---|---|
| | 04/14/17 | Friday | 1853 | Las Vegas Blvd / Fashion Show Dr Las Vegas Nv 89109 |

| RACE | SEX | D.O.B. | HT. | WT. | HAIR | EYES | PLACE OF BIRTH |
|---|---|---|---|---|---|---|---|
| B | M | | 5'10 | 170 | Bla | Bro | Las Vegas, NV |

| ARRESTING OFFICER #1: | P#: | ARRESTING OFFICER #2: | P#: |
|---|---|---|---|
| J. Chambliss | 15336 | | |

| CONNECTING REPORTS (Type or Event Number) |
|---|
| TCR, DOC, RFP, Wit List, ODV Checklist, Vehicle Tow Sheet **LLV170414003090** |

APPROVED BY (PRINTED NAME): _____

**CIRCUMSTANCES OF ARREST:**

Officers Involved:

1. J. Chambliss P# 15336 – 8M71

2. A. Frazier P#9152 – 3PT80

3. T. Gower P# 15490 – 8M72

Property Impounded:

1. .9g gross weight ODV positive cocaine

Vehicles Involved:

1. Gold Chevy Malibu - VIN – 1G1ZT52835F279410

Details:

BWC Available

On 04/14/17 at 1846 hours I, Officer J. Chambliss P# 15336 operating as marked patrol unit 8M71, was conducting patrol in the area of Las Vegas Blvd and Convention Center Dr. While on patrol I witnessed a gold Chevy Malibu traveling southbound on Las Vegas Blvd with no license plate. I conducted a vehicle stop at Fashion Show Dr and Las Vegas Blvd in Las Vegas NV 89109. The driver of the vehicle verbally identified himself as Whiney, Stephon DOB [redacted]. Whitney's identity was confirmed through Scope. A records check was performed on Whitney and he was found to have an electronically confirmed warrant out of Las Vegas Justice Court for Dom Battery, 1st NRS 200.485.1 with a bail of $3000.00. Whitney was placed under arrest for his outstanding warrant.

LVMPD 602 (Rev. 5/19/11) WORD 2010

ER_195

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# CONTINUATION REPORT

ID/EVENT #: **LLV170414003090**

During search incident to arrest Officer A. Frazier P# 9152 was searching through Whitney's clothes. Officer Frazier lifted Whitney's right foot up to take Whitney's sock off. While taking Whitney's sock off a one inch by one inch clear plastic baggie fell onto the street. Inside the baggie were small white rocks with white a powdery substance surrounding it. Through my training and experience I immediately recognized the substance to be cocaine. The baggie was picked up and held as evidence. Miranda was read at 2129 hours from a yellow LVMPD 148 Miranda card to which Whitney stated "Yeah" to understanding his rights. Whitney declined to comment on the substance and to whether or not it was cocaine.

Upon arriving at CCDC, the white powdery substance was tested in a sterile environment, while wearing blue nitrile plastic gloves, inside CCDC. The Cocaine (904B) ODV test was conducted, yielding a positive result for cocaine. The cocaine was weighed and amounted to .9g gross weight. The test was conducted by Officer T. Gower P# 15490 who was certified in ODV testing in February of 2016, and was witnessed by Officer Chambliss who was certified in ODV testing in September of 2015. The narcotic substance was impounded as evidence at CCAC.

Due to the above facts and circumstances, it was be determined that Whitney did knowingly and intentionally possess, either actually or constructively, a controlled substance in violation of NRS 453.336.

Whitney was transported and booked into CCDC without incident for PCS – Cocaine (NRS 453.336) and his outstanding warrant.

ER_196

JUSTICE COURT, LAS VEGAS TOWNSHIP
CLARK COUNTY, NEVADA

FILED

THE STATE OF NEVADA,

2017 APR 18  A 9: 26

Plaintiff,

JUSTICE COURT
LAS VEGAS NEVADA

-vs-

BY_____ W
DEPUTY

CASE NO:   17F06735X

DEPT NO:   11

STEPHON WHITNEY, aka,
Stephon James Whitney #2647736,

Defendant.

CRIMINAL COMPLAINT

The Defendant above named having committed the crime of POSSESSION OF CONTROLLED SUBSTANCE (Category E Felony - NRS 453.336 - NOC 51127), in the manner following, to-wit:  That the said Defendant, on or about the 14th day of April, 2017, at and within the County of Clark, State of Nevada, did willfully, unlawfully, feloniously, and knowingly or intentionally possess a controlled substance, to wit: Cocaine.

All of which is contrary to the form, force and effect of Statutes in such cases made and provided and against the peace and dignity of the State of Nevada.  Said Complainant makes this declaration subject to the penalty of perjury.

_____
04/17/17

17F06735X/lal
LVMPD EV# 1704143090
(TK11)

17F06735X
CRM
Criminal Complaint
7881711

ER 197

W:\2017\2017F\067\35\17F06735-COMP-001.DOCX

# Justice Court, Las Vegas Township
## Clark County, Nevada
### Court Minutes

Department: 11



L007890142

**17F06735X**   **State of Nevada vs. WHITNEY, STEPHON**

Lead Atty: Public Defender

| 4/19/2017 7:30:00 AM  Initial Appearance (In Custody) | Result: Matter Heard |
|---|---|

**PARTIES PRESENT:**

| State Of Nevada | Einhorn, Kelsey |
|---|---|
| Attorney | Lisk, Steven |
| Defendant | WHITNEY, STEPHON |

**Judge:** Goodman, Eric
**Court Reporter:** Smith, Patsy
**Court Clerk:** Contreras, Chrystina

### PROCEEDINGS

| **Attorneys:** | **Lisk, Steven** | WHITNEY, STEPHON | Added |
|---|---|---|---|
| | **Public Defender** | WHITNEY, STEPHON | Added |

**Events:** **Initial Appearance Completed**
*Advised of Charges on Criminal Complaint, Waives Reading of Criminal Complaint*

**Public Defender Appointed**

**Bail Stands - Cash or Surety**
*Counts: 001 - $0.00/$0.00 Total Bail*

**Judgment Entered**

**Case Closed - Court Order**

**Charges:** **Amended: 001: Possess drug not to be introduced into interstate commerce** — Per Negotiations

**Plea/Disp:** **001: Poss drug not for i-state commerce [51366]**
Plea: Guilty

Disposition: Guilty of Lesser Offense

Sentence: Misdemeanor Sentence

Sentence To CCDC:

Remand Term: 0 Months 60 Days     Concurrent Case #: with any other case

CTS: 6 Specific Days

```
C5082421                                              PAGE:   74
J5082421-REPORT 2A                                    04/19/2017
                   JUSTICE COURT, LAS VEGAS TOWNSHIP
                   CLARK COUNTY REGIONAL JUSTICE CENTER
                            200 LEWIS AVENUE
                         LAS VEGAS, NEVADA  89101
                               COURT 128
                      DISPOSITION NOTICE AND JUDGMENT

                      CASE NUMBER - 17F06735X

     STATE VS: WHITNEY, STEPHON JAMES              ID #: 02647736

          AKA: WHITNEY, STEPHON             DR NUMBER:

     START DATE: 04/14/2017

   ARRESTED BY: CHAMBLISS, JACOB ALEXANDER    ARREST DATE: 04/14/2017

  SUBMITTED BY: NO SUBMITTING OFFICER         SUBMIT DATE: 04/14/2017

     PROSECUTOR: KELSEY EINHORN               DISPO DATE: 04/19/2017


 001     CHARGE: 453.336.2A   F POSS SCH I, II, III, IV C/S, (1ST/2ND)
         DISPOSITION: ---GUILTY--- M POSS DRUG NOT FOR I-STATE COMMERCE

         SENTENCED: 04/19/2017
                   FINED: $   0      EXCUSED: $   0
                   JAIL TIME:  MOS      DAYS 60  HRS     CONS/CONC: CONCURRENT
                   CTS     :  MOS      DAYS 006  HRS
                   COMM SERV: DAYS       HRS      MIN
                   RESTITUTION: $    0  CONTRIBUTION: $   0  DRUG FEE: $   0
                   EDUCATION:

                   NONE
                   CONCURRENT WITH ANY OTHER CASE.

     CITATION: 1704143090    PCN: 0025681210   SEQ: 001
```

JUSTICE OF THE PEACE - DEPT. 11

ER_199

Skip to Main Content  Logout  My Account  Search Menu  New Criminal Search  Refine Search  Back  Location : Justice Court   Images Help

# REGISTER OF ACTIONS
## CASE NO. 17F06735X

| State of Nevada vs. WHITNEY, STEPHON | § | Case Type: | **Felony** |
| | § | Date Filed: | **04/18/2017** |
| | § | Location: | |
| | § | Case Number History: | **PC17F06735X** |
| | § | | **17F06735X** |
| | § | ITAG Booking Number: | **1700147748** |
| | § | ITAG Case ID: | **1873274** |
| | § | Metro Event Number: | **1704143090** |
| | § | Other Agency Number: | **1704143090** |
| | § | | **1700147748** |
| | § | | **1873274** |
| | § | | |
| | § | | |

### PARTY INFORMATION

| | | | Lead Attorneys |
|---|---|---|---|
| Defendant | **WHITNEY, STEPHON** | | **Public Defender** |
| | | DOB: 05/23/1990 | *Public Defender* |
| | | | 702-455-4685(W) |
| | | | |
| State of Nevada | **State of Nevada** | | |

### CHARGE INFORMATION

| Charges: WHITNEY, STEPHON | Statute | Level | Date |
|---|---|---|---|
| 1.  Poss drug not for i-state commerce [51366] | 454.351 | Misdemeanor | 04/14/2017 |

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

04/19/2017 | **Plea** (Judicial Officer: Goodman, Eric)
1. Poss drug not for i-state commerce [51366]
    Guilty

04/19/2017 | **Disposition** (Judicial Officer: Goodman, Eric)
1. Poss drug not for i-state commerce [51366]
    Guilty of Lesser Offense

04/19/2017 | **Misdemeanor Sentence** (Judicial Officer: Goodman, Eric)
1. Poss drug not for i-state commerce [51366]

**OTHER EVENTS AND HEARINGS**

04/14/2017 | **Standard Bail Set**
    *Ct1: $3000 Cash/$3000 Surety*
04/14/2017 | **CTRACK Track Assignment JC11**
04/15/2017 | **48 Hour Probable Cause Review**  (7:20 AM) (Judicial Officer: Kern, Rebecca)
    Result: Signing Completed
04/15/2017 | **Probable Cause Found**
04/15/2017 | **Bail Reset - Cash or Surety**
    *Counts: 001 - $0.00/$0.00 Total Bail SET IN COURT*
04/15/2017 | **Probable Cause Arrest Documents**
04/15/2017 | **Bail Set - No Bail**
    *Ct1: $0 Cash/$0 Surety Set in Court*
04/17/2017 | **CTRACK Case Modified**
    *Jurisdiction/DA;*
04/18/2017 | **Criminal Complaint**
04/19/2017 | *CANCELED  72 Hour Hearing*  (7:30 AM) (Judicial Officer: Goodman, Eric)
    *Vacated*
    *IN CUSTODY*
04/19/2017 | **Initial Appearance**  (7:30 AM) (Judicial Officer: Goodman, Eric)
    *In Custody*
    Parties Present
    Result: Matter Heard
04/19/2017 | **Initial Appearance Completed**
    *Advised of Charges on Criminal Complaint, Waives Reading of Criminal Complaint*
04/19/2017 | **Public Defender Appointed**
04/19/2017 | **Bail Stands - Cash or Surety**
    *Counts: 001 - $0.00/$0.00 Total Bail*
04/19/2017 | **Minute Order - Department 11**
04/19/2017 | **Judgment Entered**
04/19/2017 | **Case Closed - Court Order**

Exhibit C

Motion to Amend the Judgment

Las Vegas Justice Court
Electronically Filed
9/14/2022 5:07 PM
Melissa Saragosa
CLERK OF THE COURT

1   **YI LIN ZHENG, ESQ.**
2   Nevada Bar No. 10811
    VEGAS GOLDEN LAW
3   2801 S Valley View Blvd, Ste 16
    Las Vegas, Nevada 89102-0168
4   Phone: (702) 385-7170
5   VegasGoldenLaw@gmail.com
    Attorney for Defendant
6   STEPHON WHITNEY

7                **JUSTICE COURT, LAS VEGAS TOWNSHIP**

8                    **CLARK COUNTY, NEVADA**

9

10  STATE OF NEVADA,                          Case No.: 17F06735X

11              Plaintiff,                     Dept. No.: 11

12          vs.

13  STEPHON WHITNEY,

14              Defendant.

15

16                    **MOTION TO AMEND JUDGMENT**

17

18          COMES NOW the defendant, STEPHON WHITNEY, by and through his

19  attorney, YI LIN ZHENG, ESQ. and requests this Honorable Court to place the above-

20  entitled case on calendar for the purposes of amending the disposition and judgement

21  notice to a conviction of loitering in a public place for an unlawful purpose, pursuant to

22  NRS 207.270, by agreement of the parties in this matter.

23

24          DATED this 14th day of September, 2022.

25                                      */s/ Yi Lin Zheng*

26                                      _____

27                                      YI LIN ZHENG, ESQ.

28

                              **ER_202**

**NOTICE OF MOTION**

It is hereby ordered that the time for the hearing on the foregoing motion will be heard on the <u>21st</u> day of **September, 2022, at the hour of 7:30 a.m.** in above-referenced court.

DATED this 14th day of September, 2022.

/s/ Vanessa Serrano
_____
CLERK OF THE COURT

**MEMORANDUM OF POINTS AND AUTHORITIES**

This Motion to Amend Judgment is filed pursuant to NRS Chapter 176, which allow judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders.[1] This pleading is based upon the papers and pleadings on file and any evidence or argument heard at the time of the hearing on this matter.

**CERTIFICATE OF SERVICE**

SERVICE via E-Mail of the Defendant's MOTION TO AMEND JUDGMENT is hereby effectuated on this 14th day of September, 2022, via the following email:

<u>Motions@ClarkCountyDA.com</u>

*/s/ Yi Lin Zheng*
_____
An Employee of Vegas Golden Law

---
[1] See NRS 176.565

**ER_203**

Exhibit D

Minute Order Amending the Judgment to
"Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]"

**JUSTICE COURT, LAS VEGAS TOWNSHIP**
**CLARK COUNTY REGIONAL JUSTICE CENTER**
**200 LEWIS AVENUE**
**LAS VEGAS,NEVADA 89101**
**COURT 128**

## DISPOSITION NOTICE AND JUDGMENT

**Court Case Number: 17F06735X**

| | |
|---|---|
| State of Nevada vs. WHITNEY, STEPHON | ID#: 2647736 |
| AKA: WHITNEY, STEPHON | Arrest Date: 4/14/2017 |
| Citation: | Submit Date: 9/22/2022 |
| Department: 11 | Disposition Date: 9/21/2022 |

**Sentencing Information**

**001  Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]  (4/14/2017) (M)**
**PCN/SEQ: 0025681210 001**

Filed As:        Possess schedule I, II, III or IV controlled substance, first or second offense [51127]  (F)

Plea: Nolo Contendere (9/21/2022)                          Disp: Guilty as Amended (9/21/2022)

**Misdemeanor Sentence**                                                                 9/21/2022

Credit for Time Served

_____
Justice Of The Peace

**ER_205**

Exhibit E

Minute Order Amending the Judgment to "loitering about a school or public place."

# Justice Court, Las Vegas Township
## Clark County, Nevada

Department: 11

**Amended Court Minutes**



L015255036

| 17F06735X | **State of Nevada vs. WHITNEY, STEPHON** | Lead Atty: Yi Lin  Zheng, ESQ |
|---|---|---|

**9/21/2022 7:30:00 AM  Motion (No bail posted)**                    Result: Matter Heard

| **PARTIES PRESENT:** | State Of Nevada | Clemons, Jennifer |
|---|---|---|
| | Attorney | Zheng, Yi  Lin, ESQ |

| **Judge:** | Goodman, Eric |
|---|---|
| **Court Reporter:** | Silvaggio, Rene |
| **Court Clerk:** | Pallan, Jeff |

---

**PROCEEDINGS**

---

**Events:**      **Side Bar Conference Held**

**Motion**

By defense to amend the judgement to a loitering charge-no objection by the State-Motion is granted

**Judgment  Entered**

**Charges:**   **Amended: 001: Loiter in or about public toilet for lewd, lascivious or**          Court Ordered
**unlawful act**

**Plea/Disp:**   **001: Loiter about school/place children congregate [53176]**
Amended Plea – Court Ordered: Nolo Contendere

Amended Disposition - Court Ordered: Guilty as Amended

Amended Sentence – Court Ordered: Misdemeanor Sentence

Credit for Time Served                9/21/2022 –                            Satisfied (9/21/2022)

---

1   JASON M. FRIERSON
    United States Attorney
2   District of Nevada
    Nevada Bar No. 7709
3   DANIEL J. COWHIG
    Assistant United States Attorney
4   501 Las Vegas Boulevard South, Suite 1100
    Las Vegas, Nevada 89101
5   702-388-6336
    daniel.cowhig@usdoj.gov
6   *Attorneys for the United States of America*

7

                    **UNITED STATES DISTRICT COURT**
8                    **FOR THE DISTRICT OF NEVADA**

9   UNITED STATES OF AMERICA,              Case No. 2:21-cr-2-JAD-NJK

10              Plaintiff,                  United States' Response to Defendant
                                            Stephon Whitney's Sentencing
11         vs.                              Memorandum on the Four-Level
                                            Enhancement Under § 2K2.1(b)(6)(B)
12   STEPHON JAMES WHITNEY,                 [ECF No. 41] and Supplemental Sentencing
            a.k.a. Stephone James Whitney,  Memorandum [ECF No. 42].
13          a.k.a. Steff Bizzle,
            a.k.a. Stef B,
14
                Defendant.
15

16   Certification: This response is timely filed.

17          United States of America, through the United States Attorney, Jason M. Frierson, and

18   the undersigned Assistant United States Attorney, Daniel J. Cowhig, respectfully submits this

19   response to defendant Stephon Whitney's sentencing memoranda, ECF Nos. 41 and 42.

20          The United States respectfully requests this Honorable Court sentence defendant

21   Whitney to a 100-month term of custody, consecutive to any term of custody adjudged in the

22   state case, *State of Nevada v Stephon Whitney*, Eighth Judicial District Court in Clark County,

23   Nevada, Case No. C-19-338650, followed by a 3-year term of supervised release on the

24

conditions recommended by the United States Probation Office (USPO)[1] and the additional

special conditions of supervision set out below. Because the defendant appears to lack the

resources to pay a punitive fine, the United States respectfully requests the Court not impose a

fine.

## I. Brief Summary of Factual and Procedural Context

On January 5, 2021, a grand jury seated in the District of Nevada found probable cause

to believe that defendant Whitney knowingly possessed a firearm, specifically a Canik model

TP9 SF Elite 9mm semiautomatic pistol bearing serial number 20BH02246, on September 2,

2020, while knowing that he had previously been convicted of crimes punishable by

imprisonment for a term exceeding one year. ECF No. 1. Specifically, among the previous

crimes and convictions listed in the indictment were:

> Possession of a Controlled Substance with Intent to Sell, in the
> District Court of Nevada in Clark County, Nevada on or about July 16,
> 2009, in Case No. C-19-338650;
> First Degree Kidnapping, in the District Court of Nevada in Clark
> County, Nevada on or about March 26, 2008, in Case No. C-236921;
> Conspiracy to Commit Robbery, in the District Court of Nevada in
> Clark County, Nevada on or about March 26, 2008, in Case No. C-236921,
> and;
> Robbery with a Deadly Weapon, in the District Court of Nevada in
> Clark County, Nevada on or about March 26, 2008, in Case No. C-236921.

*Id*. Finding also that the Canik TP9 SF Elite 9mm handgun had been shipped and transported in

interstate commerce, the grand jury returned an indictment charging defendant Whitney with

the crime of Felon in Possession of a Firearm in violation of Title 18, United States Code

sections 922(g)(1) and 924(a)(2). *Id*.

---

[1] As of the filing of this response to defendant Whitney's sentencing memoranda, defendant
Whitney had not objected to the conditions of supervision recommended by the USPO.

Defendant Whitney made his initial appearance in this matter on January 22, 2021, before United States Magistrate Judge Ferenbach, having been brought before the Court on a Writ of *Habeas Corpus ad Prosequendum* granted by United States Magistrate Judge Koppe. ECF Nos. 7 and 5, respectively. Defendant Whitney was detained pending trial. ECF Nos. 16 and 17.

On June 21, 2022, defendant Whitney pleaded guilty to the indictment without benefit of a plea agreement. ECF No. 33 (Notice of Intent to Plead Guilty); ECF No. 34 (defendant's Memorandum in Support of Guilty Plea without a Plea Agreement); ECF No. 36 (United States' Memorandum in Support of Plea without a Plea Agreement); ECF No. 37 (Minutes).

By pleading guilty without the benefit of a plea agreement, the defendant entered an unconditional guilty plea. *United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005). "An unconditional guilty plea constitutes a waiver of the right to appeal all nonjurisdictional antecedent rulings and cures all antecedent constitutional defects." *Id*.

The USPO Presentence Investigation Report (PSR) prepared on August 11, 2022, and revised on October 27, 2022, includes a description of the offense conduct:

On September 2, 2020, officers with Nevada Parole and Probation conducted a home search on Stephon Whitney, who was on probation for the conviction of Possession of a Controlled Substance with Intent to Sell. As a condition of Whitney's probation, a search condition was imposed.

Upon conducting a search of Whitney's bedroom, officers observed in plain view on the top shelf of the closet, two fully loaded semi-automatic firearm magazines, containing 9 mm ammunition. A detective with the Las Vegas Metropolitan Police Department subsequently assisted officers and spoke with Whitney's girlfriend, Jessica Rodosh, who advised that she did not own any weapons, nor would she allow any in her residence due to the presence of her son. She further advised that she had no idea about the loaded magazines.

As the search continued, detectives located a Canik Model TP9-SF Elite, 9mm pistol, bearing serial number 20BH02246, and a second fully loaded magazine hidden inside the headboard in Whitney's bedroom. On top of the handgun was an envelope containing $4,450 in United States currency. Also found in Whitney's bedroom were two large jars containing marijuana as well as a large plastic bag containing marijuana, which was later weighed and found to be approximately a half pound of marijuana. In the laundry

3

area, detectives located a box of plastic sandwich bags that contained a digital scale. The scale had a green leafy residue consistent with marijuana.

Whitney was subsequently interviewed after being advised of his Miranda Rights and agreed to speak with detectives, and eventually admitted that he had knowledge of both the firearm and the marijuana, and that his girlfriend did not have any knowledge of what was occurring. He further admitted that his DNA would be located on the firearm and that due to the current pandemic, he had lost his job and began selling marijuana to make money. He further indicated that he had been selling narcotics since approximately nine years of age and did not know what else to do.

PSR at paras. 6-9. Defendant Whitney objected only to the last of these paragraphs in the PSR, asserting that the paragraph 9 "summary does not accurately reflect [defendant's] custodial interview," PSR at 27 (Objection No. 4), supplying the LVMPD transcript of defendant's voluntary statement as an exhibit to his Sentencing Memorandum on the Four-Level Enhancement Under § 2K2.1(b)(6)(B). ECF No. 41, Ex. F.

A more comprehensive description of the offense conduct is contained in the Officer's Report (OR), Las Vegas Metropolitan Police Department (LVMPD) Event No. LLV200900007194, dated September 2, 2020. ECF No. 36, Ex C. Images taken during LVMPD investigation in Event No. LLV200900007194 provide further detail. *Id.* at Ex. D; ECF No. 41 at 14 and Ex. B.

## II.  Offense Level Computations and Defendant's Objections

The Base Offense Level (BOL) and specific offense characteristics (SOC) applicable to the unlawful possession of a firearm are described by U.S.S.G. § 2K2.1.

a.  Base Offense Level

Where "the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense," the applicable BOL is 24 under U.S.S.G. § 2K2.1(a)(2). In this case, defendant's prior felony conviction for Robbery with a Deadly Weapon, in the District Court of Nevada in Clark

County, Nevada on or about March 26, 2008, in Case No. C-236921, ECF No 36, Ex. A, is a crime of violence; his prior conviction for Possession of a Controlled Substance with Intent to Sell, in the District Court of Nevada in Clark County, Nevada on or about July 16, 2009, in Case No. C-19-338650, *id.*, Ex. B, is a controlled substance offense.

The USPO also assessed a BOL of 24 under U.S.S.G. § 2K2.1(a)(2). PSR at para. 16.

Defendant Whitney has not objected to the BOL assessed by the USPO. *See* ECF Nos. 41 and 42. Defendant Whitney acknowledges the application of the 24-level BOL under U.S.S.G. § 2K2.1(a)(2), ECF No. 21 at 3:25, and argues that "the increase in Base Offense Level overrepresents the severity of [defendant]'s criminal history," ECF No 42 at 6:7-8.

b. <u>Specific Offense Characteristics</u>

Where a defendant "used or possessed any firearm or ammunition in connection with another felony offense," the offense level is increased by 4 levels. U.S.S.G. § 2K2.1(b)(6)(B).

In this case, defendant Whitney possessed the charged firearm and the 9mm ammunition in connection with the felony offense of Possession of a Controlled Substance with Intent to Distribute (Marijuana) under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). PSR at paras. 6-9; ECF Nos. 36 and 41.

On September 2, 2020, the Nevada Probation & Parole (P&P) officer supervising defendant Whitney in *State of Nevada v. Stephon James Whitney*, Eighth Judicial District Court in Clark County, Nevada, Case No. C-19-338650, Officer J. Vargas, conducted a home visit with defendant Whitney. ECF No. 36 at 1; ECF No. 41, Ex. E. On August 28, 2020, law enforcement had found defendant Whitney in vehicle in the community during hours of his supervision curfew, in the company of felons who possessed 3 firearms. *Id*. Defendant Whitney had provided a false identity to law enforcement, delaying their identification of defendant Whitney and impeding his supervision. *Id*. During the September 2, 2020, inspection, P&P

officers, aided by LVMPD officers, found and seized the Canik 9mm handgun charged in the instant case, along with two loaded magazines fitting the handgun, 70 more rounds of 9mm ammunition, two large jars and a separate plastic bag containing 264.5 gross grams of marijuana, and a box containing small baggies and a digital scale with marijuana residue. *Id.*; ECF No 36, Ex. D; ECF No. 41, Ex. A. Some of the marijuana in one of the jars was subdivided into separate baggies. ECF No 36, Ex. D at 6. None of the jars was consistent with "dispensary marijuana." *Id*. The handgun, the magazines, the ammunition, and all but one of the jars of marijuana were all found in the master bedroom and closets of the master bedroom. *Id*. The other jar of marijuana was found in the bathroom, and the baggies and digital scale were found in the laundry, both close to the master bedroom. *Id*.

During a warned, recorded, post-arrest interview, defendant Whitney initially falsely denied possessing the Canik 9mm handgun, the ammunition, or the marijuana. ECF No. 41 at 4-8. Defendant Whitney also falsely told the interviewing officers his deoxyribonucleic acid (DNA) would not be found on the firearm. *Id*. at 5. Through the course of a 90-minute interview, defendant Whitney came to admit that he possessed the Canik 9mm handgun and the magazines, describing the firearm and its location as well as the location of the magazines for the officers. *Id*. at 64-69. Whitney also came to admit that some of the marijuana was his, and that he was selling marijuana to make ends meet during COVID. *Id*. Defendant Whitney described how the marijuana was packaged and where the marijuana was found, and that the baggies and scale were together. *Id*. None of those facts was supplied by the interviewing officers. *Id*.

The quantity of marijuana, the packaging of the marijuana, the storage of a small digital scale with marijuana residue in a box of small baggies in the same area as the marijuana but well

1    away from a kitchen, are all objective physical evidence of marijuana distribution. Defendant

2    Whitney's admission that he was distributing marijuana, coupled with the objective physical

3    evidence of distribution, is more than sufficient to show by a preponderance of the evidence that

4    defendant Whitney was engaged in the felony offense of Possession of a Controlled Substance

5    with Intent to Distribute (Marijuana) under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D).

6        Defendant Whitney's assertion in his sentencing memoranda that the digital scale "would

7    be necessary to weigh out individual servings before consumption," rather than serving as a tool

8    of distribution, is an absurdity. ECF No. 41 at 6:25-26.

9        Under U.S.S.G. § 2K2.1(b)(6)(B), the offense level is increased by 4 levels where a

10    defendant "used or possessed any firearm or ammunition in connection with" a felony "drug

11    trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing

12    materials, or drug paraphernalia." U.S.S.G. § 2K2.1, comment. (n. 14(B)).

13        In this case, defendant Whitney possessed the charged firearm and the 9mm ammunition

14    in connection with the felony offense of Possession of a Controlled Substance with Intent to

15    Distribute (Marijuana) under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). Defendant Whitney was

16    engaged in the business of distributing marijuana out of the apartment, specifically the area of

17    the master bedroom of the apartment. The drugs, drug-manufacturing materials, and drug

18    paraphernalia all were found in or near the master bedroom, as were the Canik 9mm handgun,

19    the magazines and the ammunition. In cases involving "a drug trafficking offense in which a

20    firearm is found in close proximity to drugs," the four-level enhancement is warranted "because

21    the presence of the firearm has the potential of facilitating another felony offense." *United States*

22    *v. Chadwell*, 798 F.3d 910, 916 (9th Cir. 2015) (quoting U.S.S.G. § 2K2.1 cmt. n. 14(B)).

23        The USPO also assessed 4 additional levels under U.S.S.G. § 2K2.1(b)(6)(B). PSR at

24    paras. 17 and p. 28 ("Response No. 5").

Defendant Whitney has objected to the application of the U.S.S.G. § 2K2.1(b)(6)(B) Specific Offense Characteristic (SOC) that he "used or possessed any firearm or ammunition in connection with another felony offense." ECF No. 41. To support his argument, defendant Whitney attaches the transcript of the September 22, 2020, Revocation of Probation Hearing in *State of Nevada v. Stephon James Whitney*, Eighth Judicial District Court in Clark County, Nevada, Case No. C-19-338650. ECF No. 41, Ex E. In that proceeding, it should be noted that the presiding judge found defendant in violation of the terms of his probation, specifically that:

> I do find him in violation as to the second home visit based upon the results of the search and the information provided in the declaration of arrest. The defendant knew or had access to a semi-automatic handgun with two loaded magazines involving at least -- and then there was additional 70 rounds of nine millimeter ammo that was found. There was a substantial amount of marijuana. The circumstances here suggest that it was being sold, and especially looking at the amount of currency found in the house. So I do find him in violation and sufficient evidence of his possession and access both to the magazines -- loaded magazines and to the firearm. I am going to revoke his probation; institute the original sentence of 18 to 48 months in the Nevada Department of Corrections.

ECF No. 41, Ex. E at 24:25-25:11.

Notably, the presiding judge in that matter did not have the opportunity to consider the LVMPD Forensic Laboratory Report matching trace DNA found on the Canik firearm and the two magazines to that of defendant Whitney in the September 22, 2020, Revocation of Probation Hearing. *Id.*; ECF No. 36, Ex. F. The LVMPD Forensic Laboratory Report was not distributed until December 11, 2020. *Id.*

The standard of proof applicable to probation revocation in Nevada state court proceedings, defined by the Supreme Court of Nevada in *Lewis v. State*, 529 P.2d 796 (1974), differs from the preponderance of the evidence standard generally applicable to Federal sentencing proceedings, *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir.2006); *United States v. Garcia*, 522 F.3d 855, 860 (9th Cir. 2008). Under *Lewis*, "[e]vidence beyond a reasonable doubt is

not required to support a [Nevada state] court's discretionary order revoking probation." Instead, "[t]he evidence and facts must reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation." *Lewis* at 797. While the Supreme Court of Nevada has observed that the *Lewis* "reasonably satisfied" standard differs from "a preponderance of the evidence standard," that difference is effectively undefined. *Dail v. State*, 610 P.2d 1193, 1196 (1980). As a consequence of that distinction, this Honorable Court should not rely entirely upon the judgment on revocation in the state proceeding, but should also examine the evidence that informed that judgment, together with other relevant evidence.

In his instant motions, while urging this Honorable Court to disregard the findings of the presiding judge on revocation in that state proceeding, "afford[ing] those conclusions no weight" because of that distinction, ECF No. 41 at 5:9, defendant Whitney quotes and relies upon the testimony of Jessica Rodosh during that proceeding. ECF No. 41 at 7:3-8:6. It is the testimony of that witness that should be given no weight. When the witness' quoted statements are examined in the context of the remainder of the witness' testimony, that testimony is plainly contradicted not only by defendant Whitney's plea in the instant case, but also by extrinsic facts, including the LVMPD Forensic Laboratory Report:

> Q: … you know that ultimately there were items that were found in the bedroom that would constitute contraband for Mr. Vargas?
> A: I think -- I didn't know until they said they were seizing the house.
> Q: Did you know that those items were in the house?
> A: Yes.
> Q: And why do you know that those items were in the house?
> A: Because they were mine.
> Q: And *when you say that they were yours, what items are you referring to?*
> A: *The gun*, the money, *ammunition*, and the marijuana.
> Q: And do you know where they were located?
> A: I do.
> Q: As to -- so you heard a lot of testimony in regards to the loaded magazine that was found in the closet. Whose closet did that -- was that magazine in?
> A: That was my closet.

Q:  And how many closets are in that bedroom?

A:  There's two closets in the bedroom. When you walk in, there's the one that's right there to the right. And then you go further in the bedroom, which is mine on the left. Stephon's is in -- so Stephon's is right there on the right-hand side when you walk in the bedroom, it's all male's clothes. And that's -- I have a lot of clothes, so I have my own closet which is on the left.

Q:  And that's the closet that Officer Vargas is referring to in regards to whether there were purses that are located?

A:  Yes.

Q:  And then, is the side that Stephon sleeps on the bed, is that closer to your closet? However, that is not the closet on the left is necessarily his closet.

A:  No.

Q:  But he sleeps closer to the left side of the closet on the left?

A:  Yeah. I mean, if -- kind of. We just -- yeah.

Q:  So he would not necessarily have known the entirety of the contents that were in your closet?

A:  No.

Q:  And with respect ultimately to the marijuana that was found, it was hidden in a laundry hamper?

A:  It was.

Q:  *And your testimony here today is that those items belonged to you?*

A:  *They do.*

ECF No. 41, Ex. E at 18:4-19:24 (emphasis added). Even in the absence of the conclusions of the LVMPD Forensic Laboratory Report matching trace DNA found on the Canik firearm and the two magazines to that of defendant Whitney, the presiding judge in that hearing clearly found Ms. Rodosh's testimony unpersuasive. *Id.* at 24:25-25:11.

### c.  Adjustments

Based on defendant Whitney's timely plea of guilty, the United States motions the Court for the application of U.S.S.G. §§ 3E1.1(a) and (b), affording a combined 3-level reduction for acceptance of responsibility. With these adjustments, the final Total Offense Level is 25.

As noted above, the USPO applied the same offense level computations. PSR at paras. 16-25.

### III. Criminal History Computation

The USPO computed defendant Whitney's total Criminal History Score as 11. PSR at paras. 27-39. The USPO computed defendant Whitney's Criminal History Category as V. *Id.* at para. 39. The United States concurs with those computations.

Defendant Whitney objects to the USPO computation of his Criminal History Score and Category, asserting that his April 19, 2017, conviction of Possession of a Drug Not to be Introduced into Interstate Commerce (Cocaine) in *Nevada v. Whitney*, Las Vegas Justice Court Dept 11, Case No. 17F06735X at paragraph 33 of the PSR "was amended to 'loitering about a school or public place' in violation of NRS 207.270. Because the conviction is now for loitering, this offense no longer counts for criminal history under 4A1.2(c)(2)." PSR at p. 28 ("Objection 6"). Defendant Whitney provided the amended judgment. Ex. A.

The probable cause arrest documents, criminal complaint, minute order at initial appearance, judgment of conviction and previous register of actions all are consistent with the original conviction. Ex. B.  On September 14, 2022, defendant Whitney had filed a motion to amend the judgment in *Nevada v Whitney*, Las Vegas Justice Court Dept 11, Case No. 17F06735X to change the "disposition and judgement notice to a conviction of loitering in a public place for an unlawful purpose, pursuant to NRS 207.270, by agreement of the parties in this matter." Ex C. That motion cited NRS Chapter 176 as the authority for the "correction." *Id*. The state magistrate, after a sidebar, granted the motion on September 21, 2022, changing the judgment to a conviction for "Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]" Ex. D. A second minute order revised the judgment again to "loitering about a school or public place." Ex. E.

"In our American system of dual sovereignty, each sovereign – whether the Federal Government or a State – is responsible for the administration of its own criminal justice system." *Setser v. United States*, 566 U.S. 231, 241 (2012) (internal quotation marks and citations removed). "State courts cannot be given the authority to change a defendant's federal sentence by issuing a ruling that alters history and the underlying facts." *United States v. Yepez*, 704 F.3d 1087, 1091 (9th Cir. 2012) (*en banc*), *cert. denied* 569 U.S. 969 (2013); *United States v. Lizarraga-Carrizales*, 757 F.3d 995, 1000 (9th Cir. 2014). "[S]tate courts may not interfere in federal sentencing by retroactively altering a defendant's status after commission of a federal offense." *United States v. Jones*, No. 3:07-CR-00168-MO, 2014 WL 3818671, at *9 (D. Or. Aug. 4, 2014), vacated and remanded on other grounds, No. 14-35706, 2015 WL 13932567 (9th Cir. Oct. 29, 2015).

The USPO computation of defendant Whitney's total Criminal History Score as 11 and Criminal History Category as V are correct. Defendant Whitney's effort to manipulate his criminal history score and category are unavailing.

## IV. Applicable Law

Under Title 18, United States Code section 3553(a), the factors to be considered when imposing a sentence include both "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 USC § 3553(a)(1).

Title 18, United States Code section 3553(a) mandates that "the Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in 18 USC § 3553(a)(2). Those purposes include "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner." 18 USC § 3553(a)(2).

The law also requires the Court to consider "the kinds of sentences available," 18 USC § 3553(a)(3); "the kinds of sentence and the sentencing range established … set forth in the guidelines … issued by the Sentencing Commission pursuant to" Title 28, United States Code section 994(a)(1), 18 USC § 3553(a)(4), and; pertinent policy statements issued by the sentencing Commission, 18 USC § 3553(a)(5).

Section 3553(a) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 USC § 3553(a)(6).

Finally, section 3553(a) requires the Court to consider "the need to provide restitution to any victims of the offense." 18 USC § 3553(a)(7).

### V. United States' Sentencing Recommendation and Rationale

United States respectfully requests this Honorable Court sentence defendant Whitney to a 110-month term of custody, the high end of the applicable guideline range, and a 3-year term of supervised release on the conditions recommended by the USPO, "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in Title 18, United States Code section 3553(a)(2).

The United States respectfully requests the Court not impose a fine as defendant Whitney does not appear to have the resources to pay a punitive fine. Restitution is not applicable in this case. *See* 18 U.S.C. §§ 3663 and 3663A; USSG § 5E1.1.

Taken as a whole, the nature and circumstances of the offense and the characteristics of the defendant do not present mitigating factors that would militate for a downward variance or departure from the guideline range. *See* PSR at paras. 93-94; 18 USC §§ 3553(a). Here,

**ER_220**

13

imposition of a guideline range sentence would adequately address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 USC § 3553(a)(6).

The United States concurs with the sentencing justification set out by the USPO in Part G of the PSR. PSR at paras. 95-98.

Defendant Whitney, a mature man of 32, has a lengthy criminal history extending back to when he was 17, with prior felony convictions of First Degree Kidnapping, Conspiracy to Commit Robbery, and Robbery with a Deadly Weapon, in the District Court of Nevada in Clark County, Nevada on or about March 26, 2008, in Case No. C-236921, for which he was sentenced to 48 to 156 months custody, and; Possession of a Controlled Substance with Intent to Sell, in the District Court of Nevada in Clark County, Nevada on or about July 16, 2009, in Case No. C-19-338650, for which he was sentenced to 18 to 48 months custody. These prior sentences did not deter defendant Whitney from reoffending.

Defendant Whitney possessed the charged Canik 9mm handgun and the ammunition in connection with another felony offense, Possession of a Controlled Substance with Intent to Distribute (Marijuana) under 21 U.S.C. §§ 841(a)(1) and (b)(1)(D). Anything less than a 110-month term of custody would be insufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

In his sentencing memorandum, defendant Whitney urges this Honorable Court to grant an 82-month downward departure from his custodial sentence. Such an extreme departure is inconsistent with the purposes of sentencing.

The United States respectfully requests this Honorable Court sentence defendant Whitney to a 110-month term of custody, the low end of the applicable guideline range, consecutive to any term of custody adjudged in the related state case, *State of Nevada v Julio*

1   *Whitney*, Eighth Judicial District Court in Clark County, Nevada, Case No. C-21-357095,

2   followed by a 3-year term of supervised release on the conditions recommended by the USPO.

3   Because defendant Whitney appears to lack the resources to pay a punitive fine, the United

4   States respectfully requests the Court not impose a fine.

5        The United States respectfully requests to be permitted to supplement this filing should

6   new circumstances require.

7   Respectfully submitted this November 3, 2022.

8                      JASON M. FRIERSON
United States Attorney

9

10                     *//s// Daniel J Cowhig*

11                     DANIEL J. COWHIG
Assistant United States Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

## INDEX OF ATTACHMENTS

A.    Amended Judgement in *Nevada v. Whitney*, Las Vegas Justice Court Dept 11, Case No. 17F06735X

B.    Probable Cause Arrest Documents, Criminal Complaint, Minute Order at Initial Appearance, Judgment of Conviction and previous Register of Actions

C.    Motion to Amend the Judgment

D.    Minute Order Amending the Judgement to "Loiter in or about public toilet for lewd, lascivious or unlawful act [53148]

E.    Minute Order Amending the Judgement to "loitering about a school or public place."

YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
2801 S Valley View Blvd, Ste 16
Las Vegas, NV 89102
Phone (702) 385-7170
VegasGoldenLaw@gmail.com
Attorney for Defendant
Stephon Whitney

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATE OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>STEPHON WHITNEY,<br><br>          Defendant. | Case No. 21-cr-0002-JAD-NJK<br><br>**SUPPLEMENTAL SENTENCING MEMORANDUM** |

     Yi Lin Zheng, counsel for defendant Stephon Whitney, hereby files this supplemental sentencing memorandum in conjunction with the sentencing memorandum on the four-level enhancement under §2k2.1(b)(6)(B), (ECF #41), respectfully requesting a sentence of 28 MONTHS as sufficient, but not greater than necessary to achieve the goals of sentencing.

## I.     THE COURT SHOULD ASSESS MR. WHITNEY AS A CRIMINAL HISTORY CATEGORY IV

     "All sentencing proceedings are to begin by determining the applicable Guidelines range." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). "The range must be calculated correctly and it would be procedural error for a district court to fail to calculate – or calculate incorrectly – the Guidelines range." *United States v. Hammons*, 558 F.3d 1100, 1105 (9th Cir. 2009) (internal quotations omitted).

**ER_224**

1    "Sentences for the following prior offenses and offenses similar to them, *by whatever*

2    *name they are known*, are never counted [for criminal history points] … *loitering*."  U.S.S.G. §

3    4A1.2(c)(2) (emphasis added).  If an offense is specifically listed in §4A1.2(c)(2), the offense is

4    "never counted" and the court's analysis ends.  *United States v. Calderon Espinosa*, 569 F.3d

5    1005, 1008 (9th Cir. 2009).  Courts may look beyond the statute of conviction only when it is

6    being argued that the challenged prior offense is "similar" to an enumerated offense.  *Id.*

7        In *Calderon Espinosa*, the Ninth Circuit held a California "loitering for drugs activities"

8    conviction was "never counted" under § 4A1.2(c)(2).  The Ninth Circuit relied on the plain

9    language of § 4A1.2(c)(2) and concluded "the offense of 'loitering' is specifically listed in §

10   4A1.2(c)(2), and thus is 'never counted' in a defendant's criminal history score."  *Id.*  The Ninth

11   Circuit distinguished a prior case where it held a California "under the influence of a controlled

12   substance" conviction was not "similar" to the § 4A1.2(c)(2) enumerated offense of "public

13   intoxication."  *Id.*  Because "loitering," by whatever name is it known, was an enumerated

14   offense in § 4A1.2(c)(2), looking beyond the plain language, and conducting "similar to"

15   analysis, was unnecessary.  *Id.*

16       Here, the prior conviction described in PSR ¶33 should not count for criminal history

17   points under §4A1.2(c)(2).  The amended judgment reflects that Mr. Whitney was convicted and

18   sentenced for "loitering about school or public place where children congregate" under NRS

19   207.270.  Because "loitering" is an enumerated offense in §4A1.2(c)(2), *Calderon Espinosa*

20   controls and this conviction is "never counted" for Mr. Whitney's criminal history.  569 F.3d at

21   1008. Although the statute of conviction was amended after the plea because the Court has not

22   yet commenced "sentencing proceedings" in this case, this Court should treat Mr. Whitney's

criminal history as it is on the day of sentencing, modifications and all. *See Carty*, 520 F.3d at 991.

Mr. Whitney's situation is akin to a state proceeding that requires a person to plead guilty to a misdemeanor DUI, which always counts for criminal history points, but later reduces the statute of conviction to reckless driving, which counts under certain circumstances, if certain requirements are met. So long as the amended state judgment of conviction reflects a reckless driving at the time of the federal sentencing, this Court would look to §4A1.2(c)(1)'s provisions to determine if the offense counted rather than relying on the preamble that "[s]entences for misdemeanor and petty offenses are counted."

Section 4A1.2 application notes 6 and 10 are inapplicable to this situation. Application note 6 provides no guidance. The prior conviction does not count for criminal history points because the statute of conviction is an enumerated offense listed in § 4A1.2(c)(2), not because the entire prior conviction was "reversed, vacated, or invalidated." Similarly, application note 10 is not helpful. The state proceedings did not set aside the conviction, result in pardon, or lead to a restoration of civil rights. The conviction stands, just under a different statute. In this situation, *Calderon Espionsa* prevents this Court from looking beyond the "loitering" statute of conviction when assessing criminal history points under §4A1.2(c)(2). 569 F.3d at 1008.

Without the two criminal history points assessed in PSR ¶33, Mr. Whitney moves down from a criminal history category V to a category IV. This Court should not count the "loitering" conviction for criminal history points and find Mr. Whitney is a criminal history category IV.

## II. MR. WHITNEY REQUESTS A 26-MONTH DOWNWARD VARIANCE REPRESENTING THE TOTAL TIME HE HAS SPENT IN CUSTODY

Since his arrest on September 2, 2020, Mr. Whitney has been in custody for the same firearm. By the time of sentencing, Mr. Whitney will have been in continuous custody for 26

3

months. Undersigned counsel represented Mr. Whitney at the probation hearing and continued her representation when the instant case was indicted. Based on the facts known at the time, undersigned counsel made strategic decisions that inadvertently resulted in Mr. Whitney accruing additional criminal history points. Had undersigned counsel known a federal indictment was coming, she would have delayed the imposition of the state revocation sentence to save Mr. Whitney two additional criminal history points.

Mr. Whitney was initially held in state custody pursuant a probation violation. The principal allegation at his violation hearing was that he was a prohibited person in possession of a firearm. Def. Sentencing Memo (ECF #41) Exhibit E. The state court held Mr. Whitney's revocation hearing within twenty days of his arrest, found in violation based on the testimony of his probation officer, and imposed the underlying 18–48-month sentence. Id. Undersigned counsel advised Mr. Whitney to proceed with the revocation hearing quickly with an eye towards resolving any new state charges arising from the gun for a stipulated sentence that would run concurrent to his revocation sentence.

The state did charge Mr. Whitney with being a prohibited person in possession of a firearm in a single-count complaint approximately one month after his revocation hearing. Plea negotiation were well under way but before a plea agreement could be signed, the parties were informed that the U.S. Attorney's office was investigating Mr. Whitney for possible federal prosecution. Negotiations ceased and Mr. Whitney was transferred to state prison to serve his revocation sentence.

In January 2021, the federal government indicted Mr. Whitney on the instant offense. Mr. Whitney was transported to federal custody pursuant to a writ of habeas corpus ad prosequendum. (ECF #5). Undersigned counsel attempted to get Mr. Whitney transferred to

4

primary federal custody, and thus begin accruing federal time credit, by keeping him in a state facility to finish out his state time as soon as possible. (ECF #11, 15). Although this position appears counterintuitive at first, the logic behind it lies with the state's parole system. The state parole system requires that a person be granted parole by the parole board and be physically present in a Nevada Department of Correction facility to complete the parole process. This is true even if the person would parole into the custody of another jurisdiction. In short, had Mr. Whitney been allowed to remain at a state facility, the state would have been able to complete the parole process and parole him to federal custody.

The first step did occur. Mr. Whitney was returned to state custody so that he could attend a video parole hearing from High Desert State Prison in late March 2021. Undersigned counsel represented Mr. Whitney at the parole eligibility hearing from the parole commissioner's office in Las Vegas. Despite his desire to remain in state custody, Mr. Whitney was ordered to be immediately transported back to federal custody in Pahrump following the parole hearing. (ECF #11). Undersigned counsel subsequently confirmed in April that the commissioners had granted Mr. Whitney parole. However, the state was unable to complete the parole process because Mr. Whitney was not physically at a state facility. The state needed a body to parole and Mr. Whitney's body was noticeably absent from the state facilities. Thus, the state could not move forward with the grant of parole and required him to expire his sentence by serving the remaining state custodial time. Had counsel's plan been implemented, Mr. Whitney would have paroled to his federal detainer on or about April 30, 2021. This would have allowed Mr. Whitney to accrue 19+ months of federal credit by the time of sentencing.

Mr. Whitney's state sentence and this sentence result from the same firearm. He requests that this Court vary down 26 months to represent the total time he has spent in custody before

sentencing.  In the alternative, Mr. Whitney requests a 19-month downward variance to represent the federal custody credit he would have accrued had he completed the state parole process and paroled to federal custody.  Mr. Whitney was and remained, until very recently, in state custody for the duration of this case.  Despite undersigned counsel's best efforts, Mr. Whitney served the entirety of his expected state sentence even after he was granted parole.

### III.  THE INCREASE IN BASE OFFENSE LEVEL FOR THE FELONY KIDNAPPING CONVICTION OVERREPRESENTS THE SEVERITY OF MR. WHITNEY'S CRIMINAL HISTORY

The two felony offense entries in Mr. Whitney's criminal history disproportionately impact his guideline calculations.  Mr. Whitney only has two instances where his conduct resulted in felony convictions.  PSR ¶ 31, 34.  Both instances now serve as predicates to increase his base offense level.  Mr. Whitney has no other felony convictions.  In particular, the 2007 conviction for felony kidnapping,[1] classified as a crime of violence, disproportionately impacts Mr. Whitney's guidelines

At the age of 17, Mr. Whitney was certified to adult court and convicted of felony offenses arising out of a robbery, where one of his co-defendants died.  Mr. Whitney did not plan the robbery.  He was not the first or the second to enter the store.  He did not carry a gun.  Mr. Whitney was the lookout and seen standing by the getaway car. PSR ¶ 31.  Despite his minor role, Mr. Whitney pled guilty to all counts and was sentenced to 56–240 months in prison.

Considering Mr. Whitney's youth, the near absence of parental guidance growing up, and the lack of other violent crimes in his criminal story, the 2007 kidnapping conviction is an

---

[1]  Although the PSR does not specify, the only conviction that would qualify as a crime of violence is the Nevada kidnapping.  The Nevada robbery with a deadly weapon and the conspiracy to commit robbery are categorically excluded from being crimes of violence.  *United States v. Edling*, 895 F.3d 1153, 1156-57 (9th Cir. 2018).

6

aberration. The rest of Mr. Whitney's criminal history is either minor traffic offenses or drug related. The classification of the kidnapping conviction as a crime of violence has a disproportionate impact on his overall guideline calculation. It is over representative of the severity of his criminal history.

**IV. THE MITIGATING CHARACTERISTICS OF MR. WHITNEY, BASED ON 18 U.S.C. § 3553(a) FACTORS, CALL FOR A 28-MONTH SENTENCE AS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE SENTENCING PURPOSES**

Being able to finish his sentence and go home to his fiancée, son, and their family might be the only thing left in the world for Mr. Whitney to hold out hope for. Reflecting on his past and his life, he states "I don't remember ever being hopeful of anything." This dogma developed given the lifetime of traumas that he has endured. However, after each setback, he persevered and worked hard to rebuild his life. The area in his life that he has worked hardest on are his relationships with the people that he loves. Mr. Whitney would sacrifice himself to protect those closest to him, so that they would not have to suffer the same fate or pain that he has. He remains steadfast in his commitment to uplift and protect those who most need him. Naturally, each defendant comes before the court with their individual struggles that put them on the path for which they stand to be sentenced. The nature and circumstances of the offense and the history and characteristics of the defendant must then be given individualized consideration. *18 U.S.C. § 3553(a)(1)*. In this case, a guideline sentence is overly punitive, a sentence of 28-months is appropriate to serve sentencing purposes.

**A. A childhood event resulted in a pervasive and continuing series of traumas, which has impacted all aspects of Mr. Whitney's life.**

Mr. Whitney's life was forever altered from infancy when in a single stroke he was deprived of his father and older brother. When he was nine months old, Mr. Whitney and his

7

siblings were left in the care of his biological father, Keith. While caring for the children, during a bathing incident, Mr. Whitney's older brother, DeAngelo, was scalded and suffered third-degrees burns throughout his body. Their father was eventually convicted of felony child abuse and was sentenced to 15 years in prison. As a result, DeAngelo was removed from the home and adopted out of the family. His incarcerated father would not be present in Mr. Whitney's life until his teenage years. PSR ¶46.

Accordingly, Mr. Whitney was "raised" by a single mother. The family lived in Section 8 subsidized housing. His mother worked graveyard shifts in hotel housekeeping. His mother was absent at night, presumably for work, but also absent during most of the day. His mother spent her days gambling the family's money away. She had a gambling addiction that led her to neglect her children. Mr. Whitney remembers not knowing where his mother was or where their next meal was coming from or when it would be. The children were left to fend for themselves. They would alternate between learning to cook their own meals, stealing food, and occasionally getting a square meal or some leftovers from their aunt's house. PSR ¶46.

The removal and adoption of Mr. Whitney's brother, DeAngelo, evolved into a continuing and new source of trauma. The brothers continued to have contact with each other through and open adoption. DeAngelo's adoptive parents would allow him to visit the family regularly. And once or twice a month, Mr. Whitney would spend the weekend with DeAngelo and his adoptive parents. This proved to be a double-edged sword for both of them. As children they had no way to process how or why their childhoods were so different. DeAngelo's interpretation was that he was taken away from his rightful family and forced to live apart. Whereas, Mr. Whitney craved the resources, opportunities, and stability that DeAngelo's family

8

1    provided. It underscored for each of them that they were no longer a family and that their father

2    was incarcerated because of the physical abuse. PSR ¶49.

3           Mr. Whitney's visits with DeAngelo's adoptive family exposed him to another kind of

4    abuse. While at their house, Mr. Whitney recalls a lot of inappropriate touching, which he

5    considers to be sexual abuse. The touching mainly occurred while he was being bathed. He

6    remembers being touched at his private parts and feeling violated and very uncomfortable, but

7    denies that there was any penetration involved. Mr. Whitney reports that his older cousins also

8    inappropriately touched his private areas without penetration. PSR ¶49.

9           On more then one occasion, Mr. Whitney and his family were the victims of violent

10   crimes. Once, Mr. Whitney witnessed a home invasion when a group of males, who were

11   associates of his cousin, broke into their apartment and roughed up his mother intending to rob

12   her of something they thought she had in her possession. On another occasion, when he was

13   about age 14, Mr. Whitney was jumped, in what he believed was a gang affiliated incident. He

14   remembers feeling a hot pain at the back of his head. When he touched the area, his hand came

15   away with blood. He saw one of the females with a box cutter in her hand. He immediately ran

16   home and had to go to the hospital to get stiches. Mr. Whitney suffered a significant cut on the

17   back of his head resulting the scar/identifying mark that remains. PSR ¶50.

18          Mr. Whitney was in high school when his father was released from prison and returned

19   home. Everyone insisted that things go "back to normal" and acted as if nothing had happened.

20   His parents married and they began living together as a family. Mr. Whitney struggled to adjust

21   to his father's return. Unsurprisingly, his parents were volatile as a couple and the marriage

22   lasted roughly a year before they divorced. There was always an undercurrent of friction in the

23   house. During their short marriage, they argued frequently and fought fiercely. While he did

9

not directly witness when the incidents turned physical, Mr. Whitney saw the aftermath of the physical violence between his parents.  Years later, the horrors of domestic violence would once again rip through his family.  In 2017, Mr. Whitney lost his eldest brother, Teddy Seals, when he was shot and murdered by an ex-girlfriend in a domestic violence incident. PSR ¶47, 50.

Under the same roof as his parents, Mr. Whitney could not reconcile his idealized version of having his father back versus the reality. They clashed over the respect and submission his father demanded despite his prolonged absence from the family and his father's "street" attitude. Mr. Whitney challenged his father's authority by asking questions and wanting to discussed what had happened and/or was happening. But his concerns were brushed aside and not addressed. The lack of family support and the denial of the existence of any issues caused the unprocessed trauma to fester and grow. PSR ¶47.

At age 16, after an argument with his mother, Mr. Whitney was told to leave the house. He went and moved in with his sister, Ebony, who had also been kicked out of the house at age 15 when she got pregnant (from a statutory sex seduction relationship). PSR ¶48.

Up until this point, Mr. Whitney was still on track to graduate from high school. However, shortly after turning 17, Mr. Whitney was involved in the offense that resulted in his first felony conviction and incarceration. On that day, his cousin's boyfriend and his friends picked up Mr. Whitney. After getting in the car, he learned that the group was on its way to rob a jewelry store.  Mr. Whitney was told to be the lookout.  He did not plan the robbery.  He was not the first or the second to enter the store.  He did not carry a gun.  He was seen standing by the getaway car.  He witnessed his cousin's boyfriend get shot with and die by his own gun. Even though Mr. Whitney was a juvenile, he was certified as an adult and prosecuted. Despite his minor role, he accepted responsibility, pleaded guilty to multiple charges, received a

1    substantial sentence, and served eight years. Because of his incarceration, he could not finish

2    high school. PSR ¶31, 48.

3            Mr. Whitney's family history is the antithesis of a healthy childhood.  He has struggled

4    since infancy.  His father was sent to prison for physically abusing his older brother.  That brother

5    was adopted out of the home.  His absentee-mother gambled away the family's subsistence.  He

6    was sexually abused/molested.   He and his mother are both victims of violent crimes.  He

7    experienced a significant history of domestic violence in his upbringing. He was kicked out of

8    the house and left to fend for himself again.  His childhood culminated with receiving a lengthy

9    sentence all before turning the age of majority.  With the odds so stacked against him, Mr.

10   Whitney has nonetheless consistently tried to rise above of his circumstances.

11         **B.    Mr. Whitney is someone who is determined to seek and create a stable
            and supportive life for him and his family.**

12          Despite the unpredictability of his home life and tumultuous childhood, Mr. Whitney

13   has always sought stability and to provide support to those closest to him.  As children raising

14   themselves, Mr. Whitney prided himself on trying to maintain a clean home. It was practically

15   the only part of his environment he could control.  With little to no support and resources, Mr.

16   Whitney tried to stay out of trouble by enrolling in youth sports. He signed himself up for

17   football between fifth and eighth grade.  He stopped when he did not have the means to continue

18   and/or the support to get to and from practices and games.  Mr. Whitney maintained good grades

19   in school.  He credits his older sister, Ebony, with impressing upon him the importance of staying

20   in school and graduating high school.  He was on track to graduate high school and earning a

21   diploma, until the event that resulted in his first felony conviction and incarceration. PSR ¶46,

22   48. When he was released from prison, Mr. Whitney obtained and sustained employment up

23   until his arrest in the instant case. PSR ¶67-73.

11

Mr. Whitney's demeanor is remarkable. He is quiet, polite, introspective, and thoughtful. He reports that he often spends his free time thinking about the events of his life and how they have impacted him as well as others. Mr. Whitney expressed a willingness to attend mental health counseling to help him process and live with the immense bouts of trauma he has experienced in his life. He wants to be able to heal and help those around him to heal also.

For someone whose life is punctuated with extreme trauma and who has not really been given any tools to process his trauma, Mr. Whitney is reliably the one person that everyone depends on to be there for them. For having little to no support given to him, Mr. Whitney is the support system and source of motivation for those closest to him. This is evident in the multiple letters submitted on his behalf. He will give every bit of himself to see someone not have to suffer as he did. He will give you hope, even if he has none for himself. Mr. Whitney is the person who will hold you together, even as he is falling apart. Exhibits G-N.

**C.    The tremendous loss that predicated the nature and circumstances of the instant case warrants a departure from a guideline sentence.**

Mr. Whitney has been a committed relationship with his fiancé, Jessica Rodosh, for the past five years. Initially, she had pursued him. He was resistant to the idea of being in a relationship. Mr. Whitney believed that he had too much emotional baggage to be good for anyone in a relationship. But when he decided to engage in a romantic relationship with Ms. Rodosh, he did so wholeheartedly. He describes his relationship with her as "the best relationship I have with anyone." She describes her relationship with him as, "he treated her better than anyone has ever treated her." PSR ¶52, Exhibit H.

In the beginning, her family was concerned with her involvement with Mr. Whitney. But they stood by each other. When Mr. Whitney was introduced to Ms. Rodosh's son, Michael Wills, he stepped up and was present for all the milestones of Mikey's life. He was there for

12

Mikey's first day of kindergarten, parent-teacher conferences, school projects, practices and games, and they had developed their own daily and weekly rituals. Mr. Whitney modeled the father figure he wanted for himself. Ultimately, he won over Ms. Rodosh's family. This was no easy task considering the opposition they faced. Ms. Rodosh's family have now fully embraced Mr. Whitney and remain supportive of their union, even in light of the current case. Exhibits H-J. Mr. Whitney proved himself by letting his actions speak for him.

Over the course of their relationship, they have weathered through several losses together and discovered joyous news. Ms. Rodosh learned that she was pregnant and they were expecting a baby boy to be named Legacy. It was a high-risk pregnancy and there were complications. But nothing could have prepared either of them for the devastating loss they suffered in August 2019. Of the experience, Ms. Rodosh writes:

> But like I said I was having complications and the doctor just wouldn't listen. I woke up one night, 5 1/2 months pregnant, at 3am to go to the bathroom and my water broke. I looked down and Legacy's tiny feet were coming out. I had to pull our son the rest of the way out of me. My heart broke. I screamed "the baby," and Steff stood in the bathroom door, on the phone with the ambulance screaming "I can't lose them." My heart was broken. At the hospital, I was holding our son and the nurses were doing whatever they do to try to help, but I needed Steff so bad right then. That night I thought he would leave but he didn't he stood there in the hospital room and said, "baby look at me, baby look at me, just pay attention to me, you're my person, I'm never leaving you." I knew his heart was broken but he was being strong for me, for us. That night we laid in the hospital bed and held our son.
>
> Steff had to go home and clean the blood and mess from me and Legacy. I can't imagine what he went through cleaning that. He made it look like nothing had happened. He did that to protect me, all while he was hurting. Still, he never left. Most couples don't make it through that but we became stronger. Steff got stronger for us whereas I had a mental breakdown. He never left me, he stood by me through my mental breakdowns, he comforted me when I was crying and in pain, he took me to counseling, he also when to counseling.

13

Exhibit G.

In the wake of the tragedy and unable to cope, Ms. Rodosh goes on to explain:

> I didn't want to take pills or anything like that so I smoked marijuana. It would help me to sleep by numbing the pain of losing our son. I was barely able to function as a normal person. The marijuana kept me from crying all the time and it helped get my anxiety and depression a little more under control. I tried to hide it from Steff. That's why I hid it in the laundry hamper and the other stuff around the house. I would smoke when they would go to sleep and before they would wake up, I would go outside so nobody would smell it or know.

> When Covid happened, I was scared, I felt like I had to and so I went and got a gun to protect my family. Steff had nothing to do with it. He didn't want it in the house but I wanted it. I didn't know what was gonna happen, I had already lost our son, I wasn't losing anymore people I love. I know it doesn't make sense and it wasn't rational but my depression was so bad. I was so scared and my anxiety was out of control. It was just like I couldn't breathe, it's like someone is sitting on my chest, and I can't catch my breath. I've never felt anything like this until we lost our baby boy. I know now I shouldn't have gotten the gun but I wasn't in my right mind. Between losing our baby, Covid, losing our jobs, and being stuck in that house, I just felt like we needed protection. If I could go back and change it all I would. I blame myself for him being in there. Steff is in in this case because of me, because of what I wanted. I feel like this is my fault. I wish I could take the charge instead of him.

Exhibit G.

Mr. Whitney accepts full responsibility for his constructive possession of the gun in the home. He is in fact a felon and prohibited from possessing a gun, actual or constructive. However, the nature and circumstances for the presence of the gun in this case warrants special consideration. It is also important to note that Mr. Whitney has no prior criminal history involving his possession or use of a gun. Guns are not his thing. This is uncharacteristic of him. As Ms. Rodosh explained and for the reasons stated in the sentencing memorandum regarding

1    the four-level enhancement under §2K2.1(b)(6)(B), (ECF #41), the gun was not possessed in

2    connection with Mr. Whitney committing another felony offense, to-wit: reselling the marijuana.

3         Probation's guideline range is disproportionately high because it calculated the "in

4    connection with" enhancement at a higher criminal history category. However, undersigned

5    counsel did not know that the same gun, which forms the basis of Mr. Whitney's state probation

6    violation and state gun case, would be indicted federally and would inadvertently result in

7    additional criminal history points. Nor could it have been anticipated that when Mr. Whitney

8    was transported back to federal custody immediately after his state parole eligibility hearing, it

9    would keep him in primary state custody, forcing him to expire his state sentence without

10   accruing federal time credit.  A guideline sentence would simply compound punishment for

11   constructive possession of the same gun across two different systems.

12        A 28-month sentence is more than sufficient to serve sentencing purposes. This number

13   represents the largest bottom number Mr. Whitney could have received in a state gun case, had

14   it not been federally indicted. Combined with the 26 months that he has been in continuous

15   custody since the discovery of the gun, it is basically the equivalent having to expire consecutive

16   time between the state revocation and a state gun case.

17        So long as Mr. Whitney releases to a stable home environment, he will be able to succeed

18   after any term of incarceration and able to successfully reintegrate into society. Mr. Whitney has

19   a consistent employment history and an offer of employment that awaits him at Robertson

20   Industries upon his release.  He has the love and support of his fiancé, as well as that of her

21   family.  For all that he has suffered, Mr. Whitney deserves the spark of hope that he can return

22   home to his family as soon as possible.

1  **V.    EXHIBITS IN AID OF SENTENCING**

2         Attached hereto, please find a list of the following exhibits in support of Mr. Whitney's

3  arguments in mitigation of sentence:

4

5         **A.**    LVMPD Property report, dated September 2, 2020; (ECF #41)

6         **B.**    Photo of monies seized on September 2, 2020; (ECF #41)

7         **C.**    Source of funds emails for return of monies seized, dated October 23, 2020;
                    (ECF #41)

8

9         **D.**    Check issued emails dated January 14-21, 2021 for monies seized on September
                    2, 2020; (ECF #41)

10

11        **E.**    State probation revocation transcript, Case No. C-19-338650-1, dated September
                    20, 2020; (ECF #41)

12

13        **F.**    Stephon Whitney's voluntary statement, dated September 3, 2020; (ECF #41)

14        **G.**    Letter from Jessica Rodosh, Mr. Whitney's fiancée, dated October 20, 2022;

15        **H.**    Letter from Brian Robertson, owner of Robertson's Industries, Mr. Whitney's
                    future employer, and Ms. Rodosh's cousin;

16

17        **I.**    Letter from Bette Rodosh, Ms. Rodosh's mother/Mr. Whitney's future mother-
                    in-law;

18

19        **J.**    Letter from Cody Rodosh, Ms. Rodosh's cousin;

20        **K.**    Letter from Janice Whitney, Mr. Whitney's mother;

21        **L.**    Letter from Ebony Whitney, Mr. Whitney's older sister;

22        **M.**    Letter from De'Asia Whitney, Mr. Whitney's second niece; and

23  / / /

24  / / /

25  / / /

26

27

28

16

1   **N.**     Letter from Datajjah Shumate, Mr. Whitney's niece.

2

3   DATED: October 31, 2022.

4                                          Respectfully submitted,

5

6                                   By:    */s/ Yi Lin Zheng*
                                           Yi Lin Zheng, NV #10811
7                                          Vegas Golden Law
                                           Attorney for Stephon Whitney

8

9                    **CERTIFICATE OF ELECTRONIC SERVICE**

10         The undersigned hereby certifies that she is an employee of the Vegas Golden Law and

11  is a person of such age and discretion as to be competent to serve papers.

12

13  That on the 31st day of October, 2022, she served an electronic copy of this **SUPPLEMENTAL**

14  **SENTENCING MEMORANDUM** by electronic service (ECF) to the persons named below:

15                       JASON FRIERSON
                         United States Attorney
16                       DANIEL COWHIG
                         Assistant United States Attorney
17                       501 Las Vegas Blvd. South
                         Suite 1100
18                       Las Vegas, NV 89101

19

20                                  */s/ Yi Lin Zheng*
21                                  Employee of Vegas Golden Law

22

23

24

25

26

27

28

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 107 of 284

# EXHIBIT "G"

ER_241

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 108 of 284

**Jessica Rodosh** j.r.rodosh@icloud.com                    Thu, Oct 20, 2022 at 7:59 PM

     Hello. I am Jessica Rodosh, Stephon's fiancé. We have been together 5 years and in those 5 years, our relationship has been through a lot. I have a 10-year-old son. He was 4 1/2 when we got together. On ████ first day of kindergarten, Steff got up and took him with me. He never missed a day of taking him or picking him up. At parent teacher conferences, Steff was there asking questions. He stepped up in a place that most men don't want to do. ████ had school projects and him and Steff would sit down and do them. They made clay figures for his living art project and for his person project they made a poster board. Steff took ████ to his football practices and games. Every Sunday, they played chess ████ would get the chess out and they would sit down and play. Every morning before school, they would have a wrestling match. ████ loves his stepdad, he misses him, the nerf gun wars, and our family dinners.

     Steff and I have been through a lot. I lost my dad to cancer. About a year later, we lost his brother when his brother was murdered in a domestic violence incident. That was a difficult time for all of us but in the middle of this pain and heart break we found out I was pregnant and we were so happy. Steff changed. Our son gave him a whole new look on life. He did not miss one doctor's appointment. He took care of us. It was a high-risk pregnancy and when I started having complications, he did everything to try to make me feel better and at ease. When we found out we were having a boy, Steff glowed with pride. He picked out our son's name, Legacy, and would not budge on changing it. Steff is an amazing dad to ████ and I knew he was going to be one to our baby boy. Steff had a job but was looking for a second because he wanted me to rest. He would get up at all hours for my pregnancy cravings. I love seeing the man he was becoming. He never took his hand off my belly. I couldn't wait to see him hold our baby.

     But like I said I was having complications and the doctor just wouldn't listen. I woke up one night, 5 1/2 months pregnant, at 3am to go to the bathroom and my water broke. I looked down and Legacy's tiny feet were coming out. I had to pull out son the rest of the way out of me. My heart broke. I screamed "the baby," and Steff stood in the bathroom door, on the phone with the ambulance screaming "I can't lose them." My heart was broken. At the hospital, I was holding our son and the nurses were doing whatever they do to try to help, but I needed Steff so bad right then. That night I thought he would leave but he didn't he stood there in the hospital room and said, "baby look at me, baby look at me, just pay attention to me, you're my person, I'm never leaving you." I knew his heart was broken but he was being strong for me, for us. That night we laid in the hospital bed and held our son.

     Steff had to go home and clean the blood and mess from me and Legacy. I can't imagine what he went through cleaning that. He made it look like nothing had happened. He did that to protect me, all while he was hurting. Still, he never left. Most couples don't make it through that but we became stronger. Steff got stronger for us whereas I had a mental breakdown. He never

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 109 of 284

left me, he stood by me through my mental breakdowns, he comforted me when I was crying and in pain, he took me to counseling, he also when to counseling.

I didn't want to take pills or anything like that so I smoked marijuana. It would help me to sleep by numbing the pain of losing our son. I was barely able to function as a normal person. The marijuana kept me from crying all the time and it helped get my anxiety and depression a little more under control. I tried to hide it from Steff. That's why I hid it in the laundry hamper and the other stuff around the house. I would smoke when they would go to sleep and before they would wake up, I would go outside so nobody would smell it or know.

When Covid happened, I was scared, I felt like I had to and so I went and got a gun to protect my family. Steff had nothing to do with it. He didn't want it in the house but I wanted it. I didn't know what was gonna happen, I had already lost our son, I wasn't losing anymore people I love. I know it doesn't make sense and it wasn't rational but my depression was so bad. I was so scared and my anxiety was out of control. It was just like I couldn't breathe, it's like someone is sitting on my chest, and I can't catch my breath. I've never felt anything like this until we lost our baby boy. I know now I shouldn't have gotten the gun but I wasn't in my right mind. Between losing our baby, Covid, losing our jobs, and being stuck in that house, I just felt like we needed protection. If I could go back and change it all I would. I blame myself for him being in there. Steff is in in this case because of me, because of what I wanted. I feel like this is my fault. I wish I could take the charge instead of him.

Steff is a amazing man he opens my doors, he cooks for us, he just loves us. My son loves him. ████ asks all the time when Steff is he coming home. Steff protects him, he wants ████ to stay a kid as long as possible. He said he knows what he went through as a kid and he will be damned if ████ ever feels how he felt as a kid. He connects with ████. Steff knows how to talk to him, he knows how to get through to him. Even now, when Mikey is having trouble at school, Steff calls every morning and ████ tells him what's going on and they talk the whole 20 minutes. Steff always cared about how ████ looks at him and sees him. Steff said Mikey will know nothing of the streets. He is determined to make sure ████ won't be lost to the streets. As a family, we are lucky to have him. We need him home. My son, his "little buddy" or "little big man," as Steff calls ████, needs and wants him home.

Steff has a job with my cousin, when he gets home. We can't wait to start our new life. Steff isn't what people think he is. He is an amazing man, who needs a break in life. He is smart and kind and protects the people he loves. My son needs and wants Steff home, probably more than I do. Please give him the shortest sentence possible so he can come home to us.

Sincerely,
Jessica Rodosh

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 110 of 284

# EXHIBIT "H"

ER_244

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 111 of 284

My name is Brian Robertson.  My cousin is Jessica Rodosh and she has been dating Stephon for 5 years. Since they have been together, I have seen a positive change in my little cousin and her son ███ Steff has been at every school function and parent teacher conferences.  He has come to all our family functions never missed one.  He helps light the fireworks with me and we bar-b-que for the 4th of July.  We have missed him a lot at our family holidays.

I run a family business Robertson's Industries.  We build parks, awnings, structures.  My company has been in business for about 10yrs.  I have a job for Steff when he gets home.  He would be working for my company building playgrounds and whatever else we get jobs for.  He will never be without work.  He is a very hard worker.  He was about to start working for me when all this happened. He is a good guy he deserves a second and my cousin's need him home.

He took ███ to all his football practices and his Jiu Jitsu practices.  When they lost their son, he protected my cousin Jessie, he made sure she was not left alone, and took care of her.  I see how he loves her, how he loves a little boy that he didn't make but you can't tell him that and I see how they love him. He deserves a chance to come home and watch mike grow from the little boy he has been helping mold to a little man.  We have a family reunion coming up this summer and we all want Steff there.

I had a baby boy and I Steff to meet him he is good with baby's and the kids we all love him and want him home. Like I said he has a job waiting for him with my company it's hard manual labor.


Thank you
BRIAN ROBERTSON
ROBERTSON INDUSTRIES

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 112 of 284

# EXHIBIT "I"

ER_246

My name is Bette Rodosh.  My daughter is Jessica and Steff is my son in law. I'm gonna be honest I was not Steff's biggest fan when they started dating.  My daughter has been in some very bad relationships and we are very protective of her. But she stood by her word he was different, she said he treated her better than anyone has ever treated her.  She also brought him around my grandson and she never brought any man around him. She protects that boy with everything in her. Even though I was mean as hell to Steff, he still came around he still spoke to me, he never let that stop him from loving her or my grandson.

When they found out she was pregnant I was not happy. She was high risk and I wasn't sure if he would take care of her and my new grandson. He came to the house and him and I sat down and we had a talk, I told him my worries and concerns, He understood all of that and he said he was not going to leave them he loved her and ███████ and the new baby. He proved me wrong he did not miss a day of taking ██████ to school or picking him up.  He was at everything that a parent was supposed to be and mike wasn't even his. He went to every single dr appointment for Jessie and the baby. He drove her everywhere.

I saw her change with him.  I saw all her fear and hurt start to heal she was smiling and laughing again. I saw him grow into an amazing father and husband for her and my grandsons. The night they lost Legacy was a horrible and traumatic experience, he called me crying on the phone saying he can't lose her not her.  At the hospital he never left her side we had to make him go home to change. I felt horrible I saw the hurt in his eyes and him trying to be strong for my daughter and Mikey. The baby changed Steff.  He made him want a better life for them all.  I watched him pull my daughter out of a dark depression while fighting his own. Steff deserves to be home he made a mistake but nothing that should keep him away from his family.  He loves my daughter and grandson and will protect them with everything he has. My nephew has a job ready and waiting for him when he gets home our whole family loves him and wants him home. He has even grown on me and want him home to take care of his family.

Jessica's mother
BETTE RODOSH

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 114 of 284

# EXHIBIT "J"

ER_248

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 115 of 284

Hello my name is Cody Rodosh,

I'm Jessica's cousin and Steff is my in-law.  He is engaged to my cousin Jessie. I met him at one of our family dinners.  He was a very quiet guy I had to go over and give him a hard time to get him out of his shell. I made him play the family card games which he became my partner in cards and we found out we had a lot in common. We have fun together he gets me and I get him.

We laugh about the same dumb shit.  We both love of music.  I love talking with him about music we listen to the same stuff a lot of underground music.  I love to pick his brain, Steff is a very smart guy.

He is great with the kids.  They get him to play finger board and other games we have to rescue him from. My little cousin ▮▮▮▮, Jessie's son, Steff has been a super dad to him. He never missed a school function.  He stepped up and filled shoes that weren't his but honestly you wouldn't be able to tell that ▮▮▮ isn't his.

When we found out they were having a baby we were all excited because my cousin had been through so much and so has Steff.  We knew he would be a great father cause of how he was with ▮▮▮. But they lost the baby and Jess fell into a bad depression.  He stepped up even more he never left her side he made sure someone was there with her. He got even more protective over ▮▮▮ He made sure ▮▮▮ didn't feel the loss of his baby brother. He loves my cousins and they love him, we all love him.

He has a good job with our family business when he gets home. I've seen my cousin grow into a better woman and a stronger mother being with him. We would love to see him home for the next family functions.  He missed enough already and we got a family reunion he needs to be at we got water balloon and nerf wars to plan on these kids.

Thank you
CODY RODOSH

**ER_249**

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 116 of 284

# EXHIBIT "K"

ER_250

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 117 of 284

My name is Janice Whitney.  I am the mother of Stephon Whitney. He is the third child out of three children.  I am a child of nine children the second to the last.  I grew up with both of my parents in my home I graduated from high school, before I decided to have children, I always made the choice to have both parents in my home for my children of course.  His father went to prison when he was 7 months old.

I became a single mother of three children.  Stefon has always been a person to not have a lot of friends.  He stayed to himself.  He never been a bad child.  After his father came home from prison, things start happening in my home and my son couldn't stand what was going on between us.  He never been a bad child in school.  He loved school.  He loved people his family he always made time to make us laugh.

He cares about his nieces to guide them in the right direction.  When you make a mistake in life no one wants to be reminded of the mistake that they made if they already paid the price.  My son is humble and all through his life he always made me proud even the mistake he made I've always stood by his side. I always guided, him no matter how old my children get I will always tell them right for wrong.

He have nieces that need him as a father figure to guide them through life, give them relationship advice, let them know the mistakes not to make in life, and what to expect if you become a mother.  He's the only person in the family that they need.

I don't consider Federal time a ticket or time in jail could have been considered.  I pray that the judge would be lenient on my son because he's not menace to society.  He's not harmful to people everyone he goes around they're laughing he brightens up their day because he have that mentality. Whatever you going through he can make you feel better. He can't solve the problem but you will feel better because he's smart.  He have that mentality and no one in life should have to pay double price for what they did as a grown man what he did as a child or juvenile he shouldn't have to pay that price.

Me as a mother, I feel for my son because I love my children.  My children have always been my one number one priority.  I worked my fingers to the Bone to make sure I protected my children financially, emotionally and spiritually.  Everyone doesn't deserve a beat down sometimes. Counseling sometimes leniency but to be thrown in federal prison to do federal time this is just bizarre to me. I continue to pray I continue to have faith I continue to guide my son I continue to ask the judge to have leniency on my son.  We as so called African Americans are not a bad nation we are human people. Please take this letter in consideration.  I pray for release.

thank you,
Janice Whitney

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 118 of 284

# EXHIBIT "L"

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 119 of 284

To Whom it may concern

I am Stephon's big sister, Ebony Whitney, I am asking can you please give my baby brother another chance. My mom was a single mom our whole life. Since we were young I helped raised him. Our mom work nights. She had gambling problem. I had to take on the job of helping. We lost our big brother, Teddy Seals, when his ex-girlfriend killed him. It's been even harder without my brother and now I'm losing my other bother. I helped raise him we have a bond like no other that I really miss. I need you to understand he is all I have now. I need him, I'm breaking, and the phone calls is not enough.

Stephon is my go to person, my everything. I have 3 girls that looks up to him as the father figure. I just had a son 8 months ago and he needs his uncle. I need my brother. My life is hard without him. I'm out here alone raising my 4 kids and he missing out on that.

I know he made a mistake but please find it in your heart to give not only him but us another chance. I'm asking to please give him another chance at making a better life for him and our family. Please give our family another chance at a peaceful life. Thank you for giving me the chance to let you know how I feel about my brother. He is really all I have, I mean all I have, so please please let him come home to his family. Thank you.

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 120 of 284

# EXHIBIT "M"

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 121 of 284

To who it may concern,

I am De'Asia Whitney.  I am Stephon Whitney second niece.  I'm writing this to give out positive reasons on to why I think my uncle should be home.

One reason since my other uncle passed away in 2018, Stephon has been the man of the family. Making sure the family sticks together, making sure everyone is doing okay in life, and just being there for each one of us whenever he could in any way possible.

Another reason is I have always looked at my uncle as a father figure since unfortunately I haven't had a real "dad" in my life.  He's there when I need help, advice anything I could always turn to him.  Its life things do happen and at some point, we do have to take responsibility for our actions. I'm asking if you would give my uncle Stephon Whitney another chance at being free.

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 122 of 284

# EXHIBIT "N"

Case: 22-10326, 08/11/2023, ID: 12772746, DktEntry: 17-3, Page 123 of 284

To whom it may concern,

I, Datajjah Shumate, his niece, is writing this letter to inform you on why Stephon Whitney should be home. The system may have him labeled as otherwise but he's really a good person. Stephon is very intelligent and family oriented.  He's always focused on positivity and make sure everyone in the family is going on the right path.  He's the type to put everyone before his self because he's so caring of others feelings.

He's very capable of handling everyone's weight because he's so strong and I love that.  I feel as if my uncle and I have very similar ways! I'm definitely him but a girl version.  Stephon has always been the role model and father figure in my life since I've never had one growing up.  If I need advice, he'll have the answers and random motivation messages.  Even if I'm feeling down or going through something, somehow he calls me at that time asking me if I'm okay because he has sensed something.  I don't know how but it's always on time.

You would think since he's away, his energy or vibe would be negative but it's not because he always looking at the positive things to any situation! Stephon deserves this chance and I feel as if he was given this chance, he would prove his self. I love my uncle and would love to see him soon. Thank you!

YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
2801 S Valley View Blvd, Ste 16
Las Vegas, NV 89102
Phone (702) 385-7170
Email: vegasgoldenlaw@gmail.com
Attorney for Defendant
Stephon Whitney

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATE OF AMERICA, | Case No. 21-cr-0002-JAD-NJK |
| Plaintiff, | **SENTENCING MEMORANDUM ON THE FOUR-LEVEL ENHANCEMENT UNDER §2K2.1(B)(6)(B)** |
| v. | |
| STEPHON WHITNEY, | |
| Defendant. | |

Yi Lin Zheng, counsel for defendant Stephon Whitney, hereby files this sentencing memorandum regarding the inapplicability of the four-level enhancement, under §2K2.1(b)(6)(B), for the alleged use or possession of a firearm in connection with another felony, for the foregoing reasons. A supplemental sentencing memorandum will be filed shortly respectfully requesting a sentence of 28 MONTHS as sufficient, but not greater than necessary to achieve the goals of sentencing.

## I. THE FOUR-LEVEL ENHANCEMENT FOR USE OR POSSESSION OF A FIREARM IN CONNECTION WITH ANOTHER FELONY UNDER §2K2.1(B)(6)(B) SHOULD NOT APPLY

The government seeks to apply a four-level enhancement based on Mr. Whitney's use or possession of a firearm in connection with another felony offense. Specifically, the government argues Mr. Whitney possessed marijuana with intent to

**ER_258**

sell, a felony in Nevada, and possessed a handgun in connection with that offense. The government's argument, as well as probation's rationale, relies on the fruits of the September 2, 2020 home search. The government's argument in favor of the four-level "in connection with" enhancement fail for three reasons. First, the government cannot meet its burden by clear and convincing evidence that Mr. Whitney committed another felony offense or that he possessed the handgun in connection with that offense. Second, irrespective of the government's burden, the evidence seized from the apartment does not lead to the conclusion that the marijuana was being resold. Finally, the location of the handgun rendered it inaccessible and undermines any argument that it was possessed in connection with another felony offense.

### A. The government cannot meet its burden by clear and convincing evidence that the four-level enhancement applies

"The burden of proof for a factual finding underlying a sentencing enhancement depends on the magnitude of the finding's effect on the sentencing range." *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019). "As a general rule, a preponderance of the evidence standard applies, but the Government must meet a higher standard—proof by 'clear and convincing evidence—in cases where there is 'an extremely disproportionate impact on the sentence.'" *Id.* (quoting *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001)). Courts "look to the totality of the circumstances to see if that heightened standard applies." *Id.* Factors considered include:

> (1) whether the enhanced sentenced falls within the maximum sentence for the crimes alleged in the indictment;
> (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;

2

(4) whether the increase in sentence is based on the extent of the conspiracy;

(5) whether the increase in the number of offense levels is less than or equal to four;

(6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Jordan*, 256 F.3d at 930.

Here, based on the increase in punishment embodied in enhancement as well as the nature of the "in connection with" enhancement, the government is required to establish the enhancement by clear and convincing evidence. As an initial matter, the fourth *Jordan* factor, the enhancements increase on the overall offense level weighs in favor of the heightened standard. The "in connection with" enhancement increases the offense level by four levels, which is the threshold increase necessary to satisfy the fourth factor. Likewise, the third *Jordan* factor weighs in favor of the higher burden. By its nature, the "in connection with" enhancement requires the government to establish that Mr. Whitney committed another felony offense. The felony drug offense the government believes Mr. Whitney committed through his possession of the marijuana discovered in his home could give rise to separate criminal charges for which a separate punishment would be warrant. The third *Jordan* factor thus weighs in favor of the higher burden.

The sixth Jordan factor, the enhancement's impact on the overall sentence, also weighs in favor of a clear and convincing standard. Probation's calculation that his base offense level is 24 and his placement in criminal history category V, after a three-level reduction for acceptance of responsibility, this results in a guideline range of 70-87 months. An additional four-levels for the "in connection with" enhancement would

3

**ER_260**

increase the guideline range to 100-125 months. Admittedly, this 30-month increase is not the "doubling" of the initial sentence envisioned in *Valle* and *Jordan*. The increase does, however, represent an approximately 43% increase in Mr. Whitney's sentence. It takes him from a sentence just over the middle of the ten-year statutory maximum to a guideline range that potentially exceeds that maximum. When combined with the other *Jordan* factors weighing in his favor,[1] the "totality of the circumstances" favors a clear and convincing standard.

### B. The government cannot rely exclusively on Mr. Whitney's probation revocation to establish facts sufficient to support the enhancement

Mr. Whitney anticipates the government will attempt to skirt its responsibility to establish facts supporting the enhancement by relying on the state probation revocation hearing. At the conclusion of the revocation hearing, a state court judge appeared to conclude Mr. Whitney was engaged in criminal activity involving drugs and that he possessed a firearm as part of the activity. Although the state judge's remarks fail to state the basis for these conclusions, indeed he appeared to parrot law enforcement's interpretation of the evidence, the government adopts them whole cloth. The standard to revoke a state probationer's grant of probation, however, does not meet even the lower preponderance of the evidence standard. *Lewis v. State of Nevada*, 529 P.2d 796, 797 (Nev. 1974) ("In considering the standard to be applied in revoking probation the law is well-established that revocation of probation is within

---

[1] The first *Jordan* factor weighs against the heightened standard. Even with the four-level enhancement, his guideline range is below the statutory maximum. Additionally, the fourth *Jordan* factor is irrelevant. The government did not charge or allege that Mr. Whitney participated in a conspiracy during the instant offense.

4

**ER_261**

the exercise of the trials court's broad discretionary power … [t]he evidence and facts must reasonably satisfy the judge that the conduct of the probationer has not been as good as required by the conditions of probation."). In adopting a "reasonably satisfy" standard, the Nevada Supreme Court rejected a preponderance of the evidence standard for probation revocations. *Id.*

Because the state court applied an amorphous standard, lower even than preponderance of the evidence, to revoke Mr. Whitney's probation, this Court should afford those conclusions no weight. Instead, this Court should examine the same facts and evidence and, for the reasons stated below, find that Mr. Whitney was neither committing another felony offense nor possessing a firearm in connection with a felony offense.

### C. There is insufficient evidence that Mr. Whitney possessed the marijuana with intent to sell

To obtain an enhancement under §2K2.1(b)(6)(B), the government must establish Mr. Whitney was committing another felony offense. The government believes that Mr. Whitney possessed the marijuana found in his house with the intent to sell. From the outset, the government does not have direct evidence that Mr. Whitney was selling drugs. They did not catch him conducting hand to hand transaction nor did they have a tip he was selling. Rather, the government's conclusion is based largely on items found in Mr. Whitney's home on the day he was arrested coupled with a vague sentence in his 88-page voluntary statement.

In addition to approximately eight ounces of bulk-packaged marijuana in the bedroom, officers seized sandwiches bags, a scale, and $4,450 in a bank envelope. Exhibit A (LVMPD property report); Exhibit B (photo of monies seized). The

5

**ER_262**

government argues that these items are indicative of Mr. Whitney conducting street-level marijuana sales from his house. When viewed in their totality, these items, coupled with the notable absence of other indicia of an active drug operation, do not suggest that Mr. Whitney possessed the marijuana with intent to sell.

First, the $4,450 discovered in the headboard were not proceeds from drug sales. Officers found the money in a bank envelope in crisp, large denomination bills. This neat collection of $20s and $100s stands in stark contrast to the crumpled, small denomination bills expected in drug sales. Furthermore, the funds can be traced to a legitimate source. At the outset of the COVID-19 pandemic, Mr. Whitney and his fiancée, Jessica Rodosh, lost their service-industry jobs. Both applied for and received state unemployment because of their job loss. The $4,450 represented the couple's unemployment funds. Exhibit C (source of funds emails). The state of Nevada evidently concluded the money was derived from a legitimate source since it returned the money to Ms. Rodosh. Exhibit D (check issued emails).

Second, the way the marijuana was stored coincides more with personal use than with individual sale. Officers discovered approximately eight ounces of marijuana in three unequally portioned bags, two of which were stored inside glass jars. The marijuana was loose rather than packaged and proportioned for individual sale. A person could easily reach into the jar, weigh out a portion for a joint, blunt, or bowl, then reseal the rest for later use. There would be no need to individually package marijuana for personal consumption, but it would be necessary to weigh out individual servings before consumption. The lack of individually packaged bundles of marijuana

6

**ER_263**

and other indicia of ongoing sales, such as owe sheets, support the conclusion that the marijuana was for personal consumption.

Additionally, Ms. Rodosh's testimony at Mr. Whitney's state probation revocation hearing supports the personal use conclusion. Ms. Rodosh's testimony at the revocation hearing was that she possessed the marijuana for her personal use.

> Q:    And with respect ultimately to the marijuana that was found, it was hidden in a laundry hamper?
>
> A:    It was.
>
> Q:    And your testimony here today is that, those items belonged to you?
>
> A:    They do.
>
> Q:    And, I guess—I'm sure you understand that he's not supposed to have those items, so why were those items in your home?
>
> A:    We lost a baby in August 8th, 2019, and I was in severe anxiety and I can't—it felt like I can't breathe. So the doctors wouldn't help, and so I smoke because it helps with—it helps with the loss and the anxiety. I can't—there's just times I just—I feel like I can't catch my breath. Like someone sitting on my chest, so I smoke. I didn't think it would get him in trouble. I wasn't trying to get him in trouble. I was five months pregnant when we lost our baby and it happened at home. So it was traumatic experience, its hard to—I don't talk about it still.

Exhibit E at 19:19-20:11(state probation revocation transcript).

Ms. Rodosh further explained that she hid her marijuana use from Mr. Whitney and that he did not partake.

> Q:    Why were you keeping the marijuana in the laundry basket?
>
> A:    I just put it there. To be honest, I just put it in places that only I would go through. He never went through the laundry basket. I do the laundry.
>
> Q:    Okay. So you're saying he didn't know you were smoking marijuana?

A:      Um, he probably didn't.  I didn't smoke in the house.  So if I smoked, I would go outside or go for a walk.  I don't smoke in the house.

Exhibit E at 20:23-21:7.

Ms. Rodosh's testimony is consistent with the physical evidence officers found in the house.  Bulk storage in a laundry basket is convenient for home use, yet the lack of readily accessible, pre-packaged parcels would be a poor sales strategy.

Finally, Mr. Whitney's voluntary statement is insufficient to establish he was selling marijuana.  Mr. Whitney's post-arrest voluntary statement sprawls across 88-pages, the first 60 of which pass without Mr. Whitney claiming ownership of the gun or the marijuana.  Throughout the interrogation, the officers allude that they will charge Ms. Rodosh with the gun and marijuana if Mr. Whitney does not claim ownership.

Q:      I have to present the facts.  So if I present the facts at the district attorney's office as they are now, it-its not my decision.  They're gonna say, "We're gonna charge these folks with a criminal conspiracy and all these charges."  I'm just telling you right now based on my investigation, these are the facts that are before me.  So…

A:      So, it's more than likely she'll be charged too?

Q:      As of right now, yes.

A:      And with what?  Child endangerment?

Q:      Probably the narcotics charge.  The owned or established residence, ah, for narcotic sales with a child present and then there's the felony child abuse and neglect charges because the unsecured firearm was left.  So…

A;      Unless what?

Q:      I still have to interview her.  I'm here to interview you tonight.  I still have to go and interview her.

A:      Just saying, unless what?

Q:     Pardon me?

A:     I'm just saying, unless what?

Q:     If someone…

A:     She don't need that bro.  That-that's- she don't even fucking barely have a fucking traffic ticket to my knowledge.  She don't need that.  Now, I mean, she probably do have a traffic ticket.  I don't know, but I do know she don't live like that bro.

Q:     I-I don't know.  I never met her.  I've never met you.

A:     I understand.  That's why I said…

Q:     So I have to take this opportunity-its my job as a detective to try to sort through all the information, right?  I get a set of facts and then there's this person's version of the story.  There's this person's version of the story.  There's these facts and then we kind of lay'em all out and then we make a presentation, this is what we found through the course of our investigation.  That's our job.

A:     That's why I said, or what?

Q:     Unless there's some type of…

A:     There is no-there's always a different side.

Q:     Unless there's some type of mitigating circumstances or some additional information that I've learned throughout the course of my investigation then those are the facts that have to be presented in court, you understand?

A:     And you mean that as in what?  To my owning up to everything?

Q:     I'm not asking to own up to anything that's not yours.

A:     No-no.  I'm-I'm not saying you're asking me.  *I'm just saying that-to get an understanding of the only way to protect her from that.  All of that is going to occur unless what?  There's always another side.*

Exhibit F at 47-49 (voluntary statement) (emphasis added).

Mr. Whitney also struggled to provide details about the marijuana he was allegedly

selling.

9

**ER_266**

Q:     Okay The marijuana that I found where did I find it?

A:     In the bathroom.

Q:     Anywhere else?

A:     Um, by the TV-by the TV

Q:     Which TV?

A:     In our room.

Q:     In your room?

A:     Yeah.

Q:     Okay  What was it packaged in?

A:     What you mean?

Q:     How was it stored?

A:     Um, it was individually, um, put into one container because, like, majority of it, like the-the-not the-the loose-not the loose stuff, but the stuff that was inside something is the stuff that she smokes.

Q:     Okay.

A:     So that's why it was all put in there together.
...
Q:     The scales and baggie.  Where did I find the baggie and scales?

A:     Um, I don't really know where the baggie was at though?  'Cause I gave it to...

Q:     What about the scale?

A:     Those had to be together wherever they were.

Q:     Okay.  You-you...

A:     I don't really remember.

Exhibit F at 66-68.

Even when officers directly asked Mr. Whitney about selling marijuana, he gave an

obtuse, non-response.

> Q:     Okay.  Were you actively involved in trying to sell a little bit of
> marijuana to make money?  Remember, I only want your truth.  I don't
> want her involvement.  I just want your involvement.  I'll ask her for her
> involvement.
>
> A:     If-only I- I ain't know what to do with it last minute like that.  I just
> went back to the first thing that I was ever taught by somebody bro.
> That's…

Exhibit F at 68-69.

The officers, and the government, understood the "went back to the first thing"

statement to mean that Mr. Whitney was selling marijuana from his house.  On closer

examination, however, the officers supply Mr. Whitney with that conclusion

> Q:     Can I ask you how old you were when someone taught you to sell
> drugs?
>
> A:     Taught me to sell drugs?
>
> Q:     Mm-hm.
>
> A:     Man, I been running the streets since I was nine-years-old bro.  I
> start selling drugs at nine-years-old.
>
> Q:     What'd you start selling?  Little bit of weed
>
> A:     A little bit of weed, but that was…
>
> Q:     Was that on the West?
>
> A:     Nah.  That was actually on the eastside 'cause on the Westside we
> had-it was too domestic over there at that time…

Exhibit F at 69.

Throughout the interview, officers believed Mr. Whitney was selling marijuana

from his house.  They signal their theory when they tell Mr. Whitney that his

11

**ER_268**

girlfriend would be charged with felony child abuse for having a child present during drug sales conducted from the home. The apparent "admission," however is inconsistent with this theory. Mr. Whitney qualified the "went back to the first thing" statement by telling the officers that, as a child, he sold marijuana away from his home and community because it was "too domestic." This would mean that had Mr. Whitney been selling the marijuana, he would have been doing so away from his home. The fact that officers did not find any evidence of the marijuana being transported for sale, such as pre-packaged marijuana in a car, backpack, or pants pocket, undermines the officers' theory that Mr. Whitney was reselling the marijuana they discovered in the laundry hamper. The ambiguity of the "went back to the first thing" statement combined with the offices' coercive interrogation tactics and Mr. Whitney's desire to protect Ms. Rodosh render his "statement" that he was selling marijuana out of the house unreliable.

In conclusion, the government cannot establish that Mr. Whitney was selling marijuana in violation of Nevada or federal law. The officers did find approximately eight ounces of marijuana and a handgun inside the house. Apart from a scale and sandwich bags, however, officers did not discover any evidence that the marijuana they found was being resold. None of the marijuana was pre-packaged for individual sale. There were no owe sheets. The money found in the headboard was from a legitimate source. The items discovered are more consistent with Ms. Rodosh's assertion that the marijuana was for her own personal use than with any criminal activity on Mr. Whitney's part.

### D. There is insufficient evidence that Mr. Whitney used or possessed a firearm in connection with any drug felony

"[I]n imposing enhancements under the Guidelines, [courts] cannot be swayed by speculation or convinced by conjecture." *United States v. Grimaldo*, 993 F.3d 1077, 1082 (9th Cir. 2021). "For the four-level [in connection with] enhancement to apply, the government 'must show that the firearm was possessed in a manner that permits an inference that it facilitated or potentially facilitated – i.e., had some potential emboldening role in – a defendant's felonious conduct.'" *Id.*

While an emboldening role may be sufficient to find "facilitation," mere possession is not. *United States v. Pinex*, 720 Fed. Appx. 345, 348 (9th Cir. 2017). "Key to the determination that the gun emboldened [a defendant's] conduct was the fact that it was easily accessible." *Id.* ("Here, the gun was not accessible to Pinex. Indeed, it was in a locked suitcase in the trunk of his car. … The fact that the gun and the drugs were both in the trunk does not support the district court's finding that the gun emboldened Pinex's possession of the drugs. The district court erred by focusing on proximity rather than accessibility.").

Here, the handgun discovered in zipped up headboard did not embolden Mr. Whitney to commit any crime. Although marijuana was found in the same room as the handgun, the handgun's location in the room made it inconvenient for someone looking to quickly arm themselves prior to an impromptu drug sale. Officers discovered the handgun in a hollow cavity inside a zipped headboard. The headboard was pressed against a wall and sandwiched between another wall and a heavily laden trash bin.

13

1
2
3
4
5
6
7
8
9
10
11
12
13



Based on the purple sheet in the background, it appears officers discovered the handgun in the section nearest the corner of the room.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



The handgun's location in the room made it practically inaccessible. To retrieve the gun, someone would need to maneuver through the narrow space between the bed and the wall, push the entire bed set away from the wall, unzip the headboard, reach into the crevasse, and retrieve the gun. Like a gun stored in a locked suitcase was inaccessible to the defendant in *Pinex*, a handgun hidden in a headboard wedged between the mattress and the wall would be inaccessible to Mr. Whitney. 720 Fed. Appx. at 348. Highlighting the difficulty of this task, officers removed the mattress from the bedframe before pushing the headboard away from the wall and unzipping the headboard. An arduous task for officers searching Mr. Whitney's bedroom under controlled circumstances would be next to impossible for someone needing to quickly arm themselves before or during a tense drug transaction. *See id.*

Indeed, the storage of the handgun in the same location as the couple's unemployment money indicates that the handgun was intrinsically valuable. The headboard cavity was akin to a safe. The couple stored their valuables, including the handgun, in this area. Its physical proximity to the marijuana is a coincidence. The handgun's inaccessibility is the determining factor and renders the "in connection with" enhancement inapplicable. *Pinex*, 720 Fed. Appx. at 348.

### Conclusion

The government cannot establish the four-level "in connection with" enhancement. First, due to the impact the enhancement has on Mr. Whitney's overall sentence, the government must prove the enhancement by clear and convincing evidence. Second, the items discovered inside the house do not establish

that Mr. Whitney was reselling the marijuana found in the bedroom. Finally, the handgun's inaccessibility, wedged inside a headboard between a wall and the mattress, precludes a finding that the handgun somehow emboldened or facilitated the nefarious conduct the government believes Mr. Whitney was committing inside his house.

DATED: October 25, 2022.

Respectfully submitted,

By: _/s/ Yi Lin Zheng_____
Yi Lin Zheng
Vegas Golden Law
Attorney for Stephon Whitney

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers. That on the 28th day of October, 2022, she served an electronic copy of this **SENTENCING MEMORANDUM ON THE FOUR-LEVEL ENHANCEMENT UNDER §2K2.1(B)(6)(B)** by electronic service (ECF) to the persons named below:

JASON FRIERSON
United States Attorney
DANIEL COWHIG
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

_/s/ Yi Lin Zheng_____
Employee of Vegas Golden Law

16

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# PROPERTY REPORT

| | |
|---|---|
| Date of LVMPD Possession: 9/2/20 | Time of LVMPD Possession: 1818 |
| | Page(s) 1 of 2 |

Incident: SEARCH WARRANT

Event #: 2 0 0 9 0 0 0 7 1 9 4

**☒ EVIDENCE**
☒ Felony ☐ Gross Misd ☐ Misdemeanor
List other related event #s (if any):

☐ **NO EVIDENTIARY VALUE:**
☐ No Owner Identified
☐ Destroy
☐ Return to DMV

☐ **SAFEKEEPING**
Must provide owner information in the Persons section below and assign an owner #.

☐ **HIGH RISK ORDER FOR PROTECTION – FIREARM(S) SURRENDERED**

| Impounding Officer (print name) J. COSTELLO | Assigned Bureau SNCTC | P#/Initials ✓ 9139C | Task Force officers from other jurisdictions: Print LVMPD sgt. name and P#. |
|---|---|---|---|
| Assigned Supervisor (print name) | Assigned Bureau | P# | |

## PERSONS – (S)USPECT / (V)ICTIM / (O)WNER / (F)INDER

| S ☒ O☐ V☐ F☐ | Last Name: WHITNEY | | DOB: /90 |
|---|---|---|---|
| Assign Owner #: 1 | First Name, MI: STEPHON | | Ph: |
| | Charges: PPPFA/PCSWITS/PROB. VIO. | | |
| Street Address: | City LV | State NV | Zip Code 89142 | Arrest Date 9/2/20 | ID# 2647336 |

| S ☐ O☐ V☐ F☐ | Last Name: | | DOB: |
|---|---|---|---|
| Assign Owner #: | First Name, MI: | | Phone #: |
| | Charges: | | |
| Street Address: | City | State | Zip Code | Arrest Date | ID# |

| S ☐ O☐ V☐ F☐ | Last Name: | | DOB: |
|---|---|---|---|
| Assign Owner #: | First Name, MI: | | Phone #: |
| | Charge(s): | | |
| Street Address: | City | State | Zip Code | Arrest Date | ID# |

Remarks (Relating to Impound): ALL ITEMS RECOVERED BY HONORABLE JUDGE ZIMMERMAN APPROVED TELEPHONIC SEARCH WARRANT.

| Pkg # | Item # | Assign Owner # (Corresponds to owner # listed above.) | Serial #, Owner Applied Number, State and Gov. Issued ID #s | Qty | Property Description (Include make, brand, model, color, etc. when applicable.) | Recovered Stolen or Embezzled? |
|---|---|---|---|---|---|---|
| 1 | 1 | 1 | | 1 | GREEN LEAFY SUBSTANCE PURPORTED TO BE MARIJUANA 140 grams NET | ☐ ☐ ☐ |
| 1 | 2 | 1 | | 1 | GREEN LEAFY SUBSTANCE PURPORTED TO BE MARIJUANA 69.1 grams gross IN CLEAR BAGGIE w/ BLACK TIE | ☐ ☐ ☐ |
| 1 | 3 | 1 | | 1 | GREEN LEAFY SUBSTANCE PURPORTED TO BE MARIJUANA 55.4 grams gross CLEAR BAGGIE | ☐ |

## FIELD RELEASE ONLY

| Released Item(s) # | Officer (P#/initials) | Released to Owner # (from above) | Owner's Signature |
|---|---|---|---|
| | | | |

ER_274

LVMPD 67A (Rev. 1/20)

Distribution: White: Records/OnBase | Yellow: Evidence Vault | Pink: Citizen

# LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# PROPERTY CONTINUATION REPORT

Event # 2 0 0 9 0 0 0 7 9 H

| PKG # | ITEM # | OWNER # | Make or Brand | MODEL | COLOR | Serial # / OAN State & Gov. Issued ID #'s | Qty. | PROPERTY DESCRIPTION *If firearms MUST list: 1) Barrel Length 2) Country Made/Importer 3) Caliber 4) Action Type (S/A, Auto, Bolt, Revolver, Etc.) |
|---|---|---|---|---|---|---|---|---|
| 1 | 4 | 1 | | | | | | GREEN LEAFY SUBSTANCE PURPORTED TO BE MARIJUANA 8.4 grams net in grey bottle & clear container |
| 1 | 5 | 1 | | | | | 1 | Clear baggies in box 4 scale NARCO kit |
| 1 | 6 | 1 | | | | | 1 | BAGGIE UNK WHITE SUBSTANCE |
| 2 | 7 | 1 | | | | | 1 | ENVELOPE W $4,450.00 US CURRENCY 4 PINK Sheet |
| 3 | 8 | 1 | | | | | 70 | 9mm ROUNDS W/in two boxes |
| 3 | 9 | 1 | | | | | 2 | MAGAZINES 4 AMMO (DNA) |

LVMPD 67-B (Rev. 9/12)

↑ Corresponds to # Listed in PERSONS section (Suspect / Victim / Owner / Finder)

**Distribution:** White: Records/Onbase | Yellow: Evidence Vault | Pink: Citizen

ER_275





**Vegas Golden Law <vegasgoldenlaw@gmail.com>**

---

## Fwd: EV#200900007194 SETEPHON JAMES WHITNEY/JESSICA RODOSH
1 message

**Jessica Rodosh** <j.r.rodosh@icloud.com>                                         Sat, Jul 2, 2022 at 6:42 PM
To: vegasgoldenlaw@gmail.com

Sent from my iPhone

Begin forwarded message:

> **From:** Jessica Rodosh <j.r.rodosh@icloud.com>
> **Date:** October 23, 2020 at 5:47:02 PM PDT
> **To:** Jessica Anaya <J16092A@lvmpd.com>
> **Subject: Re: EV#200900007194 SETEPHON JAMES WHITNEY/JESSICA RODOSH**
>
> I'm sorry I'm just frustrated with this whole situation I don't mean to be short with you, you have been
> extremely helpful. But Bank of America is sending me my unemployment transactions all the way back till
> April and they are also sending Stephon's but his was the PUA unemployment so he got paid one lump sum
> in June for $9,985 so all that should be more than enough proof that the money was legal. I won't have the
> transcripts till after Monday because it takes 2 business days to email it to me. Again thank you and I'm
> sorry
>
> Sent from my iPhone
>
>> On Oct 23, 2020, at 4:16 PM, Jessica Rodosh <j.r.rodosh@icloud.com> wrote:
>>
>> My paycheck stubs show I made all that I'm sorry this is so frustrating because that's my
>> unemployment and from my job. Let try to see if unemployment can send me something, I'm
>> showing that I make that and I did make it that is my money I work so hard.  I will see what I
>> can get but honestly I don't know just give a cple days please
>>
>> Sent from my iPhone
>>
>>> On Oct 23, 2020, at 10:16 AM, Jessica Anaya <J16092A@lvmpd.com> wrote:
>>>
>>>
>>> Hi Jessica:
>>>
>>>
>>> My attorney has reviewed all the emails you sent in
>>> with your proof of income.   While the majority of
>>> proof shows the unemployment funds being deposited
>>> to your account, we need more information of the
>>> withdrawals from your account to correlate with the
>>> cash seized.  We see approximately 3 withdrawals of
>>> $600.00 around July, however, that $1,800.00 does
>>> not account for the total amount seized of $4,450.00.

**ER  277**

Can you provide proof of the other amounts withdrawn from your account to account for that sum of money?


Thank you,


Jessica Anaya

Legal Assistant to

S. Scott Greenberg, Esq.

Office of General Counsel

Forfeiture Section

Las Vegas Metropolitan Police Department

Phone: (702) 828-4970

Fax:  (702) 828-4973

Email: J16092A@LVMPD.com


**ATTORNEY/CLIENT PRIVILEGE**

**ATTORNEY WORK PRODUCT**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you are not the addressee, or it appears from the context or otherwise that you have received this email in error, please advise me immediately by reply email, keep the contents confidential, and immediately delete the message and any attachments from your system.



**Vegas Golden Law <vegasgoldenlaw@gmail.com>**

---

## Fwd: 200900007194 STEPHON WHINEY/JESSICA RODOSH
1 message

---

**Jessica Rodosh** <j.r.rodosh@icloud.com>                              Sat, Jul 2, 2022 at 6:36 PM
To: vegasgoldenlaw@gmail.com

Sent from my iPhone

Begin forwarded message:

> **From:** Jessica Rodosh <j.r.rodosh@icloud.com>
> **Date:** January 21, 2021 at 12:08:49 PM PST
> **To:** Jessica Anaya <J16092A@lvmpd.com>
> **Subject: Re: 200900007194 STEPHON WHINEY/JESSICA RODOSH**

Thank you again I truly do appreciate all the help.

Sent from my iPhone

> On Jan 21, 2021, at 8:33 AM, Jessica Anaya <J16092A@lvmpd.com> wrote:

> Hi Jessica:

> As you can see from the email below, the new check should be
> mailed out next week if you want to keep an eye out for it
> coming in the mail.

> Have a great day!

> Jessica

---

**From:** Nan Bower <C6933B@LVMPD.COM>
**Sent:** Thursday, January 21, 2021 6:32 AM
**To:** Jessica Anaya <J16092A@LVMPD.COM>
**Subject:** RE: 200900007194 STEPHON WHINEY/JESSICA RODOSH

Good morning,

**ER 279**

I will go ahead and void the previous check and re-issue a new one.  The check will be mailed out next week since the county do not cut the check on Fridays.

Can you please let Jessica Rodosh know.

Thanks.

Nan

---

**From:** Jessica Anaya <J16092A@LVMPD.COM>
**Sent:** Wednesday, January 20, 2021 4:10 PM
**To:** Nan Bower <C6933B@LVMPD.COM>
**Subject:** FW: 200900007194 STEPHON WHINEY/JESSICA RODOSH

Letter from Jessica Rodosh.  Scott said sufficient proof to him to have check reissued to solely Jessica Rodosh.

---

**From:** Jessica Rodosh <j.r.rodosh@icloud.com>
**Sent:** Wednesday, January 20, 2021 3:59 PM
**To:** Jessica Anaya <J16092A@LVMPD.COM>
**Subject:** Re: 200900007194 STEPHON WHINEY/JESSICA RODOSH

**CAUTION:** This email originated from an **External Source**. Please **use caution** before opening attachments, clicking links, or responding to this email. **Do not sign-in with your LVMPD account credentials.**

<image001.jpg>
<image002.jpg>

Sent from my iPhone

On Jan 19, 2021, at 6:01 PM, Jessica Rodosh <j.r.rodosh@icloud.com> wrote:

Ok just waiting on it to get here.

**ER_280**

Sent from my iPhone

On Jan 19, 2021, at 7:52 AM, Jessica Anaya
<J16092A@lvmpd.com> wrote:


You can try to send a pic and I'll see if that
is sufficient before you make the trip down
here.




Jessica Anaya

Legal Assistant to

S. Scott Greenberg, Esq.

Office of General Counsel

Forfeiture Section

Las Vegas Metropolitan Police Department

Phone: (702) 828-4970

Fax:  (702) 828-4973

Email: J16092A@LVMPD.com


ATTORNEY/CLIENT PRIVILEGE

ATTORNEY WORK PRODUCT


This message is intended only for the use of the individual or entity to
which it is addressed and may contain information that is privileged,
confidential and/or exempt from disclosure under applicable law.  If the
reader of this message is not the intended recipient, or the employee or
agent responsible for delivering the message to the intended recipient,
you are hereby notified that any dissemination, distribution or copying
of this communication is strictly prohibited.   If you are not the
addressee, or it appears from the context or otherwise that you have
received this email in error, please advise me immediately by reply
email, keep the contents confidential, and immediately delete the
message and any attachments from your system.

**ER_281**

**From:** Jessica Rodosh <j.r.rodosh@icloud.com>
**Sent:** Friday, January 15, 2021 10:51 AM
**To:** Jessica Anaya <J16092A@LVMPD.COM>
**Subject:** Re: 200900007194 STEPHON WHINEY/JESSICA RODOSH

---

**CAUTION:** This email originated from an **External Source**. Please **use caution** before opening attachments, clicking links, or responding to this email. **Do not sign-in with your LVMPD account credentials.**

Stephon is sending the letter tonight do u want me to bring it to you when I get or send a picture of it.

Sent from my iPhone

> On Jan 14, 2021, at 3:59 PM, Jessica Rodosh <j.r.rodosh@icloud.com> wrote:
>
> Thank you so much
>
> Sent from my iPhone
>
>> On Jan 14, 2021, at 3:39 PM, Jessica Anaya <J16092A@lvmpd.com> wrote:
>>
>> Hi Jessica:
>>
>> Our attorney said you would need to get a statement from Stephon agreeing that LVMPD can have the check made out to just you. The statement should mention the event number the money was seized under and the amount seized. Also, at the end of his statement it should have this language specifically: **I, [name], do solemnly swear, under the**

**penalty of perjury, that I agree to the above. NRS 208.165.**

Thanks, if you have any questions please do not hesitate to contact our office.

Jessica Anaya

Legal Assistant to

S. Scott Greenberg, Esq.

Office of General Counsel

Forfeiture Section

Las Vegas Metropolitan Police Department

Phone: (702) 828-4970

Fax:  (702) 828-4973

Email: J16092A@LVMPD.com

**ATTORNEY/CLIENT PRIVILEGE**

**ATTORNEY WORK PRODUCT**

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the addressee, or it appears from the context or otherwise that you have received this email in error, please

**ER 283**

advise me immediately by reply email,
keep the contents confidential, and
immediately delete the message and any
attachments from your system.

**ER_284**

Electronically Filed
1/7/2021 1:22 PM
Steven D. Grierson
CLERK OF THE COURT

**RTRAN**

DISTRICT COURT

CLARK COUNTY, NEVADA

THE STATE OF NEVADA,

            Plaintiff,

vs.

STEPHON JAMES WHITNEY,

            Defendant.

CASE#:  C-19-338650-1

DEPT.  XX

BEFORE THE HONORABLE ERIC JOHNSON, DISTRICT COURT JUDGE

TUESDAY, SEPTEMBER 22, 2020

***RECORDER'S TRANSCRIPT OF HEARING:***
***REVOCATION OF PROBATION***

APPEARANCES:

| | |
|---|---|
| For the State: | MEGAN THOMSON<br>Chief Deputy District Attorney |
| For the Defendant: | YI LIN ZHENG, ESQ.<br>(Appearance via video] |

RECORDED BY:  ANGIE CALVILLO, COURT RECORDER

1           [Las Vegas, Nevada, Tuesday, September 22, 2020, at 2:24 p.m.]

2

3           THE COURT:  State of Nevada versus Stephon Whitney, case

4  number C338650.  Counsel, please note your appearances for the

5  record.

6           MS. THOMSON:  Megan Thomson for the State.

7           MS. ZHENG:  And good afternoon, Your Honor.  Yi Lin Zheng

8  on behalf of Defendant Stephon Whitney.  He is present in custody.

9           THE COURT:  All right.

10          THE RECORDER:  We have an officer on this case, Your

11  Honor.

12          THE COURT:  Good.

13          THE RECORDER:  Officer Vargas?

14          MR. VARGAS:  Yes, I'm here, Your Honor.

15          THE COURT:  All right.  This is on for consideration of the

16  violation report dated September 8, 2020.  Where do we stand with this

17  one?

18          MS. THOMSON:  My understanding is the last time we were

19  here, the defendant stipulated to some of the violations but not all of

20  them and that we need to have a hearing on the remaining ones.

21          THE COURT:  All right.  I think it was -- what did you

22  agree -- I don't know if we ever, really, got it firmed up as to what the

23  defendant was stipulating to.  What, if anything, is the defendant

24  stipulating to, Counsel?

25          MS. ZHENG:  We're stipulating to the August 14th presumptive

1   test for marijuana that meet his first test to set the baseline.  We're

2   stipulating to the January 29th curfew violation in regards to the fact that

3   he left the house early for -- to go to his employment and to drop his

4   girlfriend off to her employment.  And I'm stipulating to the fact that on

5   September 1st that he was arrested and ultimately booked for the North

6   Las Vegas Justice Court case.  I do stipulate to the fact that he was

7   ultimately booked as a result of the search warrant that was executed on

8   September 20 -- of September 2nd, however, we disagree as to the

9   circumstances there.

10              THE COURT:  All right.  Well then, I think, pretty much we just

11  have a stipulation to the marijuana and the curfew violations.  Is that

12  correct, Mr. Whitney, you will stipulate to the August 14th presumptive

13  positive test for marijuana and signing an admission form, and then for

14  being not home during a curfew hour on January 29th, 2020?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  All right.  State, prepared to go forward today?

17              MS. ZHENG:  Your Honor, we're also stipulating to the

18  fact -- sorry.  We're also stipulating to the fact that he does have a new

19  case in North Las Vegas Justice Court.

20              THE COURT:  All right.  Well I think that will come out when

21  we do the hearing.  So for right now, we'll --

22              MS. ZHENG:  Sure, fair enough.

23              THE COURT:  -- we'll go on from there.  State, ready?

24              MS. THOMSON:  Yes, Your Honor.

25              THE COURT:  All right, call your first witness.

1    MS. THOMSON:  Thank you.  I call Officer Vargas.

2    THE COURT:  All right.  Officer, if you'll raise your right

3 hand and be sworn in by our clerk.

4    MR. VARGAS:  Yes, Your Honor.

5                          **JOSE VARGAS**

6         [having been called as a witness and first duly sworn]

7                    **DIRECT EXAMINATION**

8 BY MS. THOMSON:

9    THE CLERK:  Please state and spell your name for the

10 record.

11   MR. VARGAS:  First name is Jose, J-O-S-E.  Last name is

12 Vargas, V-A-R-G-A-S.

13   THE COURT:  Go ahead, Counsel.

14   MS. THOMSON:  Thank you.

15   Q      Officer Vargas, were you supervising Stephon

16 Whitney on September 2nd of this year?

17   A      Yes, I was.

18   Q      And on that date, did you perform a home visit at

19 the address 1888 Winterwood Boulevard?

20   A      Yes, I did.

21   Q      Was that the address that he had provided to you

22 indicating that he lived there?

23   A      Yes, ma'am.

24   Q      Okay.  When you went to the address, were you

25 there with officers from Metro?

1          A          I was accompanied with Officer/Detective

2    Costello, at that time, and two other officers from P&P.

3          Q          Okay.  And during the search of the home both

4    before and after the obtaining of the search warrant, were there any

5    items that concerned you based upon the fact that Mr. Whitney was on

6    probation?

7          A          Yes.  I found two loaded magazines with nine mils

8    that were found on the top right corner of his closet.

9          Q          And how did you know it was his closet?

10         A          I asked him who slept in that room; what side

11   belonged to who, and he was in there with me when we were doing the

12   search.

13         Q          Okay.  And then during the best of the search of

14   the house, was there also a weapon located?

15         A          Yes, that was after Metro got the search warrant.

16         Q          And what kind of weapon was it?

17         A          It was a nine millimeter and two other magazines

18   additional to the two that I had found in the beginning.

19         Q          Okay.  And did you discuss that weapon with Mr.

20   Whitney?

21         A          Before we obtained -- before Metro obtained the

22   search warrant, I did ask Mr. Whitney if there was any weapons; any

23   other weapons, or any ammo.  He told me there was not; there was

24   nothing inside of that residence.  After they obtained the search warrant,

25   I had already departed from the scene when they got the search

warrant.  I departed from the scene.  I got a call later on giving me --

Metro letting me know that they found the weapon and several other

items.

Q      And those other items, were they marijuana?

A      They were.

Q      Can you tell us just generally how much

marijuana there was?

A      They found two jars and many other items.  If I

can look back at my file, real quick, I can tell you the exact amount that

they found.

Q      If you can -- we don't need it to the decimal

accuracy.  But, yes, please.

A      Okay.  They found -- in one of the -- in one of the

jars they found approximately 69.1 grams; in another one 55.4 grams; in

another one 8.4, it was in a gray bottle.

Q      And the 69 and 55, do you know if those were

weighed with or without the jar?

A      They were weighed -- they were weighed with

them because there was grams gross.

Q      Okay.  And when you had contact with Mr.

Whitney, did he provide you with all of his cell phones?

A      When I took him into custody and I searched for

weapons, he had two cell phones on -- in his right front pocket.  On one

of them he gave us with a facial recognition; the other one he suggested

it was a family cell phone, but he did not have the passcode to it and

1    kept denying he didn't have the passcode to it; which doesn't make

2    sense of it being a family cell phone.

3              Q      Okay.  And you said that that was in his pocket,

4    correct?

5              A      That is correct.

6         MS. THOMSON:  I'll pass the witness.

7         THE COURT:  All right.  Cross examination.

8                        **CROSS EXAMINATION**

9    BY MS. ZHENG:

10             Q      Officer Vargas, you are relatively new to

11   supervising Stephon, correct?

12             A      That is correct.

13             Q      And he previously had another probation officer, it

14   was a female officer?

15             A      That is correct.

16             Q      And when you were there to -- when you visited

17   the house on September 2nd, were you there on a regularly scheduled

18   home visit?  Or were you actually there to accompany and assist Metro

19   because they were conducting a separate investigation?

20             A      It was both because he had just gotten -- his file

21   had just gotten to me in the beginning of September; something that I

22   deal with is usually go over the files, and I just randomly go to people's

23   houses.

24             Q      Okay, so this was actually your first contact with

25   him.  And he wouldn't, I guess -- he wouldn't necessarily know that you

1    were with P&P anymore than he would know that you were with Metro,

2    correct?

3              A       Can you rephrase that, please?

4              Q       He had never met you before as his probation

5    officer?

6              A       That is correct, yes.

7              Q       And when you came in, you were accompanied

8    by multiple Metro officers?

9              A       I was not.  I was just with the additional two P&P

10   officers.  Metro was not -- they were standing by near the scene but not

11   right there with me.

12             Q       Okay.  Did you guys identify yourselves first as

13   Metro or -- I mean, as Parole and Probation?

14             A       I did specifically because I was -- I called Mr.

15   Whitney through a cell phone, and I had been talking to Mr. Whitney the

16   whole entire time.

17             Q       Okay.  And when you went in, you had executed

18   what would be a P&P search, right?

19             A       Yes.

20             Q       And you were the one who found the two loaded

21   magazines in the room?

22             A       That's correct.

23             Q       And it was located above on a ledge; above the

24   bed?

25             A       Not on the bed.   It was inside of the closet, the

1    top right corner of the closet.

2         Q    Okay.  But that bedroom was a shared bedroom,

3    correct?

4         A    That is correct.

5         Q    And despite the fact that you found the two

6    magazines, in essence, by Parole and Probation standards, that would

7    be a technical violation?

8         A    Yes.

9         Q    But it was then that Metro then took over?

10        A    We froze the scene.  And I told Metro they can

11   get the search warrant to conduct for further search of the room.

12        Q    Okay.  And then additional items that Metro

13   ultimately found, you were not -- you said you had departed the scene,

14   correct?

15        A    That is correct.

16        Q    So you were not present nor did you see where

17   the other items were located?

18        A    I did not.

19        Q    And you couldn't say to what proximity the nine

20   millimeter was to where you found the magazines?

21        A    No.  I could just go off of the police report or --

22   that Metro had filed when they found it.

23        Q    Sure.  But at that point, you had no knowledge of

24   the proximity of it?

25        A    No.

1    Q    Or whether or not -- and you had no further

2    discussions with Mr. Whitney, correct?

3    A    That is correct.  Not until I went to go serve him

4    both the violation report and the supplemental report.

5    Q    Okay.  So you could not have said that he had

6    known that they were present at that time?

7    A    At that time -- at the time, he told me there was

8    no weapons in the house.

9    Q    Okay, fair.  And then as to the marijuana, you did

10   not find those items either?

11   A    That is correct.

12   Q    Okay.  And then as to the cell phones, he did

13   provide you pursuant to the digital search function, at least the passcode

14   to one of them, correct?

15   A    He gave me a face recognition for one of them.

16   He never gave me the extra password --

17   Q    Okay.  The second phone that -- the second

18   phone that you discussed, it was not needed for his face recognition?

19   A    He told me he just didn't know what the code

20   was, or how to get access to that phone.

21   Q    Okay.  But you didn't hold the phone up to his

22   face to see if it would open?

23   A    I did not.

24   Q    Okay.  But otherwise, even if that were the case,

25   that would be a technical violation?

1      A      That is correct.

2      Q      Fair enough.  So as to any of your interactions

3  with Mr. Whitney and everything else that is in the violation report, in

4  essence, this would otherwise be a technical violation report; other than

5  the fact that subsequently Metro then booked him on the charges?

6      A      Well, first, he was going to get charged for the

7  north case for lying to them, and also being over his curfew on

8  September 1st when he had -- on August when he had contact with

9  Officer Cooke [phonetic] of North Las Vegas.

10     Q      Fair enough.  But his charges in the North Las

11  Vegas case nonetheless still constitute a technical violation, it does not

12  constitute a new felony or gross misdemeanor, correct?

13     A      It would just constitute that him lying to Officer

14  Cooke of his identity, which would not constitute to a technical violation;

15  that would be a nontechnical.

16     Q      Okay.

17     MS. ZHENG:  I have no further questions for this witness.

18     THE COURT:  Redirect.

19     MS. ZHENG:  Well actually --

20  BY MS. ZHENG:

21     Q      Officer Vargas, even though you were new to the

22  file, your file does note that -- originally, with the first violation was that

23  he had come in and his first test was a positive and that was a baseline

24  test, correct?

25     A      That would've been during his intake.

1    Q    Sure.  And then subsequent to that, he's provided
2    a negative test?
3    A    That is correct.
4    Q    As a result of that first test, he was also ordered
5    to do an evaluation, and he was also ordered to do counseling for those
6    items after the evaluation, correct?
7    A    Correct.
8    Q    And he in fact had done all of those things?
9    A    Yes.  He had completed the evaluation, and he
10   conducted the classes that were instructed for him to do.
11   Q    Thank you.  And then during the January 29th
12   violation, your file shows that he was in fact employed at that time?
13   A    In January, yes.  According to the last P&P
14   officer.
15   Q    Okay.  And that, I think, they had a discussion in
16   regards to that curfew violation that his shift started shortly after eight
17   a.m. but that morning he had dropped his girlfriend off to work?
18   A    According to the notes, it was that they had the
19   discussion after they had already gone and checked -- and tried to
20   attempt the home contact.  Obviously, he was not there.  So when they
21   finally got in contact with him, that's when he explained the reason why
22   he was in violation of the curfew.
23   Q    And then because you were -- you had departed
24   the scene; you didn't know that the additional items were found;
25   following this, you went to see Mr. Whitney in custody to give him the

1  violation report -- the supplemental report, correct?

2          A     That's correct.

3          Q     Had you also received a call from someone

4  claiming ownership of those items that were ultimately found?

5          A     No.  I received a call from his girlfriend.  I believe

6  it's the girlfriend.  She stated that one of those items was hers.

7          Q     Okay.  Thank you.

8          THE COURT:  All right.  Redirect.

9          MS. THOMSON:  No, Your Honor.

10          THE COURT:  Officer, when you found the loaded magazines,

11  you indicated that you had some conversations with the defendant at the

12  time concerning control of the room?

13          MR. VARGAS:  Yes, Your Honor.  When we went in I asked

14  him, which one was his room; he directed me to his room.  I asked him,

15  if he shared the bedroom; he said, yes.  I asked him, if there was a

16  certain side that he slept on or which -- wherever his property was at; he

17  said, yes; he directed me, that's when I went into the closet.  One side of

18  the closet had purses, and the other side was a little bit more empty, and

19  so that's when I went to the other side of the closet, Your Honor.

20          THE COURT:  Okay.  Did he make any statement when you

21  found the magazines?

22          MR. VARGAS:  I asked him, who did they belong to?  And he

23  said he didn't know where those come from; that those weren't his.

24          THE COURT:  Okay.  All right.  Does that generate anything

25  further from the State?

1    **REDIRECT EXAMINATION**

2    BY MS. THOMSON:

3             Q      Officer, the report that you received from Metro

4    regarding their search, did you provide that to Defense and the Court?

5             A      I emailed to the Defense, and I emailed initially

6    to -- whoever was the one that contact -- I can't remember their name,

7    I'm sorry.

8             Q      Elise.

9             A      I emailed them everything that Metro sent me

10   from their report; to even the report from North Town; to the pictures that

11   they sent me as well of what they found.  I emailed it to both sides, yes.

12            MS. THOMSON:  At this time, I would ask for admission of the

13   declaration of the arrest report.  I have a copy for the Court if you don't

14   already have one.

15            THE COURT:  Okay.  And that's what's provided to Defense

16   Counsel?

17            MS. THOMSON:  Yes.

18            THE COURT:  Okay.  All right.

19            MS. ZHENG:  It was, Your Honor.

20            MS. THOMSON:  And I have no further questions.

21            THE COURT:  Okay.  Any objection to the declaration of the

22   arrest report?

23            MS. ZHENG:  No, Your Honor.

24            THE COURT:  All right, that will be admitted.  Okay.  Any other

25   witnesses for the State?

1    MS. THOMSON:  No, Your Honor.

2    THE COURT:  Well let me just ask you, Defense Counsel, my

3    questions to the officer generate any further questions from you?

4    MS. ZHENG:  Yes.

5    **RECROSS EXAMINATION**

6    BY MS. ZHENG:

7        Q    Officer, I guess, in regards to the bedroom that

8    you entered, were there in fact two closets in that bedroom?

9        A    No.  I just remember seeing the big one next to

10   the bedroom -- next to the bed, I'm sorry.

11       Q    When you walk in, is there an additional -- if you

12   remember, when you walk in, is there an additional closet on the right-

13   hand side?

14       A    Walking into the bedroom?

15       Q    Yes.

16       A    Not that I remember on the right-hand side, no.

17       Q    Okay.  But you are also saying that the closet in

18   which you found the magazine; when you went into that closet, it also

19   contained like women's purses, and clothing and those items, correct?

20       A    I remember seeing the purses.  I don't remember

21   seeing the women's clothing.  I do remember seeing a few purses inside

22   the closet off to the left.

23       Q    Okay, fair.  Thank you.

24   THE COURT:  All right.  Does that generate anything further

25   from the State?

1    MS. THOMSON:  No, Your Honor.

2    THE COURT:  You did say -- you did say, Officer, that the

3    person representing themselves to be a girlfriend called and said one of

4    the items seized was theirs?

5    MR. VARGAS:  Yes, Your Honor.

6    THE COURT:  What item did they say was theirs?

7    MR. VARGAS:  It was the four thousand five hundred that they

8    found in cash.

9    THE COURT:  Okay.  Does that generate anything further

10   from either side?

11   MS. THOMSON:  No.

12   THE COURT:  Defense?

13   MS. ZHENG:  No, not for Officer Vargas.

14   THE COURT:  All right.  Thank you, Officer, you're excused.

15   Does the State have any other witnesses?

16   MS. THOMSON:  No, Your Honor.

17   MR. VARGAS:  Thank you, Your Honor.

18   THE COURT:  Defense, have any witnesses?

19   MS. ZHENG:  I do, Your Honor.  I want to call Jessica Rodosh

20   who is Mr. Whitney's girlfriend and was sharing the bedroom with him.

21   THE COURT:  All right.

22   MS. ZHENG:  And she's actually present.

23   THE COURT:  Okay.  I'll ask her to raise her right hand and

24   then be sworn in.

25   **JESSICA RODOSH**

1     [having been called as a witness and first duly sworn]

2        **DIRECT EXAMINATION**

3 BY MS. ZHENG:

4     THE CLERK:  Can you please state and spell your name for

5 the record?

6     MS. RODOSH:  Jessica Rodosh, J-E-S-S-I-C-A,

7 R-O-D-O-S-H.

8     THE COURT:  All right.  Go ahead, Counsel.

9     Q  Ms. Rodosh, what is your relationship to Mr.

10 Whitney?

11     A  I'm his girlfriend.

12     Q  And how long have you guys been together?

13     A  Three years.

14     Q  And do you share a residence together?

15     A  We do.

16     Q  And that includes sharing a bedroom together?

17     A  Yes.

18     Q  And were you present on the day of September

19 2nd when Officer Vargas arrived at the home?

20     A  Yes.

21     Q  Did you have any contact with Officer Vargas at

22 that time?

23     A  No.  Oh, well, they just brought him in -- they

24 didn't say -- Officer Vargas never really talked to me.  It was another guy

25 with them that talked to me, but he didn't.

1    Q    Okay.  And so, you were separated from Mr.

2    Whitney during the Parole and Probation?

3    A    Yes.

4    Q    And given that you were separated from him, you

5    know that ultimately there were items that were found in the bedroom

6    that would constitute contraband for Mr. Vargas?

7    A    I think -- I didn't know until they said they were

8    seizing the house.

9    Q    Did you know that those items were in the house?

10   A    Yes.

11   Q    And why do you know that those items were in

12   the house?

13   A    Because they were mine.

14   Q    And when you say that they were yours, what

15   items are you referring to?

16   A    The gun, the money, ammunition, and the

17   marijuana.

18   Q    And do you know where they were located?

19   A    I do.

20   Q    As to -- so you heard a lot of testimony in regards

21   to the loaded magazine that was found in the closet.  Whose closet did

22   that -- was that magazine in?

23   A    That was my closet.

24   Q    And how many closets are in that bedroom?

25   A    There's two closets in the bedroom.  When you

1   walk in, there's the one that's right there to the right.  And then you go
2   further in the bedroom, which is mine on the left.  Stephon's is in -- so
3   Stephon's is right there on the right-hand side when you walk in the
4   bedroom, it's all male's clothes.  And that's -- I have a lot of clothes, so I
5   have my own closet which is on the left.

6          Q      And that's the closet that Officer Vargas is
7   referring to in regards to whether there were purses that are located?

8          A      Yes.

9          Q      And then, is the side that Stephon sleeps on the
10  bed, is that closer to your closet?  However, that is not the closet on the
11  left is necessarily his closet.

12         A      No.

13         Q      But he sleeps closer to the left side of the closet
14  on the left?

15         A      Yeah.  I mean, if -- kind of.  We just -- yeah.

16         Q      So he would not necessarily have known the
17  entirety of the contents that were in your closet?

18         A      No.

19         Q      And with respect ultimately to the marijuana that
20  was found, it was hidden in a laundry hamper?

21         A      It was.

22         Q      And your testimony here today is that, those
23  items belonged to you?

24         A      They do.

25         Q      And, I guess -- I'm sure you understand that he's

1   not supposed to have those items, so why were those items in your

2   home?

3          A       We lost a baby in August 8th, 2019, and I was in

4   severe anxiety and I can't -- it felt like I can't breathe.  So the doctors

5   wouldn't help, and so I smoke because it helps with my -- it helps with

6   the loss and the anxiety.  I can't -- there's just times I just -- I feel like I

7   can't catch my breath.  Like someone sitting on my chest, so I smoke.  I

8   didn't think it would get him in trouble.  I wasn't trying to get him in

9   trouble.  I was five months pregnant when we lost our baby and it

10  happened at home.  So it was a traumatic experience, it's hard to -- I

11  don't talk about it still.

12         Q       But as to the fact that you have those items, this

13  is not something that Stephon partakes with you as he continues to

14  provide negative drug tests?

15         A       No, not at all, not at all.

16         MS. ZHENG:  I have no further questions, Your Honor.

17         THE COURT:  Cross examination.

18                            **CROSS EXAMINATION**

19  BY MS. THOMSON:

20         Q       Why were you keeping the marijuana in the

21  laundry basket?

22         A       I'm sorry?

23         Q       Why were you keeping the marijuana in the

24  laundry basket?

25         A       I just put it there.  To be honest, I just put it in

1  places that only I would go through.  He never went through the laundry

2  basket.  I do the laundry.

3          Q      Okay.  So you're saying he didn't know you were

4  smoking marijuana?

5          A      Um, he probably didn't.  I didn't smoke in the

6  house.  So if I smoked, I would go outside or go for a walk.  I don't

7  smoke in the house.

8          MS. THOMSON:  Okay.  Thank you.

9          THE COURT:  Any other questions?

10          MS. THOMSON:  No, Your Honor.

11          THE COURT:  All right.  Any other redirect?

12          MS. ZHENG:  No, Your Honor.

13          THE COURT:  All right.  Thank you, you're excused.  Any

14  other witnesses for the Defense?

15          MS. ZHENG:  No, Your Honor.

16          THE COURT:  All right.  Any rebuttal from the State?

17          MS. THOMSON:  No, Your Honor.

18          THE COURT:  Does the State wish to argue on the alleged

19  violations?

20          MS. THOMSON:  Just briefly, Your Honor.  And I'm going to

21  focus on that firearm because I think that, when we look at the report,

22  the defendant's statements pretty much tell us where we're going with

23  this revocation.  When he indicated that he knew it was a nine millimeter;

24  that he knew it was a brand that he hadn't heard of before, that tells us

25  that he knows the firearms in the house.

1        Particularly when we look at the fact that it is a brand

2   that's really quite unique, it's not something that -- like a Glock where we

3   expect sort of a name that we have heard before.  And the combination

4   of the facts, and the facts that he didn't know about that firearm, tells us

5   he knew it was in the house; he knew he was on probation.  And for that

6   reason, he had access and possession of the firearm.

7        And it's the State's position that when you combine that

8   along with the other facts of the revocation report; the fact that he

9   indicated that he didn't know the password to the phone he was carrying

10  in his pocket; the phone that was with the other phone that he could

11  open with his face, it tells us that it's not that he was waiting for a phone

12  call, he just didn't want P&P in that phone.

13       He is not being honest with the officers.  He's being

14  stopped in vehicles where there are other individuals who are felons;

15  where there are other firearms.  At this point, it's the State's position that

16  the possession of the firearm has been proven up; that it is a non-

17  technical violation; that he should be revoked.

18       THE COURT:  All right.  Defense.

19       MS. ZHENG:  And, Your Honor, I'm going to ask that, in this

20  case -- you know, in preparing for this, I had a lot of conversations with a

21  lot of people.  And given what Officer Vargas encountered when he went

22  to the house; what was otherwise contained on the violation report, most

23  of it stands to be technical violations.

24       I do understand that it is concerning in regards to the

25  North Las Vegas case.  But I think to that extent, he was candid about

1   the matter and that he was somewhere where he shouldn't have been.

2   And he was candid in regards to the fact that he didn't want problems

3   with Parole and Probation because to the extent for the time that he has

4   been on probation, I think Officer Vargas has it right in his report that, I

5   think Stephon has done quite well on probation for what one would

6   assume he was otherwise.  There were a lot of conditions that were put

7   on him, but he was, otherwise, working.  He showed up.  He was testing

8   negative, and he has been on probation for quite a period of time.

9            With regards to the matter of the gun, I don't necessarily

10  read it the same way as the State in regards to the fact that I know

11  Officer Vargas wasn't present, but I've had a lot of conversations with

12  the individuals.  With regards to when Metro had come into execute the

13  search warrant, they were asked -- Ms. Rodosh was asked at that time

14  whether or not those items were hers.  And she was afraid to say

15  anything because what was applied to her was that a protective services

16  could've been called and that she might have been facing the fact that

17  she was having her children removed for having those items in the

18  house.

19           And then subsequent to that, when he was -- when Mr.

20  Whitney was subsequently interviewed at the jail, he had told the officers

21  initially, "I don't know anything about those items; they're hers; ask her

22  about it; she is the one who smokes."  And then the report goes on to

23  say, it wasn't until Metro explained the totality of the circumstances to

24  him; that he then stated, "He didn't want his girlfriend to get in any

25  trouble."  And that's when he admitted those items were his because

1    ultimately what was told to him; the totality of the circumstances was

2    that, she stood to have her child removed given the situation and her

3    association with him.

4              That means that -- I know that ultimately the new case

5    isn't filed yet.  The fact that he was ultimately booked in on it stands to

6    be a violation.  What I'm asking the Court to do is consider this; consider

7    the year plus that he has been on probation; consider the fact that the

8    remainder of the violation report stands to be technical violations and

9    that they haven't filed new charges yet.

10             And there is quite a murky area here in terms of the

11   providence of the gun; the marijuana; where it was located; his

12   knowledge of it.  And count the somewhere between a first and a second

13   technical violation; give him 45 days in custody and let him serve out the

14   45 days as a punishment for his involvement in this, and then allow him

15   to return on probation because everything else -- the indications are that,

16   he was doing well on probation, and he can succeed the rest of his term.

17        THE COURT:  All right.  Does your client wish to make any

18   statement?  I'm not hearing anything.  All right.  I do find the defendant in

19   violation of conditions of his probation.  I'll find the stipulated use of

20   marijuana in August of 2019; the curfew violation in January of 2020;

21   that he was arrested and charged in relation to false statement to a

22   police officer.  And what concerns the Court with that event is that he

23   was with apparently multiple felons, known gang members, and there

24   was a firearm in the vehicle.

25             I do find him in violation as to the second home visit

based upon the results of the search and the information provided in the declaration of arrest. The defendant knew or had access to a semi-automatic handgun with two loaded magazines involving at least -- and then there was additional 70 rounds of nine millimeter ammo that was found. There was a substantial amount of marijuana. The circumstances here suggest that it was being sold, and especially looking at the amount of currency found in the house. So I do find him in violation and sufficient evidence of his possession and access both to the magazines -- loaded magazines and to the firearm. I am going to revoke his probation; institute the original sentence of 18 to 48 months in the Nevada Department of Corrections. Do we have an agreement as far as credit for time served?

MS. ZHENG: I think there is 30 days, Your Honor. Is there any chance that the Court, if you will, consider reinstating him to consider a modification of his probation down to a 12 to 30 sentence?

THE COURT: No. So how many days credit for time served?

MS. THOMSON: Officer Vargas, do you know?

MS. ZHENG: I think I have him at, like, 32 or --

MS. THOMSON: Officer Vargas, do you know?

MR. VARGAS: Give me one second. I'm actually looking back at the violation report now.

MS. ZHENG: I have 30 days.

MS. THOMSON: That sounds right.

MS. ZHENG: So according to the violation report, eight days in the PSI; eight days pursuant to his stay at city jail; eight days up to the

1    17th, and then we've now gone five additional days.

2           MR. VARGAS:  That's correct.

3           THE COURT:  All right, 30 days credit for time served.  Thank

4    you.

5           MS. THOMSON:  Thank you.  And just for the record,

6    obviously, he's on felony probation.  The Court took judicial notice that

7    he's a felon.

8           THE COURT:  Yes.  The Presentence Investigation Report

9    indicates three prior felonies.  The most significant one which concerned

10   the Court was the 2007 robbery with a deadly weapon.  He was

11   convicted of first-degree kidnapping, conspiracy to commit robbery,

12   robbery with use of a deadly weapon and was dishonorably discharged

13   from the day of the weapon enhancement in 2017.  He's also convicted

14   with possession convicted -- well those were his three felonies.

15          MS. THOMSON:  Thank you.

16          THE COURT:  All right.  Thank you, Your Honor.

17          MR. VARGAS:  Thank you, Your Honor.

18                   [Hearing concluded at 3:00 p.m.]

19

20

21   ATTEST:    I do hereby certify that I have truly and correctly transcribed the
     audio/video proceedings in the above-entitled case to the best of my ability.

22

23   _Angie Calvillo_____

24   Angie Calvillo
     Court Recorder/Transcriber

25

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 1**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

**SPECIFIC CRIME:**

**DATE OCCURRED:**    09/03/2020                    **TIME OCCURRED:**    1718 Hours

**LOCATION OF OCCURRENCE:**    Clark County Detention Center

**CITY OF LAS VEGAS**          **CLARK COUNTY x**

**NAME OF PERSON GIVING STATEMENT:**    Whitney, Stephon

**DOB:**                                              **SOCIAL SECURITY #:**

**RACE:**                                             **SEX:**

**HEIGHT:**                                           **WEIGHT:**

**HAIR:**                                             **EYES:**

**HOME ADDRESS:**
                                                      **PHONE 1:**
**WORK ADDRESS:**
                                                      **PHONE 2:**

The following is the transcription of a tape-recorded interview conducted by Detective M. Cook, P# 2201, North Las Vegas Police Department and Detective J. Costello, P# 9139, LVMPD, Central Intelligence Unit, on September 3, 2020 at 1718 hours.

Q:    Yeah.  That's fine.  (Unintelligible).  Thank you.  Appreciate ya.  Hello again.  All right Mr. Whitney.  Today, I have a search warrant for your DNA.  So, I gotta do a buccal swab.  You had that done before where they swabbed the inside of your mouth?

A:    I haven't gotten it done before, but I'm sure...

Q:    You never had it done before?  Okay.

ER_311

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

A:     I'm sure (unintelligible).

Q:     Okay.  All right.  So, again, because you are here and you are in custody and I am talking to you, I'm gonna read your rights.  All right, you understand that?

A:     Yeah.

Q:     They're saying you have the right to remain silent.  Anything you say can be used against you in the court of law.  You have the right to a presence of an attorney.  If you can't afford an attorney, one will be appointed before any questioning.  You understand all those rights?

A:     Yeah.

Q:     Okay.  So, again, you wanna just take a look of that real quick?  Ah, you get a chance to talk to your girl?

A:     Ah, yeah.  Earlier.

Q:     So, she let you know that we did a search warrant on the house?

A:     Yeah.

Q:     She tell you what all we took?

A:     Um, no.  she didn't really be specific.

Q:     Okay.  So, we took about 5,000 in cash.  We took about a half-pound of weed and we took that burner that you had hidden in your headboard.  So, I'm getting this DNA, buried in - your burner in the headboard.  I'm also gonna compare it to them three burners that were in the - the van on, ah, (unintelligible), all right?

A:     All right.

# ER_312

Case 2:21-cr-00002-JAD-DJA   Document 41-5   Filed 10/28/22   Page 179 of 188

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
### PAGE 3

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q:     What's, ah, what's the story with your girls' son?

?:     (Unintelligible).

Q:     Is he your son?

A:     What you mean?

Q:     Is it your son or her son?

A:     No.

Q:     Okay, um, I found a bunch of paperwork in the house.  Is he a special needs child?

?:     (Unintelligible).

A:     No.  He, um...

?:     You ready?  Let's go.

A:     What is it when you can't talk right?

Q:     He has a speech impediment?

?:     (Unintelligible).

Q:     Okay.  So, he is special needs because he...

A:     Right.

Q:     ...he's got the...

A:     Yeah.

Q:     He's got the speech impediment.

A:     He go to speech class.

Q:     Oh, he goes to speech classes?  How old is he?

**ER_313**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 4

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A: Well, he was going to speech classes before all that shit.

Q: Well - before the pandemic happened?

A: Yeah.

Q: How old is he?

A: Just turned 8.

Q: Just turned 8. Okay. I saw his room. He's pretty a small boy. I just didn't know what his age was.

A: Yeah.

Q: Um, honestly, your girl, she's upset. Big time. Um, ah, she's, uh, she's pretty distraught over the fact that her house got wrecked. She's also distraught over the fact that she faces potential child abuse charges. So, um, having a firearm in the house and having it not be secured when you have a child at that age, carries a potential child abuse charge and then on top of that, ah, it's obvious to us that narcotic sales are going on there and so having a child in a home where narcotic sales are going on is a - is another charge. So I spoke to her briefly about it before she left last night. She had to go pick up her son and take - take him somewhere else and drop him off. She didn't want him to come home to see all that. What time do we got here? Um...

Q1: 17:19 for the, um, search warrant.

Q: But I just kinda wanna let you know where we at in the investigation. So, that's - that's a good possibility coming down the line for both you and her. So, um, I

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

spoke to her before the search warrant happened and she indicated to me that she had no knowledge of any firearms inside of the house and that there shouldn't be any firearms. So, my question to you is, is she trying to cover for you, or does she honestly not know that you have a gun stashed in that room?

A:    I don't know.

Q:    You don't know?

A:    No.

Q:    Okay. That's fair enough. Um, let's be straightforward. Is it your burner?

A:    No.

Q:    You holding it for somebody else?

A:    No.

Q:    Is your DNA gonna be on it?

A:    No.

Q:    Is your fingerprints gonna be on it?

A:    No.

Q:    You understand you're getting charged with it, correct? It's in your bedroom next to a nightstand that has on your pills on it on your side of the bed. So you're going to be charged for that, an ex-felon in possession of a firearm. You're also going to be charged with a new count of possession with an intent to sell. I seized your money. How much money did you have there?

A:    I'm not sure.

**ER_315**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:    Can you give me a ballpark number of how much money you think you had?

A:    That was our money from, um, when she was getting her, um, getting her unemployment.  So, it's, like, 3,000 I think - 2500 or something like that.

Q:    Out of curiosity, why hide it there?

A:    Why hide what?

Q:    Why hide the money?  Why not put it in the bank?

A:    Why I hide the money?

Q:    Yeah.

A:    I mean, people burglarize stuff.  So, it's like...

Q:    Wh- well, exactly why I would put the money in the bank.  Ain't nobody burglarizing the bank.

A:    Neither - neither one of us have a bank account though.

Q:    How old are you?

A:    30.  I just had one.  It got closed though.

Q:    Okay.  Well...

A:    That was about a year ago.

Q:    I mean, you walk in with three bands, any bank in town's gonna open up an account for you.  So...

A:    It's possible, but...

Q:    It makes sense?

A:    The responsibility of it is a lot.

**ER_316**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 7

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q:     There's no...

A:     Basically gotta pay to keep a bank account open.

Q:     Well, not if you keep a certain amount of money it.  I think if you keep over $500
       they don't charge you.

A:     But you gotta withdraw a certain amount in a certain amount of weeks.

Q:     I believe there's a minimum amount of activity that you need to...

A:     That's what I'm saying...

Q:     ...to keep it going.

A:     ...that we don't want, um, do any processing consistent enough to even have
       that.

Q:     Okay.  That makes sense.

A:     So, the - the bills and all that stuff, that's a once a month thing pretty much
       'cause they all fall around the same time.

Q:     Okay.  Um, your PO wasn't there when I served the search warrant, but I sent
       him the - the information about what we found...

A:     Okay.

Q:     ...and all the, ah, the photographs, um, your already on for a sales case.  What
       did you get convicted of selling the first time?

A:     Um, coke.

Q:     Coke?  Okay.  This time I'm charging you with selling weed, um, you had a whole
       bag of shake.  What's up with that?  Anybody buying shake?

# ER_317

Case 2:21-cr-00028-JAD-DJA    Document 41-5    Filed 10/28/22    Page 184 of 188

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
### PAGE 8

**EVENT #:** LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:     A whole bag of shake?

Q:     Yeah.  It looked like a whole bag of shake you had.

A:     If it was that's because that's where she smoke - that's her little smoke and the...

Q:     So, you're saying all that weed is her?

A:     You said all that is shake?  Is that what you said?

Q:     Not all of it, no.  I got about a half of pound of weed.

A:     I'm saying that's what she smoke.

Q:     She smoke shake?

A:     She smoke weed.

Q:     Okay.

A:     But if you go buy weed from the dispensary a ounce at a time it'll add up.  Not smoking an ounce a day.

Q:     Okay, but this ain't no dispensary weed.  You and I both know that.  We - we can cut that 'cause this ain't my first day on the block.  I mean, you got the big - two big, ah, two big jars of weed there partner, ah, that - that ain't dispensary weed. It was actually still in the plastic bag that you originally purchased it in when it's from sale from somebody else (unintelligible) what strain it is.  I don't remember what the little, ah, sticker on the big plastic bag was, but you just trying to trap and keep things going during hard times during COVID or wh- what's your deal man?  I've never met you before.  I don't know anything about you.  I haven't even heard about you.

ER_318

**EVENT #:** LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:   I never met y'all before.  That's why I didn't understand it was so much

aggression towards someone y'all never even encounter before.

Q:   I didn't feel there was any aggression.

A:   I did.

Q:   What did you feel was aggressive?

A:   What I felt was aggressive was the fact that on one hand I'm being asked

questions to make whatever the process is lighter, but on the other hand, when

I'm asking those questions I'm just being dismissed because I guess it's not the

exact thing that they was wanting to hear at the time - that y'all was wanting to

hear.

Q:   Who did you - let's put it like this...

A:   I j- I don't even know...

Q:   ...who was dismissive?

A:   I don't even know if it was you 'cause I don't even recognize your face really.

Q:   I briefly talked to you at the beginning of the whole thing.

A:   That's what I'm saying, like, I don't even recognize you really.  So...

Q:   You recognize my partner here?

A:   I recognize him.

Q:   You - you and him had a conversation for a while.

A:   But it was, like, five of them in there.  I'm not saying he personally did something.

I just felt like, you know...

Case 2:22-cv-00002-JAD-NJK Document 41-5 Filed 10/28/22 Page 10 of 88

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
**PAGE 10**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:     Those were the - the VMP people.

Q1:    Those are your probation officers.  So...

A:     But see this is - this is the thing with - with that, my PO called me two months

       ago, right?

Q:     Okay.

A:     ...and told me that - because I been, up until this situation completely complying

       with my probation.  I been on probation since July of last year.  I've had a curfew.

       I've had a - I've - I had a U.A.  the first month thought, but I told them that came

       from - I was smoking on my way to sentencing.

Q:     Okay.  So...

A:     So I - 'cause...

Q:     You - you smoke weed?

A:     Right.

Q:     Got it.

A:     But, um, the only requirements that I had from a judge was my counseling.  I did

       my counseling flawlessly.  I was paid up on my fees up until, you know, all this

       shit broke out - the COVID shit and all that.

Q:     Mm-hm.

A:     You know, but like I said, I was complying with everything.  I had never been out

       of curfew, never - nothing.  All I was doing was working and program, you know,

       so, um, she called me and she tells me, like, um, I'm gonna be transferring your

**ER_320**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 11**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

case.  So when she tell me that I'm, like, "Okay.  You know," um, "I haven't seen you in about a month," you know, since I checked in, but I was expecting her instead of calling me to come by.

Q:  Mm-hm.

A:  You know so...

?:  (Unintelligible).

A:  ...she basically tells me, like, "I'm gonna come by and I'm gonna have you fill out your last monthly report and then," um, and "then basically I'm gonna - Imma - Imma transfer your file over," you know?  After that, I don't hear from her anymore.

Q:  Can I...

A:  I don't...

Q:  ...a- well, you said you complied with all your conditions.  What were your conditions?

A:  The only thing the judge specified me to do...

Q:  Mm-hm.

A:  ...like what I had to do was counseling - treatment.

Q:  Did you have a work requirement or anything?

A:  Well, that's - that's just a part of the program in general.

Q:  Oh okay.

A:  To stay employed and...

**ER_321**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
**PAGE 12**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:     Okay.

A:     ...you know stuff like that, but your - your conditions are basically, you know what - what she's getting off of you based off of what she's knowing off you.

Q:     Okay.

A:     Like, what type of treatment you need.  You know, the process of going on with you.

Q:     Yeah.  Like a rehabilitation center.

A:     So I did that flawlessly.  Right.  So I - I - I did that flawlessly.  They discharged me from - when I got discharged, it's around the same time that she told me that she was transferring my case over.

Q:     Okay.

A:     You know what I mean?  After she did that, I didn't hear from her no more for, like, really at all.

Q:     Okay.

A:     I went two months without hearing from anybody at all...

Q:     From the parole and probation center?

A:     Anybody.

Q:     Okay.

A:     So the first time I heard from that PO...

Q:     Uh-huh.

A:     ...was the day he called me and told me he was coming to see me yesterday.

**ER_322**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:      Okay.

A:      So what I felt was aggressive was because he was telling me that, um, I'm
        purposely being, m, you know not truthful to him or telling him something that's
        not in, um, in compliance with my probation when I didn't know you was my
        probation officer.  Bro, I never seen you before a day in my life.-

Q:      Okay.

A:      When you pulled up - when I came outside, because he called me and told me,
        "I'm outside.  Come outside," when I come outside bro it's three trucks and like
        five polices standing around.  No - no uniforms differentiating from, um, probation
        officer.

Q:      Mm-hm.

Q1:     Except that was all probation - everybody who was at your house was from
        probation.

A:      That's what I'm saying?  How do I - how am I suppose to know that?

Q:      No.  I - I understand.

A:      I never seen him a day in my life and I'm not saying he did, you know, anything
        malicious or none of that...

Q:      Mm-hm.

A:      ...'cause he, you know, more than likely from his point of view went with protocol,
        but as soon as I came out, you know, he put me in cuffs and, you know, the first
        thing I asked him, "Am I under arrest for anything?  What's going on?"  he, like,

EVENT #: **LLV200900007194**
**STATEMENT OF:** Stephon Whitney

"No you just being, ah - ah, detained." I'm, like, "Okay," you know, um, so it was

casual up to that point, but once they - I forget what exactly what was said, but it

gave me an inclination again that I'm being charged with something. So, I asked

him again, like, "Okay, am I under arrest though?" and that's when one of 'em

say, "Yeah. You under arrest and we gone read you your rights," and all that.

So, I'm like, "Okay," you know, I got the right to remain silent, whatever, but right

after I'm read my rights, I'm being asked more questions and I'm being dismissed

from being, you know, as in - as in, I'm being dismissed as in not being truthful or

not wanting to be cooperative when in my mind, "You just read me my rights."

I'm thinking that this is the end of the program for me. You can take me out of

here. You can search me or whatever you want.

Q:   I - I think what the confusion with you is, there was two totally different things

going on and if you have a moment, I'll explain. You had the incident that

occurred on (unintelligible) side day where the man got stopped and you were

there, and you lied about your name. so that was the - that was the unlawful

providing false information to a police officer. There was a curfew violation.

Obviously, there is a violation for being with other probationers and felons and

gang members and narcotics and marijuana, all that.

A:   Right.

Q:   So, your probationer knew about all of that.

A:   Right.

**ER_324**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:    There then became a new issue when your probation officer found the two

magazines in the closet.  Does that make sense?

A:    So, they became separate issues?

Q:    Yes.  So initially, you had an issue with probation because one of your conditions

of probation is to comply with law enforcement...

A:    Right.

Q:    ...and by providing the false information, you were not complying and that's part

of the agreement you signed.  So that was a separate misdemeanor issue that

had occurred a few days prior.  The new issue arose when your PO found those

two loaded magazines in your closet.  That becomes a whole separate thing

because you being a four-time convicted felon, you're aware you can't have

firearms, correct?

A:    Yeah.

Q:    So when he pulls out the two loaded handgun magazines from your closet, that

changes from, "He lied about his name last week 'cause he was on the way to

the hood and he didn't want to get fucked with" to, "Okay, now he's maybe got

firearms hidden inside his house and he's lying to us."  So that's most - I can't

speak to why your - why your probation officer's demeanor changed, but that

would be my - my guess is that it moved from one thing to something totally

different.  Does that make sense?

A:    But what I'm saying is from my point of view, I don't have consistent knowledge

**ER_325**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

of these processes.  I've been in, you know, in trouble, a few times in my life.

They just been for, you know, different things in a different time period.

Q:    Mm-hm.

A:    So, I'm under the impression for my whole life, once you read me my rights,

that's pretty much the end of it all.  I never had a run in with, you know,

(unintelligible) tied into nothing else.

Q:    Okay.

A:    I don't know that you can separate situa- I had no knowledge of that.

Q:    No.

A:    He said that I'm not being compliant about something, like, "Man, I don't have no

problem whatever - whatever it is that you asking me for and speaking to you if I

have knowledge that I'm speaking to my probation officer"...

Q:    Mm-hm.

A:    ...about something that has to do with, you know, my probation or...

Q:    Absolutely.

A:    ...but all I see is everybody in the same uniform.  One person over here is

reading my rights.  The other person over here that I'm not even sure is even

paying to me - attention to each other is asking me questions pretty much at the

same time I'm being read my rights.

Q:    Okay.

A:    That don't even feel like it make sense to me at that time.

**ER_326**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

Q:   Okay.  I understand.  It's...

A:   You understand what I'm saying to you?

Q:   It's probably overwhelming.  Law enforcement shows up to your house, I mean, they put you in handcuffs.  I - I understand.  Your probation officer is doing his own search.  Um, just - the reading of your rights is something that is constitutionally guaranteed to you.  So, just like when I come and speak to you know, you're not free to leave.  You can't get up and walk out of here, right?

A:   Right.

Q:   So, because I'm law enforcement and you're not free to leave, the constitution guarantees you certain rights.  So if I'm gonna speak to you and have this conversation with you like we're having right you, it's my responsibility as the keeper of the law to make sure you're afforded your legal rights and that's why before I speak to you, I read you your rights and then I explain to you that we're - we're doing the search warrant and everything else is going on.  I - I don't want there to be confusion and that's why I'm taking this extra time to explain.  Does that make sense?

A:   Yeah.  It makes sense, but you know...

Q:   Does that clear things up a little bit for you even about what happened yesterday?

A:   It - it - that's what I'm saying, future references, it's all good because it - it - there's an understanding now.

**ER_327**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 18**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:    Mm-hm.

A:    I'm saying in that moment, in that situation, it can go from zero to fucking 60 that fast...

Q:    I got it.

A:    ...with, you know, five different officers all with they different...

Q:    It all...

A:    ...approaches to me.

Q:    It seems overwhelming.  I got...

A:    They all had a different approach to me.

Q:    I got you.  I completely understand.

A:    'Cause at one point while I'm engaging with one officer, trying to get an understand of exactly what the communication is between me and him, there will be another officer that has his own agenda for what he's interested in me in and he wants to know and all these things are happening at the same time and all these guys have the same uniform on.  When I go see my PO, he's not dressed like a police officer on the street.

Q:    You're use to just checking in and out of the main office, correct?

A:    That's it.

Q:    Okay.

A:    But even when they come to the house...

Q1:   All right - all right.

**ER_328**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:    ...you know, I don't process them and identify them as, you know, Metro cops at the door.

Q:    Mm-hm.

A:    I know they're officers.

Q:    Yeah.

A:    I'm saying, but, you know, I don't look - I don't see that as, "This is a Metro cop at the door." I look at it, like, "This is my probation officer," because I - I know her.

Q:    Mm-hm.

A:    You know what I mean?

Q:    Yeah.

A:    I'm - I'm familiar with her. So, I - I don't need to - when you familiar with somebody - if I'm familiar with your face, I'm not gonna check out anything other than your face on a regular basis. You understand what I'm saying? Like, if - if we just happened to run into each other and I see you familiar like in a Wal-Mart or something, I'm not gonna look at your clothes and try to determine what type of officer you are because it's the familiarity, but if there's no familiarity in your face and I'm trying to get some type of understanding of what you are, but it's five of you guys dressed the same, it's only two answers to me. Either all of y'all are P&P or all of y'all are officers.

Q:    Okay.

A:    You understand what I'm saying?

**ER_329**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:     Yeah.  Absolutely.

A:     So, that's where...

Q:     I can certainly see how it seemed overwhelming with everything that's going on.

A:     So that's where the confusion came, but that's what I'm trying to explain to them that, you know...

Q:     That's probably - that probably wasn't your initial...

A:     You see what I'm saying?

Q:     That wasn't your normal P&P contact from the start because the other one left you.

A:     They all - and so it wasn't malicious on my part to, you know, um, to dismiss whatever it was that they was requiring of me.

Q:     Mm-hm.

A:     It was just that because it was so much going, I didn't want to be caught in a situation to where I'm trying to please everybody that's looking for some type of question from me and then me thinking in my mind that I'm just simply asking a question and then it get crossed over with something and the majority always rules.  So, even if I tell you, I mean, "Man, I didn't even understand what you were trying to," that's not gonna matter.

Q:     Okay.

A:     So, to prevent all that, me trying to process all this shit as fast as I possibly can, Imma just shut down because if - if I tell you it's over- overwhelming to me and I

ER_330

tell you I can't understand all of, you know, what it is that y'all trying to get across to me at the same time in the - in the - in that moment? Nobody's gonna, you know, digress and try to see exactly what it is that I'm trying to figure out.

Q: Like, with your probation...

A: Right. Because even when I saw - because this is a different energy though.

Q: Mm-hm.

A: I have no problem with this approach. I don't feel fearful. I don't feel - you can close the door if you want to. I don't feel threatened. I don't feel aggression, none of that. Your whole vibe is different, and I'm not saying that's from you personally. I'm just saying, you know, the approach and the time, it matters though.

Q: Absolutely.

A: Because if you feel like you're being poked at, you're gonna shut down because you don't wanna, like, "What the fuck is y'all - what the hell's going on?" Like, "Is one person gonna ask me thing?" because on one hand one person reading me my rights, on the other hand the other person is telling me I have to talk - and talk to him, but he was telling me that I was- wasn't complying from the jump, but I didn't even know you was my probation officer. I never even seen you before. I've been going two months without supervision. Not one time did he call me during that - during that absence and introduce his self to me and say, "I'm such and such," and, you know, it - there was none of that. She told me who his name

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

was that she was transferring over to, but I can't place a name with a face that I've never seen before.

Q: Absolutely.

A: I'm not gonna just, you know, racially profile you and say, "Well, the name she gave was Hispanic. You must be such and such." People will be offended by that. You know what I mean? You will look at that, like, "Bro, how you just gonna assume that I'm just like a - a - a Jorge or something?" You know what I mean? Like, it would just come across the wrong way. I don't know that dude from nothing. So when he was getting mad at me for not being compliant, "Bro, I don't even know who you are," you saying I'm not compliant - he was saying I wasn't - I was intentionally uncompliant with my probation officer. "Bro I didn't even - I've never met you before. How am I gonna dismiss you as my probation officer? I never even met you."

Q: Right.

A: I don't know what's going on.

Q: Okay. We're not probation. He's Las Vegas. I'm Las Vegas Metro.

A: Yes, sir.

Q: So, we - we're on a whole different (unintelligible), all right?

A: It's all the same thing. You know...

Q: So...

A: ...but they - they basically, you know, why I said the aggression came from them

ER_332

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

because once that confusion got into play like that and the opinions came into

the atmosphere and they felt like I was being, you know, um - um, uncompliant...

Q:   Disrespectful or whatever.

A:   ...or I was being disrespectful and all that, now everybody's on the attack though.

Everybody energy changes at that point. Everybody is on the attack. There's

no, you know what I mean, "Let's - let's try to see what's going on. Hold on. Let

me talk to him." It wasn't none of that going and you could clearly see that, bro

I'm pretty much confused. He didn't tell me that you was, ah, um, bringing to my

attention of what he was even coming here for. You understand what I'm

saying? You di- you didn't - you didn't ask me about nothing or nothing. So I'm

thinking it's a regular process which is rightfully so, you don't have to tell me...

Q:   Mm-hm.

A:   ...but the initial shock of it is, like, "Okay, what's going on? Okay. Who are you?

You grabbing all on me. I know you the police, but what are you here for?"

because he just started off by asking me questions and I'm, like, what - what -

what happened though, like, why - you know you - you can't just say, ah, "Oh

yeah, ah, give me your and, ah, so what you do this weekend?" I'm, like, "Bro

who are you? Where you come from? I don't know you from nothing. I'm not

dismissing my probation office bro." I was unsupervised for two months.

Q:   I gotcha.

A:   I had no problem if they popped up eight times in those two months.

EVENT #: **LLV200900007194**
STATEMENT OF: Stephon Whitney

Q:    Or worse, ah, did he piss test you yesterday?

A:    No.

Q:    No?  I think they're either gonna stop by here tonight or you're gonna get transferred over to CCDC when your case here is done and they're gonna U.A. you.  You're gonna be clean?

A:    Yeah.

Q:    Okay.  Um, what questions do you have for us?

A:    Um, I'm just curious of what the process is.

Q1:    So, you have - the process here, you were booked in on the obstruction for a (unintelligible) here.

A:    Okay.

Q1:    Okay.  You have a probation hold and you're getting other chances.  So you'll probably be transferred over to CCDC.

A:    Okay.

Q1:    Um, then you'll go to court on the new charges and you'll probably have a separate revocation hearing where the judge is going to say, "Okay, give him another chance or we revoke it."

A:    Okay.

Q1:    All right.  Um, and from there then you - if they revoke you, you're gonna sit in CCDC for a couple days till you get your ticket out or, um, you'll sit in CCDC to, ah, to add some chargers on the new charges 'cause that ain't gone be resolved

**ER_334**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

until weeks - months from now.

A:    Right.

Q1:    And then from there, you know, you'll either go up or whatever (unintelligible).

A:    Right.  So - 'cause when I talked to her, you know, the only thing she pretty much indicated to me was that she called my PO.

Q1:    Who is she?

A:    Um, ah, my girl.

Q1:    Okay.

A:    She said she called my PO and she...

Q:    Can I just stop you for one sec.  Two girls showed up out there last night.  There was the white girl that was at the house with you - well, actually three girls.

A:    The black girls is my family.

Q:    Okay.  'Cause there was a skinnier black girl and a heavier black girl that showed up out there.

A:    That's - that's my sister and my niece.

Q:    Okay.

Q1:    So, your sister said you the only brother left.  What does that mean?

A:    I'm the only brother left.

Q1:    What, um, did you have other brothers?  I'm just asking.

A:    Um, I don't even like talking about stuff like that man.

Q1:    Okay.

**ER_335**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:      It's - it's, you know.

Q1:    I - you - I respect it.

Q:      No - no - no disrespect.

Q1:    Okay.

Q:      We're just - we're trying to get clarification because she was talking to us after the - the officers took you away.

Q1:    She - she was screaming at me that, "That's my only brother left," and I'm, like, "Okay. Well...

A:      You know what the bad thing is man? And I'm not a sympathy person. I don't - I can care less bro, like, honestly it wasn't even on my mind to even take probation. The only reason I even took probation bro - I was already still wired from being incarcerated. You dig what I'm saying? I was institutionalized still.

Q:      How long did you do on your first bid?

A:      Altogether about nine and a half years. I went in there at 17. I got off parole at 27.

Q:      Okay.

A:      You see what I'm saying? So, it wasn't - I - I had no issues in taking probation because it was irrelevant to me because in my mind I felt like I might as well just go ahead and get it over and be able to get back out to do what I wanna do. Then I found out I had a son on the way. Then I realized that I have a family. I never had a family before bro. I never been responsible for anybody. I mean,

**ER_336**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 27

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

your nieces and things like that, it's different. You know what I mean?

Q:      Mm-hm.

A:      Like - but people that you are directly responsible before, I never had that before.

Q1:     When it's your blood.

A:      When it's mines.

Q:      Yeah.

A:      So, at that point, you know, everything changed for me. It was, like, there was no way I could be selfish enough to say I'm gonna go voluntarily sit in prison and just sit and do nothing until that time comes knowing what type of responsibility I had. You understand what I'm saying? So, I convinced that judge to give me probation. I convinced him to do that. It was my intention to go in there and not say nothing. I'm not gonna plead for you to let me out because I just really wanna go and get whatever time it is over so I can get back to doing whatever I be doing. You know what I mean? So, what I'm saying is the whole - this whole situation came about because something changed for me. Then once I lost son right after I lost my last brother, on top of not having any other male anything's around, I don't know when the last time I spoke to my father. You understand what I'm saying? You gotta think. I went to prison at 17-years-old bro.

Q1:     You became a man in prison. You grew up in prison.

A:      I grew up - my life happened in prison.

Q:      Mm-hm.

**ER_337**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
**PAGE 28**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

A:     So, the same thing I was explaining to the judge, my whole slip up with everything is me still trying to - I'm still learning life. I haven't even been on the street five full years yet still to this day right here. So, everything - and it's not like - like I just said, it's not on no sympathy shit trying to get you to look at me different or a judge to look at me different. I'm paitnin' a honest picture of who I am to you. This is the honest - the most honest painting I can give you of myself. So, it's like, man, I'm - I'm - I'm figuring shit out, out here. The same thing I told the judge. When I got off of parole, there was nothing. There was nothing. There wasn't a - a - a residence. I couldn't sleep on anybody couch until I got my shit together. I couldn't - I didn't have a girlfriend at the time. You understand what I'm saying? Like, when everything's from scratch, it's different from that point. You're more than certain to make mistakes because you're gonna naturally go back to the basics of how you manage to...

Q1:    Are you doing all right? You're surviving.

A:     ...to go about. I need some help because I'm out here by myself.

Q1:    You were surviving.

A:     There's nobody that I can even think of to call to even ask for a little help to get me by so I can make a better decision. It's never been like that and when the times are so critical, there's no way I can afford not to make a decision on what it is that I need to do and wait for something better to come. I didn't even have the luxury of that. So, when she said, "That's - that's my last brother," you know, it's

**ER_338**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

- it's not even about the brotherness.  It's about - that's the - the last man that's

around right there.  Everything I ever did has been, you know, um, it always

came from a positive place.  You understand what I'm saying?  Nothing that I

ever did that I say shit that I've ever been caught for or anything, it's never been

malicious.  It's a reason that this is the first time me and you ran across each

other.  I know who you are bro from your name.  I know who you are.

Q1:     Oh, you heard his name?

A:      I know who you are from like - from your demeanor.  It's - it's - it's easy to kinda,

you know what I mean, to see how people react to somebody, like, "Ah, that must

be the legendary," you understand what I'm saying, but...

Q1:     Oh, the legendary, huh?

Q:      Careful.  His head's getting big.  No.  I'm just messing.

A:      And you know it's - it's - it's just like, you know, it's just, like, nothing I ever did

came from a malicious place.  Even - okay, look, I'm a person - I don't - I don't -

my son is gone.  I don't have friends or none of that shit bro, like, even if this was

a life sentence right here bro, it would have the same effect on me.  Honestly,

because it's like it never changes.  Time goes by and time progresses, but

nothing ever changes.

Q1:     You gotta make that change.

A:      And I put all effort into making that change.

Q1:     You are that change.

**ER_339**

# VOLUNTARY STATEMENT
**PAGE 30**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:      I was working consistently up until this COVID shit happened.

Q1:     When'd you stop working?

A:      About, close to April.

Q1:     What were you doing for work?

A:      That's when they first started shutting it down - a cleaning service.

Q1:     Cleaning service?

A:      We was, like, cleaning up PetSmart and, um, doing people's homes and stuff like that.

Q1:     Okay.

A:      Ah, mobile homes, you know, anything anybody called in to get clean.

Q:      Was it a side hustle or...

A:      No.  It was - it was a job.

Q:      Oh.  It was like a legit...

A:      Yeah.  It was a job.

Q:      Okay.  It's a company.

A:      It was Desert Breeze - Desert Breeze Cleaning Service.

Q:      Okay.

A:      You know it was basically, like, people who work out of town and stuff like that, they can basically, you know, set up like a subscription with you.

Q:      Mm-hm.

A:      You know, give you $35 or something and you come twice a month to clean their

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

house up.

Q1:    Okay.  While they're out of town.

A:    Or if it's a company, they can give you a contract and give you two or three days to clean the whole store up.  You know, strip the floor.  Polish it back.  You know what I mean, for a lump sum of money.  The owner of it gets it, but he supplies the workers and stuff like that.

Q:    Mm-hm.

A:    I was doing that for - bro I've - I don't even - I don't know if you can contact my PO to see that, like, if that's ever relevant, but she can prove that I've been complying with my work and all of that consistently up until COVID happened.  So, it's not like you know the whole time I'm existing and I'm being out here that I'm doing whatever the fuck it is that's going on.  This type of shit.

Q:    Okay.  Well, so let - let me ask then.  Is this - is this a result of shit go sideways so you go back to what you know?

A:    Man, this is a result of I have people depending on me and I don't even - I'm nowhere familiar with that type of pressure.

Q:    Well, this is the first time in your life that you've ever been responsible for anybody other than you.

A:    Exactly.  That's why I said I'm not familiar with that pressure because for me to step back and say, you know what, if it was just me by myself, there's no way I would even be half stressing about whatever the fuck is going on because if

**ER_341**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

anything I can bop myself, you know, around and around to wherever the fuck, but when you have people depending on you, I gotta stay put now. Just because COVID is going on don't mean that people is just gonna sit and watch they family whither away.

Q:     Absolutely.

Q1:    Yeah. Absolutely.

A:     There's no way. I washed cars bro. I still - whatever, you know, skills that I learned from that - that fucking cleaning shit, I still tried to put that into action. It's just that without the professionalism of it, there's not much business for somebody like that.

Q:     Mm-hm.

A:     People's not gonna welcome you into they home, you know what I mean? Just...

Q1:    You're doing what you do to try to get by.

A:     Man, I don't know...

Q1:    I - I didn't think you were Pablo Escobar man. When I find a half-pound of loose weed, some scales, and a baggy, I'm like, "The guy's got a girl and a small kid. The kid's got special needs. He's trying to take care of them." I - I get it. "He ain't the - he ain't the, ah, city's largest drug dealer. He's not, um," like I said, "He's not Pablo Escobar. He's not the drug king pin of Las Vegas." So...

A:     But I mean, that - that - all those details like that, they all will go unnoticed though. They always do because all this...

# ER_342

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q1:    No - no.  That doesn't change the facts.  The facts are the facts.

A:     I understand that, but the malicious intent of somebody could deter how you feel
about their behavior.  If I know that a kid is maliciously breaking stuff in my house
because he's excited about breaking it and I've already let him know that that
was a bad thing, okay I punish you for that.  But if I feel like you breaking stuff
because you're a kid and you're stuck in a kid mentality of not being able to
actually process that this is as bad as it is, I'm going to deal with that kid
differently.  The same way I deal with her - her kid differently.  He has a speech
impediment, which causes him to behave differently when he's trying to
communicate.

Q1:    Absolutely, he's frustrated...

A:     He's frustrated.

Q1:    ...'cause he can't get his message across.

A:     So early on, when I'm trying to communicate with him or listen to something that
he's trying to tell me, he's interested in me.  I'm getting frustrated because I don't
know if I'm dealing with this the right way, like, do I just sit and wait for him to get
him out, do I help him, or do I try to figure out what he's trying to say?  But when
he gets frustrated and he does too much or, you know, he - he screams or
something like that, I can't treat him like the regular kids that's - that has the
regular mentality that knows shouting at a - at an adult is a bad thing because
he's stuck in the - the mind frame of somebody who's not really able to

**ER_343**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 34

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

comprehend that just because you're frustrated, that don't give you, you know - you know, any type of, you know, leverage to feel like you can impose yourself on the communication. Like, if we riding in the car and I'm just talking to his mom and he trying to explain something to me and I'm thinking that it's just a kid talking and whatever, but he's getting frustrated about it and he yells, like, "Is it my turn? Can I talk?" like, "What - what's the problem? I didn't know it was that serious. I thought you was just talking shit to me." Like I didn't think it was a big deal. You know? So, that - that's what I'm saying as far as, you know, somebody who's in a mentality that they only know.

Q1: You're in a survival mode. That's what you're in. That's what you're saying.

A: Man, look...

Q1: And - and that's natural. That's for anybody, me, him, you, we gone do what we gotta do to survive. Now, we may take different - you may think Las Vegas Boulevard is the way to survive. He may think Carey and I'm gone take Civic Center to survive. They - they different roads, but we all got survival on the brain. So, I get what you saying. I 100% - don't think that we don't. This one of things that you said you have heard about me and you probably heard, ah, "He - he out here and he grabbing up on the gang members. He doing this. He doing that," but what you don't hear...

A: Not even that.

Q1: Oh, no okay, but okay, even if it's not that, they're program we made calls to, for

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 35**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

people that have worse records than you do to get them jobs, to get them going even in the middle of a pandemic.  So, you can - don't - and - and you don't know, but you - don't let what you been through hinder you from going on.  Don't let what you been through keep you from going on.

A:     I been to those programs and the communication always falls apart.

Q1:    Why?  If you been in any...

A:     Because the distance.

Q1:    If - the distance from who?

A:     Distance.  'Cause when I get involved in those programs, I'm usually in a halfway house or something like that and it's kinda just taken as in you doing something you wanted to do, but you know where the communication falls is when I'm not even, you know, in a position to even keep up the program because I'm in a whole different environment now than when I was at the halfway house or when I was living at my mom's house and it wasn't that far away from whatever the situation of this program was.

Q1:    Mm-hm.

A:     Now that I'm off parole and I can't stay at mom house anymore because her step, you know, or - or, you know, her husband or whatever the fuck is, like, I did what you did what you wanted me to do for you, but that - now that shit is, like, "What are you gonna do then?"  and I'm across town somewhere.  Bro, like I can't...

**ER_345**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 36

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q1:     Here's the deal.

A:      I - I can't even navigate.  I - I - I don't have the license at the time.  I'm nowhere

        near having a car.  Getting on a bus to get fucking from Tropicana to fucking

        Washington.  From fucking Trop and by the fucking or Rio or whatever the fuck

        that is to get fucking to Washington and back all the time, even past Washington

        sometimes.  It's, like, it's damn near possible.  This is what people have for jobs

        where they work when they don't have transportation.

Q1:     Damn near, but it's not impossible and so, he- you - nothing worth having never

        came easy.  Nothing.  And - and yeah, you got a record.  So it's a little bit harder.

        You signed the rights from here where people without records is starting here.  I

        get it, but here's what you got to do, you got to push yourself.  Don't worry about

        the distance.  Put together a strategy to one that works.  That's what you need to

        focus on.  Getting in the right place and the right position to move forward.  Now

        that being said, I don't know a- about male figures in your life.  We don't know

        that and quite frankly that sucks that you didn't.

A:      Man, I grew up in prison bro.

Q1:     I get it.  I - I...

A:      I've been visiting prison ever since I remember how to tie my shoes bro.  I grew

        up - my father, not even just him bro.  Every male figure in my family was in

        prison during my upbringing and by the time they came out I was going in.  So

        the program of incarceration it's - it's always been wired into me.  You know what

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
PAGE 37

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

I mean?  Like, that - that's - that's just what that was.  Nobody was ever around unless it was that.

Q1:     You gotta get rid of that mentality.  You gotta break that cycle.

A:      That's easier said than done man.

Q1:     I - I - I get it, but you gotta push - you gotta get - you gotta push yourself too.  Nothing's going to be given to you because you been incarcerated.  Nothing was given to him.  Nothing was given to me.  So, don't get out with that expectation that the - you see - if you been incarcerated since you was 17, we didn't have Facebook back then.  We didn't have a- all of this technology and all of this stuff that we got right now.  So, all of this stuff is happening.  The world is evolving.  Politics is changing.  People are changing.  People are moving on, leaving you, dying, staying, calling you.  All of that changes and you are in a room like this.  I get it.  That - that would - mentally, that would mess me up, but at the same time there are programs for you to help you.  John Connolly hope for prisons.  Some people like him.  Some don't.

A:      I did hope for prison.

Q1:     Okay.

A:      The - the complication came because even though I was involved in that program, I still had to - to work and...

Q1:     And feed your family and survive.

A:      ...survive.  So, like, the whole thing couldn't been about programming and

## ER_347

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
PAGE 38

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

programming for me.  I still had to earn and live though.

Q1:    But you - you gotta...

A:    That's - the priorities came in.  'Cause it's, like, at - at - at what point does the program become worth more than me taking care of myself and the people that's depending on me.

Q:    You gotta think long-term though.  There's - you gotta think about the situation right now.  I get it.  You were in a survival mode.  This here is a result in being in survival mode and trying to do what you needed to do to overcome a - a bad spot with a global pandemic and an economic shutdown and everything else, but the old ways of doing things got you where you're at now.  They got you in prison the first time.  Potentially another time.  I mean, if you keep doing the same, you know, and this is what I had a - a teacher in high school.  She kept telling me, "Josh, you keep doing the same thing, you're gonna get the same results.  Until you change something and do something different, you're gonna get the same outcome and you come in here and talk to me all the time you don't like the outcome, but you keep doing the same thing Josh."

A:    I was though.

Q:    So she slap me upside my head and told me to do different and thank God she did 'cause, ah, I made a positive change 'cause there's a good possibility if she wouldn't have done that while I was in high school, I might be sitting right beside you wearing the same jumpsuit.  So...

EVENT #: **LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A: And I mean, at one point that's where I thought I was going. I was working every day. I had - family good, but then all of a sudden I look up one day and everything shut down. There's no work for anybody. People who been working all they life and don't even have a record don't even jobs.

Q: Yeah. Mm-hm.

A: That shit is discouraging.

Q: Absolutely.

A: Because the first thing you think about, "Man, if these regular families who don't do nothing but depend on, you know, this type of program as, you know, to sustain they self in life is out here complaining about not having unemployment and things like that? What the fuck hope is there for us?" What hope is it for anybody else that's nowhere near as - as, you know, um, as eligible as these people?

Q1: I - I don't know what your - your belief system is. I don't know what your - who you believe in, but don't let doubt overrule, ah, ingenuity. Don't let doubt stop you because these people didn't get it. That doesn't mean anything. Some people need street smart people. I don't need - I don't need the square around the corner. I need you 'cause you know how to put something together. I don't need - I wouldn't call, ah, anybody in the Trump family to put anything up for me because you know why? They don't know how because they had people putting stuff up on the walls for them. You know how to work with your hands. Don't let

**ER_349**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

doubt stop you. Don't let the devil do that to you because just like I was saying, there's hope for prisoners. There's today. There'll be (unintelligible) tomorrow. We called over there, "Aye, could y'all hook this square up for a job?" No. "Nope. We don't normally do that for people like him." Our - our thing is for people that have records re-enter.

Q:   Yup. We specialize in re-entry. I rather not give employment to someone who's not in the re-entry phase because these jobs that we work to obtain are for people who are in re-entry that need them. This other individual isn't in the same circumstances as the folks in re-entry are. "So, although I respect the fact that you're calling and trying to help this individual get a job, um, I'm gonna need to decline because I need to save these jobs for people who are in re-entry who are in a different set of circumstance."

Q1:   That was in the middle of the pandemic.

Q:   Yeah. That was about two weeks ago. So, I said, "Hey, this - this - this man, he needs...

A:   And see that where the complications come in at though 'cause had I had contact or even consistent supervision during that time, maybe I could've siphoned that information from somewhere. We couldn't even go inside the P&P building this whole time.

Q:   Mm-hm.

Q1:   Mm-hm. They gotta protect themselves.

**ER_350**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 41**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A:    I tried to turn something in, they peeking out the door like I'm at the wrong house or something.  You understand what I'm saying?

Q1:    Mm-hm.

A:    Nobody's calling.  Nobody's showing up.  I called down there for...

Q1:    But the whole world - the whole world was turned upside down right now.  They - they - they gotta protect them too.

A:    I don't know - so what I'm saying, I don't know...

Q:    I - I understand.

A:    You understand what I'm saying?  From somebody who already has a certain type of point of view because of how I know things to be and how they have been...

Q1:    Mm-hm.

A:    Just - just, you know, everything can't be about, you know, you have to always, you know, be strong enough to think, ah, higher than where you're thinking at in most of those times.  It can't be about that all time.  Sometimes the help has to be extended and somebody has to instill some information to.

Q1:    We're standing here right now instilling information.  I hope you take it.  I hope you're wiling to.

A:    Listen, it's just...

Q1:    Listen, what's done is done.

A:    ...and can't - we can't just, like...

**ER_351**

Case 2:21-cr-00062-JAD-NJK Document 41-5 Filed 10/28/22 Page 42 of 88

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 42**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q1:     What's done is done.  We can't change that.  That's over and done with.  What we're talking about is...

A:      I'm not talking about changing that.  I don't - I don't...

Q1:     No, but I'm saying about tomorrow.  When - when tomorrow comes, when all this other legal B.S.  is concluded and tomorrow comes, I'm hoping you're able to go forward after our conversation today and - and realize that there are resources for people who are in your exact situation.  Not with no people who are 14 and 40 - 25 convicted...

A:      Ain't no...

Q1:     ...felons who committed murder and a slew of other things.  I'm making $40 an hour because of this program that we are talking about.  So...

Q:      The resources are available and - and I'm sorry if you never heard that speech before, but I can assure you we work with these people constantly and these jobs are available and the resources are there.  If you're wanting to make the sacrifice and reach out and attend the training and get the information, it's - it's available.

Q1:     And yeah, it's - it's six weeks and I don't know how we gone make ends meet, but them six weeks helps you for years...

Q:      Can lead to six decades of - of success.

Q1:     Yeah.

Q:      It can break the cycle.  It can change lives.  I mean y- i- with you opening up and giving me a window into your world of what's going on there in your little duplex

**ER_352**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

with that gal, that makes a lot more sense when I'm addressing what I'm finding in the apartment with that gal upfront and she's freaking out over the totality of the circumstances because now I have a better understanding of what not only you're going through, but what she's going through as well.

Q1:     Because it's - it doesn't just affect the...

A:       It's a lot of pushing man.

Q1:     It is.

A:       I can't handle this shit.  I can't handle it sometimes.

Q1:     It is.

A:       It's easier to not care sometimes man.  It's - it just is.

Q1:     But you stop taking...

A:       I've raised myself.  I did prison bids by myself bro.  I've build my life up to this point by myself bro.  I don't even know people who - who able to even half-ass get that far and still be optimistic about anything.  If I was that reckless and had that much ill intention to do wrong, there's no way I would've survived over a year of probation bro.  We all know that.  We seen people get out on probation and violate in two weeks and...

Q1:     You're still going through the same thing.

A:       ...and, like...

Q:       It is what it is.

A:       This is what I'm saying, so if I had any intention on just being malice about shit...

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q:   I don't think you have malice in your heart.

A:   I wouldn't last a y...

Q:   I don't...

A:   I wouldn't of last a year on probation.

Q:   ...think you got ill will.  I honestly think at the end of the day knowing what's going on, you got caught in the fact that you're trying to provide for your people and there's a whole lot of bullshit going on in the world right now and so, thank you for not selling cocaine.  I appreciate that because that shit is horrible.  Marijuana's legal.  It's not legal to sell.  It's not legal to possess in those quantities, but thank you for not possessing cocaine because I don't - I don't - did you grow up here in Vegas?

A:   Born and raised here.

Q:   So then you - what year were you born?  You were born in 90, right?  so when you were a small man, do you remember the crack epidemic going on?

Q1:  You see what it does to people?

Q:   A- a- there are people in West Las Vegas who have never come back from that.  I deal with them on a daily basis.

A:   I know.  They all my family.  The never came back from that shit man.

Q:   Exactly.  So, again, selling trees is not the end of the world.  It's, ah, like I said, in 40 something states in the country it's legal now.  In fact the U.S.  House of Representatives has a bill on the floor right now to legalize it federally or - or not

**ER_354**

EVENT #: **LLV200900007194**
STATEMENT OF: Stephon Whitney

legalize it, decriminalize it federally so again honestly, I believe that this is what this was.  The problem is your girl's caught up now.

A:     And I...

Q:     Because there's no way that she can't know what's going on.  So based on the totality of the circumstances I - I'm left to believe she knows what's going on so she's probably gonna catch heat from it to and that doesn't do anything good for that young man who's struggling in life right now.

A:     But why would she though?

Q:     Why what?

A:     Why would she catch the heat for that?  Knowing what that situation is like, nothing about that was malice.

Q:     I - I totally understand, but you have to...

A:     I understand the legal side of it.  I understand that.

Q:     I'm gonna present the facts based on what we saw.  I mean, we got photographic evidence of what - what was going on...

A:     I'm just saying I know every time something like that happens, you don't have to put the nail in the coffin for everybody that's involved in it.

Q:     I - but here's where I sent right now, okay?  Straight up.  You go by Steph, Stephon, what do you go by?

A:     Just Stephon.

Q:     All right.  Stephon, here - here's what it is on my plate right now.  I do this work.

**ER_355**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

We got the photographs. We got the evidence. This is what we recovered. This is a set of facts. Everybody says, "Man, I don't know nothing about nothing. I don't know nothing about what's in that house." So at the end of the day I have to write my report to say, "I came into this house based on this information. I got a search warrant. These are the things I found. It's reasonable to believe based on the information that I have set before me that both he and she were actively engaged in the conspiracy to sell narcotics within this residence where there's a young man who lives," that's owned or established a residence for narcotics sales with a child present is a separate felony. It involves a - a child abuse statute. There's an unsecured firearm inside the residence. It doesn't have a child lock on it and it's at a level where a child can obtain it. A child can get that firearm. It has access to it. It's not locked up. Again, that's a child ab- we've actually have officers from our agency lose their job because they left their duty weapon in a place where one of their children was able to take it and discharge their firearm inadvertently in a residence. It was a husband and a wife. They both were terminated and charge criminally from our agency. So, asking anyone saying, "Hey, you know what, this is mine. I did this. The other person doesn't know about it or this is the circumstances," I'm left to present the facts as they are Stephon. You understand what I'm saying?

A:     So you basically saying unless I own up to all that shit...

Q:     I'm - I'm not saying that at all. I'm just telling you on my side I have to document

**ER_356**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

the facts.

A:   No.  I know.  I understand that.

Q:   So, a- as I'm going right now, when I talked to her last night, she didn't know anything about any firearms.  Said she had no knowledge of any firearms, no firearms in the residence, no narcotics, nothing.  She told me there would be no firearms allowed inside her house because she has a small child and she would never endanger her child.  I do a search warrant on a room that you and her share and I find a gun right there.  It's this high off the ground.  Maybe two feet.  A one-year-old child can access that firearm.

A:   She a good girl.  She don't need that.

Q:   I'm not saying she's not a good girl, man.

A:   She don't need that man.

Q:   Do you understand what I'm saying though Stephon?

A:   I do.

Q:   I have to present the facts.  So if I present the facts at the district attorney's office as they are now, it - it's not my decision.  They're gonna say, "We're gonna charge these folks with a criminal conspiracy and all these charges."  I'm just telling you right now based on my investigation, these are the facts that are before me.  So...

A:   So, it's more than likely she'll be charged too?

Q:   As of right now, yes.

**ER_357**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A:     And with what?  Child endangerment?

Q:     Probably the narcotics charge.  The owned or established residence, ah, for narcotic sales with a child present and then there's the felony child abuse and neglect charge because the unsecured firearm was left.  So...

A:     Unless what?

Q:     I still have to interview her.  I'm here to interview you tonight.  I still have to go and interview her.

A:     Just saying, unless what?

Q:     Pardon me?

A:     I'm just saying, unless what?

Q:     If someone...

A:     She don't need that bro.  That - that's - she don't even fucking barely have a fucking traffic ticket to my knowledge.  She don't need that.  Now, I mean, she probably do have a traffic ticket.  I don't know, but I do know is she don't live like that bro.

Q:     I - I don't know.  I never met her.  I've never met you.

A:     I understand.  That's why I said...

Q:     So, I have to take this opportunity - it's my job as a detective to try to sort through all the information, right?  I get a set of facts and then there's this person's version of the story.  There's this person's version of the story.  There's these facts and then we kind of lay 'em all out and then we make a presentation, this is

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

what we found through the course of our investigation.  That's our job.

A:    That's why I said, or what?

Q:    Unless there's some type of...

A:    There is no - there's always a different side.

Q:    Unless there's some type of mitigating circumstances or some additional information that I've learned throughout the course of my investigation then those are the facts that have to be presented in court, you understand?

A:    And you mean that as in what?  To me owning up to everything?

Q:    I'm not asking to own up to anything that's not yours.

A:    No - no.  I'm - I'm not saying you're asking me.  I'm just saying that - to get an understanding of the only way to protect her from that.  All of that is going to occur unless what?  There's always another side.

Q1:    No - no.  Her truth - this was her truth yesterday when she...

Q:    I told you what her truth was yesterday.

A:    She - she - she's - we all know what that is man.  I'm not saying it's right.  I'm not saying she had the right to say whatever she said or how she said it.  I'm not saying that, you know, um, nothing about it isn't or - or is understandable, you know what I mean?  All I'm saying is - man, that - that's not her problem.  That's not her issue.  That's...

Q:    So, well I - I still have to talk to her about it.

A:    But like...

**ER_359**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

Q:   You understand I have to talk to her about it, right?

A:   I understand that man, but...

Q:   Okay.

A:   ...put it like this, this is...

Q:   It's - it's not to be disrespectful.

A:   I understand that. Me morally - me being quiet and letting her get in a situation like that is just as bad as me giving away my manhood and I mean that as far as anything that makes up a man that I respect about myself to just disarm and dishonor. You understand what I'm saying? Anything that my father may have taught me - anything that makes me, me will be dishonored by me just letting y'all walking out of here without trying to reason about her in that situation. She don't need that man. That's all I'm saying.

Q:   I - I com...

A:   You - you can lock me up for life. You can - you can...

Q:   I'm not trying to lock anybody up for life.

A:   I'm just - I'm just, you know, giving a - a - a...

Q:   I understand.

A:   ...broad understanding of - of where my expectations are with, you know, what I'm willing to accept.

Q:   Okay. So if I'm understand what you're saying, I'm gonna paraphrase. You feel it's disrespectful to her to allow her to take the fall for this charge?

**ER_360**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 51**

**EVENT #:** LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:    That's disrespectful to her, her father, her family...

Q:    But you have to understand if she's complicit, if she did that...

A:    Man she - she's...

Q:    ...that's not your fault.

A:    I understand that.

Q:    Everybody has to stand on their own two feet.

A:    But - but it is my fault.

Q:    She's forty something years old.

A:    It is my fault because, you know, anything she would do in the situation, we had no contact at that time.

Q:    At what time?

A:    You know that was when they separated us.

Q:    At what time?  I'm sorry.

A:    Like, that day.  Yesterday.

Q:    Oh okay.  I'm sorry...

A:    So what I'm saying is...

Q:    I thought you were talking in the past.

A:    So what I'm saying is anything that she would do or say is - is usually because she probably feels like that's what I expect her to say or do even though I didn't talk to her.  They separated us immediately.  He called me outside and he cuffed me outside.

**ER_361**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:     Mm-hm.

A:     So, I had no way of even, you know, telling her this or that or whatever because I thought it was actually a regular probation (unintelligible).

Q:     I understand.

A:     I had no knowledge it was getting to this point.

Q:     That there was other stuff going on.  Okay.

A:     So, there was no reason for me to even give her a rundown of what to tell y'all in case y'all asked her 'cause I had no knowledge that anything was taking place.

Q:     Which is why I tend to believe her when she tells me yesterday 'cause I know that you had not have an opportunity to communicate your thoughts to her because I watched them handcuff you outside.

A:     That's - that's why I said, by her knowing me and by us being together for so long, whatever she did say or didn't say was because she more than likely felt like that's what I would want her to say or do in that situation which is not necessarily my truth though because I would never want her - I wouldn't look at her like she turned her back on me if she rejected anything, you know, about knowing about anything and put it on me.  I would not - I would never put her in - in a negative light for that.

Q:     Okay.

A:     Because I understand what it is that she lives for aside...

Q:     She has - she has a young man...

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:      ...from all the bullshit, I'm not her son.

Q:      Right.  She has a young man.

A:      The same thing I told her - exactly.  The same thing I told her when I first talked
        to her in here, "Regardless of what's going on with me, you still got somebody to
        provide for."  They can fry me right now fucking for whatever may occur in the
        world, but he still gone be here though.

Q:      Mm-hm.

A:      You understand what I'm saying?  So basically me trying to explain to her, don't
        do nothing to try to, you know, to think that you making it, you know, better for me
        or you being a - a - a loyal to me or nothing like that when it involves, you know,
        any type of harm being inflicted on how you go about belong a mother.  Do you
        understand what I'm saying?

Q:      Mm-hm.

A:      I been around that kid since before he really started school and I didn't know him
        for nothing.

Q:      How long y'all been together now?

A:      Like, three years now.

Q:      Okay.

A:      And I didn't know him - I didn't know him for nothing, you know what I mean?  I
        met her at a time where when I got off parole and I was trying to figure my life,
        but I always had enough respect for her to know that I don't want to dilute her

**ER_363**

EVENT #: **LLV200900007194**
**STATEMENT OF:** Stephon Whitney

with nothing about me which is why I stayed my distance from her.  You know how many times I tried to get rid of her?  Not saying like...

Q:    I'm not gonna tell her you said that.

A:    No.  I'm not - I'm not saying like to treat her bad to get her to run away or nothing like that.  I'm just saying that the times where I understand that she not use to.  She don't have struggle bro.  Her parents are homeowners.  She don't have to struggle with me.  Her sister's a homeowner.  Her cousin's own businesses and you know true - true enough, they're about closest.  You know how families are, but take me out of the equation, they would never let her fall too far because that's the foundation of their family.

Q:    Mm-hm.

A:    They're gonna always keep each other, you know...

Q:    That's what families for.

A:    ...sustained enough to continue to go upwards.

Q:    Family's there to support you.

A:    The only differenti- exactly.  The only difference in that is me in the picture because of - of - of the love that's going on now amongst us.  So it's like, you know what, whatever goes on we'll fucking sink on the Titanic together.  From her philosophy though.  I don't feel like that.  I told her many times even when we couldn't pay the rent, "Why won't you go and - and go back?  Go stay at your mom's house or something," like this shit is normal for me.  I know it's not normal

**ER_364**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

for you because your parents been homeowners since you was a kid.  They

bought that house that they - that they was living in and started their family, like,

the - the classic way.  So, I know it's not normal for you.  You can't lie to me and

tell me you use to fucking eviction notices and shit like that.  Why don't you just

go and, you know what I mean?  But for - for - is - I don't know what it is about

how she sees me, but something about me mean something to her.  You

understand what I'm saying?  When I first start dealing with her bro, her dad was

dying of cancer.  Unbeknownst to me, I'm just looking at it, like, I'm just checking

up on somebody that, you know, that has a good energy to me and that I know is

going through something.  When I'm checking up on her I don't even have deep

thoughts about it all the time.  I just know from what I don't been through in life

that when it gets so hard like that you can only imagine, you know, how much it'll

mean if somebody just at least showed that they cared.  Especially nobody that

have no connection to this.  So, I would take away the - the time and energy for

whatever it does for me and what's going on in my life to reach out to her and let

her know, like, "Man, look.  That - your world don't stop just 'cause that man is

gone."  That man lived a - a fucking hell of a life.  He took care of his family.  He

raised his family.  He - he bought a house for them.  He fucking work

construction for fucking 20 years.  He got a pension.  Whatever the fuck is - is -

you know, he built with his life, I tried to get her to see the beautiful side of that.

You understand what I'm saying?  I know it's hurtful when people have to leave,

**ER_365**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

but what I do from death and things like that is when they've lived a hell of a life

death get - it can be a bad thing. What else do you want from that person? It'll

be selfish of you to still want that person to be here. It's just the way shit is made

up. They have to go. They have to go sometime.

Q: The moment you're born, you're dying.

A: That's what I'm saying. They have to go sometime. So, you know, what I'm

saying is there has to be some alternative to me keeping that away from here.

There has to be bro, like...

Q: Hey, listen...

A: I can't - I can't - I can't - I can't just let her...

Q: I'm not coming here and asking you to take responsibility for anything that you're

not responsible for, okay?

A: And I - I - I never said you were.

Q: Okay.

A: I'm not...

Q: I just want you to understand.

A: I understand clearly and I don't care if you recording or whatever, but I'm not - I'm

not responding to you as in you expecting me to say something or you, you

know, trying to lead me into saying nothing. I'm not - that's not what's going on

here.

Q: Okay.

**ER_366**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 57

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

A:      All I'm asking is...

Q:      I just - I have to - I want you to understand that I have a pure heart when I say...

A:      I - I - I do understand and I feel the energy.

Q:      It's - it's my job to weigh facts and I...

A:      And I feel the energy and I understand that, you know, you just getting across to me the structure of what's going on of the obligations of what y'all position is.  I understand that.

Q:      Absolutely.  I have an investigation to do and I have to weigh facts.

A:      But I'm saying is even within everything else you putting in the investigation, it can also include me shielding her from that.  she don't have nothing to do with that bro.

Q:      An- an- anything you tell me today...

A:      You can - you can put any type of suggestion, she don't have nothing to do with that bro.

Q1:     Okay.  So if sh- if she doesn't have anything to do with it then what is it?  What is the stuff in there?

A:      What you mean?

Q1:     Why is there a unsecure gun in the headboard?  According to what you know.  What is your truth?  You talked about her truth.  What's your truth?

Q:      Yeah.  I'm - I'm here for your truth.

A:      And - listen, to my truth - to - to my knowledge - to my knowledge she - she's

**ER_367**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

always been use to firearms and things like that. To my knowledge, her dad had a collection of guns and stuff like that too. You understand what I'm saying?

Q:     Mm-hm.

A:     But one thing I know about her is she's not no - bro she's not no fucking gun-toter bro. I never even seen her fucking kill an insect. If there's a bug in the house she's gonna scoop it up in the fucking - fucking dustpan and set it outside bro. That's the type of female she is. You understand what I'm saying?

Q1:    Yeah - yeah.

A:     And I'm looking at it, like...

Q1:    She's got that caring loving heart.

A:     That's - that's just - and...

Q1:    And I - I have a sister who has a special needs child. So I have a special place in my heart. The people who raise, care for, and love special needs individuals have a different type of compassionate heart than other people because they have to look at the world in a different light.

A:     It's piercing - it's piercing - it's piercing though. Me and her have times to where I would get mad her for being so loving to the world because from my point of view and how I'm looking through everything it's, like, man don't fucking care too much about people, like people will leave you, people will fuck you over, people will hurt you.

Q1:    That's been your experience.

**ER_368**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:     That's what I'm saying.

Q1:    Mm-hm.

A:     So, at times I felt like I was polluting her because I was trying to get her to be able to protect herself and not look at everything through this, you know, butterfly glass...

Q1:    Rose colored glasses, yeah - yeah.

A:     Absolutely and just be - protect yourself and also, I'm not saying dismiss people as potentially having good character, but also be aware that they can potentially hurt you too.

Q1:    Right.

A:     The same way I could. As much love and loyalty and - and as much - man, it was only me and her there that night we lost our child. I never left her. I've never left her.

Q1:    You had your child with her?

A:     Yeah. We los- I lost my child with her.

Q1:    Okay - okay.

A:     But what I'm saying is I never left her because she never left me. I never left her. I didn't - I never got mad at her. Bro that was the hardest thing in my life to ever do. Doing ten years in prison was a cakewalk compared to how I had to stand up under that.

Q1:    Mm-hm.

**ER_369**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

A: Imagine cleaning your wife's blood after the floor bro after fucking - man, this shit is...

Q: It's tough. I've - I've never been there. I can't pretend to understand. I mean, I love - I've lost loved ones. I've lost my grandparents. I've lost both of my parents.

A: Man, I lost damn near my whole family bro and that shit ain't nothing like that type of...

Q: But I - I - I've never - I've never had a child to lost a child to know that love and to experience that pain of loving a child and losing child. I've never experienced that. Thank God.

A: Bro, whatever - absolutely and that's truly a blessing because it's something that I've never - it's a club I never thought I would be a part of.

Q: Mm-hm.

A: Something that I didn't even - you don't think about stuff like that.

Q: Parents don't think about burying their children.

A: You don't think about stuff like that. You don't - even when you hear it from other people, you don't even take the time to think, "What if that happened? How would I respond?" It's - it's just not a natural processing thing.

Q: I saw the way my grand- my grandmother was 80 when my father died and she said, "I never should have to bury a child," and that touched me and seeing this 80-year-old woman burry her 50-year-old son and say, "I never should've had to

**ER_370**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
**PAGE 61**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

do this." So, I saw the pain in her eyes, but I never lived it. That - I came here tonight to get your truth so that I can get your side of the story.

A: All I'm saying to you is whatever she said about...

Q: I'm - I'm gonna have another conversation with her. Our conversation last night was relatively short before the totality of the investigation had unfolded.

A: Which is understandable, you know because it was just in (unintelligible) or...

Q: It was at the beginning...

A: Right.

Q: It was at the beginning before - before the search warrant was served. Obviously there's new facts that are known. So...

A: Man, look bro...

Q: I'm here to ask you your side of your story. What's going on there? What's your involvement in that? So that when I write your report I say, "On this date and time I talked to Stephon and Stephon indicated that he was involved in A B and C and that she was or was not involved in A B and C." And then it'll also read, "On this date and time I talked to her and she indicated that she did or did know or did or did not have involvement in any of these other things."

A: But I'm saying when you do that will you bring it to her knowledge of what I told you?

Q: I cannot...

A: 'Cause...

**ER_371**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:   When I do investigations, I won't do this "Well, he said this thing about you."  She saying...

A:   No, but - but, I'm saying, like, it has to be brought to their attention the same way you brought it to my attention.  Before you asked me my version of it, you told me what went on, on her side.  All I'm saying is - is that same gesture gonna be given on that side of it?  Before you try getting her side of it again, will you bring to her attention what I said about it?

Q:   Yeah.  Absolutely.

A:   Just like you did with me.

Q:   I have - I have her phone number 'cause I got her phone number last night to call her...

A:   That's what I'm - that's what I'm saying.

Q:   ...and get the, ah, to give her the house back when we were done with the search warrant 'cause I knew it was gonna be a while...

A:   That's what I'm saying.

Q:   I'll call her and I'll ask her to come and meet me and have a conversation with me.  Then I'm gonna say, "Listen, I had a conversation with Stephon," ah, whether you do or you don't talk to her, I don't know, that's your own personal business.  That's your relationship.  Are y'all married or just dating?

A:   Ah, we should be.  I just put a ring on her finger bro.

Q:   Okay.  So maybe - maybe get married someday down the road?

**ER_372**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A:    She stare at that shit e- she stare at that everyday bro.

Q:    All right.  Well, maybe when this is all over, maybe y'all get married, but listen, I'm gonna sit down with her.  I'm gonna have the same conversation I had with you.  I'm gonna say, ah, what is it?  Jessica, right?

A:    Yeah.

Q:    I'm gonna say, "Ms. Jessica, here's the deal.  Obviously, we were at your house. I'm gonna explain to you what's going on."  She already know some of it 'cause there's paperwork left on her counter.  She's gonna see, "Oh, they took all these things from my house."  She's either gonna say, "Well, what the fuck was that doing in my house?  How the fuck did that get here?"  or "Oh, shit.  They found it."

A:    Right.

Q:    Right?  So, um...

A:    'Cause I'm not - I'm not telling to you know explain it to her in a way where you trying to convince her of what role to play with what you're describing to her. that's not what I'm asking you.  All I'm saying is...

Q:    I'm just throwing the facts out to her.

A:    The same way - the same way it was explained in the reverse situation to how you explained to me what she said before you asked me...

Q:    And tell her, "Hey, I had a conversation with Stephon...

A:    Right.

**ER_373**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:     ...this - this is what he told me his involvement is...

A:     Okay.

Q:     ...I need to ask you now ma'am, what's your involvement?" and I - I just - I ask everybody the same thing.

A:     Okay.

Q:     Be truthful with me.

A:     Okay.

Q:     Being truthful is like being present. You either are or you aren't. You can't be 85% truthful because then you're 15% a liar. So, I - I...

A:     She had no...

Q:     I'm gonna ask her the truth.

A:     She had no involvement in that. She don't even have the time to bro. She work all day.

Q:     What she do for work?

A:     She's a waitress at, ah, Peppermill.

Q:     Oh okay. Um...

A:     She works all day bro. She don't even fucking have the energy to be a part of nothing, but fucking being a mother bro.

Q:     Okay.

A:     Nothing at all.

Q:     This isn't meant to be disrespectful or anything else and I understand that in this -

**ER_374**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

in this instance you feel need to be a man and - and you wanna take accountability for what's yours, but I'm gonna ask you a couple of plenty of questions if you are being truthful with me because you're gonna know - you're either gonna know what it was or you're not gonna know what it was, right?  If - if you didn't have any involvement, you're not gonna know some certain facts about what was or wasn't there, right?

A:     Right.

Q:     Okay.  What did I find in the headboard of the bed?

A:     You found, pretty much her money 'cause my money is what I had on me and you found the firearm.

Q:     What kind of firearm?

A:     It wasn't hers.

Q:     Okay.  What kind of firearm?

A:     Nine-millimeter.

Q:     Do you know the brand?

A:     I don't.  I know it was one I never seen before.

Q:     How did you never seen it before, but you know it was there?

A:     But I know it was there?

Q:     Yeah.  You said you never seen it before...

A:     No.  I never - I said it was a brand that I've never seen before.

Q:     Okay.  I apologize.  I thought you were saying you never seen the firearm before.

**ER_375**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A:   No.  It was a brand that I never seen before.

Q:   Okay.  Can you describe what it looks like?

A:   Um...

Q:   Just generically?

A:   I think it was all black.

Q:   Okay.  Was it a semi-automatic or a revolver?  Do you know the difference?

A:   It wasn't no revolver.

Q:   You know the difference?

A:   The revolver is the spin thing, right?

Q:   Yeah.  It's, like, a cowboy gun?

A:   Not a revolver.

Q:   Okay.

A:   I think it was all black though.

Q:   Okay.

A:   Well, majority black.

Q:   And what caliber did you believe it was?

A:   Nine-millimeter.

Q:   And you're certain of that?

A:   Yeah.

Q:   Okay.  The marijuana that I found where did I find it?

A:   In the bathroom.

**ER_376**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:      Anywhere else?

A:      Um, by the TV - by the TV.

Q:      Which TV?

A:      In our room.

Q:      In your room?

A:      Yeah.

Q:      Okay.  What was it packaged in?

A:      What you mean?

Q:      How was it stored?

A:      Um, it was individually, um, put into one container because, like, majority of it,

        like the - the - not the - the loose - not the loose stuff, but the stuff that was inside

        something is the stuff that she smokes.

Q:      Okay.

A:      So that's why it was all put in there together.

Q:      Okay.  Where was her...

A:      I'm saying because it's - it's - it's all weed, but...

Q:      I understand it's all marijuana.

A:      ...but the reason it was in something different was because okay this is the little

        shit that she'll roll up whenever she want.

Q:      Okay.

A:      You know what I mean?  This is the stuff that probably a little bit too strong for

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 68

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

her, but she'll roll up and smoke sometime.  You know what I mean?  So it's - it's - it's only to our, you know to our, um, to our understanding of how we go about our daily program basically.

Q:    Okay.

A:    As far as why it was separated and what it was that was separated.

Q:    Okay.

A:    You see what I'm saying?

Q:    The scales and baggie.  Where did I find the baggie and scales?

A:    Um, I don't really know where the baggie was at though?  'Cause I gave it to...

Q:    What about the scale?

A:    Those had to be together wherever they were.

Q:    Okay.  You - you...

A:    I don't really remember.

Q:    You see what it looks like to me, right?

A:    I understand.  I completely understand.  I don't really remember where the baggies were.

Q:    Okay.

A:    But I know that they were together.

Q:    All right.  That's fine.  I'll agree with that.

A:    All that belong to me.  Everything.

Q:    Okay.  Were you actively involved in trying to sell a little bit of marijuana to make

**ER_378**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

money?  Remember, I only want your truth.  I don't want her involvement.  I just want your involvement.  I'll ask her for her involvement.

A:    If - only I - I ain't know what to do with it last minute like that.  I just went back to the first thing that I was ever taught by somebody bro.  That's...

Q:    Can I ask you how...

A:    That's...

Q:    Can I ask you how old you were when someone taught you to sell drugs?

A:    Taught me to sell drugs?

Q:    Mm-hm.

A:    Man, I been running the streets since I was nine-years-old bro.  I start selling drugs at nine-years-old.

Q:    What'd you start selling?  Little bit of weed.

A:    A little bit of weed, but that was...

Q:    Was that on the West?

A:    Nah.  That was actually on the eastside 'cause on the Westside we had - it was too domestic over there at that time...

Q:    Okay.

A:    ...as far as grandparents and aunties and stuff like that knowing each other.  So you would basically be...

Q:    Catch - catch an as whooping.

A:    Absolutely.  You basically would be parented.  Um, (unintelligible) because there

**ER_379**

# VOLUNTARY STATEMENT
**PAGE 70**

**EVENT #: LLV200900007194**

**STATEMENT OF:** Stephon Whitney

was too many people around that...

Q1:     That knew you.

A:      ...and that, you know, knew my family and stuff like that.  So, you know...

Q1:     Gotcha.

A:      ...you can't even solicit your way into fucking trying to do no shit like that without your nerves being fucking wrecked thinking that, you know what I mean?  So, how that went about was basically, it's not like I'm a fulltime hustler at nine-years-old.

Q:      No.

A:      I'm not a - I'm not tripping over a program, you understand what I'm saying?  Not re-ing up, but the first time the science of it is being broken down to me, yeah, I was about 9 years old.

Q:      To me, that's while.  At 9 years old...

A:      And I resent that because...

Q:      ...I was feeding cows.

A:      ...I see an eight-year-old now.  I tell her that all the time.  Sometimes you gotta stop because I forget that I'm talking to a kid.

Q:      Mm-hm.

A:      So when he tells me something that he thinks is exciting and through the roof, my natural reaction is, "Bro, you know what I was doing at eight-years-old bro?"

Q1:     Mm-hm.

**ER_380**

Case 2:21-cv-00028-JAD-NJK, Document 41-5 Filed 10/28/22 Page 71 of 88

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
### PAGE 71

**EVENT #:** LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:    Then I'm, like, "I'm - I'm sorry because I don't want you to...

Q1:    Your - your childhood growing up...

A:    And that's...

Q1:    ...is different than his reality.

A:    I don't wanna dilute you...

Q1:    Yep - yep.

A:    ...and I don't want your imagination to start running.

Q1:    Mm-hm.

A:    You understand what I'm saying?

Q1:    Yep.

A:    And to trying to figure out what it could be that he was - I don't want you to do that...

Q1:    Mm-hm.

Q:    Mm-hm.

A:    Because I understand you look up to me as a role model or somebody to protect and I'm not gonna pollute you like that bro. Half the time I'm around him, I got my shirt on.

Q1:    Mm-hm.

A:    You don't need to see tattoos. You - I don't - I'm - I'm just conscious of what the mind is like at that age because I remember what my mind was like.

Q:    You were very impressionable.

## ER_381

# VOLUNTARY STATEMENT
### PAGE 72

**EVENT #:** LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:     I remember what my mind was like.

Q:     Very impressionable at that age.

A:     I was more observant and more of a sponge...

Q:     Mm-hm.

A:     ...than the people that were suppose to realized and I picked up all the things that, not that they hid from me, but that...

Q:     Maybe they didn't want you to know.

A:     ...that they didn't want me to know, but at the same time that they thought I wouldn't be curious enough about to be interested in it.

Q:     Mm-hm.

A:     You understand what I'm saying?  Like, if I see a grown man fucking counting money and fuckin with coke on the table and I'm just a 8-year-old walking past, most times they wouldn't think that you would even, you know...

Q:     Pay them any mind.

A:     ...be mature enough to even have a question about what it is they're doing.

Q:     Mm-hm.

A:     A actual legit question to try to get a real answer.  You might say something out of being a kid, like, what y'all doing?  But that's not an insight, you know what I mean, like, that's not, "Oh, what is that?"  like...

Q:     Mm-hm.

A:     You understand what I'm saying?  So, I remember what my mind was like at that

**ER_382**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
### PAGE 73

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

age. It's - it's - it's a bad thing especially now when I see kids or anybody -

teenagers, anybody. When I see anybody going through the stages and time

point in time periods where I remember what my mentality was like, it makes me

feel worser about myself because I'm like that's the proof right there that I am as

bad as they say I am. You can't tell me I'm not. I know I am. I might not - that

might not be the complete reflection of who I am, but that's a part of me though

because at this age I can't even imagine seeing these 15-year-old kids, you

know, out here trying to be adults in the street lifestyle. When we were 14-years-

old thinking that we were relevant people, you understand what I'm saying?

Q:      Mm-hm.

A:      Amongst people that was fucking seasoned vets in this type of shit, but we

        actually had the nerve to think that we had some respect from these people.

Q1:     Mm-hm.

A:      Bro, you 13-years-old...

Q:      All the youngsters...

A:      You don't even...

Q:      ...think they're smarter than the O.G's.

A:      But that's what I'm saying. So...

Q:      You know that now that you've lived that life.

A:      Absolutely. So, when I see, um...

Q:      You've reached O.G. status to look back and be, like, "Hey, look at these

**ER_383**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

youngsters.  I thought I knew everything."

A:     Exactly.  Absolutely, so when I see those - when I see them at those ages all the way down from fucking 17 to 8-years-old, I remember where my mind was at every time period.  I know exactly where I was living at and pretty much for the most part what I was doing when I was living there.  You understand what I'm saying?  So, it's like everything about that is reflected every day that I'm present in this environment because it's making me keep myself intact because I can't afford to let, you know, my reckless habits spill out in any type of way because people are affected by that.

Q:     Mm-hm.

A:     If I'm too caught up in, you know, my gangster memories and all this type of shit and I'm just fucking recklessly talking on the phone like I'm fucking have a, you know what I mean, a fucking hip hop conversation or something...

Q:     Little man's listening.

A:     I gotta remember that at 8-years-old I wasn't as dumb as they thought I was.

Q:     Mm-hm.

A:     I probably...

Q:     You weren't - you weren't as oblivious as what they thought you were.

A:     Right.  I wasn't and even, you know, at recent points...

Q:     You were picking up - you were picking up the game.

A:     Absolutely.  At recent points in my life, I've had conversations like that with

**ER_384**

EVENT #: **LLV200900007194**
**STATEMENT OF:** Stephon Whitney

certain people that I remember being around.  I would just ask them a random question, like, "Bro you - you - who you," you know because sometimes I don't necessarily remember specially who the people were, but I remember who was around at that time.  So, you know, if I had a memory, like, I saw one of my older cousins loading a gun, I probably don't, you know, I'm not sure that that was you, but I know that you weren't locked up at that time and you was staying at my grandma house.  So, I would bring it up just to see if you have any recollection of that day.

Q:     Of loading a gun in front of you.

A:     You know what I mean?  Because I remember seeing that vividly.  The picture is vivid.  It's like in the movies where the whole picture is vivid but the face is like splurred out.

Q:     A little bit blurred out.  Yeah

A:     You know what I mean?  That's exact- that's the - the best way I can put it. That's exactly how it looks to me when I think about those memories at different ages.  That's exactly how it looks to me.  I remember seeing the picture and everything.

Q:     Have you ever loaded that gun in front of little man?

A:     No.  Hell no.

Q:     Does - does he know that gun's there?

A:     Hell no.

**ER_385**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 76

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

Q:   Okay.

A:   Hell fucking no.

Q:   I gotta ask, right?

A:   I understand, but hell fucking no.  I don't - I don't...

Q:   That's your DNA.  Am I gonna find it on that gun?

A:   Yeah.

Q:   All right.  I appreciate your honesty.  I do.  Because there's only one person who can settle your side of the story and that's you.

A:   Absolutely.  In the - in the, you know - you know, in the sense of her and him?  Oh, there's no way.  The - the codes don't matter anymore at that point.  You understand what I'm saying?

Q:   The whole G code?

A:   The whole - there's no reason to talk.  Let the court take, like, in that type of situation, that don't fucking matter.  I've seen that a 1,000 times to where I've seen situations like that and I'm like there's no way you was suppose to let that lady get in no shit like that.  I understand if it did - it just happened - sometime life be so fast that, you know, even when you try to get somebody away from something, all the time they gone take to it.

Q:   Mm-hm.

A:   'Cause sometime shit is just moving that fast and life is happening.

Q:   Mm-hm.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 77

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

A:     But when it all slows down and it stops, "Bro, come on.  You know you wasn't

       suppose to let her, come on bro."  I've seen that a thous...

Q:     I've watched a man take a violation in the feds for 18 months and let his girl who

       never had a case in her life take eight to ten years because she grabbed his gun

       and dope.  She got his gun and his meth and said, "No - no - no - no.  It's all

       mine.  It's all mine.  He didn't have nothing to do with it."

A:     That's what I'm saying.

Q:     She never had a case in her life.

A:     This is what I'm saying.

Q:     But because she said she loved him and they got married after only knowing

       each other for a week, she took a eight to ten year bid on his behalf.

A:     And this is what I'm saying, in that situation, it's not always, us trying to mold

       them into being that for us when the time comes.  It is with - with - in a lot of

       situations.  It happens like that.

Q:     I g- I gave him the same opportunity I gave you.  He said, "Nope.  I know nothing

       about nothing.  Fuck you.  Take me to jail."  I talked to her and I said, "Listen, he

       said he don't know nothing about nothing.  I'm asking you now to tell me the

       version of the truth.  Not - not what you think he wants you to say or anything

       else.  I want you to tell me the real truth," and she jumped on that sword and

       was, like, "I did that."

A:     This is what I'm saying, I'm, you know, I - that's clear to me, but what I'm saying

**ER_387**

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

is the same way of this situation, her doing that, you know, in those type of

situations, it doesn't always come from, um, you know him trying to mold her to

do that.

Q:     Mm-hm.

A:     Or convince her that if ever this time comes, this is what you need to do.

Q:     It's out of love or dying loyalty or whatever.

A:     Sometimes - whatever are and whatever makes up with him...

Q:     They're going to.

A:     ...you know, aside for God.  That's something that they feel...

Q1:    They have to do.

A:     ...like is worth more than anything to them.

Q1:    They've known each other a week and they went and got married.  Aye, that's -

that's on them.

A:     In three years we never left each other side bro and I can never allow myself to -

I will never bro.  I would never in life.

Q:     Okay.  I have - I have to give you this, ah, this is the receipt.  This is the pink

copy.  It just says that I took the two (unintelligible) swabs.  If you can just hold

this for me so I can take a photograph and just to, ah, just to hold it on your lap

there, that - the pink copy there and then I just take a photograph to show that

you received your copy.  Do they have an issue here with him retaining the

paper?

# VOLUNTARY STATEMENT

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q1:     Ah...

A:      I don't think so because I got my phone number on me.

Q1:     Okay.

Q:      Oh okay.

Q1:     But I - that piece of paper, they may just put it in your property.  Just so you

        know.

Q:      Because it does have your personal identifying information.  It has the double

        copy.

((Crosstalk))

Q:      Did you have any other questions about it?  You've had time to read it, correct?

A:      Yes.  I have no questions bro.  I'm just - I'm just - I just wanna know, like this is

        gonna be with me.  You understand what I'm saying, like...

Q:      I understand.

A:      You know, um, but I don't fucking, like, I don't know.  I don't think to the other

        side of it.  I just go through day by day.  So I don't think of, you know, what step

        is...

Q:      That's how you lived the majority of your life man.

A:      I'm - I'm saying as far as - I'm saying as far as trying to figure out, you know,

        what the punishment is for something like this.  You understand what I'm saying?

        Like, I'm not gone drive myself crazy with that because most times, you know,

        one thing I do remember taught is to, you know, be aware of the crimes you

**ER_389**

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

breaking, you know what I mean?  And know the potential time that you have from anything that you doing that's illegal.  So, you know, it's just, you know, it's - it's my problem to deal with.  That's the only thing I can boil it down to because there's no way in hell is it's respectful in any type of way bro to let her include herself in that.

Q:      Well, like I said, I'm gonna have the same conversation with her to give her that respect.  I gave you the same respect and, ah, I expect that any detective who conducts an investigation will be respectful in the same manner because everybody deserves to be treated with respect.  Does that make sense.

A:      And you will make sure that - that gets across to whoever?

Q:      The same candor and demeanor I had with you will be the same with her.  I can promise you because that's the way I do business.  You and I never met before.  So all I have is my word when I meet someone that I've never met.  So, when I tell someone I'm gonna do something, I do it.  if I don't, that person thinks I'm a liar and I've lost all credibility with him.  I can never make another first impression.

A:      Yeah.

Q:      So, I'm not asking for your - you to believe in me or believe I'm truthful.  I just...

A:      I'm not - I'm don't - I don't...

Q:      I'm a real person and that's the way I conduct myself.

A:      I'm not in a position to debate that or not.  You know what I mean?

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 81

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

Q:      I understand.

A:      So...

Q:      But I'm just saying that - that's the manner in which I conduct myself.  So...

A:      But all I'm saying is bro that - that there's no way.  There's no way.  I can never be allowing that to happen.

Q:      Okay.

A:      I never see me allowing that to happen.

Q:      You have any other questions for us?  If not, we'll drop your paperwork and property...

A:      You said this will, ah, well, since it is a sales it'll be treated just like a regular drug sales case, right?

Q:      Yeah, like what you're on paper for.  Yeah.

A:      And a firearm?

Q:      I have honestly no idea.  July 1 of 2020 is all new laws and sentencing guidelines and things all went into effect and I absolutely have no idea what the new sentencing guidelines are.  They're completely different from what they use to be.

A:      You don't have a scale?

Q:      I - I don't.  I promise you I don't.  I'm not gonna lie to you.  Um, if you can go to the - the law - do you guys - I'm sure you guys got a law library here or some type of legal...

Q1:     Mm-mm.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## VOLUNTARY STATEMENT
**PAGE 82**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q:      No?

Q1:     They do have books.

Q:      Okay.  Well, so I know you're gonna transfer over to CCDC and I know that you have that option over there, um, try to get ahold of the most recent copy of the (unintelligible) of Rights Statute.  The sentencing guidelines, I - like I said, they just changed a month a half ago.  Everything just changed.

Q1:     (Unintelligible) weighs everything.  So...

Q:      Yeah.  The weights are different for trafficking charges, drug weighs, everything, ah, theft values, everything changed.

A:      So, you think it's a potential, ah, these drug charge being reduced?

Q1:     There's always a potential for anything.

A:      Because my - my - what I'm saying is my initial charge that I'm on this for was trafficking.

Q:      How much did you - how much weight did you have?

A:      Like, two grams less than an ounce maybe.

Q:      Okay, under the new sentencing or under the new laws, that's not trafficking anymore.  The trafficking weights are dramatically higher for things like, cocaine, heroin, methamphetamine.  The trafficking weights are now much higher.

Q1:     Yeah.

A:      That's what - that's what I'm saying though, like in the same situation, by this being charged as whatever the fuc- what is it?

**ER_392**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 83

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q1:     Possession with the intent to sell.

Q:      Possession with intent to sell.

A:      Right, that's what I'm saying.  You see how that went from trafficking to possession with intent to sell.

Q:      An- anything's possible.  Again, we don't make those deals.  We just present the facts to the district attorney and...

Q1:     That - yeah, that's up to the lawyers and the judge.

Q:      ...and go - go with it from there.  I honestly - I would be lying to you if I tried to give you a number and I'm not gonna do that because everything's so new.  It's literally a month and a half and the month and a half the laws went into effect, the courts have almost been closed because of COVID.  I mean, there's almost no - there's no jury trials going on.

Q1:     There's no precedence - there's no precedence to go off of.

Q:      There's no - I mean, they're having video court for people who are in custody.

A:      So what's the - what's the (unintelligible).

Q1:     We - we don't know.  We really don't know.

Q:      Everybody's waiting to find out.

A:      It's - I'm saying, to like - like - what...

Q:      Every - the majority of cases got continued to August and then...

A:      September.

Q:      ...now August is here and over and they're like...

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 84

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

Q1: They're pretty much taking murder cases. Them the only ones that are showing up in person. Everything else is video court. There's no precedence to say, "Okay, well the person that had the same charges as you got this much time or that much time." We don't know.

Q: So, the global pandemic shut everything down. We never dealt with this before.

A: So, nobody's going to court? What you saying?

Q: Some people are going to - you going to court but you going in on video.

A: Right - right.

Q: So you look at the camera and, "Hey, your honor."

A: Right.

Q: And even people are appearing from their attorney's offices...

Q1: Yeah.

Q: ...where their attorney, "Hey, we're here in our office." The district attorney is at their office. The judge is in their office.

Q1: The witness is at home on - on video phone or...

Q: On zoom or whatever and they're trying to do things that way. It's just it's - we never been at this place in the history of the world. I mean, it's - the whole world's messed up right now. So, again, for me to try to give you some type of a number here, it'd be a lie.

A: I understand. That's cool, you know, I'm just saying, like...

Q1: But ultimately - ultimately at the end of the day all of that rest with the judge at

**ER_394**

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 85

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

the end of the day anyone.

A:     Right.

Q1:    All that depend on what side of the judge - what side of the bed the judge woke up on.  They're having a good day, "Here you go.  Take the ankle monitor and go back on out the door.  You do it again and I'm sending you up for the whole full 48."

A:     All right.

Q1:    Or you know what...

A:     That won't happened with this though.

Q1:    That we don't know.

Q:     I - I honestly can't tell you.  You're gonna have to - North Las Vegas Jail is completely different than Metro Jail.

A:     I understand.

Q:     So they got a whole different program they're doing over there and numbers that they're allowed to have due to COVID and everything else and everything gets weighed out based on the totality for - your - your main issue for you - keeping you in custody right now is your probation...

Q1:    Probation violation.

Q:     That's your main issue.

A:     I understand and that's what I was going back to because the only conflict that I see and you know me being able to deal with this, you know, in a better situation

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**
PAGE 86

EVENT #: LLV200900007194
STATEMENT OF: Stephon Whitney

than just fucking being slapped on probation shit is the - the - this, ah, you know, um, ah, miscommunication between me and the PO he feels like...

Q: He's gonna come and serve you with your violation notification.

A: I understand.

Q: He ha- I think he has seven days to do that or something.

A: Right.

Q: So, you'll have that opportunity to have that conversation.

A: 'Cause he feel like I dismissed him.

Q: Mm-hm.

A: But what I've been explaining pretty much to everybody since I've been here, I didn't even know who the man was.  I never met him in my life.  I wasn't dismissive.

Q: You don't feel like you were being disrespectful to him, you just didn't know who he was.

A: I didn't know who he was and I didn't know what the situation was.

Q: Mm-hm.

A: So, when you're asking me stuff, I'm, like, "What's going on?"

Q: I actually have to speak with him because I have to give him some paperwork and some photographs...

A: This - this is the only thing...

Q: Would you like for me to relay to him that...

Case 2:21-cv-00002-JAD-NJK Document 41-5 Filed 10/28/22 Page 287 of 288

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
# VOLUNTARY STATEMENT
PAGE 87

EVENT #: LLV200900007194
**STATEMENT OF:** Stephon Whitney

A:     Absolutely, the only thing that I want you to relay to him is that, um, PO before him called me and let me know that I was going to be transferred to him.

Q:     Mm-hm.

A:     I was aware of his name, but mind you that was two months ago.

Q:     But you had no face. You had no idea.

A:     I had no understanding or knowledge that that's who I was talking to at that point.

Q:     Okay.

A:     Because had I known that - I've been on parole before.

Q:     Mm-hm.

A:     And I been on probation for a year. There would be no point or no reason for me to fucking try to send him through a loop knowing the power that he has in this situation.

Q:     Mm-hm.

A:     That wouldn't even make sense. All it would be doing is frustrating him and agitate him that I'm stupid enough to act like, you know, I didn't pretty much sign over my rights to be on probation. You understand what I'm saying? So...

Q:     Oh, I understand.

A:     It's like the only problem or miscommunication, I didn't know who he was.

Q:     I - I have to call Mr. Vargas tonight because he needs the photographs that we took.

A:     Yeah, I didn't know that was him.

# ER_397

Case 2:21-cv-00002-JAD-NJK Document 41-5 Filed 10/28/22 Page 488 of 888

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
# VOLUNTARY STATEMENT
**PAGE 88**

**EVENT #: LLV200900007194**
**STATEMENT OF:** Stephon Whitney

Q:      And I - I have to get his email address.  So when I call him I'll - I'll let him know I

        spoke with you tonight and I'll let him know that there was a - a misunderstanding

        on your behalf because of not knowing who he was initially.

A:      That's all it was.  I didn't know who he was.

Q:      Okay.  Can I get that paperwork from you as well?  Oh you...

Q1:     (Unintelligible).  All right.  See you.

Q:      All right man.  Best of luck to you sir.

A:      Thank you.

Q:      End of interview.  Time is 1858 hours on 9-3 of 20-20.  Myself, J.  Costello, P#

        9139, Detective M.  Cook, P# 2201, North Las Vegas present.

---

**THIS VOLUNTARY STATEMENT WAS COMPLETED AT Clark County Detention Center ON THE 3rd DAY OF September, at 1719 HOURS.**

ER_398

*2:21-cr-00002-JAD-NJK-1 - June 21, 2022*

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEVADA

 3    UNITED STATES OF AMERICA,    )
                                   ) Case No. 2:21-cr-00002-JAD-NJK
 4               Plaintiff,        )
                                   ) Las Vegas, Nevada
 5    vs.                          ) June 21, 2022
                                   ) 2:02 p.m. - 2:22 p.m.
 6    STEPHON JAMES WHITNEY,       ) Courtroom 6D
                                   ) CHANGE OF PLEA
 7               Defendant.        )
      _____) CERTIFIED COPY
 8

 9              REPORTER'S TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE JENNIFER A. DORSEY
10                UNITED STATES DISTRICT COURT JUDGE

11

12    APPEARANCES:

13    For the Government:  DANIEL COWHIG, AUSA
                           UNITED STATES ATTORNEY'S OFFICE
14                         501 Las Vegas Boulevard South, Suite 1100
                           Las Vegas, Nevada 89101
15                         (702) 388-6336

16

17    (Appearances continued on page 2.)

18

19

20

21    Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24    Proceedings reported by machine shorthand.  Transcript
      produced by computer-aided transcription.
25
```

**ER_399**

1    APPEARANCES CONTINUED:

2    For the Defendant:

3         *YI LIN ZHENG, ESQ.*
          *VEGAS GOLDEN LAW*
4         *2801 South Valley View Boulevard, Suite 16*
          *Las Vegas, Nevada 89102*
5         *(702) 385-7170*

6                              *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ER_400**

```
 1            LAS VEGAS, NEVADA; TUESDAY, JUNE 21, 2022; 2:02 P.M.

 2                            --o0o--

 3                      P R O C E E D I N G S

 4            COURTROOM ADMINISTRATOR:  Now's the time set for a

 5    change of plea in Case Number 2:21-cr-2-JAD-NJK, United States

 6    of America versus Stephon James Whitney.

 7            Counsel, please state your appearances.

 8            MR. COWHIG:  Good afternoon, Your Honor.  Dan Cowhig

 9    for the U.S. Attorney's Office.

10            MS. ZHENG:  And good afternoon, Your Honor.  Yi Lin

11    Zheng, CJA counsel, on behalf of Stephon Whitney.  He is

12    present in custody.

13            THE COURT:  All right.  Good afternoon.

14            Mr. Whitney, I am Judge Jennifer Dorsey.  You're here

15    in my courtroom in the United States District Court for the

16    District of Nevada.  I understand that you wish to withdraw

17    your previous plea of not guilty and enter a guilty plea to

18    being a felon in possession of a firearm, and you are going to

19    do so without the benefit of a plea deal with the Government;

20    is that right?

21            THE DEFENDANT:  Yes.

22            THE COURT:  All right.  Would you do me a favor and

23    just pull that microphone down just a little bit so it's

24    closer to you?  Wonderful.  Thank you.

25            Now you have the right to remain silent, but I'm
```

**ER_401**

```
 1    going to ask if you wish to waive that right so you can answer
 2    my questions and provide me with the information I need to
 3    decide if I can accept your plea.  I advise you that if you
 4    waive your right to remain silent anything you say can be held
 5    against you for any purpose.  But I ask you, sir:  Do you wish
 6    to waive your right to remain silent so we can have this
 7    conversation about your plea today?
 8             THE DEFENDANT:  Yes.
 9             THE COURT:  Before we start this conversation about
10    your plea, my clerk will administer to you an oath where you
11    will promise to answer my questions truthfully and under
12    penalty of perjury.  Do you understand what that means?
13             THE DEFENDANT:  Yes, ma'am.
14             THE COURT:  All right.  Would you stand and raise
15    your right hand for me?
16        (Defendant sworn.)
17             THE DEFENDANT:  Yes.
18             COURTROOM ADMINISTRATOR:  Thank you.
19             THE COURT:  All right.  Sir, please tell me your full
20    and true name.
21             THE DEFENDANT:  Stephon James Whitney.
22             THE COURT:  And Mr. Whitney, do you understand that
23    you just took an oath to tell the truth, and that if you don't
24    answer my questions truthfully, your answers may later be used
25    against you in another prosecution for perjury or making a
```

2:21-cr-00002-JAD-NJK-1 - June 21, 2022

```
 1   false statement?

 2            THE DEFENDANT:  Yes, ma'am.

 3            THE COURT:  And do you read, write, and understand

 4   the English language fluently?

 5            THE DEFENDANT:  Yes.

 6            THE COURT:  How old are you, sir?

 7            THE DEFENDANT:  Thirty-two.

 8            THE COURT:  And how far did you go in school?

 9            THE DEFENDANT:  I completed 12th grade, but I didn't

10   graduate.

11            THE COURT:  Okay.  Tell me about the last job you

12   had.

13            THE DEFENDANT:  Desert Breeze Cleaning Service.

14            THE COURT:  What were you doing there?

15            THE DEFENDANT:  Cleaning houses and commercial

16   places, like PetSmarts and stuff like that.

17            THE COURT:  How long did you do that?

18            THE DEFENDANT:  About six months or so.

19            THE COURT:  What's the longest job you've ever held?

20            THE DEFENDANT:  I think a year, a little over a year.

21            THE COURT:  What were you doing?

22            THE DEFENDANT:  I worked at Granny's Kitchen, like a

23   food place.

24            THE COURT:  Okay.  And what were you doing there?

25            THE DEFENDANT:  Food prep and, like, cleaning.
```

```
 1    Anything she really asked of me.
 2              THE COURT:  Okay.  Have you taken any drugs or
 3    medicine or pills in the last 24 hours?
 4              THE DEFENDANT:  No, ma'am.
 5              THE COURT:  Have you been treated recently for any
 6    mental illness or an addiction?
 7              THE DEFENDANT:  No, ma'am.
 8              THE COURT:  Do you feel that you fully understand
 9    everything going on in this hearing?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Would you say that you feel clear-minded?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Have you had sufficient time to consult
14    with your attorney to be fully prepared to plead guilty today?
15              THE DEFENDANT:  Yes.
16              THE COURT:  Was your attorney able to answer all of
17    your questions?
18              THE DEFENDANT:  Yes, ma'am.
19              THE COURT:  Are you satisfied with your attorney's
20    representation of you?
21              THE DEFENDANT:  I am.
22              THE COURT:  Ms. Zheng, in the course of your
23    representation of this client, how many times did you
24    personally meet with him?
25              MS. ZHENG:  We were just out in Pahrump yesterday,
```

 1    and then throughout the course of the pandemic I think we had

 2    maybe three video visits.  And then, in between that, maybe

 3    once a month we would have a phone call.

 4              **THE COURT:**  All right.

 5              **MS. ZHENG:**  Yeah?

 6              **THE COURT:**  During those meetings --

 7              **THE DEFENDANT:**  Not really in person --

 8              **THE COURT:**  During those meetings, did you see

 9    anything that would cause you to doubt his competence?

10              **MS. ZHENG:**  No, Your Honor.

11              **THE COURT:**  Mr. Cowhig, is the Government aware of

12    anything that would cause it to doubt the defendant's

13    competence?

14              **MR. COWHIG:**  No, Your Honor.

15              **THE COURT:**  Thank you.

16              Based on counsels' representations and the

17    conversation that I've been having in the courtroom here so

18    far with the defendant and also based on my personal

19    observations of him here in this courtroom, I do find he is

20    competent to plead and waive rights in this case.

21              Sir, let's talk about the charge against you.  You

22    have been charged by a document called an indictment, a

23    criminal indictment, and it charges you with a single count of

24    being a felon in possession of a firearm in violation of Title

25    18 United States Code §§ 922(g)(1) and 924(a)(2).  That itself

2:21-cr-00002-JAD-NJK-1 - June 21, 2022

```
1   is a felony offense.
2           Do you understand that that's the charge against you
3   and that's how it was brought?
4           THE DEFENDANT:  Yes, ma'am.
5           THE COURT:  And have you read this indictment?
6           THE DEFENDANT:  Yes.
7           THE COURT:  And did your attorney fully explain this
8   indictment to you?
9           THE DEFENDANT:  Yes, ma'am.
10          THE COURT:  And do you believe you fully understand
11  everything in this indictment?
12          THE DEFENDANT:  Yes, ma'am.
13          THE COURT:  All right.  Ms. Zheng, does your client
14  waive the reading of the indictment?
15          MS. ZHENG:  Yes, please, Your Honor.
16          THE COURT:  So the offense that you're charged with
17  has certain essential elements that the Government would have
18  to prove against you beyond a reasonable doubt if you took
19  this case to trial.  Those elements are written down inside
20  this memorandum, and I'm going to go over those with you now.
21          So the essential elements of being a felon in
22  possession of a firearm, as you're charged in this case, are:
23          First, that you knowingly possessed the firearm
24  described in the indictment.  And here that's a Canik -- I'm
25  unfamiliar with that one -- C-a-n-i-k -- Model TP9 SF Elite
```

**ER_406**

1    nine millimeter semiautomatic pistol bearing Serial

2    Number 20BH02246;

3            Second, that gun had been shipped or transported from

4    one state to another or between a foreign nation and the

5    United States or the firearm was possessed in or affecting

6    interstate or foreign commerce;

7            Third, at the time that you possessed this gun you

8    had been convicted of a crime punishable by imprisonment for a

9    term exceeding one year; and

10           Fourth, at the time that you possessed this gun you

11   knew you had been convicted of a crime punishable by

12   imprisonment for a term exceeding one year.

13           Do you understand that these are the essential

14   elements of the charge in the indictment against you?

15           **THE DEFENDANT:**  Yes.

16           **THE COURT:**  And do you understand that, if you took

17   this case to trial, the Government would have to prove each of

18   those essential elements against you beyond a reasonable doubt

19   in order for you to be convicted of this charge?

20           **THE DEFENDANT:**  Yes, ma'am.

21           **THE COURT:**  And do you understand by pleading guilty

22   to this charge you are admitting that each of those essential

23   elements is true as it applies to you?

24           **THE DEFENDANT:**  Yes, ma'am.

25           **THE COURT:**  Ms. Zheng, have you explained the

**ER_407**

2:21-cr-00002-JAD-NJK-1 - June 21, 2022

```
 1    essential elements of this offense to your client?
 2              MS. ZHENG:  I have, Your Honor.
 3              THE COURT:  Are you satisfied that he fully
 4    understands them?
 5              MS. ZHENG:  Yes.
 6              THE COURT:  So, sir, I understand you're here today
 7    because you intend to plead guilty to this charge against you
 8    without any plea agreement whatsoever with the Government; is
 9    that true?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Did the Government make you any promises
12    to cause you to plead guilty?
13              THE DEFENDANT:  No, ma'am.
14              THE COURT:  Did anybody promise you a certain
15    sentence in this case or not to file additional charges or
16    anything at all in exchange for your plea?
17              THE DEFENDANT:  No, ma'am.
18              THE COURT:  Are you pleading guilty in reliance on
19    something that the Government said or did for you?
20              THE DEFENDANT:  No, ma'am.
21              THE COURT:  Did anybody threaten you to get you to
22    plead guilty?
23              THE DEFENDANT:  No, ma'am.
24              THE COURT:  As you sit here today, do you feel
25    coerced or forced under duress and that's why you're going to
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914     *Page 10*

**ER_408**

*2:21-cr-00002-JAD-NJK-1 - June 21, 2022*

1    plead guilty?

2            **THE DEFENDANT:**  No, ma'am.

3            **THE COURT:**  Do you understand that because you have

4    no agreement whatsoever with the Government, the Government

5    does not have to give you any benefit for pleading guilty,

6    which means they don't have to agree to argue for your

7    sentence to be reduced for acceptance of responsibility, they

8    don't have to forgo additional charges or dismiss charges;

9    they don't have to give you any benefit at all.  Do you

10   understand that?

11           **THE DEFENDANT:**  Yes, ma'am.

12           **THE COURT:**  All right.  I want to make sure there's

13   sufficient facts to support your guilty plea.

14           Mr. Cowhig, have you reviewed the memorandum in

15   support of a guilty plea without a plea agreement submitted by

16   defense?

17           **MR. COWHIG:**  I have, Your Honor.

18           **THE COURT:**  And do you find those facts to be

19   sufficient?  Before I ask him to commit to those facts, I

20   wanted to make sure the Government was satisfied with them.

21           **MR. COWHIG:**  I think they're a bit nebulous,

22   Your Honor.  Particular points that might be of concern is the

23   term "felon" does not actually appear in the statute.

24           **THE COURT:**  Right.

25           **MR. COWHIG:**  The prohibition is that a person has

**ER_409**

*2:21-cr-00002-JAD-NJK-1 - June 21, 2022*

```
 1    been convicted of a crime punishable by more than a year's
 2    time in prison and that the individual was aware that he was
 3    convicted of -- under Rehaif, of that offense or an offense
 4    that would involve more than a year in prison potentially.
 5              THE COURT:  Okay.  All right.  So let's -- why don't
 6    we try to go -- so, Ms. Zheng, I'm going to take a look at the
 7    factual basis in the Government's memo.
 8              MS. ZHENG:  Sure.
 9              THE COURT:  And I'll ask Mr. Whitney a few questions
10    then.
11              Mr. Whitney, do you -- is the true that on or about
12    September 2nd of 2020 in the state and federal district of
13    Nevada you knowingly possessed a firearm, and that firearm was
14    the Canik Model TP9 SF Elite nine millimeter semiautomatic
15    pistol bearing Serial Number 20BH02246?
16              THE DEFENDANT:  Yes, ma'am.
17              THE COURT:  And do you acknowledge that that gun was
18    manufactured outside the state of Nevada, and so to get here
19    it had to be shipped or transported from another state or
20    another nation to get into Nevada?
21              THE DEFENDANT:  Yes, ma'am.
22              THE COURT:  And is it true that before you possessed
23    that gun you had sustained multiple felony convictions
24    punishable by a term of imprisonment exceeding one year?
25              THE DEFENDANT:  Yes, ma'am.
```

**ER_410**

2:21-cr-00002-JAD-NJK-1 - June 21, 2022

```
 1          THE COURT:  And at the time you possessed that gun,

 2    did you know that you had sustained multiple felony

 3    convictions punishable by a term of imprisonment exceeding one

 4    year?

 5          THE DEFENDANT:  Yes, ma'am.

 6          THE COURT:  Mr. Cowhig, is the Government satisfied

 7    by the factual basis for those admissions?

 8          MR. COWHIG:  Yes, Your Honor.  Thank you.

 9          THE COURT:  Thank you.

10          All right.  Mr. Whitney, do you understand that by

11    admitting those facts under penalty of perjury, those facts

12    could later be used against you for any reason, even if for

13    some reason you are permitted to withdraw your guilty plea?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Sir, by pleading guilty you'll be giving

16    up a number of important legal rights.  I'm going to now list

17    them, and after I do I'm going to ask you whether you

18    understand that you have those rights and you are giving them

19    up by pleading guilty today.  There are about eight of them.

20          You are entitled to plead not guilty and have a

21    speedy and public jury trial here in this courthouse.  You

22    have the right to an attorney at trial and at all stages of

23    proceedings against you.  At trial you would be presumed

24    innocent, and before you could be convicted the Government

25    would have to overcome that presumption of innocence and prove
```

**ER_411**

1  to the jury that you are guilty beyond a reasonable doubt.  In

2  order for you to be convicted at trial, all of the jurors --

3  and there would be 12 of them -- would have to agree that you

4  are guilty beyond a reasonable doubt.

5        At trial, the witnesses for the Government would have

6  to come to court and testify in your presence, and your

7  attorney could cross-examine those witnesses, object to any

8  evidence that she believed was objectionable, offer evidence

9  on your behalf, and use the Court's subpoena power to compel

10 witnesses to come to court and testify on your behalf.  At a

11 trial, while you would have a right to testify if you chose

12 to, you also would have the right to remain silent and not

13 testify.  If you decided not to testify or decided not to put

14 on any evidence at your trial, those decisions could not be

15 used against you in any way.  And finally, if you were tried

16 by a jury and found guilty, you would have the right to appeal

17 that verdict to a higher court than this one.

18       Do you understand that you have all of these rights?

19       **THE DEFENDANT:**  Yes, ma'am.

20       **THE COURT:**  And do you understand that you are

21 waiving these rights and instead entering a guilty plea

22 without going to trial?

23       **THE DEFENDANT:**  Yes, ma'am.

24       **THE COURT:**  And did you make to decision to give up

25 all of these rights only after fully consulting with your

1    attorney about these important rights and waivers?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  Has your attorney explained to you about

4    the federal sentencing guidelines and how she believes they

5    may affect your sentence in this case?

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  I must calculate the sentencing guideline

8    range that applies to you and consider it and any possible

9    departures and all sentencing factors under Title 18 of the

10   United States Code § 3553(a) when determining your sentence in

11   this case.  But the guidelines are only advisory, and the

12   Court can impose a sentence on you that's either within or

13   outside of the guidelines.  Do you understand that?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  Regardless of what the attorneys argue,

16   request, or recommend, it is up to the Court to decide what

17   sentence you will receive in this case.  Do you understand

18   that?

19             THE DEFENDANT:  Yes, ma'am.

20             THE COURT:  The Court will not be able to determine

21   your sentencing range under the guidelines until after an

22   investigation and report have been completed by the Probation

23   Office.  And after that process is over it's possible that the

24   sentencing guidelines that apply to you may be different from

25   the level you expect.  Do you understand that if that happens

2:21-cr-00002-JAD-NJK-1 - June 21, 2022

```
 1    and it's a different guideline level than you're expecting,
 2    that would not give you a basis to withdraw your plea?
 3             THE DEFENDANT:  Yes, ma'am.
 4             THE COURT:  The Probation Office will review your
 5    criminal history and assign points to certain qualifying
 6    convictions.  Those points affect the guideline range.
 7    Roughly, the more points, the longer the sentence.  You may
 8    have some idea of your criminal history score or category, but
 9    if they're different than you were expecting, that will not
10    give you a basis to withdraw your plea.  Do you understand
11    that?
12             THE DEFENDANT:  Yes, ma'am.
13             THE COURT:  During Probation's investigation it may
14    be determined that you are subject to an enhancement to your
15    sentence such as enhancements that apply to people
16    characterized under the law as career offenders due to their
17    extensive criminal history.  I don't know whether that will
18    happen to you or not, but if it does happen and it's
19    determined that your sentence must be enhanced, that would not
20    give you a basis to withdraw your guilty plea.  Do you
21    understand that?
22             THE DEFENDANT:  Yes, ma'am.
23             THE COURT:  Do you understand that the offense you're
24    pleading guilty to carries a sentence of up to ten years, and
25    even if I were to sentence you to ten years in prison, that
```

```
 1    would not give you a basis to withdraw your plea?
 2            THE DEFENDANT:  Yes, ma'am.
 3            THE COURT:  Ms. Zheng, is your client subject to a
 4    state court proceeding?
 5            MS. ZHENG:  He is no longer, Your Honor.
 6            THE COURT:  He is not?
 7            MS. ZHENG:  No.
 8            THE COURT:  Okay.  Do you understand, sir, that a
 9    federal prison sentence cannot be shortened by parole because
10    there is no parole in the federal system?
11            THE DEFENDANT:  Yes, ma'am.
12            THE COURT:  After completing a term in prison, you
13    may be required to serve a term of supervised release of
14    three -- of up to three years, and there would be terms and
15    conditions that would apply to your supervised release.  And
16    if you violated them, your supervised release could be
17    revoked, and you could be imprisoned for the full term of
18    supervised release without credit for good time served while
19    you were out on supervised release.  Do you understand that?
20            THE DEFENDANT:  Yes, ma'am.
21            THE COURT:  In addition to giving you a prison
22    sentence, the Court can impose a fine on you of up to a
23    quarter of a million dollars, and the Court must impose a
24    special assessment of $100 against you at sentencing.  Do you
25    understand?
```

**ER_415**

*2:21-cr-00002-JAD-NJK-1 - June 21, 2022*

```
 1              THE DEFENDANT:  Yes, ma'am.

 2              THE COURT:  Are you a U.S. citizen, sir?

 3              THE DEFENDANT:  I am.

 4              THE COURT:  As you sit here in court today, sir, do

 5    you feel that you fully understand all the possible

 6    consequences of pleading guilty in this case without a benefit

 7    of a plea agreement?

 8              THE DEFENDANT:  Yes, ma'am, I do.

 9              THE COURT:  We are almost done.  In just a minute I'm

10    going to ask you to stand and tell me how you wish to plead.

11    But before I do that, do you have any remaining questions you

12    would like to ask your attorney about as you sit there

13    privately at the table with her or any questions for

14    Government counsel or for the Court?

15              THE DEFENDANT:  No, ma'am.

16              THE COURT:  Counsel, is there anything that I missed

17    in the canvass or that I need to revisit or address?

18              MR. COWHIG:  No, Your Honor.  Thank you.

19              MS. ZHENG:  None that I can think of, Your Honor.

20              THE COURT:  Thank you.

21              All right.  Mr. Whitney, please stand.

22              With respect to the single count against you charging

23    you with being a felon in possession of a firearm, a felony

24    offense, in violation of Title 18 United States Code

25    §§ 922(g)(1) and 924(a)(2), how do you plead, sir?
```

**ER_416**

```
1          THE DEFENDANT:  Guilty, Your Honor.

2          THE COURT:  Are you pleading guilty because in truth

3    and in fact you are guilty and for no other reason?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  All right.  You can sit down.

6          It is finding of the Court that the defendant is

7    fully competent and capable of entering an informed plea and

8    that he is aware of the nature of the charge and the

9    consequences of his guilty plea and that his plea of guilty is

10   a knowing, intelligent, and voluntary plea supported by an

11   independent factual basis containing each one of the essential

12   elements of this offense.  His plea's accepted, and he is now

13   adjudged guilty of the offense as charged.

14         The Court will now order a Presentence Investigation

15   Report to be prepared by the Probation Office.  When that

16   document is completed, a copy will be provided to your

17   attorney, and she'll review it with you.  If there are any

18   errors in that document or anything has been left out, that

19   can all be brought to the attention of the Probation Office

20   and to this Court before your sentencing hearing.

21         At your sentencing hearing, your attorney will, of

22   course, argue on your behalf, but you'll have an opportunity

23   that day to speak to the Court and tell me why you -- or tell

24   me anything that you think I should consider in deciding what

25   sentence to give you in this case.
```

1    This matter is now referred to the U.S. Probation
2  Office for presentence investigation and report.  We will
3  return here for your sentencing on September 19th at 3:00 p.m.
4  September 19th at 3:00 p.m.
5    Is there anything else that we need to address?
6    **MR. COWHIG:**  Not from the Government, Your Honor.
7  Thank you.
8    **THE COURT:**  Ms. Zheng?
9    **MS. ZHENG:**  None from the defense either, Your Honor.
10    **THE COURT:**  All right.  Defendant's remanded to the
11  custody of the Marshal to await sentencing.  We'll see you in
12  September.
13    *(Proceedings adjourned at 2:22 p.m.)*
14                    --o0o--
15              COURT REPORTER'S CERTIFICATE
16
17    I, AMBER M. McCLANE, Official Court Reporter, United
18  States District Court, District of Nevada, Las Vegas, Nevada,
19  do hereby certify that pursuant to 28 U.S.C. § 753 the
20  foregoing is a true, complete, and correct transcript of the
21  proceedings had in connection with the above-entitled matter.
22
23  DATED:  5/1/2023
24
25        /s/  *Amber M. McClane*
      AMBER McCLANE, RPR, CRR, ~~CCR #914~~

**ER_418**